1                  UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3             HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5    MARK PEDANTE,                    )
                                      )
6                   PLAINTIFF,        )
                                      )
7              vs.                    ) No. CV 17-6656-AB
                                      )
8    FORD MOTOR COMPANY, A            )
     DELAWARE CORPORATION, AND DOES   )
9    1 THROUGH 10, INCLUSIVE,         )
                                      )
10                  DEFENDANTS.       )
     _____)

11

12

13

14             REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               TUESDAY, NOVEMBER 5, 2019

16                      9:39 A.M.

17               LOS ANGELES, CALIFORNIA

18      Day 1 of Jury Trial, Pages 1 through 118, inclusive

19

20

21

22   _____

23            **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
              FEDERAL OFFICIAL COURT REPORTER
24            350 WEST FIRST STREET, ROOM 4311
              LOS ANGELES, CALIFORNIA 90012
25                 cmjui.csr@gmail.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3          THE ALTMAN LAW GROUP
            BY:  BRYAN C. ALTMAN, ATTORNEY AT LAW
 4          10250 CONSTELLATION BOULEVARD, SUITE 2500
            LOS ANGELES, CALIFORNIA 90067
 5          310-277-8481

 6              AND

 7          KIESEL LAW LLP
            BY:  STEPHANIE M. TAFT, ATTORNEY AT LAW
 8          8648 WILSHIRE BOULEVARD
            BEVERLY HILLS, CALIFORNIA 90211
 9          310-854-4444

10              AND

11          KNIGHT LAW GROUP LLP
            BY:  RUSSELL HIGGINS, ATTORNEY AT LAW
12          AND ROGER KIRNOS, ATTORNEY AT LAW
            AND ZACHARY POWELL, ATTORNEY AT LAW
13          1801 CENTURY PARK EAST, SUITE 2500
            LOS ANGELES, CALIFORNIA 90067
14          310-552-2250

15   FOR THE DEFENDANT:

16          SHOOK, HARDY & BACON L.L.P.
            BY:  FRANK P. KELLY III, ATTORNEY AT LAW
17          AND ANDREW L. CHANG, ATTORNEY AT LAW
            AND SAMANTHA K. BURNETT
18          ONE MONTGOMERY TOWER, SUITE 2700
            SAN FRANCISCO, CALIFORNIA 94104
19          415-544-1900

20              AND

21          GORDON & REES LLP
            BY:  SPENCER P. HUGRET, ATTORNEY AT LAW
22          275 BATTERY STREET, SUITE 2000
            SAN FRANCISCO, CALIFORNIA 94111
23          415-986-5900

24

25
```

```
 1          LOS ANGELES, CALIFORNIA; TUESDAY, NOVEMBER 5, 2019

 2                          9:39 A.M.

 3                           -  -  -

 4          THE CLERK:  Calling civil case 17-6656, Mark

 5   Pedante versus Ford Motor Co.; jury trial, Day 1.

 6          Counsel, please state your appearances.

 7          MR. ALTMAN:  Yes.  Good morning.  Bryan Altman on

 8   behalf of Mr. Pedante, Your Honor, who is present in court.

 9          THE COURT:  Good morning.

10          MR. HIGGINS:  Russell Higgins on behalf of

11   Mr. Pedante.

12          THE COURT:  Good morning.

13          MR. KIRNOS:  Good morning, your Honor.

14   Roger Kirnos.

15          THE COURT:  Good morning.

16          MR. POWELL:  Zachary Powell.

17          MS. TAFT:  Stephanie Taft.

18          THE COURT:  All right.  Good morning.

19          For Ford, please.

20          MR. KELLY:  Good morning, your Honor.  Frank Kelly

21   on behalf of defendant Ford Motor Company, and with me in

22   the courtroom is Douglas Lampe from Ford Motor Company's

23   general counsel's office.

24          And, your Honor, Steve Patterson is assisting with

25   jury selection today.  With your permission, could he sit at
```

```
 1    counsel table?
 2              THE COURT:  That's fine.
 3              MR. KELLY:  Thank you, your Honor.
 4              MR. HUGRET:  Good morning, your Honor.
 5    Spencer Hugret for Ford Motor Company.
 6              THE COURT:  Good morning.
 7              MS. BURNETT:  Good morning, Your Honor.
 8    Samantha Burnett for Ford.
 9              THE COURT:  All right.  Good morning.  All right.
10              So we're going to start the trial today.  I
11    understand the parties have some matters they want to
12    discuss with me beforehand.  Who wishes to be heard?
13              MR. HIGGINS:  Your Honor, Russell Higgins for the
14    plaintiff.
15              I am sure the Court is aware of the ex parte
16    application that was filed yesterday afternoon by
17    Ford Motor Company and of the opposition that I filed late
18    last night.
19              THE COURT:  Right.  I have not read them.  I am
20    just going to be honest with you.  I saw them, but I haven't
21    had a chance to review them thoroughly.
22              MR. HIGGINS:  Thank you.
23              THE COURT:  Okay.
24              MR. HIGGINS:  But we will address that I'm sure,
25    at some point before the commencement.
```

```
 1              THE COURT:  Well, we can address it right now.  I
 2    mean, what's the issue?  About sealing deposition
 3    transcripts?  Is that the ex parte that you are talking
 4    about?
 5              MR. HIGGINS:  It is not just that, Your Honor.
 6    Ford is seeking to close the trial proceedings.
 7              THE COURT:  Right.  Which seems absurd, but
 8    we'll -- go ahead.
 9              MR. HIGGINS:  Then it sounds like the --
10              THE COURT:  I am going to hear from what they have
11    to say, but I don't know how we're going to have this trial
12    and -- we're not talking about state secrets.  I'm not sure
13    what is going to come out in this trial that would be so
14    detrimental to Ford that we would have to, in essence, close
15    these proceedings.
16              I have had patent cases, child exploitation cases,
17    national security cases that we haven't done that.  I would
18    really need to hear from Ford why this case merits such a
19    drastic remedy.
20              MR. HIGGINS:  Thank you, Your Honor.  I wouldn't
21    take up much time.  Having said that, I am sure we'll return
22    to it when everyone has an opportunity to review the
23    paperwork.
24              I would simply point out that many of the exhibits
25    that are on the exhibit list are already matters of public
```

 1   record.  I went through as much as I could last night and

 2   tried to direct the Court to information supporting that.

 3          Having said that, we also wish to -- after

 4   reviewing and considering the Court's orders concerning the

 5   motions in limine, we have some concerns about how precisely

 6   Ford intends to try to introduce evidence and what evidence

 7   of settlement offers that were made in the case.

 8          We don't know if the Court has had the opportunity

 9   to review any of the documentary evidence concerning that.

10   There is a letter which states by its terms that it cannot

11   be given in evidence, and then we have a Rule 68 document

12   that, of course, is subject to the provisions of Rule 68(b).

13          We don't believe that there is any witness on

14   Ford's portion of the witness list who can lay a foundation

15   or authenticate those documents, and to that end, we ask the

16   Court to consider restricting any discussion about that in

17   opening until it's ascertained whether and if and how any

18   such evidence would be introduced in this case.

19          THE COURT:  All right.  Thank you.

20          MR. HIGGINS:  Thank you.

21          THE COURT:  Who wishes to be heard from Ford?

22          MR. HUGRET:  Good morning, Your Honor.

23          On the motion to seal, we filed a conditional

24   motion to seal certain documents that are subject to the

25   protective order.

```
 1              THE COURT:  Mr. Hugret, we're in trial now.

 2              MR. HUGRET:  I understand.

 3              THE COURT:  What's the issue with these documents?

 4    What information is Ford so concerned that I am going to

 5    have to shut down the courtroom, excuse everyone from the

 6    audience just for an exhibit to get introduced?

 7              MR. HUGRET:  Your Honor, if I may, there has been

 8    affidavit support filed supporting the confidentiality of

 9    these documents that they are proprietary --

10              THE COURT:  The document you filed, when did you

11    file this?

12              MR. HUGRET:  We have filed affidavits at the

13    beginning of October in -- at the same -- so backing up, the

14    exhibit list was initially significantly longer and then was

15    pared down.

16              Once the final exhibit list was filed, we reviewed

17    the exhibit list that was filed on Friday jointly by the

18    parties, and then there are a number of documents on there

19    which are not subject to the motion.  There are a

20    significant number of documents.

21              There are some documents on plaintiffs' exhibit

22    list that are still subject of the protective order entered

23    in this case, and whenever those -- it's sort of in the

24    abstract because we don't really know exactly what document

25    is going to be used when and when it will come up.
```

1            So the motion was filed to preserve our client's

2    right to protect these confidential trade secret proprietary

3    documents, but if plaintiffs don't ever use them, then the

4    issue is moot.  Right?

5            THE COURT:  So I guess potentially an obvious

6    question is have you thought about discussing that with

7    counsel to figure out what exhibits they intend to introduce

8    or not?

9            MR. HUGRET:  I had sent them meet and confer

10   correspondence including documents that are identified on

11   their exhibit list throughout the end of last week and over

12   the weekend identifying which documents they intend to use

13   at this trial, and I have not received a substantive

14   response other than eight documents were removed from the

15   exhibit list.

16           A number of documents related to unrelated claims

17   for an unrelated vehicle remain for the 6 liter diesel

18   engine which I said are not proper subject.  Plaintiffs

19   wouldn't remove them.  So I said, okay.  I guess we'll have

20   to bring it up with Your Honor at the time they're attempted

21   to be introduced.

22           THE COURT:  Okay.

23           MR. HUGRET:  So, again, this is not -- this has

24   just been filed for a conditional request.  We have to see

25   what actually is put into evidence.

```
 1          If, in fact, for example, a document that is
 2   already in the public record as a result of another trial or
 3   is a document that the parties believe is not confidential,
 4   then it's not subject of our request.  It's not seal the
 5   entire trial from go.  It's address these issues when these
 6   documents --
 7          THE COURT:  Right.  So I know it's not seal the
 8   entire trial from go, but what it is is just wasting more
 9   and more time having unnecessary fights when I would
10   argue -- and I am sure you are going to have a response to
11   this -- that the parties could have met and conferred and
12   figured out what exhibits are we talking about so that I
13   could focus on what is the issue at hand instead of getting
14   buried with paper over the weekend and into the night before
15   trial about conditional pleadings.
16          MR. HUGRET:  Understood, Your Honor, and my
17   apologies for that, but we do have -- every document that is
18   on plaintiff's exhibit list at some point through the life
19   of this case has affidavit support that was filed through
20   motions to seal throughout the proceeding which this Court
21   has conditionally granted through those motions, and what is
22   remaining on the list is now -- have been subject to those
23   rulings and subject to the affidavit support.
24          So there are a significant number of the documents
25   on the exhibit list that this does not apply to specifically
```

1  anything related to Mr. Pedante's vehicle himself, his own

2  experiences, his own repair orders, his own warranty claims.

3  But if there are any general documents that are used that

4  are --

5              THE COURT:  Let me stop you.  You have made your

6  record.  You all are going to meet and confer in the evening

7  and try to figure this out.

8              MR. HUGRET:  Will do.

9              THE COURT:  I am not going to waste time

10 particularly when I have a jury waiting on this -- on

11 nonsense, to be honest with you.  We're set for trial.  We

12 need to start going.

13             MR. HUGRET:  Thank you, Your Honor.

14             THE COURT:  All right.  Anything further that the

15 sides wish to raise?

16             MR. HIGGINS:  Not at this time, Your Honor.

17             THE COURT:  From the defense?

18             MR. KELLY:  Thank you, Your Honor.

19             There was a request by counsel to prohibit the

20 reference to the settlement offer that was made in October

21 of 2017 both orally to counsel and in a letter to counsel

22 that we intend to reference in our opening statement.

23             THE COURT:  Is there an exhibit number that you

24 are referring to or -- that I can just look at the documents

25 at issue?  Is it just you are going to refer to it in

1 opening?  Or do you intend to introduce it at trial?  I

2 assume it's both.

3       MR. KELLY:  It's both.  I don't intend to show it

4 to the jury during opening.  I am just going to reference

5 it.

6       It's the subject -- it hasn't been the subject of

7 any dispute.  There is a declaration from counsel in the

8 record that admits to this discussion, the offer, the

9 rejection in October of 2017.  So there is a variety of ways

10 to offer proof of it at trial either by the document itself

11 or by reference to the admissions of counsel concerning the

12 offer and the rejection.

13       THE COURT:  Let me rewind that for a second.  How

14 would you introduce that into evidence?  You're saying

15 through the admissions of counsel?

16       MR. KELLY:  There's a declaration counsel has

17 filed, and it's part of the record in the case dating back

18 to the time period of the remand motion acknowledging the

19 receipt, the conversation between counsel, exchanging an

20 offer to settlement -- to settle, and the rejection of that

21 settlement offer.  There is also the letter itself that was

22 sent to counsel.

23       THE COURT:  So how would those get introduced at

24 trial?  That's what I am trying to figure out.  And do you

25 have the declaration?  Are you saying the declaration would

```
 1   then be introduced as an admission of a party-opponent's

 2   counsel?

 3            MR. KELLY:  Yes, it is as an admission of the

 4   party's counsel, and we'd ask Your Honor to take judicial

 5   notice of it from the record in the case.

 6            As I say, it hasn't been a dispute up till now,

 7   but we also have the letter that was sent in October of

 8   2017.  I don't have it on me right now, Your Honor.  It's in

 9   the collection of exhibits.

10            THE COURT:  Can somebody get it?  Or is that too

11   much to ask?

12            MR. KELLY:  It's not too much to ask, Your Honor.

13   I didn't want to bog this down at this time.

14            THE COURT:  But, counsel, you all say, "We don't

15   want to bog it down."  Do you want to just deal with it on

16   the fly?  We could do it that way.

17            MR. KELLY:  Your in limine ruling did indicate

18   that settlement discussions are relevant to the issue of

19   Ford's conduct post-demand for a buyback.

20            So we assumed that we were talking about this

21   settlement offer in October of 2017.  Didn't have any notice

22   that this was coming up this morning.

23            THE COURT:  All right.

24            Mr. Higgins.

25            MR. HIGGINS:  Just briefly, your Honor.
```

1           The Court's ruling on the motion in limine is not

2      an evidentiary ruling in terms of admissibility of

3      documentary evidence.  Doesn't deal with hearsay issues.  It

4      doesn't deal with foundation.

5           THE COURT:  But Mr. Kelly is saying that it would

6      be admissible, the declaration as an admission by a

7      party-opponent I guess.  I've never seen it used to the

8      extent -- I've never seen it extended to counsel, but I

9      could be wrong on that.  I have always seen it as it relates

10     to the party.

11          But I think Mr. Kelly's argument, it could be

12     admissible via that form and then the letter, I'm not

13     sure -- I didn't -- in fairness, I didn't ask Mr. Kelly what

14     his theory of admissibility would be as it relates to the

15     letter.

16          MR. HIGGINS:  Well, as far as those matters go,

17     plaintiffs -- just so the Court understands what's the --

18     how we're being hamstrung is that this was never a matter of

19     discovery in trial preparation.

20          So we, for example, didn't get the opportunity to

21     take deposition from Ms. Mrowka who signed the October

22     letter or anyone else such as a designee under Rule 30(b)(6)

23     concerning the making of the offer, the decision making

24     behind it, if they're going to offer it into evidence.  We

25     think that it should have been explored in some way as

```
 1   though it were evidence before now.

 2             THE COURT:  Why don't you take a moment to confer.

 3             MR. HIGGINS:  Thank you very much.

 4             MR. KELLY:  Your Honor, the letter was used during

 5   Mr. Pedante's deposition.  It was Exhibit AC to his

 6   deposition.

 7             I don't have the deposition -- I don't have the

 8   exhibit number for the Court yet handy, but it is being

 9   offered as the fact of an effort to resolve the case

10   in 2017.  It is not being offered as a hearsay document.

11             THE COURT:  But it is being offered for the truth

12   of the matter, the contents of the letter -- or am I missing

13   something?

14             MR. KELLY:  It's being offered for the fact of an

15   effort to resolve the case in October of 2017.

16             THE COURT:  But in -- only the fact that there was

17   an effort to resolve it -- is that what you are saying? --

18   versus what's contained in the letter that says, we, Ford,

19   hereby extends, et cetera?  I mean --

20             MR. KELLY:  That as well, Your Honor, yes.

21             THE COURT:  But so then it is being offered for

22   the truth.  That's what I am trying to understand.

23             I mean, it's one thing -- it sounded like you are

24   parsing things by saying it's only offered for the fact that

25   there was an offer but the contents the jury is supposed to,
```

```
 1   sort of, ignore.
 2              MR. KELLY:  No.  The fact is that in October 2017
 3   an offer was made in this -- first in a conversation but
 4   then followed up by a letter to resolve the case for $75,000
 5   and one dollar, and that is a fact.
 6              THE COURT:  Right.
 7              MR. KELLY:  And to prove that fact, the letter
 8   establishes that fact.
 9              THE COURT:  Okay.  So are you saying -- you are
10   saying that the letter is nonhearsay, then?
11              MR. KELLY:  I believe it's nonhearsay, Your Honor.
12   I believe it goes -- it's being offered to prove Ford's good
13   faith efforts to attempt to resolve the case and that it --
14   that's a separate fact than statements in the letter.
15              THE COURT:  Has anyone been able to find this
16   letter?  I don't remember it.  I don't have it.  I don't
17   think I have it.  I'm sure I have it amongst these binders,
18   but I'd like to just see the letter, if possible.
19              MR. KELLY:  We'll certainly get it for Your Honor.
20              THE COURT:  All right.
21              MR. KELLY:  I did have a question about voir dire
22   if we're done.
23              THE COURT:  We're not done, but go ahead.  You can
24   ask the question of voir dire while they're conferring.
25              MR. KELLY:  We did have some suggested changes to
```

```
 1    the PowerPoint.
 2              THE COURT:  I made some.
 3              MR. KELLY:  Did we show those to you already?
 4              THE COURT:  I got a document that had some
 5    scribbling on it with names and et cetera.  Was that it?
 6              MR. KELLY:  That's it.
 7              THE COURT:  All right.  My apologies for not
 8    putting names of counsel, particularly Mr. Chang and
 9    Miss Taft who's been here -- or Miss Taft who suffered
10    through this for years.  So I didn't want her to think that
11    she's being ignored.  But I made some changes, not all.
12              MR. KELLY:  In reviewing, Your Honor, the process
13    for voir dire, when we get to peremptory challenges, could I
14    ask the Court to indicate what the procedure is for
15    exercising peremptory challenges as back and forth between
16    the parties and whether -- what your procedure is.
17              THE COURT:  So we have the group of 16.  I do the
18    voir dire.  You all get -- I think I said ten minutes
19    voir dire.  After that's all done, we'll go over to the side
20    here, deal with challenges for cause.
21              Depending on how many challenges for cause -- for
22    example, there is only one challenge for cause, and there
23    would be 15 jurors left.  You each get three peremptories.
24    So I will just then proceed to peremptories.
25              If the challenges for cause are such that, if you
```

```
 1    exercise your peremptory we'll be short jurors, I will
 2    reseat the jurors that were excused, the seats that were
 3    excused for cause, go through the voir dire again, come back
 4    to sidebar, do the cause challenges.
 5            Once we get to a point where we think with the
 6    peremptories we'll have our eight, then we deal with the
 7    peremptories at the sidebar.  Plaintiff first, defendant
 8    next.  Plaintiff, defendant, plaintiff, defendant.
 9            If you pass, that's a strike.  It counts.  You
10    can't save them up.  So if you pass, it's considered a
11    strike.  We go back and forth until each side exercises
12    three peremptories.  And you can exercise your peremptories
13    of the entire group of 16, but when the peremptories are
14    done, I will pick the first eight jurors.
15            Does that answer your question?
16            MR. KELLY:  I think it does.  Could I ask another
17    question?
18            THE COURT:  Sure.
19            MR. KELLY:  Let's just assume a hypothetical, if
20    we could, that plaintiff's first peremptory, they pass;
21    defense, first peremptory, we pass.
22            THE COURT:  Then we pick the first eight.
23            MR. KELLY:  Okay.  So two passes in a row, we've
24    got a jury.
25            THE COURT:  Yes.
```

```
 1              MR. KELLY:  That's fine.  Even though we have
 2     three peremptories, if you pass and the other side passes,
 3     you don't get to exercise all your peremptories.
 4              THE COURT:  Are you proposing something else?
 5              MR. KELLY:  No.  I am just trying to -- other
 6     judges do it differently.
 7              THE COURT:  If you both pass, to me, unless there
 8     is some revelation that, oh, I really meant to exercise
 9     another peremptory, if you both pass, then we're done.
10              MR. KELLY:  Fine with me.  Thank you, Your Honor.
11     That's what I needed to know.
12              THE COURT:  Any objection to that procedure from
13     the plaintiff's side?
14              MR. ALTMAN:  No.  We don't have an objection, and
15     we also have the letter to show the Court.
16              THE COURT:  All right.  So I have the letter here.
17     I am going to take a look at it.
18          (Brief pause in the proceedings.)
19              THE COURT:  Who from the plaintiff wants to be
20     heard as it relates to this point?  You've heard the defense
21     say it's a nonhearsay document.
22              I did say that the offer of the settlement would
23     be introduced.  If it's not being offered for the truth of
24     the matter, could a redacted version of this letter satisfy
25     any concerns barring the fact you don't want the letter to
```

| | |
|---|---|
| 1 | be shown to the jury at all? |
| 2 | MR. HIGGINS:  It wouldn't.  We believe that it is |
| 3 | an absolute hearsay purpose.  It is -- they are seeking to |
| 4 | attempt to introduce it for the truth of the matters that |
| 5 | are stated therein.  It is -- |
| 6 | THE COURT:  But you heard Mr. Kelly say, we are |
| 7 | offering it to show that we made a good faith offer to |
| 8 | resolve the case.  So how else would that be proved? |
| 9 | MR. HIGGINS:  But the good faith offer cannot be |
| 10 | understood without reviewing terms that would have to be |
| 11 | redacted to comply with other rulings by the Court. |
| 12 | For example, the reference to attorney's fees that |
| 13 | is contained in there, the purported 75,000 and one dollar |
| 14 | offer is inclusive of those.  There would -- it would |
| 15 | necessitate a discussion of what is the balance in between |
| 16 | those two issues. |
| 17 | It has -- by its very terms, explicitly states |
| 18 | that it is not to be used in evidence is the last sentence |
| 19 | of the -- if it's not -- if the text of the letter is not |
| 20 | admissible for the truth of the matter that is stated there, |
| 21 | then the only evidence of that issue that could be taken is |
| 22 | oral testimony, and Ford doesn't have any witnesses for |
| 23 | that. |
| 24 | THE COURT:  So you are saying you would rather |
| 25 | have a lawyer from Gordon & Reese get up and say "We made an |

```
 1   offer to the client"?

 2            MR. HIGGINS:  We would ask the Court to reject any

 3   such witness at this late date.  They were never placed on

 4   the witness list, and they were never made available for

 5   discovery, never included in the initial disclosures, never

 6   included in any supplemental disclosures.

 7            This simply isn't evidence that was ever utilized

 8   as evidence with respect to Mr. Kelly's mention that it was

 9   marked as an exhibit in a deposition.  There was never any

10   testimony.  There was never any evidence taken about it.

11            THE COURT:  All right.  I'll take a moment to look

12   at this.  I think it's nonhearsay.  I think it can come in,

13   but I want to look at this while we're waiting for the jury

14   to come upstairs.

15            MR. HIGGINS:  Thank you, Your Honor.

16            THE COURT:  Anything further we need to discuss?

17            MR. ALTMAN:  No, Your Honor.  Just could I absent

18   myself from -- if we're waiting for the jury, could I just

19   step out?

20            THE COURT:  I'm going to take a brief recess and

21   have everyone come back in ten minutes, and then by that

22   time, hopefully the jurors will be here, and then we'll just

23   begin with the process of jury selection.

24            Just so you all know, I intend to go till about

25   12:30.  I'd like to hopefully get a jury picked by then.
```

```
 1   Probably not likely given the hour, but I am going to try to

 2   push through as hard as I can to do that.  So take your

 3   restroom breaks, do what you need to do so that we can move

 4   forward with the voir dire.

 5          All right.  So we'll take a recess.

 6          THE CLERK:  All rise.  This Court is in recess.

 7      (Recess taken 10:01 a.m.)

 8      (The following was heard in open court in the presence

 9       of the prospective jurors:)

10          THE CLERK:  Calling civil case 17-6656, Mark

11   Pedante versus Ford Motor Co.; jury trial, Day 1.

12          THE COURT:  All right.  Well, good morning, ladies

13   and gentlemen.  I want to welcome you all to Courtroom 7B.

14   Excuse me one moment.  My apologies.

15          I want to welcome you again to Courtroom 7B and

16   want to thank you for your time and attention that you will

17   be giving to this important process known as voir dire.

18          We're here to pick a jury in a case, the name of

19   of which is Mark Pedante versus Ford Motor Company, and so I

20   am going to ask you all, just by name alone, has anyone here

21   heard of that case?

22          All right.  I see no hands.  Great.

23          All right.  Another question that I will ask of

24   you all is how many of you have any smartphones, personal

25   digital assistants, and the like, if you could please raise
```

```
 1   your hand.

 2            Okay.  I do that for a couple reasons:  Just to

 3   make sure you are paying attention; two, to also just remind

 4   you or advise you that I would respectfully ask that you

 5   place them on airplane mode or otherwise turn them off

 6   because we want to make sure we have your undivided

 7   attention during this process.

 8            And for your own benefit, the reception here is

 9   pretty horrible.  It's been our experience that after a few

10   hours the batteries tend to drain out if you keep your

11   phones on.

12            As I mentioned, we are here for what is known as

13   voir dire, and I just want to give you a brief historical

14   perspective on the right to a jury trial.  It goes back,

15   quite frankly, to the Declaration of Independence.

16            As you will see on the screen, the history of the

17   present King of Great Britain is a history of repeated

18   injuries and usurpations for depriving us, in many cases, of

19   the benefits of the trial by jury.

20            The Seventh Amendment of the Constitution also

21   states that in suits at common law where the value in

22   controversy shall exceed $20, the right to a trial by jury

23   shall be preserved.  Also, as you will note,

24   President Jefferson I think said it best.  Consider a trial

25   by jury the only anchor yet imagined by man by which a
```

```
 1    government can be held to the principles of its

 2    constitution.

 3            And so I can't express to you how important it is

 4    that we have this system and we have good people like you

 5    willing to come and serve and help decide important matters

 6    like this.  Jury obligation, in my view, is a -- it's not an

 7    obligation; it's a duty.  It's something that separates us

 8    from the rest of the world.

 9            My parents came over to this country from the

10    Island of Haiti in the West Indies.  The judicial system

11    there has been long regarded as quite corrupt.  The Haitian

12    police force literally took matters into their own hands,

13    and they would just whisk you away in the middle of the

14    night.

15            In civil matters, civil disputes would be dealt

16    with in the street, in street justice, and so that is,

17    obviously, not what we have here in this country.  And I

18    think it's just an important reminder of how fortunate we

19    are to have the system that we have and, again, to have good

20    people like you help serve in important matters like this.

21            Now, we anticipate this trial will last until

22    approximately next Wednesday.  As you could see, we will

23    start today.  We go typically Tuesday through Thursday.  On

24    Fridays we don't have trials because that's when I handle my

25    other remainder of calendar items.
```

```
 1              It just so happens that, on Monday, next Monday is

 2   a federal holiday.  Otherwise, we would be in trial.  And

 3   our estimate again is to end next Wednesday.  Again, it is

 4   an estimate, not a promise.

 5              I do everything I can to keep the parties moving

 6   along the case, and I'm cautiously optimistic that we will

 7   meet that deadline, but I just wanted to give you a sense of

 8   sort of how long we think this matter will last.

 9              Once you begin your deliberations, let's say for

10   some reason your deliberations continued past Thursday, you

11   could come in on Friday to deliberate because, in that

12   instance, you would be in the jury deliberation room, I

13   could still handle my other calendar, and there would be no

14   conflict.

15              But if for some reason we went and spilled into

16   the third week -- which I highly doubt that would be the

17   case, but in the unlikely event that we did, we would stop

18   the trial on Thursday and resume back the following Monday.

19              Voir dire is a French word that literally means to

20   speak the truth.  If you were literal about it, it would

21   really mean to see the words, but the theory behind it is to

22   speak the truth, to get honest answers from all the members

23   of the jury.

24              We're going to ask some individual questions of

25   you first and then some group questions.  It's important
```

```
 1    that you are honest during your answers.  These questions
 2    are not designed to embarrass you or to pry necessarily.  We
 3    just want to try to get a fair, unbiased, and impartial
 4    juror.
 5            In the event there is some question or some issue
 6    that you wish to discuss in a semiprivate session, let me
 7    know.  We'll have you walk around to the side here -- I'll
 8    turn on this button -- and then we can have a semiprivate
 9    conversation.  Again, we're not trying to pry.  We just want
10    to make sure we have a fair and unbiased jury.
11            Now, I suspect that, when you got your jury
12    summons, after jumping up and down with elation, you
13    probably went on the Internet to check all the wonderful
14    places that you would see and sites you could visit
15    Downtown, and perhaps during that process, you may have come
16    across one or more of these articles.
17            Look.  I get it.  I understand this is an
18    imposition.  You've got work, family life, et cetera, but it
19    is vitally important to our justice system to have good
20    people like you willing to come and serve.  I have served on
21    a jury on multiple occasions.  I am thankful that I've had
22    the opportunity to have done so, and I hope you will as
23    well.
24            So as I said, I understand.  You've got all these
25    other things going on in your life, but it is important to
```

 1   our system to have jurors serve in these important matters.

 2   And just think, if you are picked on this jury or, quite

 3   frankly, after having gone through this process, you can

 4   join this illustrious group of other individuals who have

 5   also been called and served on jury duty.

 6           I want to give you some brief rules before we sort

 7   of begin with the process.  I have ordered that the parties

 8   cannot speak to you at all during the course of this

 9   selection and certainly during the trial.

10           So if we take a break during the jury selection

11   process, if you happen to see any of the lawyers or parties

12   in the trial, they're going to walk past you and simply

13   ignore you.  They're not being rude; they're just simply

14   respecting and honoring the rules of this Court.

15           You have already -- I am going to introduce to you

16   some of the folks that you will see throughout this trial.

17   You already met our Madam Clerk.  She is the keeper of the

18   house.  She marks all the exhibits.  She places all the

19   witnesses under oath.  She swears you in as jurors.  She

20   runs this train station very efficiently and well.

21           Perhaps the second most important person is seated

22   to my left, and that's our court reporter.  She has the

23   unenviable task of taking down every single word that is

24   taken during the course of these proceedings.  In fact, I

25   have a monitor to my right that gives me a transcript in

1    real time.

2            I share that with you because, as you are

3    answering the questions, she cannot take nonverbal answers.

4    So shakings of the head or nodding she's not going to be

5    able to record.  So be mindful of that when you are

6    answering the questions, and make sure you give an audible

7    answer.

8            In a moment, we are going to call out 16 names.

9    We'll seat 1 through 8 in the top row, 1 starting closest to

10   me, and then 9 through 16 in the bottom row, 9 being closest

11   to me.

12           If you are not the original 16 that are picked,

13   please, please pay attention.  Think about how you might

14   answer those questions.  Make a mental note of those

15   responses because there is a high likelihood that you may

16   get called up.  We want to make the process as efficient as

17   possible, and so that would be very helpful to all of us.

18           As I mentioned to you earlier, the parties are

19   under strict orders that they can't speak to you outside of

20   court.  They're not being rude.  They're just simply

21   following this Court's orders because your job as jurors is

22   to decide this case based on the facts and evidence you hear

23   in trial and not any conversations or anything that you may

24   see or hear out in the hallway or outside the courthouse.

25           At this time, I am going to ask counsel for the

```
 1    plaintiffs to introduce themselves and introduce their

 2    client.

 3             MR. ALTMAN:  Good morning.

 4             Our client, first of all, is Mark Pedante, who is

 5    sitting right here next to me, and my colleagues on my team

 6    here are Stephanie Taft, Zach Powell, Roger Kirnos, and

 7    Russell Higgins, and my name is Bryan Altman.  Good morning,

 8    ladies and gentlemen.

 9             THE COURT:  Thank you, counsel.

10             Let's hear from the defense, please.

11             MR. KELLY:  Thank you, Your Honor.

12             Good morning, ladies and gentlemen.  I am

13    Frank Kelly, and I represent the Ford Motor Company in this

14    case.  Along with me today is Steve Paterson;

15    Spencer Hugret; if you can see, Samantha Burnett.

16             Thank you, your Honor.

17             THE COURT:  Thank you, Counsel.

18             So, now, as I mentioned, this is a civil case.  In

19    a civil case, how all civil cases begin is via the form of a

20    Complaint.  The Complaint is not evidence, however.  And in

21    this case, the defendant has denied all the claims, and you

22    are not to presume from the mere fact that a Complaint has

23    been filed that one side or the other is liable.

24             I will now read a brief statement of the case that

25    will give you a brief summary of what this case is about.
```

1          This case arises out of plaintiff Mark Pedante's

2     purchase of a 2013 Ford Focus on March 10th, 2013, from

3     Galpin Ford.  The Ford Focus was manufactured by defendant

4     Ford Motor Company and came with a written warranty.

5          Ford Motor Company equipped this vehicle with a

6     DPS6 PowerShift transmission.  Plaintiff claims the 2013

7     Ford Focus was delivered containing serious defects to the

8     transmission covered by the warranty which substantially

9     impaired the use, value, or safety of the vehicle.

10          Plaintiff claims that Ford Motor Company and its

11     authorized repair facilities were unable to repair the Focus

12     to match the written warranty after a reasonable number of

13     opportunities to do so and that Ford Motor Company failed to

14     properly replace or buy back the Ford Focus as required by

15     law.

16          Plaintiff seeks restitution for all payments on

17     the Ford Focus along with civil penalties based on

18     Ford Motor Company's willful refusal to repurchase or

19     replace the Focus when plaintiff asked Ford to do so before

20     filing this lawsuit.

21          Ford admits that authorized repair facilities had

22     been provided with a reasonable number of repair attempts

23     that could not conform the vehicle to warranty and that

24     Mr. Pedante's use of the Focus was substantially impaired by

25     the vehicle complaints he experienced but denies that the

1    transmission conditions presented any safety issues.  Ford
2    contends that it acted in good faith.
3           You have already heard the names of the attorneys,
4    but I wanted to present them all to you because I am going
5    to ask a question thereafter.  So you have Russell Higgins,
6    Roger Kirnos, Zachary Powell, Stephanie Taft, Bryan Altman,
7    Frank P. Kelly III, Amir Nassihi, Samantha Burnett,
8    Spencer P. Hugret, and Andrew Chang.
9           Now, the following are lists of potential
10   witnesses that you may hear from during the course of this
11   trial.  Mark Pedante, Anthony Micale, Darrell Blasjo,
12   Patrick McNeeley, Chris Longoria, Harry Altalaryan,
13   Garo Atamian, Jacob Doss, Greg Overla, Mark Fields,
14   Alan Draper, Kara Kennedy, Chris Kwasniewicz,
15   Robert Pascarella, Matthew Fyie, and Robert Kuhn.
16          So I will ask, does anyone know or have any
17   relationship or any experiences with either myself, the
18   court staff, the lawyers in this case, or any of the
19   potential witnesses that have been called, and if so, please
20   raise your hand.
21          All right.  I see no hands, and so why don't we
22   now at this point call our 16 jurors, please, and we'll
23   swear you in first.
24          THE CLERK:  Please stand and raise your right
25   hand.

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1          Ladies and gentlemen, do you solemnly swear that

 2   you will make true answers to such questions as may be put

 3   to you touching upon your qualifications to serve as jurors

 4   upon the trial of the cause now before this Court, so help

 5   you God?

 6          PROSPECTIVE JURORS:  I do.

 7          THE CLERK:  Thank you.  Please be seated.

 8          Melaugh, David; please have a seat in Jury Seat

 9   Number 1.  Aleman, Maria; Jury Seat Number 2.  Guerrero,

10   Christina; Jury Seat Number 3.  Yuan, Xiaozhen; Jury

11   Seat Number 4.  Chang Gilhooly, Sorqan; Jury Seat Number 5.

12   Ormsbee, Julie; Jury Seat Number 6.  Leuchtenburg, Brian;

13   Jury Seat Number 7.  Shah, Divya; Jury Seat Number 8.

14   Barboza, Lorelyn; Jury Seat Number 9.  Maslar, Jennifer;

15   Jury Seat Number 10.  Kuligowski, Chris; Jury

16   Seat Number 11.  Marlborough, Jane; Jury Seat Number 12.

17   Morgan, Wilhemina; Jury Seat Number 13.  Scruggs, Jennifer;

18   Jury Seat Number 14.  Cooper, Brian; Jury Seat Number 15.

19   Schlenger, Adam; Jury Seat Number 16.

20          THE COURT:  All right.  We'll start off with

21   Juror Number 1.  There should be a series of questions on

22   the screen in front of you.  As it relates to area of

23   residence, I don't need a specific address.  Whittier,

24   South Bay, San Fernando Valley, San Gabriel Valley, that

25   will all suffice.

```
 1              And so with that, why don't we start with you.  Is
 2     it Mr. Melaugh?
 3              PROSPECTIVE JUROR:  Melaugh.  It's like
 4     "Cavanaugh."
 5              THE COURT:  Melaugh.  Good morning, sir.
 6              PROSPECTIVE JUROR:  Good morning.  So I am from
 7     Venice.  I sell real estate.  I'm single, live with my
 8     girlfriend, and I have never provided any prior jury service
 9     in my adult life here.
10              THE COURT:  If you don't mind me asking, your
11     girlfriend, is she employed outside of the home?
12              PROSPECTIVE JUROR:  Yes.
13              THE COURT:  What does she do?
14              PROSPECTIVE JUROR:  She works for a large retailer
15     in their corporate office buying clothing for the West Coast
16     of that division.
17              THE COURT:  Great.  Thank you.
18              Let's pass the microphone over to Miss Aleman.
19     Good morning.
20              PROSPECTIVE JUROR:  Good morning.  I live in the
21     Lincoln Heights area of Los Angeles.  I am married 18 years;
22     have three children.  My husband works for
23     Los Angeles County.  My oldest is working as a cook, and I
24     have never served jury duty.
25              THE COURT:  And if you don't mind me asking, your
```

```
 1    husband, what does he do for L.A. County?
 2              PROSPECTIVE JUROR:  He is an Eligibility
 3    Worker II.
 4              THE COURT:  And is that what you do as well?
 5              PROSPECTIVE JUROR:  I'm unemployed.  I am a
 6    writer.
 7              THE COURT:  Okay.  You are a writer.  Great.  And
 8    you said one child is a cook.  You have two other children.
 9    Are they unemployed?
10              PROSPECTIVE JUROR:  They're school aged.
11              THE COURT:  Okay.  Again, if you don't mind me
12    prying, college?  High school?  Both?
13              PROSPECTIVE JUROR:  One is a senior in high
14    school.  The other is in elementary school.
15              THE COURT:  Okay.  Great.  So I take it they're
16    not employed?
17              PROSPECTIVE JUROR:  No.
18              THE COURT:  All right.  Miss Guerrero.  Good
19    morning.
20              PROSPECTIVE JUROR:  Good morning.  I live in the
21    city of Montebello.  I do general accounting, single, and I
22    haven't served before.
23              THE COURT:  All right.  Great.  Thank you.
24    Welcome.
25              All right.  Miss Yuan?
```

```
 1              PROSPECTIVE JUROR:  Yes.  Good morning.  I live in
 2    Palos Verdes.  I work as a civil engineer with
 3    City of Los Angeles.  I am married.  My husband was also a
 4    civil engineer but retired.  I have two adult children both
 5    are girls.  They both working.  And I did serve jury service
 6    before.  It was a criminal case.
 7              THE COURT:  Do you remember if a verdict was
 8    reached in the case?
 9              PROSPECTIVE JUROR:  No.  It was dismissed.
10              THE COURT:  It was dismissed.  Do you remember
11    what kind of case it was?
12              PROSPECTIVE JUROR:  Yes.
13              THE COURT:  What kind of case?
14              PROSPECTIVE JUROR:  It was sexual assault.
15              THE COURT:  And how long ago was this?
16              PROSPECTIVE JUROR:  A year and a half ago.
17              THE COURT:  All right.  And then was that here in
18    Downtown Los Angeles, or do you remember what court it was
19    in?
20              PROSPECTIVE JUROR:  It was in Torrance, City of
21    Torrance.
22              THE COURT:  All right.  And so you never began
23    deliberating as a juror?
24              PROSPECTIVE JUROR:  We did.
25              THE COURT:  You did.  The case was dismissed
```

```
 1  before a verdict was reached?
 2          PROSPECTIVE JUROR:  We couldn't reach a verdict.
 3          THE COURT:  You could not reach a verdict.  Okay.
 4          PROSPECTIVE JUROR:  Maybe I misspoke.
 5          THE COURT:  The reason why I ask is that, given
 6  that you served on a criminal case, I suspect that the judge
 7  instructed you that the burden of proof in a criminal case
 8  was beyond a reasonable doubt.  In a civil case, the burden
 9  of proof is different.  It's generally preponderance of the
10  evidence.  I will instruct you what the burden of proof is
11  if you are selected as a juror.
12          I say all that to say, if you are picked as a
13  juror on this case, will you be able to set aside those
14  instructions that you received about a year and a half ago
15  and only listen to and follow the instructions given in this
16  case?
17          PROSPECTIVE JUROR:  Yes.
18          THE COURT:  All right.  Great.  And then you said
19  you have two daughters.  Are they both working?
20          PROSPECTIVE JUROR:  Yes.
21          THE COURT:  And if you don't mind me asking, what
22  do they do?
23          PROSPECTIVE JUROR:  My older daughter works for
24  FBI, and the younger one is a marketing -- you know, working
25  in the Honey Company.
```

```
 1                    THE COURT:  The Honey Company?  And what does she
 2   do there?
 3                    PROSPECTIVE JUROR:  Marketing.
 4                    THE COURT:  Marketing.  I'm sorry.  Okay.  And
 5   then your other daughter that works for the bureau, the FBI,
 6   what does she do there?  Is she an agent?  An analyst?
 7                    PROSPECTIVE JUROR:  She's a technician support
 8   right now.  She just started a few months ago.
 9                    THE COURT:  All right.  Thank you.
10                    Forgive me.  I am going to butcher your name so
11   why don't you help me first.
12                    PROSPECTIVE JUROR:  Sorqan Chang Gilhooly.
13                    THE COURT:  Chang Gilhooly.  Okay.  Good morning,
14   sir.
15                    PROSPECTIVE JUROR:  Good morning.
16                    THE COURT:  If you wouldn't mind answering the
17   questions, please.
18                    PROSPECTIVE JUROR:  Yes.  I live in
19   West Hollywood.  I am a broadcast engineer for a TV network.
20   I am married.  My wife is an editor for the same network.
21   She edits TV shows.  And I have had no prior jury service.
22   No children either.
23                    THE COURT:  Great.  Thank you.
24                    Is it Miss Ormsbee?
25                    PROSPECTIVE JUROR:  Yes.
```

```
 1           THE COURT:  All right.  Good morning, ma'am.
 2           PROSPECTIVE JUROR:  Hi.  I live in Bellflower.  I
 3  am a high school counselor.  My husband is a middle school
 4  science teacher.  We have three children under the age of
 5  five -- sorry -- two children under the age of five.  I have
 6  been on a criminal jury for a criminal case, and they were
 7  found guilty.
 8           THE COURT:  And how long ago was that?
 9           PROSPECTIVE JUROR:  Six or seven years ago.
10           THE COURT:  And what kind of case was it?
11           PROSPECTIVE JUROR:  Attempted murder.
12           THE COURT:  And as I told Miss Yuan, I suspect you
13  were also instructed the burden of proof is different than
14  what you'll be instructed here.  Will you also be able to,
15  if you're selected, set aside those instructions and listen
16  and follow the instructions given in this case?
17           PROSPECTIVE JUROR:  Yes, sir.
18           THE COURT:  All right.  Great.
19           Is it Mr. Leuchtenburg?
20           PROSPECTIVE JUROR:  Leuchtenburg.
21           THE COURT:  Leuchtenburg.  Good morning, sir.
22           PROSPECTIVE JUROR:  Good morning.  So I work, live
23  in Santa Monica.  I work for a hedge fund.  I am married.
24  We do not have kids yet, and I have not served on a jury
25  before.
```

```
 1              THE COURT:  And does your spouse work outside the
 2   home?
 3              PROSPECTIVE JUROR:  She does.  She's a CFO for a
 4   film production company.
 5              THE COURT:  Okay.  Great.  All right.  Thank you.
 6              Is it Miss Shah?
 7              PROSPECTIVE JUROR:  Divya Shah.
 8              THE COURT:  Good morning.
 9              PROSPECTIVE JUROR:  Good morning.  I live in
10   Torrance, California.  I am a project manager.  I work for a
11   drug development contract manufacturing organization.
12   Married for six years.  Have a four-year-old son; expecting
13   another one soon.
14              THE COURT:  Congratulations.
15              PROSPECTIVE JUROR:  Thank you.  I have not served
16   before.
17              THE COURT:  And does your spouse work outside the
18   home?
19              PROSPECTIVE JUROR:  Yes.  He's a product manager
20   for an aerospace company.
21              THE COURT:  All right.  And are you feeling okay?
22              PROSPECTIVE JUROR:  On and off.  I have good days
23   and bad days.
24              THE COURT:  Okay.  Well, good luck with your
25   pregnancy.
```

```
 1                    PROSPECTIVE JUROR:  Thank you.
 2              THE COURT:  Miss Barboza, if we can get the
 3    microphone back over this way, please.
 4                    PROSPECTIVE JUROR:  Good morning.
 5              THE COURT:  Good morning.
 6                    PROSPECTIVE JUROR:  I am from Long Beach,
 7    California.  I am a nonprofit consultant.  I am married.  My
 8    wife is a high school teacher at Paramount.  I have two
 9    adult children.  Their occupations are unknown.  I have had
10    prior jury service, civil in the state.  It was probably
11    about 20 years ago, and there was a verdict on behalf of the
12    civil case.  It was a car accident.
13              THE COURT:  Okay.  All right.  There is a little
14    bit to unpack there, but you said your wife is a high school
15    teacher in --
16                    PROSPECTIVE JUROR:  In Paramount.
17              THE COURT:  In Paramount?  I confused.  All right.
18    And your children, they're adults?
19                    PROSPECTIVE JUROR:  They are adults.
20              THE COURT:  Okay.  And you believe they are
21    employed or --
22                    PROSPECTIVE JUROR:  I don't have any information
23    about their occupation.
24              THE COURT:  Okay.  Got it.  And then I thought you
25    said -- I may have misheard it.  Have you served on two
```

```
 1   juries or one?

 2              PROSPECTIVE JUROR:  I served on one jury.

 3              THE COURT:  Twenty years ago?

 4              PROSPECTIVE JUROR:  Yes.

 5              THE COURT:  And it was a car accident, and there

 6   was a verdict?

 7              PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  I don't know what the instructions you

 9   were given 20 years ago.  You may not even remember what

10   they were, but I will ask you the same question I asked some

11   of your fellow jurors.

12              Will you be able to listen to the instructions in

13   this case and abide by those instructions and not think,

14   well, the judge told me in my other case something different

15   so maybe I should go with that.  Does that make sense?

16              PROSPECTIVE JUROR:  I understand.

17              THE COURT:  All right.  Great.  Thank you.

18              All right.  Miss Maslar?

19              PROSPECTIVE JUROR:  Yes.

20              THE COURT:  Good morning.

21              PROSPECTIVE JUROR:  Good morning.  I live in

22   El Segundo.  I am a special ed teacher.  I am not married,

23   and I don't have children, and I have never served on a

24   jury.

25              THE COURT:  All right.  Thank you.
```

```
 1              All right.  Mr. Kuligowski?

 2              PROSPECTIVE JUROR:  Miss.

 3              THE COURT:  Miss Kuligowski.  Sorry.

 4              PROSPECTIVE JUROR:  Quite all right.  My first

 5    name is Chris.  It happens often.

 6              THE COURT:  Miss Kuligowski, good morning.

 7              PROSPECTIVE JUROR:  Good morning, Judge.  So I

 8    live in Santa Barbara.  I am a pharmacist at Costco.  I am

 9    married.  My husband also works at Costco.  We do not have

10    any kiddos, and I have never served on a jury before.

11              THE COURT:  Can you give us any Costco gift cards

12    today?  I'm just serious.  I'm just serious.

13              All right.  Miss Marlborough.

14              PROSPECTIVE JUROR:  You did a good job with my

15    last name.  Thank you.

16              I live in Paso Robles, work in Santa Barbara,

17    married.  My husband works in sales and marketing.  I'm a

18    banker.  Five adult children.

19              THE COURT:  Congratulations.

20              PROSPECTIVE JUROR:  Do you need the occupation of

21    all of them?

22              THE COURT:  If you know them.

23              PROSPECTIVE JUROR:  Yeah.  Attorney, electrical

24    engineer, city worker in Colorado, stay-at-home mom now, and

25    one works in the entertainment industry as a beautician.
```

```
 1          THE COURT:  All right.

 2          PROSPECTIVE JUROR:  And I served on a criminal

 3   jury in state court probably 28 years ago.  We did reach a

 4   verdict, and it was a case about drugs, but the defendant

 5   left before -- he skipped town, but we had reached a

 6   verdict.

 7          THE COURT:  Got it.  All right.  Allegedly skipped

 8   town.  No.  I am just kidding.

 9          PROSPECTIVE JUROR:  Yeah.

10          THE COURT:  Again, I will ask you the same thing

11   I've asked the other jurors.  Again, that's 28 years ago,

12   but there is an important distinction between criminal cases

13   and civil cases.

14          PROSPECTIVE JUROR:  Got it.

15          THE COURT:  The burden of proof is very different.

16   Will you be able to listen and abide by the rules as I

17   instruct you as to the burden of proof if you are selected

18   as a juror in this case?

19          PROSPECTIVE JUROR:  Yes, I will.

20          THE COURT:  All right.  Great.  Thank you.

21          All right.  Ms. Morgan.  Good morning.

22          PROSPECTIVE JUROR:  Good morning.  I live in

23   Redondo Beach.  I am an executive recruiter for marketing in

24   creative positions.  My fiancé is an architect.  I do not

25   have any children, and I have never served on a jury before.
```

```
 1              THE COURT:  All right.  Thank you.
 2   Congratulations on the engagement.
 3              PROSPECTIVE JUROR:  Thank you.
 4              THE COURT:  All right.  Miss Scruggs.
 5              PROSPECTIVE JUROR:  Good morning.  I live in
 6   Canoga Park.  I am a veterinary technician.  I am not
 7   married or seeing anyone.  I have no children, and I have
 8   never served on a jury before.
 9              THE COURT:  All right.  Great.  Thank you.
10              Mr. Cooper?
11              PROSPECTIVE JUROR:  Hi.  I am the histology
12   supervisor at Children's Hospital Los Angeles.  I live in
13   Simi Valley.  Married.  I have a 21-year-old and 15-year-old
14   daughter.  Both are students.  And I have never had jury
15   duty before.  Never served on a jury I should say.
16              THE COURT:  And you said you are married.  Does
17   your spouse work outside the home?
18              PROSPECTIVE JUROR:  Yes, she does.  She works at a
19   OB/GYN's office.
20              THE COURT:  And what does she do there?
21              PROSPECTIVE JUROR:  She does front office and back
22   office.  She's a fixer.
23              THE COURT:  Okay.  The fixer.  And forgive my
24   ignorance.  Histology --
25              PROSPECTIVE JUROR:  We're the tissue people.  When
```

```
 1    tissues are removed, we're the ones that turn them into

 2    slides for a pathologist to diagnose.

 3              THE COURT:  Got it.  Okay.  Thank you.

 4              All right.  And last but certainly not least,

 5    Mr. Schlenger.

 6              PROSPECTIVE JUROR:  Uh-huh.

 7              THE COURT:  Good morning.

 8              PROSPECTIVE JUROR:  I live in Culver City, and I

 9    am a climate change scientist and small business owner.  I

10    am single, but I have a girlfriend.  She does event

11    coordination.  I don't have any children, and I haven't

12    served jury service before.

13              THE COURT:  Okay.  Great.  Thank you, and welcome.

14              All right.  So as I mentioned earlier, I am going

15    to ask a number of group questions to the folks in the

16    audience that haven't been called.  Again, I will remind

17    you, make a mental note of how you might answer those

18    questions as you might get called up soon enough.

19              So I will ask the group questions.  If anyone has

20    a response, raise their hands.  We'll get the microphone

21    over to you so that our court reporter can take down your

22    answers.

23              So does everyone here understand that the parties

24    must prove their claim or defense by what's known as a

25    preponderance of the evidence?  And I will explain what that
```

```
 1    is if you are selected as a juror.  Does everyone understand
 2    just the basic concept that the party must prove their claim
 3    or defense?  Does anyone have any heartburn with that?
 4           Does anyone here think simply because a claim has
 5    been filed or a Complaint has been filed that the other side
 6    is automatically liable?
 7           All right.  And, now, do you have any close family
 8    friends that have legal training?  I know, Ms. Marlborough,
 9    you said you had a son, but why don't we start with
10    Miss Morgan because I think the microphone is closest to
11    you.  Miss Morgan.
12           PROSPECTIVE JUROR:  My dad is a paralegal.
13           THE COURT:  Do you know what type of work he does?
14    Does he work at a firm?  In-house?
15           PROSPECTIVE JUROR:  He works at a firm.
16           THE COURT:  And do you know the nature of the
17    firm's practice?
18           PROSPECTIVE JUROR:  Civil.
19           THE COURT:  Civil litigation?
20           PROSPECTIVE JUROR:  Yes.
21           THE COURT:  Do you know any more than that?  Do
22    they do business?  Do they do automotive?  Do they do
23    medical malpractice?
24           PROSPECTIVE JUROR:  I don't know specifically.
25           THE COURT:  Okay.  Has your dad shared any war
```

```
 1   stories with you about his work, about crazy judges, crazy

 2   lawyers, or anything of that nature?

 3              PROSPECTIVE JUROR:  We've talked in the past about

 4   what he does.

 5              THE COURT:  Okay.  And is there anything about

 6   those conversations that would make it difficult for you to

 7   be fair and impartial to either side in this case?

 8              PROSPECTIVE JUROR:  I don't -- no.  No.

 9              THE COURT:  Okay.  Great.

10              All right.  Miss Marlborough, I know you said one

11   of your children is an attorney.  What's the nature of their

12   practice?

13              PROSPECTIVE JUROR:  He just -- they just started a

14   firm.  He is the managing partner, and his expertise is

15   primarily in real estate transactional law.  He's

16   represented banks and title companies and also individuals

17   so both sides.

18              THE COURT:  And is he practicing here in

19   California?

20              PROSPECTIVE JUROR:  Yes.

21              THE COURT:  Okay.  Has he shared war stories with

22   you about the nature of his practice over the years?

23              PROSPECTIVE JUROR:  What do you mean by "war

24   stories"?

25              THE COURT:  You know, day in the life in the
```

```
 1   office, you know, cocktail stories about dealing with

 2   lawyers on the other side, or just sharing his day with you

 3   about his practice?

 4           PROSPECTIVE JUROR:  I wouldn't say stories about

 5   the parties, but we did talk in fair detail about one case

 6   that involved a bank and title policy because I am a banker

 7   and I am familiar with that.  Yeah.  So that's the one that

 8   we did talk about.

 9           THE COURT:  Okay.  And is there anything about

10   your relationship with him or anything that he shared with

11   you that would make it difficult for you to be fair and

12   impartial to either side in this case?

13           PROSPECTIVE JUROR:  No.  I don't believe so.

14           THE COURT:  Thank you.

15           Anyone else?  Yes.  Let's move -- Miss Maslar?

16           PROSPECTIVE JUROR:  Maslar.

17           THE COURT:  Maslar.

18           PROSPECTIVE JUROR:  I have a very close friend

19   that is a lawyer, and then I am not sure if this counts, but

20   a lot of my family works in the government.

21           THE COURT:  Okay.

22           PROSPECTIVE JUROR:  My brother is a cyber analyst

23   in the FBI.  Cousin, Secret Service.  Other cousin, Defense

24   Department.  Other cousin, FBI agent.

25           THE COURT:  Okay.
```

1          PROSPECTIVE JUROR:  All on the same side of the

2    family.

3          THE COURT:  Okay.  And you said you had a close

4    friend, though, that's a lawyer?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Do you know what the nature of their

7    practice is?

8          PROSPECTIVE JUROR:  Criminal.

9          THE COURT:  Criminal.  Okay.  And here in

10   Los Angeles?

11         PROSPECTIVE JUROR:  No.  Indiana.

12         THE COURT:  Indiana.  All right.  Has he shared

13   any interesting stories about his practice and the nature of

14   his work with you?

15         PROSPECTIVE JUROR:  A little bit.

16         THE COURT:  Anything about those stories that

17   would make it difficult for you to be fair and impartial?

18   Again, this is a civil case.  It's not a criminal case.

19         PROSPECTIVE JUROR:  I don't think so.

20         THE COURT:  But the old Shakespeare quote, "Let's

21   kill all the lawyers," has he said anything along those

22   lines?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  All right.  Who else had their hand

25   up?

```
 1                All right.  Miss Guerrero.

 2                PROSPECTIVE JUROR:  Yes.  I have -- my sister is a

 3     custodial for the men jail here in L.A.

 4                THE COURT:  Okay.  So she's a custody assistant

 5     or --

 6                PROSPECTIVE JUROR:  Custody assistant.

 7                THE COURT:  Okay.

 8                PROSPECTIVE JUROR:  Custody assistant.  And her

 9     husband is a sheriff, L.A. Sheriff.

10                THE COURT:  Is there anything about the

11     relationship that you have with your sister or

12     brother-in-law that would make it difficult for you to be

13     fair and impartial in a case like this?

14                PROSPECTIVE JUROR:  Not at all.

15                THE COURT:  Okay.  Great.

16                All right.  Anyone else?  Yes.  I'm sorry.  I want

17     to make sure I get the name.  Leuchtenburg.

18                PROSPECTIVE JUROR:  Leuchtenburg.

19                THE COURT:  Leuchtenburg.  Okay.

20                PROSPECTIVE JUROR:  My uncle is a managing partner

21     at Ropes &Gray, and one of my best friends is a lawyer

22     mostly working in wrongful conviction cases.

23                THE COURT:  All right.  And let's talk first about

24     your uncle.  What's the nature of his practice?  He is the

25     managing partner now; so he's herding cats, I get that,
```

```
 1   but --

 2              PROSPECTIVE JUROR:  Correct.  So M&A-type work and

 3   then more specifically working with private equity firms.

 4              THE COURT:  Okay.  And then you said you had a

 5   close friend that does post-conviction relief?

 6              PROSPECTIVE JUROR:  Correct.

 7              THE COURT:  Does your close friend work for a firm

 8   or for --

 9              PROSPECTIVE JUROR:  He started his own firm.

10   They're focused on prosecution misconduct.

11              THE COURT:  All right.  Is there anything about

12   the relationship with either your uncle or friend that would

13   make it difficult -- this is a civil case, and your uncle

14   has done M&A, private equity.  Not really connected here,

15   but is there anything about that relationship, anything that

16   they may have told you that would make it difficult for you

17   to be fair and impartial in a case like this?

18              PROSPECTIVE JUROR:  I do not believe so.

19              THE COURT:  All right.  Anyone else?  So you'll

20   just hold on to the microphone if you wouldn't mind.

21              Have you or any of your immediate family members

22   ever worked in the automotive business, including but not

23   limited to for any automobile manufacturer, for a

24   dealership, for a repair shop, or as a mechanic?

25              All right.  Mr. Leuchtenburg.  All right.
```

```
 1              PROSPECTIVE JUROR:  I worked two years at a
 2  automobile repair center, an Exxon with a attached repair
 3  shop.
 4              THE COURT:  And what did you do there?
 5              PROSPECTIVE JUROR:  A lot of stuff.  So I was in
 6  high school but helping change oil, plug tires, full
 7  service, clean the bathrooms.
 8              THE COURT:  Okay.  And were you under someone's --
 9  you mentioned you changed oil.  Were you under someone's
10  direction?  I mean, were you just a high school kid and just
11  did whatever they told you, and they showed you how to do
12  things, or did you have any training prior to that?
13              PROSPECTIVE JUROR:  They just taught me on the
14  job.
15              THE COURT:  On the job.  Okay.  This case deals
16  with a Ford motor vehicle.  Wondering if you had any
17  opportunity to work on any Fords, if you remember, during
18  that time period?
19              PROSPECTIVE JUROR:  Yes.  But it wouldn't have --
20  nothing specific about a Ford really with doing oil changes
21  or tires.
22              THE COURT:  Okay.  Is there anything about your
23  work back then that would make it difficult for you to be
24  fair and impartial in a case like this?
25              PROSPECTIVE JUROR:  I don't believe so.
```

```
 1              THE COURT:  All right.  Thank you.
 2              Who else had their hands up?  All right.  I'm not
 3    going to try to butcher your name, sir, so why don't you go
 4    ahead and answer the question.
 5              PROSPECTIVE JUROR:  One of my brothers, about ten
 6    years ago, worked at a Power Ford authorized repair shop.
 7    He probably worked there for about three or four years.
 8              THE COURT:  And do you know what your brother did
 9    there?
10              PROSPECTIVE JUROR:  He started out like detailing,
11    prepping cars to return back to customers, and sometimes he
12    would help out with certain repairs and things like that,
13    but mostly he was on maintenance and detailing.
14              THE COURT:  Did he share with you any insights or
15    experiences with -- you said it was Power Ford?
16              PROSPECTIVE JUROR:  Yeah.
17              THE COURT:  With Ford vehicles and his experience
18    working on the cars?
19              PROSPECTIVE JUROR:  Not really.  No horror stories
20    or any specifics on anything like that.
21              THE COURT:  Is there anything about that
22    relationship or anything that he's told you that would make
23    it difficult for you to be a juror on this kind of case?
24              PROSPECTIVE JUROR:  No.  I don't think so.
25              THE COURT:  All right.  Great.  Thank you.
```

1    Who else had their hands up?  All right.
2    Miss Barboza.
3         PROSPECTIVE JUROR:  It's Mrs., Your Honor.
4         THE COURT:  Mrs.  My apologies.
5         PROSPECTIVE JUROR:  I have a sister that worked
6    for Ed Butts Ford in sales, and I delivered auto parts for
7    Keystone Ford in Downey for two years.
8         THE COURT:  Okay.  And I am sorry.  You said your
9    sister did what at --
10        PROSPECTIVE JUROR:  She was sales at Ed Butts
11   Ford.
12        THE COURT:  Got it.  And how long ago did she do
13   that?
14        PROSPECTIVE JUROR:  It's been 20-something years,
15   Your Honor.
16        THE COURT:  Okay.  And you worked at Keystone.
17   How long ago was that?
18        PROSPECTIVE JUROR:  It's been about 20 years.
19        THE COURT:  Okay.  So let me ask you the same
20   questions I have asked.  Anything about those experiences?
21   Did you get any training on how to fix Fords or specifically
22   with Ford transmissions back then?
23        PROSPECTIVE JUROR:  No, Your Honor.
24        THE COURT:  All right.  Is there anything about
25   your experience or anything that you may have discussed with

```
 1   your sister and her experience that would make it difficult

 2   for you to be fair and impartial in this kind of case?

 3            PROSPECTIVE JUROR:  No, Your Honor.

 4            THE COURT:  Okay.  Great.  Thank you.

 5            Anyone else?  Yes, Mr. Cooper.

 6            PROSPECTIVE JUROR:  My father was a mechanic for

 7   20 years for the federal government.  He worked for

 8   Camp Pendleton, and then he transferred over to the U.S.

 9   Forest Service for another 15 years before he retired.

10   That's about it.

11            I did fail to mention that I have a stepson as

12   well.  He is a little bit older.  He used to be a tow truck

13   driver so --

14            THE COURT:  Okay.  Thank you.

15            Your father, having served in the military, I am

16   assuming he worked on all kinds of cars?

17            PROSPECTIVE JUROR:  It was more heavy equipment,

18   and then when he transferred over to the Forest Service,

19   then it became fire trucks and residential -- not

20   residential but more personal-type vehicles.

21            THE COURT:  Do you know whether or not he worked

22   on any Ford vehicles at all?

23            PROSPECTIVE JUROR:  He probably did, but he worked

24   on pretty much every vehicle that the fleets had.

25            THE COURT:  Did he share any experiences that he
```

```
 1   had with any specific types of cars that he worked on, good

 2   or bad?

 3            PROSPECTIVE JUROR:  No, Your Honor.  Most of his

 4   complaints dealt with the people that were operating the

 5   vehicles rather than the vehicles themselves.

 6            THE COURT:  All right.  Great.  Is there anything

 7   about anything that he may have shared with you or the fact

 8   that he spent so much time as a mechanic that would make it

 9   difficult for you to be fair and impartial in a case like

10   this?

11            PROSPECTIVE JUROR:  No, Your Honor.

12            THE COURT:  Thank you.

13            All right.  Anyone else?

14            Okay.  Have you or have any one of you personally

15   done maintenance or repair work on automobiles or trucks?  I

16   know, Mr. Leuchtenburg, we talked about that.

17            Mr. Cooper, why don't we go down the line.

18            PROSPECTIVE JUROR:  Oil changes and brake changes.

19            THE COURT:  All right.  Anything about that

20   experience that would make it difficult for you to be fair

21   and impartial in a case like this?

22            PROSPECTIVE JUROR:  No, Your Honor.

23            THE COURT:  All right.  Ms. Scruggs.

24            PROSPECTIVE JUROR:  The same.  Just oil changes,

25   brake changes, tire changes, light basic stuff.
```

```
 1              THE COURT:  No transmission stuff?

 2              PROSPECTIVE JUROR:  No transmission.

 3              THE COURT:  Anything about that experience that

 4    you had with your -- well, let me ask you, and I will ask

 5    you, Mr. Cooper, oil changes and brake changes, any that

 6    deal with any Ford vehicles?

 7              PROSPECTIVE JUROR:  No, sir.

 8              THE COURT:  No for you, Miss Scruggs.  Okay.

 9              Mr. Cooper?

10              PROSPECTIVE JUROR:  Yes.  I had a Ford Explorer

11    that I used to change the brakes and oil regularly.

12              THE COURT:  What year was that Explorer, if you

13    know?

14              PROSPECTIVE JUROR:  Maybe late '90s.

15              THE COURT:  Okay.  Anything about your work on

16    that Ford, good or bad, that would make it difficult for you

17    to be fair and impartial in this kind of case?

18              PROSPECTIVE JUROR:  No.

19              THE COURT:  Okay.  Great.

20              All right.  Miss Scruggs, anything about your work

21    on cars that would make it difficult for you to sit in a

22    case like this?

23              PROSPECTIVE JUROR:  No, sir.

24              THE COURT:  All right.  Who else?

25    Miss Marlborough.
```

```
 1                PROSPECTIVE JUROR:  So I grew up in a family of

 2     shade-tree mechanics.  So I would help my father and

 3     brother, and I know what a distributor cap is.

 4                THE COURT:  Okay.

 5                PROSPECTIVE JUROR:  That might have got me

 6     married.  So I helped my husband who is also quite a

 7     mechanic.  He has refurbished a couple of cars, and they

 8     happen to be Fords.

 9                THE COURT:  If you don't mind sharing with us,

10     what kind of Fords?  Are these classic cars or --

11                PROSPECTIVE JUROR:  Yeah, more classic.  A 1970

12     Bronco and a -- maybe a '76 full-size Bronco, an old-style

13     Bronco and a full-size broncho.

14                THE COURT:  Given the extensive work that

15     you've -- exposure to the automobile industry or I guess

16     dealing more specifically working on cars and your husband's

17     work, do you think you could be fair and impartial in a case

18     like this?

19                PROSPECTIVE JUROR:  Yeah.  I think so.  But I

20     should probably describe or let you know, even though he

21     doesn't do much work on it, he does -- we do own a Focus.

22                THE COURT:  You do.  And what year is that car?

23                PROSPECTIVE JUROR:  I think it's a '15, 2015; '14

24     or '15.

25                THE COURT:  Okay.  Great.  Thank you.
```

 1          All right.  Who else?  Mrs. Barboza.

 2          PROSPECTIVE JUROR:  Yes, Your Honor.  Part of my

 3     duties in a previous employer, I was overseeing -- we had a

 4     fleet of vans which was approximately five vans.  Four were

 5     Ford Econoline 15-passenger vans, and I oversaw the

 6     maintenance and the repair needs.

 7          And in two of those vehicles, they were 2002 to

 8     2004 Econoline vans, and we had replaced the transmission in

 9     two of them twice.

10          THE COURT:  And just so I am clear, you oversaw

11     the repairs, meaning, when complaints would come, they would

12     come to you, you would coordinate with the dealership or

13     repair facility to get them fixed?

14          PROSPECTIVE JUROR:  Correct.  We had a

15     maintenance -- we had a mechanic that we had an account

16     with, and then they would maintain our vehicles.

17          And so we did daily maintenance reports, and so

18     whenever a situation arose, then those vehicles were taken

19     over to that mechanic.

20          THE COURT:  And this case doesn't involve

21     Econoline vans, obviously, but is there anything about the

22     fact that you had that relationship, your dealings with a

23     mechanic, and specifically I think you said the transmission

24     was replaced twice in one car or --

25          PROSPECTIVE JUROR:  In two of the vehicles.

```
 1              THE COURT:  In two of the vehicles.  Anything

 2   about that experience that would make it difficult for you

 3   to sit in a case like this?

 4              PROSPECTIVE JUROR:  No.

 5              THE COURT:  All right.  And if I could jump back,

 6   Miss Marlborough, you say you owned -- you currently own a

 7   Ford Focus.

 8              PROSPECTIVE JUROR:  Correct.

 9              THE COURT:  This case deals with a Ford Focus

10   around the same vintage.  Could you sit on a case like this

11   given that you own a car that may be referenced at length

12   during the course of this trial?

13              PROSPECTIVE JUROR:  I don't see a problem with

14   that.  It is up for sale because we are downsizing.

15              THE COURT:  Okay.  And up for sale simply because

16   of downsizing or dissatisfaction with the car?

17              PROSPECTIVE JUROR:  We have way too many cars.

18              THE COURT:  But with five kids --

19              PROSPECTIVE JUROR:  Well, no.  They're all --

20              THE COURT:  I'm just kidding.  I'm only kidding.

21              All right.  So it's up for sale due to downsizing.

22   Okay.  Great.  Thank you.

23              Anyone else have any -- yes.  All right, sir.

24   Mr. C.  I am just going to call you Mr. C. if that's okay.

25              PROSPECTIVE JUROR:  That's fine.
```

```
 1          THE COURT:  All right.
 2          PROSPECTIVE JUROR:  In the past, I have done
 3   extensive repair work and maintenance on a Chevy Camaro and
 4   plenty of modifications and maintenance on a Buell
 5   motorcycle.  That's it.
 6          THE COURT:  All right.  Anything about your work
 7   with Chevy or the Buell motorcycle that would make it
 8   difficult for you to sit in a case like this?  Obviously
 9   this case doesn't involve a Buell or Chevy cars, but I ask
10   nevertheless.
11          PROSPECTIVE JUROR:  I think it's fine.
12          THE COURT:  Okay.  Great.  Thank you.
13          Anyone else?  Mr. Melaugh.
14          PROSPECTIVE JUROR:  We just finished a ground-up
15   restoration of a '62 Chevy Nova, Nova II, no post,
16   Hugger Orange paint, black leather interior.
17          THE COURT:  You are not really into cars, are you?
18          PROSPECTIVE JUROR:  I look at them every night on
19   my couch.
20          THE COURT:  Okay.
21          PROSPECTIVE JUROR:  I actually need a transmission
22   too if you know anybody.
23          THE COURT:  I don't unfortunately.  So it sounds
24   like you are very into cars and rebuilds.  Has it focused
25   more on vintage cars or even new modern cars?
```

```
 1          PROSPECTIVE JUROR:  Mainly just all vintage cars,
 2   yeah.
 3          THE COURT:  Anything about your experience dealing
 4   with vintage cars and your knowledge, would it make it
 5   difficult for you to sit in a case like this where we will
 6   be talking about transmissions and how cars work?
 7          PROSPECTIVE JUROR:  No.  That stuff is easy for me
 8   to understand.
 9          THE COURT:  Okay.  Great.
10          All right.  Anyone else?  Why don't you hold on to
11   the mike, Mr. Melaugh.
12          Will any of you have difficulty listening to or
13   viewing evidence that relates to mechanical or technical
14   issues, or any of you might be intimidated by the use of
15   technical language or jargon?  Okay.  All right.
16          Have you or any close family members ever owned or
17   leased a Ford Focus or Ford Fiesta built between 2012 and
18   2016?
19          Miss Marlborough, we covered that unless there is
20   anything else you wish to add.
21          PROSPECTIVE JUROR:  I guess I should add
22   something.  So we got -- it's close to a hundred thousand
23   miles on it, and my husband took it in for maintenance, and
24   he did have a recall notice.
25          And they -- and I believe it had to do with the
```

```
 1    transmission and they -- the dealership inspected it and
 2    said that they didn't see anything wrong, and my husband
 3    never experienced any issues with the transmission.
 4              THE COURT:  Okay.  Great.  Thank you.
 5              Is there anyone else who owned a 2011 to 2016
 6    Ford Focus or Ford Fiesta?
 7              Miss Morgan.
 8              PROSPECTIVE JUROR:  It wasn't me, but it was my
 9    mom.  She owned a Ford Fiesta, and I want to say it was a
10    2015 or 2016.
11              I don't know the exact experience they had with
12    it.  Unfortunately, she got in an accident, and the car was
13    totaled.
14              THE COURT:  Okay.  Great.  I am sorry to hear
15    about the accident, though.
16              Anyone else?  Ms. Aleman.
17              PROSPECTIVE JUROR:  We owned a Ford Focus 2012,
18    and it was totaled as well.
19              THE COURT:  Okay.  All right.  Any problems with
20    the car prior to it being totaled?
21              PROSPECTIVE JUROR:  No.
22              THE COURT:  And, Miss Morgan, you said you didn't
23    know -- you didn't have any information about any
24    experiences.  Okay.
25              Anyone else?
```

```
 1              Mrs. Barboza.
 2              PROSPECTIVE JUROR:  My son owned a Ford Focus, and
 3    its transmission was also replaced.
 4              THE COURT:  Within that time period?
 5              PROSPECTIVE JUROR:  Yes, sir.
 6              THE COURT:  Do you know or did your son relay to
 7    you any problems that he had leading up to the transmission
 8    being replaced, and/or was it subject to a recall and that's
 9    how it got replaced?  Do you know?
10              PROSPECTIVE JUROR:  I don't know the details.  I
11    know that he had it replaced and there had been some issues.
12    He ended up purchasing another car and keeping it, but I
13    know that he was having some challenges with it.
14              THE COURT:  All right.  Thank you.
15              Anyone else?
16              Miss Maslar.
17              PROSPECTIVE JUROR:  My 92-year-old grandmother has
18    a Ford Focus.  It is old, but that thing is still kicking.
19              THE COURT:  Okay.  I don't know if I need to ask
20    any more questions.
21              PROSPECTIVE JUROR:  I mean, I drove it when I was
22    in high school --
23              THE COURT:  Okay.
24              PROSPECTIVE JUROR:  -- 15 years ago.  The rearview
25    mirror fell off.  That's about all my experience with it.
```

```
 1              THE COURT:  Did your grandmother ever relay any
 2    problems with the car?  I mean, you said it's still kicking.
 3    Any problems with the transmission or any engine --
 4              PROSPECTIVE JUROR:  Worries about it going up some
 5    hill she talks about all the time, but I think that's just
 6    her age.
 7              THE COURT:  Got it. Okay.
 8              PROSPECTIVE JUROR:  And I have only owned Ford
 9    vehicles, and I'm on my fourth one.
10              THE COURT:  But no -- you have never owned a
11    Ford Focus or Fiesta?
12              PROSPECTIVE JUROR:  No.
13              THE COURT:  Great.  All right.
14              Anyone else?  All right.  Why don't you hold on to
15    the microphone, Miss Maslar, if you don't mind.
16              Have you ever owned or driven a Ford vehicle and,
17    if so, any positive or negative experiences?  Ms. Maslar,
18    you said you've owned -- you said you are on your fourth
19    one.
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  If you don't mind sharing, can you
22    walk me through the types of Ford vehicles you have owned.
23              PROSPECTIVE JUROR:  Sure.  I had the original
24    Explorer, and then I had the new Explorer -- no, not a new
25    Explorer.  Sorry -- the old Escape.  And then I had a
```

```
 1   Fusion, and the one I have now is an Escape.
 2              THE COURT:  And I assume, based on the fact that's
 3   your fourth, you have had positive experiences with the
 4   cars?
 5              PROSPECTIVE JUROR:  Yeah.
 6              THE COURT:  Have any of them ever been serviced
 7   for transmission issues?
 8              PROSPECTIVE JUROR:  I can't remember.
 9              THE COURT:  Okay.  All right.  Anyone else?
10   Mrs. Barboza.
11              PROSPECTIVE JUROR:  I have also owned four Ford
12   vehicles -- two Ford rangers, one Ford Escort, one Ford
13   Mustang, and then my wife owned a Ford Expedition.
14              THE COURT:  Okay.  Any particularly positive or
15   negative experiences with any of the cars?
16              PROSPECTIVE JUROR:  No.  I have had positive
17   experiences with all those vehicles and no transmission
18   issues.
19              THE COURT:  No transmission.  Thank you.
20              All right.  Yes, Miss Kuligowski.
21              PROSPECTIVE JUROR:  Yes.  I have leased or owned
22   three Ford vehicles in my life.
23              THE COURT:  Okay.  If you don't mind running me
24   through those, please.
25              PROSPECTIVE JUROR:  Two F-150 trucks, and I
```

```
 1   currently drive a Ford Edge.
 2            THE COURT:  Any particularly positive or negative
 3   experiences with the car?
 4            PROSPECTIVE JUROR:  I would say I am a fan of Ford
 5   vehicles, especially the trucks.
 6            THE COURT:  All right.  Thank you.
 7            Anyone else?
 8            Miss Marlborough, I have to assume with five kids
 9   you had to have had some --
10            PROSPECTIVE JUROR:  Lots and lots of Fords.  So my
11   first car was a '64 Mustang.  Then I drove a Pinto.  My
12   sister had a Maverick that I drove.  At some point, I had an
13   LTD.
14            We've had two F1 -- 250s -- actually three.  One
15   of them is a diesel that we still have.  An Edge, the
16   Bronco, and I think there was one other -- oh, the Focus.
17   Yeah.  I think that's all.
18            THE COURT:  And any particularly positive or
19   negative experiences?
20            PROSPECTIVE JUROR:  Positive.  We're obviously a
21   Ford family.  I didn't mention because I thought it was
22   unrelated, but my father-in-law, who is deceased, actually
23   worked for a Ford dealership.
24            THE COURT:  And what did your father-in-law do?
25            PROSPECTIVE JUROR:  He was a mechanic.
```

 1          THE COURT:  And dealership here in California?

 2          PROSPECTIVE JUROR:  Yeah, in California.

 3          THE COURT:  How long was he a mechanic?

 4          PROSPECTIVE JUROR:  You know, I think maybe 10,

 5   15 years, but then he was a mechanic all his life but

 6   particularly for the dealership, yeah.

 7          THE COURT:  You said it was your father; correct?

 8          PROSPECTIVE JUROR:  Father-in-law.

 9          THE COURT:  Father-in-law.  Did your father-in-law

10   ever share with you any positive or negative experiences in

11   his employment at Ford and/or specifically working on Ford

12   cars?

13          PROSPECTIVE JUROR:  No.  He was a Ford man, hence

14   the Broncos and all that and my husband, yeah.

15          THE COURT:  Got it.  All right.  Thank you.

16          Anyone else?

17          Mr. C.

18          PROSPECTIVE JUROR:  The TV network that I work for

19   owns several Fords.  That's what we use are Fords.  I have

20   driven multiple of them, a Ford Escape, a van which had a

21   transmission replacement, but it's over like 250,000 miles

22   so I'm not like -- and a Ford Flex which also had a

23   transmission replacement also over 200,000 miles.

24          THE COURT:  Your experience, positive or negative?

25   Where are you -- we've heard some people refer to them, I'm

1    a Ford person, Ford family.  Where do you stand in this?

2              PROSPECTIVE JUROR:  I have never personally owned

3    a Ford, but so far my experiences have been fine.  All of

4    our vehicles are -- I mean, not all the vehicles, but some

5    of our vehicles are very high mileage, and they just need

6    repairs.

7              THE COURT:  Got it.  Great.  Thank you.

8              Anyone else?

9              We'll go to Mr. Leuchtenburg.

10             PROSPECTIVE JUROR:  I guess two things.  One, I

11   have a Ford Mustang.  It's a classic that's been in my

12   wife's family since 1973.  It still runs great.

13             And then the previous one, I don't know if you

14   wanted to address that, but it seemed like we had skipped

15   Ford.  I have read about the recall just in some investment

16   research reports.

17             THE COURT:  Great.  Okay.  Sorry, and thank you.

18   I missed that, but we'll go back to it, but thank you.

19             Yes, Miss Ormsbee.

20             PROSPECTIVE JUROR:  My husband owns a 2015 Ford

21   Fusion.

22             THE COURT:  Any particularly positive or negative

23   experiences?

24             PROSPECTIVE JUROR:  No.  It's just one of our

25   cars.

```
 1              THE COURT:  All right.  Great.
 2              Anyone else?  Miss Guerrero.
 3              PROSPECTIVE JUROR:  Yes.  We also owned a Ford
 4   Tempo, Escort, and a Probe, and my father owned a Econoline
 5   van.  All good except for the Probe.  We forgot to put oil
 6   in the transmission but all excellent.
 7              THE COURT:  Okay.  Great.  Thank you.
 8              And then Miss Aleman, yes.
 9              PROSPECTIVE JUROR:  I wanted to clarify earlier
10   too that, when we did total the Ford Focus, it was perfect
11   driving conditions.  We were actually organ grind by two
12   other cars in front of us.  But my husband currently drives
13   his 1990 Ford 150.  My first car was a 1967 Mustang, and
14   then my second car was a 1986 Bronco.  So those are all
15   Fords.
16              While I was in college, I also was a shuttle bus
17   driver for Cal State L.A., and their shuttles were Fords.  I
18   don't know the type, but they were those buses like --
19              THE COURT:  The big vans?
20              PROSPECTIVE JUROR:  Yes.
21              THE COURT:  Okay.
22              PROSPECTIVE JUROR:  And we never had any problems
23   with any of our cars, nor do I remember the shuttle caravans
24   being difficult to handle for someone like me to drive.
25              THE COURT:  All right.  Thank you.
```

```
 1              Mr. Malaugh?  No.  Okay.
 2              All right.  And so thank you, Mr. Leuchtenburg --
 3    oh, I'm sorry -- Mr. Schlenger.
 4              PROSPECTIVE JUROR:  Actually, I have a response
 5    for the second question I just recalled.
 6              THE COURT:  Okay.  Great.
 7              PROSPECTIVE JUROR:  So my previous roommate
 8    received a recall letter in the mail for her Ford Focus and
 9    was just very unhappy about it.
10              THE COURT:  Do you know what your roommate -- did
11    your roommate end up going to the dealership?
12              PROSPECTIVE JUROR:  I don't know the details.
13              THE COURT:  But you just know that --
14              PROSPECTIVE JUROR:  Yeah.  I saw it in the mail
15    and gave it to her.
16              THE COURT:  Okay.  Great.
17              All right.  If we could, let's jump back to that
18    question that I skipped.  Thank you, Mr. Leuchtenburg, for
19    catching that.
20              Has anyone read or heard anything in the media or
21    a conversation about a recall involving the 2012 to 2016
22    Ford Focus or the 2011 to 2016 Ford Fiesta with an automatic
23    transmission?  I know Mr. Leuchtenburg read something.
24    Anyone else?
25              Miss Marlborough, let me get the microphone to you
```

```
 1   just so we get your answer.

 2            PROSPECTIVE JUROR:  So that was part of us getting

 3   that letter that there may be something wrong with the

 4   transmission.  About that time we were going to get it

 5   maintenanced, get it ready to sell, but the dealership did

 6   not find anything wrong with it, and my husband hadn't

 7   noticed anything.

 8            THE COURT:  Okay.  Great.

 9            All right.  Anyone else?  Okay.  Great.

10            Have any of you had what you consider to be a

11   significant warranty problem with an automobile that you

12   personally owned or leased, whether it's Ford or not?

13            Miss Kuligowski.

14            PROSPECTIVE JUROR:  I'm not sure if this counts,

15   but I leased a Nissan, and I believe it had some faulty

16   thing with it.  It would just stop running while I was

17   driving it.  And I brought it to the dealership, the Nissan

18   dealership, multiple times, and they couldn't find anything

19   wrong with it.

20            It was a lease.  I ended up giving it back, and

21   still to this day, I keep receiving lemon law notices -- I

22   think that's what they're called -- which I just throw in

23   the garbage because I leased it.  It's done, it's over, and

24   I don't want to think about it anymore.

25            THE COURT:  Is there anything about that
```

```
 1   experience that may make you harbor resentment towards an
 2   automobile manufacturer because you had a car that had some
 3   problems, the dealer couldn't identify it, but now it seems
 4   like all -- in your situation, you just walked away from it,
 5   but if you hear evidence to that effect in a trial like
 6   this, would that make you harken back to your Nissan
 7   ownership or have a bias against one side or the other
 8   because of your experience?
 9           PROSPECTIVE JUROR:  I definitely do not like
10   Nissan.  I will say that.
11           THE COURT:  Got it.  And so obviously Nissan is
12   not involved here.
13           PROSPECTIVE JUROR:  Correct.  So I don't know if
14   it matters or not.
15           THE COURT:  All right.  Great.  Thank you for your
16   candor.  I appreciate it.
17           PROSPECTIVE JUROR:  Thank you.
18           THE COURT:  Anyone else have had any significant
19   warranty problems with their vehicles?
20           Mr. Leuchtenburg.
21           PROSPECTIVE JUROR:  I don't know if this counts
22   exactly, but it was with a Honda, and I had a -- it's an
23   outboard engine, and there was an exterior component to it
24   that basically all the paint just came off due to the type
25   of plastic they had used.
```

```
 1                    And I guess I had not been registered as the
 2       owner, didn't get the recall, found out about it I guess
 3       past the period where they were willing to fix it for free.
 4                    THE COURT:  Okay.
 5                    PROSPECTIVE JUROR:  And --
 6                    THE COURT:  Go ahead.  I'm sorry.
 7                    PROSPECTIVE JUROR:  And I was obviously upset by
 8       it and pushed them hard to fix it, which they wouldn't do.
 9                    THE COURT:  Okay.  And you may hear evidence in
10       this case about motor vehicles with warranty claims and
11       efforts to resolve the issue.  Do you think it would be
12       difficult for you to sit in a trial where you had that
13       experience?
14                    Admittedly, it's Honda.  You said it's an outboard
15       motor.  It's not a car.  Do you think it would be difficult
16       for you to be fair and impartial in a case like this?
17                    PROSPECTIVE JUROR:  I think I can be fair.  I
18       guess the point was for me it was more of a relationship
19       thing.  It's sort of like, okay.  If that's the rule, then
20       fine, but I am not going to work with you anymore or be a
21       customer.
22                    THE COURT:  All right.  Thank you.
23                    Anyone else?  Okay.
24                    Have you or any of your immediate family members
25       ever sought to have your motor vehicle repurchased under the
```

```
 1  lemon law?
 2          Okay.  Have you ever been in a situation where you
 3  were in a car and experienced a shuddering or an unusual
 4  vibration sensation or loss of power?
 5          Okay.  Why don't -- Mr. Cooper, I think the
 6  microphone is closest to you.
 7          PROSPECTIVE JUROR:  We were really concerned when
 8  my wife's 2012 Chevy Tahoe experienced just this, and when
 9  we contacted the Keyes Chevy dealership, they said bring it
10  in, it's under warranty, and they replaced the -- it was
11  just a computer chip.  The car just completely died when we
12  were driving a couple times.
13          THE COURT:  Got it.  Anything about that
14  experience that would make it difficult for you to be fair
15  and impartial in a case like this?
16          PROSPECTIVE JUROR:  No.
17          THE COURT:  All right.  Miss Scruggs.
18          PROSPECTIVE JUROR:  My '05 Chevy Cavalier a couple
19  years ago, started having the shuddering and unusual
20  vibration when idling, and I took it in to just a repair
21  shop.  And they replaced the coil pack on the engine, and I
22  haven't had a problem since.
23          THE COURT:  Anything about that experience that
24  would make it difficult for you to sit in a case like this?
25          PROSPECTIVE JUROR:  No, sir.
```

```
 1                    THE COURT:  Okay.  Thank you.

 2          Who else?

 3          Mrs. Barboza.

 4          PROSPECTIVE JUROR:  I was driving one of the vans

 5   that I reported about earlier when the transmission gave

 6   out.

 7                    THE COURT:  So the actual transmission just died?

 8          PROSPECTIVE JUROR:  It did, yes.

 9                    THE COURT:  And I assume that resulted in one of

10   the transmission repairs that you referenced earlier?

11          PROSPECTIVE JUROR:  That is correct, Your Honor.

12                    THE COURT:  Anything about that experience that

13   would make it difficult for you to sit in a case like this?

14          PROSPECTIVE JUROR:  No, Your Honor.

15                    THE COURT:  Thank you.

16          Let's see.  Miss Aleman.

17          PROSPECTIVE JUROR:  This happened probably in like

18   the year 2000.  I was driving my GMC Jimmy which was like a

19   1989, and the car turned off.  It shook and -- the

20   vibration, turned off, kept moving, and it caused me to

21   crash into the car in front of me.

22                    THE COURT:  I am sorry to hear that.  Okay.  Were

23   you injured at all?

24          PROSPECTIVE JUROR:  No.

25                    THE COURT:  Was a lawsuit or claim filed as a
```

```
 1    result of this accident?
 2              PROSPECTIVE JUROR:  An insurance claim was filed.
 3              THE COURT:  Is there anything about that
 4    experience one way or the other that would make it difficult
 5    for you to be fair in a case like this?
 6              PROSPECTIVE JUROR:  No.
 7              THE COURT:  All right.  Anyone else?
 8              Mr. Melaugh.
 9              PROSPECTIVE JUROR:  This is a pretty standard,
10    normal thing that happens to me on a monthly basis.
11              THE COURT:  Given the cars that you drive?
12              PROSPECTIVE JUROR:  Cars, yeah.  I have come up
13    with a variety of different reasons for why it happens, but
14    it's mainly gone through insurance to fix.
15              THE COURT:  And can you walk me through what
16    exactly has happened?  Literally one of the classic cars
17    just goes out, is that it, or --
18              PROSPECTIVE JUROR:  Transmission, gas, the engine
19    in general, heat.  Pretty much, yeah.  That's as detailed as
20    I can get.  There's so many different reasons it happens.
21              THE COURT:  And this is with respect specifically
22    to the classic cars or your newer model cars?
23              PROSPECTIVE JUROR:  Just I gave up buying newer
24    model cars.  I only buy older ones now.
25              THE COURT:  Got it.  All right.
```

1          Anything about that experience that -- again,

2    we're dealing with a 2011 to 2016 car, much newer vintage.

3    Anything about your unfortunate experience dealing with

4    classic cars that would make it difficult for you to sit in

5    a case like this?

6          PROSPECTIVE JUROR:  No.  I think it's a great

7    learning experience, though, when you have to figure out

8    problems like that.

9          THE COURT:  That is true.

10         All right.  Anyone else?  Yes, Mr. C.

11         PROSPECTIVE JUROR:  One of the Ford Flexes that I

12   drive for work has stalled on me twice, which is kind of

13   weird for an automatic transmission, but that was previous

14   to some repairs that occurred with that.

15         And also one of the Ford Econoline vans also

16   experienced severe stuttering the day before the

17   transmission got replaced.  Yeah.  That's about it.

18         THE COURT:  All right.  Anything about those

19   experiences that would make it difficult for you to sit in a

20   case like this where you might hear evidence about a car

21   shuddering?

22         PROSPECTIVE JUROR:  I don't think so.

23         THE COURT:  All right.  Anyone else?

24         All right.  Can you all keep an open mind about

25   this case until you hear all the evidence presented, the

 1   jury instructions, and the argument of counsel?

 2          Okay.  And, lastly, can you follow the law even if

 3   you disagree with it?

 4          And I'm sorry.  I said "lastly," but I actually

 5   have a couple more questions.  Can you render a verdict

 6   based solely on the evidence that is presented?

 7          And now lastly, is there anything that we haven't

 8   talked about that goes to your ability to be fair to both

 9   sides in this case?  And, again, if there is something that

10   you wish to discuss in a semiprivate fashion, please let me

11   know, and we can accommodate you.

12          But is there anything that we haven't talked about

13   that goes to your ability to be fair and impartial to both

14   sides in this case?

15          Mr. Schlenger.

16          PROSPECTIVE JUROR:  Can we approach sidebar?

17          THE COURT:  Yes, please.

18     (The following proceedings were held at sidebar:)

19          THE COURT:  All right.  Go ahead, sir.

20          PROSPECTIVE JUROR:  So due to the nature of my

21   work, I tend to have a negative connotation with some of the

22   American automotive industries but not to the point where I

23   don't think I would be able to view the evidence

24   objectively.

25          THE COURT:  Okay.

```
 1                PROSPECTIVE JUROR:  That is as much as that.

 2                THE COURT:  Okay.  Does either counsel wish to ask

 3     any questions of the juror at this time?  Mr. Altman?

 4                MR. ALTMAN:  You can be fair and impartial?

 5     You'll be able to give both sides a shot?

 6                PROSPECTIVE JUROR:  Yeah.

 7                MR. ALTMAN:  You'll listen to the evidence and

 8     base your decision on the evidence?

 9                PROSPECTIVE JUROR:  Yeah.

10                MR. ALTMAN:  Great.

11                MR. KELLY:  Tell us what those feelings are that

12     you have.

13                PROSPECTIVE JUROR:  So I basically study how to

14     mitigate the impacts of climate change and especially

15     locally the automotive industries sort of basically pushed

16     for the removal of public transportation back in the day.

17                And so that caused a lot of the issues that I see

18     the fallout for so that has some negative connotations.  But

19     I don't know if that actually applies to what we're doing

20     here, but it's just sort of on the one thing.

21                MR. KELLY:  Those feelings that you've described

22     with Ford Motor Company, a company that's been around a long

23     time, is that going to influence how you look at the case

24     against them?

25                PROSPECTIVE JUROR:  If the -- it wouldn't make me
```

```
 1    see the evidence nonobjectively, but I just wanted to bring

 2    up those feelings because they're there.  Does that make

 3    sense?

 4             MR. KELLY:  Well, as we start off in this case

 5    feeling as you do, do you think both sides, one an

 6    automotive company been around a long time and the other a

 7    customer, do they start out the same or --

 8             PROSPECTIVE JUROR:  No.  I would say I lean more

 9    in one direction, but that's before seeing any evidence or

10    knowing any details about it.

11             MR. KELLY:  And which direction is that?

12             PROSPECTIVE JUROR:  More towards the person who

13    filed the Complaint.

14             MR. KELLY:  Okay.  Gotcha.  Thank you, sir.

15             MR. ALTMAN:  I have a question, Your Honor.

16             THE COURT:  Yes.

17             MR. ALTMAN:  Regardless of your leanings -- I'm

18    sorry.  Regardless of the way you might be leaning, without

19    hearing anything, do you have any doubt that you will be

20    able to follow the judge's instructions on the application

21    of, like, the burden of proof and concepts that the judge

22    will provide to you?

23             PROSPECTIVE JUROR:  No.

24             MR. ALTMAN:  None at all?

25             PROSPECTIVE JUROR:  (No audible response.)
```

```
 1            MR. ALTMAN:  Do you have any lack of confidence
 2   that you will be able to base your decision on the evidence
 3   that you actually hear in trial?
 4            PROSPECTIVE JUROR:  As long as the evidence is
 5   strongly pointing to whatever the actual truth is.
 6            MR. ALTMAN:  In other words, both sides have
 7   various burdens here.  As long as the side that meets its
 8   burden or doesn't meet its burden?
 9            PROSPECTIVE JUROR:  Yeah.
10            MR. ALTMAN:  But you seem really strong about
11   this.  You can be fair and impartial to both sides?
12            PROSPECTIVE JUROR:  Yeah.  I believe so.  I just
13   wanted to say it coming in before knowing any facts.
14            THE COURT:  I appreciate your candor.
15            Mr. Kelly, anything further?
16            MR. KELLY:  Is what you are saying is that you
17   start off leaning one way or the other, but if the evidence
18   comes in, you might change your mind?
19            PROSPECTIVE JUROR:  Yes.
20            MR. KELLY:  But if the evidence doesn't change
21   your mind, you are going to continue feeling the way you do?
22            PROSPECTIVE JUROR:  Yes.
23            MR. KELLY:  Okay.
24            THE COURT:  Okay.  Thank you.  Appreciate your
25   candor.  All right.
```

```
 1            (The following was heard in open court in the presence
 2          of the prospective jurors:)
 3            THE COURT:  All right.  At this time, I am going
 4    to give counsel, each side, about ten minutes to ask some
 5    questions of you.
 6            Mr. Altman, you may proceed.
 7            MR. HIGGINS:  Your Honor, there was --
 8            THE COURT:  I'm sorry.
 9            MR. KIRNOS:  Your Honor --
10            THE COURT:  Oh, I'm sorry.
11            PROSPECTIVE JUROR:  I just wanted to say the
12    question says about your ability to be fair to both sides --
13            THE COURT:  Yes.
14            PROSPECTIVE JUROR:  -- because of my pregnancy, I
15    just want to state I have moments of pregnancy brain fog
16    where I am phasing in and out of the conversation.  So I
17    just wanted to let both sides know about that.
18            THE COURT:  I appreciate that.  Thank you.  We
19    have three young kids, and I remember the brain fog all too
20    well.
21            All right.  Mr. Altman, you may proceed.
22            MR. ALTMAN:  First of all, good morning again.
23            Let me ask you candidly, and it's almost in this
24    area but across the panel.  Some of you are Ford fans.  You
25    have had good experiences.  You have had different cars than
```

```
 1   the one that's at issue here, but let me ask you, in your
 2   most candid self-assessment, does Ford start a little ahead
 3   here?
 4           Mrs. Barboza?
 5           PROSPECTIVE JUROR:  Do they start --
 6           MR. ALTMAN:  Do they start -- no.  In other words,
 7   both sides are looking for fair and impartial jurors.
 8           PROSPECTIVE JUROR:  Right.
 9           MR. ALTMAN:  And I don't want a juror that's in my
10   favor automatically because I want a fair fight.  I want to
11   beat these guys.  But I also want to know just at this point
12   because some of you have had very positive experiences, do
13   they start a little ahead?
14           PROSPECTIVE JUROR:  For me, no, they don't start
15   ahead.
16           MR. ALTMAN:  Okay.
17           Ms. Maslar.
18           PROSPECTIVE JUROR:  I don't think so.
19           MR. ALTMAN:  Okay.  Well, let me ask you --
20           PROSPECTIVE JUROR:  Because I have had positive
21   and negative experiences really.
22           MR. ALTMAN:  I think it was your grandmother that
23   has an old --
24           PROSPECTIVE JUROR:  Yeah.
25           MR. ALTMAN:  So that's a Focus that's well before
```

1    the years that we're talking about here?

2            PROSPECTIVE JUROR:  Yeah.

3            MR. ALTMAN:  Different transmission system as far

4    as you know?

5            PROSPECTIVE JUROR:  Yeah.

6            MR. ALTMAN:  Miss Kuligowski, you also mentioned

7    that you are a Ford person.

8            PROSPECTIVE JUROR:  I am a fan of Ford.  So I am

9    unsure entirely that I can't say no to your question.

10           MR. ALTMAN:  Okay.  So you might have some

11   leanings?

12           PROSPECTIVE JUROR:  If I am being a hundred

13   percent honest, yes.

14           MR. ALTMAN:  Well, first of all, thank you for the

15   candor, and I would like all of you to be.

16           PROSPECTIVE JUROR:  It's a little embarrassing.

17           MR. ALTMAN:  Well, let me ask you on the other

18   side.  You had the experience with the Nissan where it

19   stopped running.

20           PROSPECTIVE JUROR:  Yes.

21           MR. ALTMAN:  Terrible experience.

22           PROSPECTIVE JUROR:  Yes.

23           MR. ALTMAN:  If you were to hear information here

24   that matched your experience, would that cause you to

25   automatically jump on the other side?

```
 1              PROSPECTIVE JUROR:  No.  Because in my situation,
 2   I kind of let it go.  So I think I just -- I wouldn't
 3   purchase another Ford -- I'm sorry.  I wouldn't purchase
 4   another Nissan based on my experience, but just because I
 5   had that experience, I think it's a fairly common
 6   experience.
 7              MR. ALTMAN:  Let me go down and just skip around a
 8   little.
 9              Mr. Cooper, you just had this issue with your
10   Chevy that you had it replaced.  You had some issues
11   replaced.  Right?
12              PROSPECTIVE JUROR:  Correct.
13              MR. ALTMAN:  Did it work?
14              PROSPECTIVE JUROR:  Yes.
15              MR. ALTMAN:  And it worked on the first time?
16              PROSPECTIVE JUROR:  First try.
17              MR. ALTMAN:  Well, let me -- actually, let me ask
18   you -- or let me ask Mr. Leuchtenburg because, one, you
19   worked in an auto shop.  Have either of you ever had a car
20   where you have had to replace the transmission seven times?
21              PROSPECTIVE JUROR:  No.
22              MR. ALTMAN:  And I know, Mrs. Barboza, you also
23   worked dealing with Fords.  Have you ever had a transmission
24   where it's had to be replaced seven times?
25              PROSPECTIVE JUROR:  Do I have to wait for the mic?
```

```
 1            MR. ALTMAN:  We'll both speak up.

 2            PROSPECTIVE JUROR:  No.

 3            MR. ALTMAN:  Has anyone had a car or known anyone

 4    that's had a car where the transmissions had to be replaced

 5    seven times?  Anyone at all?  Has anyone ever gone through

 6    that?  Got it.

 7            All right.  Let me ask you a couple other things.

 8    I'm just going to skip around a bit.  Well, is there

 9    anyone -- obviously, there is a corporation and Mr. Pedante

10    is an individual.

11            Is there anyone here who feels that a

12    corporation -- they employ a lot of people -- they should

13    get a pass on the law?  They don't have to comply with

14    certain laws because they're a corporation?  Anyone feel

15    that way?

16            Okay.  Let me also ask you a couple other

17    questions.  Mrs. Marlborough, the focus that you had, there

18    were no transmission replacements; is that correct?

19            PROSPECTIVE JUROR:  Correct.

20            MR. ALTMAN:  The recall that you got -- well, let

21    me ask you, when you got the recall notice, did you go

22    online and hear any of the press coverage of this issue?

23            PROSPECTIVE JUROR:  I just saw the notice, and I

24    don't believe my husband or I Googled it or anything.  We

25    just -- at that time, he contacted the dealership and took
```

```
 1    it in and got a clean bill of health.
 2                 MR. ALTMAN:  Mr. Leuchtenburg, I think you
 3    actually did some research.  Is that right?
 4                 PROSPECTIVE JUROR:  I was, yes, just doing
 5    investment research on Ford Motor Company.
 6                 MR. ALTMAN:  Did you Google any of the press
 7    coverage about the particular years we're talking about for
 8    the Focus and Fiesta?
 9                 PROSPECTIVE JUROR:  I did not specifically Google
10    those years.  It was mentioned within the research report.
11                 MR. ALTMAN:  Let me actually skip around as well.
12    Miss Aleman, you had a -- when you lost power in your
13    vehicle, it actually caused a crash; is that correct?
14                 PROSPECTIVE JUROR:  That's correct.
15                 MR. ALTMAN:  Is there anyone else that's
16    experiencing a loss of power while they've been driving
17    other than you, Miss Aleman?
18                 Anyone else?  Mr. Chang Gilhooly?
19                 PROSPECTIVE JUROR:  Yes.
20                 MR. ALTMAN:  Did I get that right?
21                 PROSPECTIVE JUROR:  Yes.
22                 MR. ALTMAN:  You had that happen, and I think you
23    mentioned in the Flex?
24                 PROSPECTIVE JUROR:  Yes.
25                 MR. ALTMAN:  Let me ask you this.  Is there anyone
```

1   here who feels losing power while you're driving is not a

2   safety issue, anyone at all?

3           Okay.  I'm going to call you a car expert.  All

4   right?

5           PROSPECTIVE JUROR:  Okay.

6           MR. ALTMAN:  You have got vintage cars.  What do

7   you think of a '74 Bronco?

8           PROSPECTIVE JUROR:  I'll take it.

9           MR. ALTMAN:  Well, we can't do it before trial,

10  but all right.  There you go.

11          Let me also ask you as well, some of you have

12  experienced stalling as well; is that correct?  You had a

13  stall on your vehicle?  Mr. Cooper, you're --

14          PROSPECTIVE JUROR:  Uh-huh.

15          MR. ALTMAN:  Any sense that stalling is not a

16  safety issue?

17          PROSPECTIVE JUROR:  I had an old garbage

18  Volkswagen when I first started driving so it wasn't --

19          THE COURT:  Let's get the microphone to you just

20  to make sure the court reporter can hear you.

21          PROSPECTIVE JUROR:  I'm sorry.  I had an old

22  garbage Volkswagen when I first started driving that used to

23  stall all the time.  That was more of a maintenance issue

24  than a safety issue.

25          MR. ALTMAN:  But if it wasn't maintenance related,

```
 1    would you agree that that's probably an issue with safety?

 2              PROSPECTIVE JUROR:  Perhaps.

 3              MR. ALTMAN:  Got it.

 4              I am going to call you Mr. C even though I got it

 5    right.  You have a Buell motorcycle?

 6              PROSPECTIVE JUROR:  Yeah.

 7              THE COURT:  So how do you get parts now that he

 8    stopped his business, now he started it again, kind of,

 9    maybe?

10              PROSPECTIVE JUROR:  There is a lot of generic

11    parts for like Harley Davidsons that still work in Buells.

12              MR. ALTMAN:  Are you a cruiser guy?

13              PROSPECTIVE JUROR:  No.

14              MR. ALTMAN:  You're a sport-bike guy?

15              PROSPECTIVE JUROR:  Yeah.

16              MR. ALTMAN:  And the Buell is a sport bike?

17              PROSPECTIVE JUROR:  Yeah.

18              MR. ALTMAN:  What do you think of a BMW S1000RR?

19    Decent?

20              PROSPECTIVE JUROR:  Fantastic.

21              MR. ALTMAN:  All right.  Good.

22              All right.  Let me just ask you, is there anyone

23    here with your experiences that feels that they could not be

24    fair, that something about this case -- obviously,

25    Mr. Pedante has gone through an experience or experiences
```

     1    that you're going to hear about, and we're here in court

     2    after all this time.

     3           Anyone -- just with that basic fact situation, is

     4    there anyone here who feels that they can't be fair to both

     5    sides, anyone at all?

     6           Okay.  Let me ask you -- the Court already asked

     7    you does anyone feel that just because a Complaint was filed

     8    here that Mr. Pedante's automatically entitled to your

     9    verdict, and I think no one raised a hand.  Does anyone feel

    10    just because Ford denied liability that they should win,

    11    that they are automatically entitled to win because they

    12    just denied it, anyone at all?

    13           Okay.  A couple other things.

    14           THE COURT:  Mr. Altman -- Mr. Melaugh, did you

    15    have your hand raised?

    16           PROSPECTIVE JUROR:  I was just going to say that I

    17    was recently a plaintiff in a civil case.

    18           THE COURT:  Let's just get the microphone just so

    19    our court reporter can hear you.

    20           PROSPECTIVE JUROR:  I was recently a plaintiff in

    21    a civil case that we were denied on our initial filing, and

    22    it got to a settlement, and we basically got everything that

    23    we asked for in our original claim.

    24           So just because you file it, they said no at

    25    first, and then we pretty much got everything through a

```
 1   settlement.
 2              MR. ALTMAN:  You didn't have to go through trial?
 3              PROSPECTIVE JUROR:  No, I did not.
 4              MR. ALTMAN:  Or anywhere close to trial?
 5              PROSPECTIVE JUROR:  It was a year and a half.
 6   There was about to be a trial date set.  Yeah, it was a long
 7   time.
 8              MR. ALTMAN:  Did they indicate why they all of a
 9   sudden accepted responsibility?
10              PROSPECTIVE JUROR:  It was a homeowners
11   association civil issue with commercial mixed-use owner with
12   residents of the building.  So it wasn't really
13   responsibility as much as specific performance.
14              MR. ALTMAN:  Okay.  Got it.
15              Is there anything about that experience -- you
16   were a plaintiff, obviously were on the plaintiff's side.
17   They're on the defense side.  Anything about that in any way
18   that will cause you to go in one direction or another
19   direction?
20              PROSPECTIVE JUROR:  No.  I don't really know any
21   of the facts.
22              MR. ALTMAN:  Totally different case?
23              PROSPECTIVE JUROR:  Yeah.
24              MR. ALTMAN:  Your Honor, I don't know how much
25   time I have.
```

```
 1              THE COURT:  One minute.

 2              MR. ALTMAN:  Okay.  Couple other things.

 3              Mrs. Barboza, the Econoline vans that had their --

 4    that had issues, were they 6.0 diesel vans if you know?

 5              PROSPECTIVE JUROR:  No, they were not.

 6              MR. ALTMAN:  Okay.  When you were dealing with

 7    Ford, did you deal with Fords that were equipped with 6.0

 8    diesel engines?

 9              PROSPECTIVE JUROR:  No.

10              MR. ALTMAN:  When you were dealing with Ford and

11    even since then, have you heard anything in particular about

12    the particular model years that are involved from what the

13    Court has asked you?

14              PROSPECTIVE JUROR:  Yes.  Through my son's car

15    situation and then just the general media over it, over the

16    recall.

17              MR. ALTMAN:  And your son's car situation, he has

18    what year Focus?

19              PROSPECTIVE JUROR:  I'm not really sure of the

20    year.  It's in that date range, but it was a Focus.

21              MR. ALTMAN:  He is unhappy?

22              PROSPECTIVE JUROR:  He seemed to be unhappy at

23    that time, yes.

24              MR. ALTMAN:  Do you know what the current state of

25    that car is or anything?
```

```
 1              PROSPECTIVE JUROR:  I believe they -- he had --
 2    several times the transmission was replaced.  Then he -- I
 3    guess they did one final time, and then he kept the car, and
 4    then he purchased another car.
 5              MR. ALTMAN:  But he got rid of that?
 6              PROSPECTIVE JUROR:  Yes.
 7              MR. ALTMAN:  Got it.  Okay.  Thank you.
 8              THE COURT:  Thank you, Mr. Altman.
 9              Mr. Kelly.
10              MR. KELLY:  Thank you, Your Honor.
11              It's barely good morning, ladies and gentlemen,
12    but good morning.  Thank you for your patience for a little
13    while longer.
14              I am going to follow up if I could, Your Honor, on
15    Mr. Melaugh's observation that he's been a plaintiff and
16    wonder if anyone else has been a plaintiff bringing a
17    lawsuit in a civil setting.  Anybody else have had that
18    experience?
19              Looks like Ms. Nazarus?  Sorry, no clue.  I
20    apologize.  Could you get the microphone from Mr. Melaugh
21    behind you, please.
22              What kind of case was it?
23              PROSPECTIVE JUROR:  It was a civil trial for
24    sexual assault.
25              MR. KELLY:  Nothing to do with automobiles at all?
```

```
 1              PROSPECTIVE JUROR:  No.

 2              MR. KELLY:  Anything about that experience that

 3    you think might make it difficult for you to be a juror in

 4    this civil case?

 5              PROSPECTIVE JUROR:  I don't think so.

 6              MR. KELLY:  Thank you.

 7              Anyone else ever considered bringing a lawsuit

 8    against a dealership or an automobile manufacturer about

 9    some issue they had with their car?  Anybody thought about

10    doing that just because the circumstances they were dealing

11    with at the time?

12              No hands, Your Honor.

13              Mr. Melaugh, I am going to jump right back to you

14    if I could.  You mentioned that you had experience with a

15    transmission, maybe a gas issue or overheating that led to a

16    vibration or a shuddering?

17              PROSPECTIVE JUROR:  Yeah.  Pretty much all the

18    above.  I mean, it's hard to figure out where the problem

19    really comes from in an old car.

20              But my most recent car I had was early 2000s when

21    I was in college, and I haven't owned a newer car since then

22    because all the technology and everything is done through a

23    navigation screen.  I know where I am going.  I don't need

24    navigation.  So I just focus on old cars now.

25              MR. KELLY:  But have you had experience with those
```

```
 1    old cars that you were working on where you had to try and

 2    track down where that vibration, that oscillation, that

 3    feeling was coming from in the car?

 4              PROSPECTIVE JUROR:  All the time.

 5              MR. KELLY:  Sometimes you are successful;

 6    sometimes you are not?

 7              PROSPECTIVE JUROR:  It's a coin toss, yeah.

 8              MR. KELLY:  All right.

 9              PROSPECTIVE JUROR:  So it's a lot of trial and

10    error.

11              MR. KELLY:  Those are pretty much older vehicles.

12              Have you ever dealt with trying to rebuild a

13    transmission to get the transmission right?

14              PROSPECTIVE JUROR:  Right now, yeah --

15              MR. KELLY:  Are you?

16              PROSPECTIVE JUROR:  -- three-speed transmission.

17    It's going to be rebuilt next week.

18              MR. KELLY:  Which vehicle is that for, the Bronco?

19              PROSPECTIVE JUROR:  It's for the Nova, Chevy Nova,

20    '62.  It just skips a little bit from first to second.  So

21    we'll see if a little rebuilding helps.

22              MR. KELLY:  All right.  Thank you.  Could you pass

23    the microphone right next door to Miss Aleman?

24              PROSPECTIVE JUROR:  Yes.

25              MR. KELLY:  Ms. Aleman, I see that you had a
```

```
 1   situation where you were in your GMC Jimmy and it had a
 2   shutdown or a vibration and there was a crash --
 3             PROSPECTIVE JUROR:  Yes.
 4             MR. KELLY:  -- the crash that occurred.
 5             PROSPECTIVE JUROR:  Yes.
 6             MR. KELLY:  Did you track down what the cause of
 7   that shutdown was?
 8             PROSPECTIVE JUROR:  At that time, no, because it
 9   didn't occur again, and I was a college student that was
10   pretty hard up for funds; so I didn't.
11             MR. KELLY:  The crash, was it a drive-away crash?
12   Were you able to --
13             PROSPECTIVE JUROR:  No.  It happened at the
14   off-ramp of a freeway, the 210 by the California off-ramp,
15   and I hit the car in front of me because I lost control of
16   the car.  It kept on moving even though there was no power,
17   and the brakes couldn't work.  The brakes didn't work; so it
18   just collided into the car in front of me.
19             No one was hurt, but we did exchange insurance
20   information.  So there was a claim filed.
21             MR. KELLY:  The problem never came back?
22             PROSPECTIVE JUROR:  No.  I had a muffler problem
23   with that car later on that I fixed, but other than that,
24   that was the only problem I had with the car.
25             MR. KELLY:  In this case, you may hear evidence
```

1    about a loss of power under a circumstance while driving.

2    I'm not going to go into those details.

3              The question to you is and maybe some of the other

4    jurors, can you listen to the evidence in this case and

5    decide the case on the facts you hear in this case as

6    opposed to saying, well, in my experience --

7              PROSPECTIVE JUROR:  My experience doesn't matter.

8    I am a fair person.  So I am just listening to what's being

9    told to me and going to go off of what I hear.

10             MR. KELLY:  All right.  Good.  Thank you,

11   Miss Aleman.

12             PROSPECTIVE JUROR:  You're welcome.

13             MR. KELLY:  Mr. Chang Gilhooly?

14             PROSPECTIVE JUROR:  Yes.

15             MR. KELLY:  You had a couple of instances of the

16   vehicle stalling, the Flex vehicle stalling.

17             PROSPECTIVE JUROR:  Yes.

18             MR. KELLY:  Was the vehicle taken into a repair

19   shop, and was the problem diagnosed?

20             PROSPECTIVE JUROR:  The next day I believe it was,

21   yes.

22             MR. KELLY:  Was it something covered under

23   warranty, or was it something that was out of warranty and

24   had to be repaired out of warranty?

25             PROSPECTIVE JUROR:  Repaired out of warranty.

```
 1              MR. KELLY:  Do you remember what the issue was
 2   that was repaired?
 3              PROSPECTIVE JUROR:  I don't, no.
 4              MR. KELLY:  Okay.  Was it repaired?
 5              PROSPECTIVE JUROR:  Yes.  I haven't had a problem
 6   with it.
 7              MR. KELLY:  All right.  And then there was an
 8   Econoline that lost -- something about the transmission had
 9   a stuttering and stalled?
10              PROSPECTIVE JUROR:  Yeah.  Violent shaking.  It's
11   a work vehicle.  I heard that it was out for repair the next
12   day.  I believe they replaced the entire transmission.
13              MR. KELLY:  Was that just a one-time occurrence?
14              PROSPECTIVE JUROR:  Yeah.  For that van, yeah.
15              MR. KELLY:  And were you driving it at the time?
16              PROSPECTIVE JUROR:  Yeah.
17              MR. KELLY:  Okay.  And after the repair of the
18   transmission, did the problem -- was it solved or did you
19   experience it again?
20              PROSPECTIVE JUROR:  Yeah, it solved.  It's still
21   going now, and it's over 300,000 miles now.
22              MR. KELLY:  Anything about that experience that
23   causes you to be concerned about sitting as a juror in a
24   case where you hear -- we're going to talk about some
25   vibration and shudder in a transmission?
```

```
 1              MR. KELLY:  Not really.  It's something that I
 2    have experienced with a few vehicles in my time.  I mean,
 3    my -- the organization I work for, we own hundreds of Fords,
 4    and we are very good on maintenance.  And it's a problem
 5    that sometimes happens, but it happens.
 6              MR. KELLY:  And you get it fixed?
 7              PROSPECTIVE JUROR:  Yeah.
 8              MR. KELLY:  All right.  Thank you, sir.
 9              If I could ask you, Mr. C, to pass the mike down
10    to Ms. Barboza, please.
11              When did your son's issue with his Ford Focus
12    occur?
13              PROSPECTIVE JUROR:  I am going to say we probably
14    had this conversation four years ago.  He lives in Oregon
15    now.
16              MR. KELLY:  Was this when he was still in
17    California?
18              PROSPECTIVE JUROR:  No.  He was in Oregon.
19              MR. KELLY:  At the time?
20              PROSPECTIVE JUROR:  Yes.
21              MR. KELLY:  And did he make any comments to you
22    about the Ford Focus, its transmission, or his experience
23    with a dealership or with Ford that you can relate to us?
24              PROSPECTIVE JUROR:  Well, he just basically told
25    the story of how frustrated he was because of the car, and
```

```
 1    he had to keep taking it back.  And so then he had shared
 2    with me about getting another car because this car wasn't
 3    working, and so he just went ahead and purchased another
 4    car.
 5              MR. KELLY:  Now, this case also involves a
 6    Ford Focus.  Having heard those comments from your son, do
 7    you think that's going to influence in any way how you might
 8    see the evidence in this case?
 9              PROSPECTIVE JUROR:  No.
10              MR. KELLY:  Okay.  Thank you, Ms. Barboza.  If you
11    could pass the mic to Mr. Leuchtenburg, please.
12              With respect to the research that you did, it was
13    part of your job to do research into investment and
14    financial issues?
15              PROSPECTIVE JUROR:  Correct.
16              MR. KELLY:  And in doing that, you just happened
17    to come across some information about Ford and recalls?
18              PROSPECTIVE JUROR:  Correct.
19              MR. KELLY:  Anything about what you saw that you
20    think might influence you one way or the other sitting as a
21    juror in this case if you are selected?
22              PROSPECTIVE JUROR:  I don't believe so.
23              MR. KELLY:  Anything about your experience with
24    the Honda outboard engine that causes you to feel some of
25    that emotion toward the manufacturer generally, and in this
```

1   case, it would be Ford?

2           PROSPECTIVE JUROR:  I think generally I was really

3   upset with them, yes.

4           MR. KELLY:  You were upset with them?

5           PROSPECTIVE JUROR:  Yeah.  And I feel like they

6   should have fixed it, but that's -- I didn't go to court for

7   it so --

8           MR. KELLY:  Does that feeling roll over, wash over

9   onto manufacturers generally and Ford in this case?

10          PROSPECTIVE JUROR:  I don't think so.  No.

11          THE COURT:  All right, Mr. Kelly.  One more

12   question or not.

13          MR. KELLY:  Or not.  I was going to say,

14   Your Honor, may I sit down at this point?

15          THE COURT:  You are welcome to do so.

16          MR. KELLY:  Is that the right question?  All

17   right.  Thank you, ladies and gentlemen.

18          THE COURT:  Let me have counsel at sidebar,

19   please.

20       (The following proceedings were held at sidebar.)

21          THE COURT:  Just do me a favor.  Make sure you try

22   to identify yourself.  If there are going to be multiple

23   folks amongst the basketball team here identify, yourself

24   before you speak.

25          I'd like to first discuss challenges for cause.

1    We'll start with the plaintiff, Mr. Altman.

2          MR. ALTMAN:  Sure.  The only one that I saw that

3    indicated a bias that also was not one that where she then

4    voiced that she would be fair was Ms. Kuligowski, I think,

5    Prospective Juror Number 11.

6          THE COURT:  All right.  Do you want to state the

7    grounds.

8          MR. ALTMAN:  Sure.  So I asked her the question I

9    posed to the general panel and specifically her when she

10   affirmed this was did Ford start out ahead, and she was

11   leaning one direction.  She said, " I'm embarrassed by this

12   but yeah, I am leaning in the direction of Ford."  And that

13   wasn't rehabilitated or changed or altered in any way, the

14   questioning.

15         So based on her telling us that at this juncture

16   she believes she is leaning in their favor and she's

17   embarrassed about it, she didn't indicate she would be fair

18   and impartial, the response to that, I am making a challenge

19   for cause.

20         THE COURT:  What's the defense position?

21         MR. KELLY:  This is Mr. Kelly.  I don't believe

22   she said she was leaning one way or the other.  She I think

23   she said she was maybe not a hundred percent sure is more

24   what she said.  All of the jurors were rehabilitated by the

25   general questions whether they're all going to be fair,

1   whether they're all going to listen to the evidence.  So

2   there is no bias there.  There is no impartiality.

3          THE COURT:  All right.  I have to say of all the

4   jurors I think Miss Kuligowski is probably the only one

5   where there could, in the Court's humble opinion, where

6   there could be a challenge for cause simply because her

7   answer was I think somewhat unequivocal about her

8   embarrassment about the Ford -- that she's leaning towards

9   Ford, words to that effect.  And I thought, when there were

10  efforts to rehabilitate her, I didn't think she -- quite

11  frankly, did anything to rehabilitate herself.

12          I think she held to that position that, you know,

13  although embarrassed to admit it -- there is nothing

14  necessarily to be embarrassed about -- just that she leans

15  towards Ford.

16          And so I think there is a legitimate basis for

17  challenge for cause as relates to Miss Kuligowski; so I will

18  remove her for cause.

19          Any other challenges for cause, Mr. Altman?

20          MR. KELLY:  No.

21          THE COURT:  Any challenges for cause from defense?

22          MR. ALTMAN:  Yes, Your Honor, Juror 16.

23          THE COURT:  Mr. Schlenger.  All right.  Go ahead.

24          MR. KELLY:  We had a conversation up here at the

25  bench, and he indicated he has a bias going in for

1  automobile companies including Ford Motor Company, those

2  companies that have been around for a long time based on his

3  personal life experience as a climate change scientist, and

4  he is leaning in favor of the plaintiffs, and that leaning

5  is going to follow him into the case unless there is some

6  evidence to change the way he's feeling.

7          THE COURT:  Okay.  I have a slightly different

8  memory.  I suspect Mr. Altman is going to shed some light.

9  It struck me he did say that he had a leaning.  I thought

10 Mr. Altman's question in one of the responses -- I would be

11 objective, I would list even to the evidence, and if the

12 evidence -- if either side met their burden he would rule

13 accordingly but --

14         MR. KELLY:  You are right.  That's what he said,

15 and then I asked him, "Right now you are leaning in favor of

16 the plaintiff."

17             "That's right."

18             "But if evidence comes in that causes you to lean

19 the other way, then you may change your mind"; and he says,

20 "Yes, that's right."

21             It's not our burden to change the way someone is

22 leaning at the outset of the case.  He's leaning in favor of

23 the plaintiff at the outset of the case, and he is going to

24 require the defense to prove something to him to make him

25 change.  That was the final examination.

```
 1              THE COURT:  Mr. Altman.
 2              MR. ALTMAN:  Yes.  I don't remember it that way.
 3   What he was -- he followed up with this -- well, wait a
 4   minute.  Does that mean either side that carries the
 5   burden -- carry the burden or not -- he's, like, "Yeah,
 6   that's what I mean."
 7              I specifically asked him, "You seem to be emphatic
 8   that you will be objective after you hear the evidence,"
 9   which is -- was perfect response for a juror.  We want
10   jurors that are going to base it on the evidence.
11              I said, "Do you have any doubt in your mind that
12   you will be fair and impartial to both sides?"
13              He goes, "I do."
14              I think the follow-up was, "regardless of your
15   feelings in general" -- "Yes, I will be fair and impartial
16   to both sides."
17              MR. KELLY:  May I?  Those are all leading
18   questions.  When we asked him, "What effect did the leaning
19   going to have," his answer is, "Well, if I am convinced --
20   if evidence comes in to change the way I am leaning, then I
21   will change."
22              That was the final examination, and that is the --
23   an indication of the juror who is starting out leaning one
24   way or the other.
25              THE COURT:  Mr. Altman, one last word.
```

1          MR. ALTMAN:  Sure, Your Honor, both sides

2     candidly --

3          THE COURT:  Are leading.

4          MR. ALTMAN:  -- are leading.  So both sides are --

5     there is no distinction there.

6          MR. ALTMAN:  He was clear and emphatically and

7     repetitively emphatic that he would wait to hear the

8     evidence regardless of whatever sentiment he had, he's going

9     to be fair and impartial.  The side has to meet their

10    burden.  There is no doubt in his mind about that.

11         THE COURT:  I have to tell you there was a lot of

12    back-and-forth.  I thought in the end of the day -- I agree

13    with Mr. Altman as to, sort of, his ultimate conclusion

14    particularly because the witness -- not the -- juror kept

15    saying, "I am just sharing this with you to be candid, but I

16    will be objective.  I will be fair to both sides."

17         I hear your point.  I don't think that that's how

18    it left with this notion that he somehow felt that you had a

19    burden or some proof to change his mind.  And so on

20    balance --

21         MR. KELLY:  It is the problem of being the last to

22    talk, yeah.

23         THE COURT:  But it is what it is, and, like I

24    said, the Ninth Circuit will tell me if I messed up.

25         So based on the totality, I am going to deny the

```
 1   challenge for cause.

 2            So now we have 16 jurors.  I would like to try to

 3   deal with -- get a jury in the box before we break.  So I'd

 4   like to just start with peremptories.

 5            MR. KELLY:  Could we have two minutes maybe.

 6            MR. ALTMAN:  Could we --

 7            THE COURT:  You can have two minutes.  One minute

 8   59, one minute 58.

 9       (Brief pause in the proceedings.)

10            THE COURT:  All right.

11            MR. KELLY:  We're going to have eight jurors;

12   right?

13            THE COURT:  Eight jurors, yes.  And just so -- to

14   remind everyone, you can strike from the 16.  But after your

15   peremptories are done, I will pick the first eight.  All

16   right?

17            MR. KELLY:  Thank you.

18            THE COURT:  The first peremptory with the

19   plaintiff.

20            MR. ALTMAN:  Sure.  Your Honor we'd like to strike

21   Mr. Melaugh, Number 1.

22            THE COURT:  Next peremptory with the defense.

23            MR. KELLY:  Ms. Aleman.

24            THE COURT:  Are we going to go down the road?

25            Next peremptory with the plaintiff.
```

```
 1              MR. ALTMAN:  Old hold on one second.  I am sorry,

 2    Your Honor.

 3              THE COURT:  Okay.

 4              MR. ALTMAN:  Miss Marlborough.

 5              THE COURT:  Miss Marlborough, Juror Number 12.

 6              Okay.  Next peremptory with the defense.

 7              MR. KELLY:  Ms. Barboza.

 8              THE COURT:  Last peremptory with the plaintiff.

 9              MR. ALTMAN:  Your Honor, we would I would like to

10    thank and excuse Miss Yuan, Number 4.

11              THE COURT:  Miss Yuan.

12              Last peremptory with the defense.

13              MR. KELLY:  Mr. Chang Gilhooly.

14              THE COURT:  Okay.  Just so you all -- just so our

15    math is correct, Juror Number 1 is Miss Guerrero.

16    Juror Number 2 is Miss Ormsbee.  Juror Number 3 is

17    Mr. Leuchtenburg.  Juror Number 4 is Ms. Shah -- Miss Shah.

18              THE COURT:  Our pregnant juror.

19              Juror Number 5 is Ms. Maslar.  Juror Number 6 is

20    Miss Morgan.  Juror Number 7 is Miss Skruggs, and

21    Juror Number 8 is Mr. Cooper.  All right.

22              MR. KELLY:  You got it.

23              THE COURT:  I will thank these jurors.  We'll

24    swear the panel in, and we'll have them break for lunch and

25    we'll get instructions ready for this afternoon.  All right.
```

```
 1            MR. ALTMAN:  When do you anticipate resuming?

 2            THE COURT:  Quarter to 2:00.

 3            MR. ALTMAN:  Counsel will be back at a quarter to

 4   2:00?

 5            THE COURT:  No.  The jurors will come back at a

 6   quarter to 2:00.  I will let you know because I want to just

 7   discuss some preliminary matters before I let you go for

 8   lunch.

 9            MR. ALTMAN:  Got it.

10            MR. KELLY:  Thank you.

11       (The following was heard in open court in the presence

12         of the prospective jurors.)

13            THE COURT:  All right.  I am going to read a

14   number of names, and if I read your name, we are going to

15   ask that you return back to the jury assembly room.

16            Miss Kuligowski, thank you.  You can return to the

17   jury assembly room.

18            Mr. Melaugh, you can return back to the jury

19   assembly room.  Good luck with the cars.

20            Miss Aleman, you can return back to the jury

21   assembly room.

22            Ms. Marlborough, you can return back to the back

23   to the jury assembly room.  Safe travels to you.

24            Mrs. Barboza, you can back to the jury assembly

25   room.  Thank you very much.
```

```
 1              Miss Yuan, you can return to the jury assembly
 2     room.  Thank you.
 3              And Mr. Chang Gilhooly, you can return back to the
 4     jury assembly room.  Thank you.
 5              And Mr. Schlenger, you can return back to the jury
 6     assembly room.  Thank you.
 7              All right.  So to the remaining eight, I've young
 8     kids; so I talked about this with them a couple weeks ago.
 9     You are the winners of the golden ticket.  So I am going to
10     ask you all if we could just reconfigure your seats.
11              Ms. Guerrero, if you can slide down to the
12     furthest seat and everyone follow accordingly, and
13     Ms. Maslar, if you can go down -- go right up there.
14              And, Ms. Shah, you can sit next to
15     Mr. Leuchtenburg.
16              PROSPECTIVE JUROR:  Can I ask for a bathroom
17     break.
18              THE COURT:  Yes.  You could wait just a minute to
19     be sworn.  Okay.  That would be great.  Thank you.
20              So you are going to be the jurors in this case.
21     We're going to swear you in, and then I will give you a
22     lunch break.
23              THE CLERK:  Please stand and raise your right
24     hand.
25              You, ladies and gentlemen of the jury, do you
```

1   solemnly swear that you will well and truly try the case now

2   before this Court and a true verdict therein render

3   according to the evidence and instructions of the Court so

4   help you God?

5           JURORS:  Yes.

6           THE COURT:  Ladies and gentlemen, you are the jury

7   in this case.  I am going to have you come back at

8   2:00 o'clock.  Okay?  You are going to hear me say this

9   repeatedly.

10          Please do not form or express any opinion about

11  the case until the matter is finally submitted to you.

12  Don't talk with anyone about the case, don't allow anyone to

13  talk to you about the case, and do not conduct any research

14  of any kind on any subject matter connected with this case.

15          We'll have you come back at 2:00 o'clock.  At that

16  time I'll give you opening jury instructions.  Then you will

17  hear opening statements from some of the lawyers in the

18  case, and then you will begin with some testimony.  All

19  right?  So have a good lunch.  We'll see you all back at

20  2:00 P.M.

21          THE CLERK:  All rise for the jury.

22          THE CLERK:  Please be seated.

23          THE COURT:  To the folks in the audience, what I

24  am going to need to you do is return back to this courtroom

25  at 8:30 A.M.  Okay?  I am just kidding.

1    You are now excused.  You can go back to the jury

2    assembly room.  Thank you all for being a participant in

3    this important process.  You can return back to the jury

4    assembly room for further instruction.  All right?  Thank

5    you.

6           THE CLERK:  Please be seated.

7        (The following was heard in open court outside the

8         presence of the jury:)

9           THE COURT:  Let's have you come back at a quarter

10   to 2:00.  I will give you a preliminary assessment.  I am

11   looking at this letter, letter dated October 6th, 2017,

12   looked at some of the cases that we referred to in the

13   motions in limine.

14          I think the letter can come in for nonhearsay

15   purpose as it relates to willfulness.  So that will be the

16   Court's order, that the document can come in.

17          Have you had a chance to look at the opening jury

18   instructions?  I can't remember if those were provided to

19   you or not.  Any concerns, objections, issues that either

20   side wishes to raise, or do you want to come back -- I

21   prefer we deal with it now because it takes time to copy

22   these instructions.

23          I see the ever smart Mr. Chang coming up to the

24   lectern.  I assume you have some issue you wish to raise

25   with the Court, Mr. Chang.

1          MR. CHANG:  They're very minor issues, just

2   typographical.  As to Number 16, and this was honestly the

3   parties' fault we missed these typos.  In the second

4   sentence -- I apologize.

5          THE COURT:  Let me just pull them up here.

6          THE COURT:  Jury Instruction 16.

7          MR. CHANG:  Number 16, opening

8   Instruction Number 16.  It just says in the third line, it

9   says "account of commentary."  It should be "account or

10  commentary."

11         THE COURT:  "If there is a news media account or

12  commentary --"

13         MR. CHANG:  That's correct.  That's what it should

14  be.

15         THE COURT:  My version has it.

16         Go ahead.

17         MR. CHANG:  Okay.  And then -- really?

18         Yours has the correct one as well?

19         MR. KELLY:  Ours says "of."

20         MR. CHANG:  Ours says "of."

21         THE COURT:  Maybe the black cat that was at

22  MetLife Stadium yesterday has affected the Ford camp, but

23  mine says "or."

24         MR. CHANG:  The other on the fifth line towards

25  the end "receive" should be "received."

```
 1            THE COURT:  I have -- we need to fix that.

 2            MR. CHANG:  And Number 19, Instruction Number 19,

 3    you have just pluralized plaintiffs and defendants, and

 4    there is only one of each in the second paragraph.

 5            THE COURT:  Okay.  Okay.

 6            MR. ALTMAN:  That's all.

 7            MR. KIRNOS:  Your Honor, I wanted to know -- the

 8    parties disagreed as to opening Instruction Number 3 which

 9    was the burden of proof.

10            We had suggested the California CACI instruction

11    which is consistent, sort of, with the way the Court has

12    explained the burden of proof to the jury so far, giving a

13    comparison sake with the obviously higher criminal standard.

14    The CACI instruction does incorporate that comparison, and

15    so I wanted to suggest perhaps we could use that.

16            THE COURT:  All right.  And there would be no

17    reason for you to know this, but I happen -- I have I upset

18    the wrong Judge apparently.  I sit on the Ninth Circuit Jury

19    Instruction committee.  Probably not a good look for this

20    judge to give out CACI instructions when there is a Ninth

21    Circuit instruction on point.  So respectfully your request

22    is denied.

23            MR. KIRNOS:  I knew that, and I should have

24    figured that.

25            THE COURT:  So, generally speaking, I err towards
```

1    the Ninth Circuit instructions if there is an instruction on

2    point.  If there isn't, then I go to CACI and other sources.

3              So anything further from the plaintiff?

4              MR. KIRNOS:  No.

5              THE COURT:  From the defense.  All right.  So

6    let's have you --

7              Mr. Chang.  I'm sorry.

8              MR. CHANG:  No, Your Honor.

9              THE COURT:  Are you okay?

10             MR. CHANG:  Yes.  I just have a bad knee.

11             THE COURT:  Let's have you come back at a quarter

12   to 2:00 just in the event are there any issues, God forbid,

13   that come up between now and then.

14             I will give the instructions and then opening

15   statements, and then have your witnesses ready for the

16   plaintiff.

17             I don't think I said this, but I want you to have

18   your witnesses ready to go.  If you don't have them ready to

19   go, that's a big problem.  And now that I have given you, at

20   least, today's warning, if something happens today, I didn't

21   warn you in advance.  But if it happens tomorrow, you will

22   have rested your case; so have them stacked.

23             MR. KELLY:  Do you want to hear a scheduling

24   problem from the defense at this point, Your Honor?

25             THE COURT:  If there is one, yes.

```
 1            MR. KELLY:  Mr. Kwasniewicz has a long-standing
 2   medical appointment this week.  We were planning to bring
 3   him next week for Tuesday.  I think we'll be done --
 4            THE COURT:  You think we'll be done before
 5   Tuesday?
 6            MR. KELLY:  I think we'll be done on Tuesday but
 7   if -- he would have to cancel the appointment, bring him out
 8   here -- if we had him on Thursday, he would probably have to
 9   come back on Tuesday anyway over the four-day weekend.
10   Maybe it's not an issue, but he's the only witness that we
11   intend to call that would have to come next week.
12            THE COURT:  I guess we'll cross that bridge if and
13   when we have to.
14            MR. KELLY:  I wanted to alert you right away.  I
15   didn't want to try and stretch unnecessarily.
16            THE COURT:  I have been there.  I understand.
17   That's the only witness that you have a scheduling conflict
18   with?
19            MR. KELLY:  Yes, Your Honor.
20            THE COURT:  From the plaintiff's side, any
21   witnesses with scheduling issues or conflict?
22            MR. ALTMAN:  Not that I know, but I will point
23   this out.  And counsel has been very generous in terms of
24   offering to work with me.
25            We do intend to call a witness from Ford or maybe
```

1   even more than one.  So given that we should have someone on

2   deck all the time, I'll work with counsel to make sure we

3   have that from the Ford side.

4            THE COURT:  Perfect.  We'll see you back at a

5   quarter till.  Thank you.

6        (Lunch recess taken 12:56 p.m.)

7                        --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9

10   Date:  November 5, 2019.

11

12

13

14                    ___/S/ CHIA MEI JUI _____

15                    Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25
```

JURORS: [1] 111/4
MR. ALTMAN: [83]
3/6 18/13 20/16 28/2
79/3 79/6 79/9 80/14
80/16 80/23 80/25
81/5 81/9 82/21 83/5
83/8 83/15 83/18
83/21 83/24 84/2 84/5
84/9 84/13 84/16
84/20 84/22 85/6
85/12 85/14 85/16
85/21 85/25 86/2
86/19 87/1 87/5 87/10
87/14 87/19 87/21
87/24 88/5 88/8 88/14
88/24 89/2 89/11
89/13 89/15 89/17
89/20 91/1 91/3 91/7
91/13 91/21 91/23
92/1 92/5 92/9 92/16
92/20 92/23 93/4 93/6
102/1 102/7 103/21
105/1 105/25 106/3
106/5 107/5 107/19
107/25 108/3 108/8
108/25 109/2 109/8
114/5 116/21
MR. CHANG: [9]
112/25 113/6 113/12
113/16 113/19 113/23
114/1 115/7 115/9
MR. HIGGINS: [17]
3/9 4/12 4/21 4/23 5/4
5/8 5/19 6/19 10/15
12/24 13/15 14/2 19/1
19/8 20/1 20/14 82/6
MR. HUGRET: [10]
4/3 6/21 7/1 7/6 7/11
8/8 8/22 9/15 10/7
10/12
MR. KELLY: [99]
3/19 4/2 10/17 11/2
11/15 12/2 12/11
12/16 14/3 14/13
14/19 15/1 15/6 15/10
15/18 15/20 15/24
16/2 16/5 16/11 17/15
17/18 17/22 17/25
18/4 18/9 28/10 79/10
79/20 80/3 80/10
80/13 81/15 81/19
81/22 93/9 93/24 94/1
94/5 94/24 95/4 95/7
95/10 95/14 95/17
95/21 95/24 96/3 96/5
96/10 96/20 96/24
97/9 97/12 97/14
97/17 97/21 97/25
98/3 98/6 98/12 98/14
98/16 98/21 98/25
99/5 99/7 99/15 99/18
99/20 100/4 100/9
100/15 100/18 100/22
101/3 101/7 101/12
101/15 102/20 103/19
103/23 104/13 105/16
106/20 107/4 107/10
107/16 107/22 108/6
108/12 108/21 109/9
113/18 115/22 115/25
116/5 116/13 116/18
MR. KIRNOS: [5]
3/12 82/8 114/6
114/22 115/3
MR. POWELL: [1]
3/15
MS. BURNETT: [1]
4/6
MS. TAFT: [1] 3/16
PROSPECTIVE
JUROR: [339]
PROSPECTIVE
JURORS: [1] 31/5
THE CLERK: [9] 3/3
21/5 21/9 30/23 31/6
110/22 111/20 111/21
112/5
THE COURT: [358]

$

$20 [1] 22/22
$75,000 [1] 15/4

'

'05 [1] 74/18
'14 [1] 57/23
'15 [2] 57/23 57/24
'62 [1] 60/15 95/20
'64 [1] 66/11
'74 [1] 88/7
'76 [1] 57/12
'90s [1] 56/14

-

--oOo [1] 117/7

1

10 [3] 1/9 31/15 67/4
10250 [1] 2/4
10:01 [1] 21/7
10th [1] 29/2
11 [2] 31/16 102/5
118 [1] 1/18
12 [2] 31/16 108/5
12:30 [1] 20/25
12:56 [1] 117/6
13 [1] 31/17
14 [1] 31/18
15 [4] 16/23 31/18
54/9 63/24
15 years [1] 67/5
15-passenger [1] 58/5
15-year-old [1] 43/13
150 [2] 65/25 69/13
16 [14] 16/17 17/13
27/8 27/10 27/12
30/22 31/19 103/22
107/2 107/14 113/2
113/6 113/7 113/8
17-6656 [2] 3/4 21/10
17-6656-AB [1] 1/7
18 [1] 32/21
1801 [1] 3/13
19 [2] 114/2 114/2
1900 [1] 2/19
1967 [1] 69/13

1970 [1] 67/11
1973 [1] 68/12
1986 [1] 69/14
1989 [1] 75/19
1990 [1] 69/13

2

20 [4] 39/11 40/9
53/18 54/7
20-something [1]
53/14
200,000 miles [1]
67/23
2000 [2] 2/22 75/18
2000s [1] 94/20
2002 [1] 58/7
2004 [1] 58/8
2011 [2] 62/5 70/22
77/2
2012 [4] 61/17 62/17
70/21 74/8
2013 [3] 29/2 29/2
29/6
2015 [3] 57/23 62/10
68/20
2016 [6] 61/18 62/5
62/10 70/21 70/22
77/2
2017 [8] 10/21 11/9
12/8 12/21 14/10
14/15 15/2 112/11
2019 [3] 1/15 3/1
118/10
21-year-old [1] 43/13
210 [1] 96/14
2250 [1] 2/14
250,000 miles [1]
67/21
2500 [2] 2/4 2/13
250s [1] 66/14
2700 [1] 2/18
275 [1] 2/22
28 [3] 42/3 42/11
118/4
2:00 [4] 109/2 109/4
109/6 112/10
2:00 just [1] 115/12
2:00 o'clock [1] 111/8
111/15
2:00 P.M [1] 111/20

3

30 [1] 13/22
300,000 miles [1]
98/21
310-277-8481 [1] 2/5
310-552-2250 [1] 2/14
310-854-4444 [1] 2/9
3287 [2] 1/23 118/15
350 [1] 1/24

4

415-544-1900 [1] 2/19
415-986-5900 [1] 2/23
4311 [1] 1/24
4444 [1] 2/9

5

58 [1] 107/8

59 [1] 107/8
5900 [1] 2/23

6

6 liter [1] 8/17
6.0 [2] 92/4 92/7
6656 [2] 3/4 21/10
68 [2] 6/11 6/12

7

75,000 [1] 19/13
753 [1] 118/3
7B [2] 21/13 21/15

8

8481 [1] 2/5
8648 [1] 2/8
8:30 A.M [1] 111/25

9

90012 [1] 1/24
90067 [2] 2/4 2/13
90211 [1] 2/8
92-year-old [1] 63/17
94104 [1] 2/18
94111 [1] 2/22
9:39 [2] 1/16 3/2

A

a 2013 [1] 29/2
a 2015 [1] 68/20
A-type [1] 50/2
AB [1] 1/7
abide [2] 40/13 42/16
ability [3] 78/8 78/13
82/12
able [11] 15/15 27/5
35/13 37/14 40/12
42/16 78/23 79/5
80/20 81/2 96/12
absent [1] 20/17
absolute [1] 19/3
abstract [1] 7/24
absurd [1] 5/7
AC [1] 14/5
accepted [1] 91/9
accident [5] 39/12
40/5 62/12 62/15 76/1
accommodate [1]
78/11
according [1] 111/3
account [4] 58/15
113/9 113/9 113/11
accounting [1] 33/21
acknowledging [1]
11/18
across [3] 25/16
82/24 100/17
acted [1] 30/2
actual [2] 75/7 81/5
Adam [1] 31/19
add [2] 61/20 61/21
address [5] 4/24 5/1
9/5 31/23 68/14
admissibility [2] 13/2
13/14
admissible [3] 13/6
13/12 19/20
admission [3] 12/1

12/3 13/6
admissions [2] 11/11
11/15
admit [1] 103/13
admits [2] 11/8 29/21
Admittedly [1] 73/14
adult [2] 32/9 34/4
39/9 41/18
adults [2] 39/18 39/19
advance [1] 115/21
advise [1] 22/4
aerospace [1] 38/20
affected [1] 113/22
affidavit [3] 7/8 9/19
9/23
affidavits [1] 7/12
affirmed [1] 102/10
after [10] 6/3 16/19
22/9 25/12 26/3 29/12
90/2 98/17 105/8
107/14
afternoon [2] 4/16
108/25
again [18] 8/23 17/3
21/15 23/19 24/3 24/3
25/9 33/11 42/10
42/11 44/16 48/18
77/1 78/9 82/22 89/8
96/9 98/19
against [3] 72/7 79/24
94/8
age [3] 37/4 37/5 64/6
aged [1] 33/10
agent [2] 36/6 47/24
ago [18] 34/15 34/16
35/14 36/8 37/8 37/9
39/11 40/3 40/9 42/3
42/11 52/6 53/12
53/17 63/24 74/19
99/14 110/8
agree [2] 89/1 106/12
ahead [5] 5/8 15/23
52/4 73/6 78/19 83/2
83/13 83/15 100/3
102/10 103/23 113/16
airplane [1] 22/5
Alan [1] 30/14
Alan Draper [1] 30/14
Aleman [12] 31/9
32/18 62/16 69/8
75/16 87/12 87/17
95/23 95/25 97/11
107/23 109/20
alert [1] 116/14
Allegedly [1] 42/7
allow [1] 111/12
almost [1] 82/23
alone [1] 21/20
along [4] 24/6 28/14
29/17 48/21
already [7] 5/25 9/2
16/3 26/15 26/17 30/3
90/6
Altalaryan [1] 30/12
altered [1] 102/13
although [1] 103/13
ALTMAN [16] 2/3 2/3
3/7 28/7 30/6 79/3

**A**

**ALTMAN... [10]** 82/6
82/21 90/14 93/8
102/1 103/19 104/8
105/1 105/25 106/13
**Altman's [1]** 104/10
**always [1]** 13/9
**Amendment [1]** 22/20
**American [1]** 78/22
**Amir [1]** 30/7
**Amir Nassihi [1]** 30/7
**amongst [2]** 15/17
101/23
**analyst [2]** 36/6 47/22
**anchor [1]** 22/25
**and/or [2]** 63/8 67/11
**ANDREW [2]** 2/17
30/8
**Andrew Chang [1]**
30/8
**ANDRÉ [1]** 1/3
**ANGELES [11]** 1/17
1/24 2/4 2/13 3/1
32/21 32/23 34/3
34/18 43/12 48/10
**another [13]** 9/2 17/16
18/9 21/23 38/13 54/9
63/12 85/3 85/4 91/18
93/4 100/2 100/3
**answer [8]** 17/15 27/7
27/14 44/17 52/4 71/1
103/7 105/19
**answering [3]** 27/3
27/6 36/16
**answers [5]** 24/22
25/1 27/3 31/2 44/22
**Anthony [1]** 30/11
**Anthony Micale [1]**
30/11
**anticipate [2]** 23/21
109/1
**anymore [2]** 71/24
73/20
**anyway [1]** 116/9
**apologies [4]** 9/17
16/7 21/14 53/4
**apologize [2]** 93/20
113/4
**apparently [1]** 114/18
**appearances [2]** 2/1
3/6
**application [2]** 4/16
80/20
**applies [1]** 79/19
**apply [1]** 9/25
**appointment [2]**
116/2 116/7
**appreciate [4]** 72/6
81/14 81/24 82/18
**approach [1]** 78/16
**approximately [2]**
23/22 58/4
**architect [1]** 42/24
**are -- I [1]** 68/4
**area [3]** 31/22 32/21
82/24
**argue [1]** 9/10
**argument [2]** 13/11

78/1
**arises [1]** 29/1
**arose [1]** 58/18
**around [8]** 25/7 59/10
79/22 80/6 85/7 86/8
87/11 104/2
**articles [1]** 25/16
**ascertained [1]** 6/17
**aside [2]** 35/13 37/15
**asked [11]** 29/19
40/10 42/11 53/20
90/6 90/23 92/13
102/8 104/15 105/7
105/18
**asking [3]** 32/10
32/25 35/21
**assault [2]** 34/14
93/24
**assembly [11]** 109/15
109/17 109/19 109/21
109/23 109/24 110/1
110/4 110/6 112/2
112/4
**assessment [2]** 83/2
112/10
**assistant [3]** 49/4
49/6 49/8
**assistants [1]** 21/25
**assisting [1]** 3/24
**association [1]** 91/11
**assume [6]** 11/2
17/19 65/2 66/8 75/9
112/24
**assumed [1]** 12/20
**assuming [1]** 54/16
**Atamian [1]** 30/13
**attached [1]** 51/2
**attempt [2]** 15/13 19/4
37/11
**attempted [2]** 8/20
37/11
**attempts [1]** 29/22
**attention [4]** 21/16
22/3 22/7 27/13
**audible [2]** 27/6 80/25
**audience [3]** 7/6
44/16 111/23
**authenticate [1]** 6/15
**authorized [3]** 29/11
29/21 52/6
**auto [2]** 53/6 85/19
**automatic [2]** 70/22
77/13
**automatically [5]** 45/6
83/10 84/25 90/8
90/11
**automobile [7]** 50/23
51/2 57/15 71/11 72/2
94/8 104/1
**automobiles [2]** 55/15
93/25
**automotive [5]** 45/22
50/22 78/22 79/15
80/6
**available [1]** 20/4
**aware [1]** 4/15
**away [4]** 23/13 72/4
96/11 116/14

**B** #:1167

**back [44]** 11/17 16/15
17/3 17/11 20/21
22/14 24/18 29/14
39/3 43/21 51/23
52/11 53/22 59/5
68/18 70/17 71/20
72/6 79/16 94/13
96/21 100/1 106/12
109/3 109/5 109/15
109/18 109/20 109/22
109/22 109/24 110/3
110/5 111/7 111/15
111/19 111/24 112/1
112/3 112/9 112/20
115/11 116/9 117/4
**back-and-forth [1]**
106/12
**backing [1]** 7/13
**BACON [1]** 2/16
**bad [4]** 38/23 55/2
56/16 115/10
**balance [2]** 19/15
106/20
**bank [1]** 47/6
**banker [2]** 41/18 47/6
**banks [1]** 46/16
**Barbara [2]** 41/8
41/16
**Barboza [14]** 31/14
39/2 53/2 58/1 63/1
65/10 75/3 83/4 85/22
92/3 99/10 100/10
108/7 109/24
**barely [1]** 93/11
**barring [1]** 18/25
**base [3]** 79/8 81/2
105/10
**based [8]** 27/22 29/17
65/2 78/6 85/4 102/15
104/2 106/25
**basic [1]** 45/2 55/25
90/3
**basically [5]** 72/24
79/13 79/15 90/22
99/24
**basis [2]** 76/10 103/16
**basketball [1]** 101/23
**bathroom [1]** 110/16
**bathrooms [1]** 51/7
**batteries [1]** 22/10
**BATTERY [1]** 2/22
**Bay [1]** 31/24
**Beach [2]** 39/6 42/23
**beat [1]** 83/11
**beautician [1]** 41/25
**became [1]** 54/19
**before [28]** 4/25 9/14
14/1 26/6 29/19 31/4
33/22 34/6 35/1 37/25
38/16 41/10 42/5
42/25 43/8 43/15
44/12 54/9 77/16 80/9
81/13 83/25 88/9
101/24 107/3 109/7
111/2 116/4
**beforehand [1]** 4/12
**began [1]** 34/22

**begin [5]** 20/23 24/9
26/7 28/19 111/18
**beginning [1]** 7/13
**behalf [4]** 3/8 3/10
3/21 39/11
**behind [3]** 13/24
24/21 93/21
**believe [18]** 6/13 9/3
15/11 15/12 19/2
39/20 47/13 50/18
51/25 61/25 71/15
81/12 86/24 93/1
97/20 98/12 100/22
102/21
**believes [1]** 102/16
**Bellflower [1]** 37/2
**bench [1]** 103/25
**benefit [1]** 22/8
**benefits [1]** 22/19
**best [2]** 22/24 49/21
**between [6]** 11/19
16/15 19/15 42/12
61/17 115/13
**BEVERLY [1]** 2/8
**beyond [1]** 35/8
**bias [4]** 72/7 102/3
103/2 103/25
**big [2]** 69/19 115/19
**bike [2]** 89/14 89/16
**bill [2]** 87/1
**binders [1]** 15/17
**BIROTTE [1]** 1/3
**bit [5]** 39/14 48/15
54/12 86/8 95/20
**black [2]** 60/16 113/21
**Blasjo [1]** 30/11
**BMW [1]** 89/18
**bog [2]** 12/13 12/15
**both [27]** 10/21 11/2
11/3 18/17 18/9 33/12
34/4 34/5 35/19 43/14
46/17 78/8 78/13 79/5
80/5 81/6 81/11 82/12
82/17 83/7 86/1 90/4
105/12 105/16 106/1
106/4 106/16
**bottom [1]** 27/10
**BOULEVARD [2]** 2/4
2/8
**box [1]** 107/3
**brain [2]** 82/15 82/19
**brake [3]** 55/18 55/25
56/5
**brakes [1]** 56/11
96/17 96/17
**break [5]** 26/10 107/3
108/24 110/17 110/22
**breaks [1]** 21/3
**Brian [2]** 31/12 31/18
**bridge [1]** 116/12
**brief [7]** 18/18 20/20
22/13 26/6 28/24
28/25 107/9
**briefly [1]** 12/25
**bring [5]** 8/20 74/9
80/1 116/2 116/7
**bringing [2]** 93/16
94/7

**Britain [1]** 22/17
**broadcast [1]** 36/19
**broncho [1]** 57/13
**Bronco [7]** 57/12
57/12 57/13 66/16
69/14 88/7 95/18
**Broncos [1]** 67/14
**brother [4]** 47/22
49/12 52/8 57/3
**brother-in-law [1]**
49/12
**brothers [1]** 52/5
**brought [1]** 71/17
**BRYAN [4]** 2/3 3/7
28/7 30/6
**Bryan Altman [3]** 3/7
28/7 30/6
**Buell [5]** 60/4 60/7
60/9 89/5 89/16
**Buells [1]** 89/11
**building [1]** 91/12
**built [1]** 61/17
**burden [17]** 35/7 35/8
35/10 37/13 42/15
42/17 80/21 81/8 81/8
104/12 104/21 105/5
105/5 106/10 106/19
114/9 114/12
**burdens [1]** 81/7
**bureau [1]** 36/5
**buried [1]** 9/14
**BURNETT [4]** 2/17 4/8
28/15 30/7
**bus [1]** 69/16
**buses [1]** 69/18
**business [4]** 44/9
45/22 50/22 89/8
**butcher [2]** 36/10 52/3
**button [1]** 25/8
**Butts [2]** 53/6 53/10
**buy [2]** 29/14 76/24
**buyback [1]** 12/19
**buying [2]** 32/15
76/23

**C**

**CACI [4]** 114/10
114/14 114/20 115/2
**Cal [1]** 69/17
**Cal State L.A [1]**
69/17
**calendar [2]** 23/25
24/13
**CALIFORNIA [17]** 1/2
1/17 1/24 2/4 2/8 2/13
2/18 2/22 3/1 38/10
39/7 46/19 67/1 67/2
96/14 99/17 114/10
**call [7]** 27/8 30/22
59/24 88/3 89/4
116/11 116/25
**called [6]** 26/5 27/16
30/19 44/16 44/18
71/22
**Calling [2]** 3/4 21/10
**Camaro [1]** 60/3
**came [4]** 23/9 29/4
72/24 96/21

**C**

camp [2] 54/8 113/22
Camp Pendleton [1]
54/8
cancel [1] 116/7
candid [2] 83/2
106/15
candidly [2] 82/23
106/2
candor [4] 72/16
81/14 81/25 84/15
Canoga [1] 43/6
Canoga Park [1] 43/6
cap [1] 57/3
car [45] 39/12 40/5
57/22 58/24 59/11
59/16 62/12 62/20
63/12 64/2 66/3 66/11
69/13 69/14 72/2
73/15 74/3 74/11
75/19 75/21 77/2
77/20 85/19 86/3 86/4
88/3 92/14 92/17
92/25 93/3 93/4 94/9
94/19 94/20 94/21
95/3 96/15 96/16
96/18 96/23 96/24
99/25 100/2 100/2
100/4
caravans [1] 69/23
cards [1] 41/11
carries [1] 105/4
carry [1] 105/5
cars [35] 52/11 52/18
54/16 55/1 56/21 57/7
57/10 57/16 59/17
60/9 60/17 60/24
60/25 60/25 61/1 61/4
61/6 65/4 65/15 67/12
68/25 69/12 69/23
76/11 76/12 76/16
76/22 76/22 76/24
77/4 82/25 88/6 94/24
95/1 109/19
cases [9] 5/16 5/16
5/17 22/18 28/19
42/12 42/13 49/22
112/12
cat [1] 113/21
catching [1] 70/19
cats [1] 49/25
cause [18] 16/20
16/21 16/22 16/25
17/3 17/4 31/4 84/24
91/18 96/6 101/25
102/19 103/6 103/17
103/18 103/19 103/21
107/1
caused [3] 75/20
79/17 87/13
causes [3] 98/23
100/24 104/18
cautiously [1] 24/6
Cavalier [1] 74/18
Cavanaugh [1] 32/4
CCRR [1] 1/23
center [1] 51/2
CENTRAL [1] 1/2

CENTURY [1] 2/13
certain [3] 6/24 52/12
86/14
certainly [3] 15/19
26/9 44/4
CERTIFICATE [1]
118/1
certify [1] 118/3
cetera [3] 14/19 16/5
25/18
CFO [1] 38/3
challenge [5] 16/22
102/18 103/6 103/17
107/1
challenges [10] 16/13
16/15 16/20 16/21
16/25 17/4 63/13
101/25 103/19 103/21
chance [2] 4/21
112/17
CHANG [13] 2/17 16/8
30/8 31/11 36/12
36/13 87/18 97/13
108/13 110/3 112/23
112/25 115/7
change [14] 44/9 51/6
56/11 79/14 81/18
81/20 104/3 104/6
104/19 104/21 104/25
105/20 105/21 106/19
changed [2] 51/9
102/13
changes [10] 15/25
16/11 51/20 55/18
55/18 55/24 55/25
55/25 56/5 56/5
check [1] 25/13
Chevy [9] 60/3 60/7
60/9 60/15 74/8 74/9
74/18 85/10 95/19
Chevy Cavalier [1]
74/18
CHIA [3] 1/23 118/14
118/15
child [2] 5/16 33/8
children [14] 32/22
33/8 34/4 36/22 37/4
37/5 39/9 39/18 40/23
41/18 42/25 43/7
44/11 46/11
Children's [1] 43/12
Children's Hospital
[1] 43/12
chip [1] 74/11
Chris [4] 30/12 30/14
31/15 41/5
Chris Kwasniewicz
[1] 30/14
Chris Longoria [1]
30/12
Christina [1] 31/10
Circuit [4] 106/24
114/18 114/21 115/1
circumstance [1] 97/1
circumstances [1]
94/10
city [5] 33/21 34/3
34/20 41/24 44/8

City of Los Angeles
[1] 34/3
civil [24] 3/4 21/10
23/15 23/15 28/18
28/19 28/19 29/17
34/2 34/4 35/8 39/10
39/12 42/13 45/18
45/19 48/18 50/13
90/17 90/21 91/11
93/17 93/23 94/4
claim [7] 44/24 45/2
45/4 75/25 76/2 90/23
96/20
claims [6] 8/16 10/2
28/21 29/6 29/10
73/10
clarify [1] 69/9
classic [6] 57/10
57/11 68/11 76/16
76/22 77/4
clean [2] 51/7 87/1
clear [2] 58/10 106/6
Clerk [1] 26/17
client [2] 20/1 28/2
28/4
client's [1] 8/1
climate [1] 44/9 79/14
104/3
close [10] 5/6 5/14
45/7 47/18 48/3 50/5
50/7 61/16 61/22 91/4
closest [4] 27/9 27/10
45/10 74/6
clothing [1] 32/15
clue [1] 93/19
cmjui.csr [1] 1/25
Co [2] 3/5 21/11
Coast [1] 32/15
cocktail [1] 47/1
Code [1] 118/4
coil [1] 74/21
coin [1] 95/7
colleagues [1] 28/5
collection [1] 12/9
college [4] 33/12
69/16 94/21 96/9
collided [1] 96/18
Colorado [1] 41/24
comes [4] 81/18
94/19 104/18 105/20
coming [4] 12/22
81/13 95/3 112/23
commencement [1]
4/25
commentary [3]
113/9 113/10 113/12
comments [2] 99/21
100/6
commercial [1] 91/11
committee [1] 114/19
common [2] 22/21
85/5
companies [3] 46/16
104/1 104/2
company [19] 1/8
3/21 4/5 4/17 21/19
28/13 29/4 29/5 29/10
29/13 35/25 36/1 38/4

38/20 79/22 79/22
80/6 87/5 104/1
Company's [2] 3/22
29/18
comparison [2]
114/13 114/14
Complaint [6] 28/20
28/20 28/22 45/5
80/13 90/7
complaints [3] 29/25
55/4 58/11
completely [1] 74/11
comply [2] 19/11
86/13
component [1] 72/23
computer [1] 74/11
concept [1] 45/2
concepts [1] 80/21
concerned [3] 7/4
74/7 98/23
concerning [4] 6/4 6/9
11/11 13/23
concerns [3] 6/5
18/25 112/19
conclusion [1] 106/13
conditional [3] 6/23
24/9 9/15
conditionally [1] 9/21
conditions [2] 30/1
69/11
conduct [2] 12/19
111/13
confer [3] 8/9 10/6
14/2
Conference [1] 118/8
conferred [1] 9/11
conferring [1] 15/24
confidence [1] 81/1
confidential [2] 8/2
9/3
confidentiality [1] 7/8
conflict [3] 24/14
116/17 116/21
conform [1] 29/23
conformance [1]
118/7
confused [1] 39/17
Congratulations [3]
38/14 41/19 43/2
connected [2] 50/14
111/14
connotation [1] 78/21
connotations [1]
79/18
consider [3] 6/16
22/24 71/10
considered [2] 17/10
94/7
considering [1] 6/4
consistent [1] 114/11
CONSTELLATION [1]
2/4
constitution [2] 22/20
23/2
consultant [1] 39/7
contacted [2] 74/9
86/25
contained [2] 14/18

19/13
containing [1] 29/7
contends [1] 30/2
contents [2] 14/12
14/25
continue [1] 81/21
continued [1] 24/10
contract [1] 38/11
control [1] 96/15
controversy [1] 22/22
conversation [7]
11/19 15/3 25/9 70/21
82/16 99/14 103/24
conversations [2]
27/23 46/6
conviction [2] 49/22
50/5
convinced [1] 105/19
cook [2] 32/23 33/8
Cooper [10] 31/18
43/10 54/5 55/17 56/5
56/9 74/5 85/9 88/13
108/21
coordinate [1] 58/12
coordination [1]
44/11
copy [1] 112/21
corporate [1] 32/15
corporation [1] 1/8
86/9 86/12 86/14
correspondence [1]
8/10
corrupt [1] 23/11
Costco [3] 41/8 41/9
41/11
couch [1] 60/19
counsel [28] 2/1 3/6
4/1 8/7 10/19 10/21
10/21 11/7 11/11
11/15 11/16 11/19
11/22 12/2 12/4 12/14
13/8 16/8 27/25 28/9
28/17 78/1 79/2 82/4
101/18 109/3 116/23
117/2
counsel's [1] 3/23
counselor [1] 37/3
country [2] 23/9 23/17
counts [4] 17/9 47/19
71/14 72/21
County [2] 32/23 33/1
couple [11] 22/2 57/7
74/12 74/18 78/5 86/7
86/16 90/13 92/2
97/15 110/8
course [5] 6/12 26/8
26/24 30/10 59/12
court reporter [2]
26/22 44/21
Court's [5] 6/4 13/1
27/21 103/5 112/16
courthouse [1] 27/24
Courtroom 7B [2]
21/13 21/15
cousin [3] 47/23
47/23 47/24
coverage [2] 86/22
87/7

**C**

covered [3]  29/8
61/19 97/22
crash [6]  75/21 87/13
96/2 96/4 96/11 96/11
crazy [2]  46/1 46/1
creative [1]  42/24
criminal [11]  34/6
35/6 35/7 37/6 37/6
42/2 42/12 48/8 48/9
48/18 114/13
cross [1]  116/12
cruiser [1]  89/12
CSR [2]  1/23 118/15
Culver [1]  44/8
Culver City [1]  44/8
current [1]  92/24
currently [3]  59/6 66/1
69/12
custodial [1]  49/3
custody [3]  49/4 49/6
49/8
customer [2]  73/21
80/7
customers [1]  52/11
CV [1]  1/7
cyber [1]  47/22

**D**

dad [2]  45/12 45/25
daily [1]  58/17
Darrell [1]  30/11
Darrell Blasjo [1]
30/11
date [4]  20/3 91/6
92/20 118/10
dated [1]  112/11
dating [1]  11/17
daughter [3]  35/23
36/5 43/14
daughters [1]  35/19
David [1]  31/8
Davidsons [1]  89/11
day [12]  1/18 3/5
21/11 46/25 47/2
71/21 77/16 79/16
97/20 98/12 106/12
116/9
Day 1 [2]  3/5 21/11
days [2]  38/22 38/23
deadline [1]  24/7
deal [9]  12/15 13/3
13/4 16/20 17/6 56/6
92/7 107/3 112/21
dealer [1]  72/3
dealership [14]  50/24
58/12 62/1 66/23 67/1
67/6 70/11 71/5 71/17
71/18 74/9 86/25 94/8
99/23
dealing [9]  47/1 57/16
61/3 77/2 77/3 85/23
92/6 92/10 94/10
dealings [1]  58/22
deals [2]  51/15 59/9
dealt [3]  23/15 55/4
95/12
deceased [1]  66/22

**Decent [1]**  89/19
decide [3]  23/5 27/22
97/5
decision [3]  13/23
79/8 81/2
deck [1]  117/2
declaration [6]  11/7
11/16 11/25 11/25
13/6 22/15
defects [1]  29/7
defendant [8]  2/15
3/21 17/7 17/8 17/8
28/21 29/3 42/4
defendants [2]  1/10
114/3
defense [16]  10/17
17/21 18/20 28/10
44/24 45/3 47/23
91/17 102/20 103/21
104/24 107/22 108/6
108/12 115/5 115/24
definitely [1]  72/9
DELAWARE [1]  1/8
deliberate [1]  24/11
deliberating [1]  34/23
deliberation [1]  24/12
deliberations [2]  24/9
24/10
delivered [2]  29/7
53/6
demand [1]  12/19
denied [5]  28/21
90/10 90/12 90/21
114/22
denies [1]  29/25
deny [1]  106/25
Department [1]  47/24
Depending [1]  16/21
deposition [6]  5/2
13/21 14/5 14/6 14/7
20/9
depriving [1]  22/18
describe [1]  57/20
described [1]  79/21
designed [1]  25/2
designee [1]  13/22
detail [1]  47/5
detailed [1]  76/19
detailing [2]  52/10
52/13
details [4]  63/10
70/12 80/10 97/2
detrimental [1]  5/14
development [1]
38/11
diagnose [1]  44/2
diagnosed [1]  97/19
died [2]  74/11 75/7
diesel [4]  8/17 66/15
92/4 92/8
different [10]  35/9
37/13 40/14 42/15
76/13 76/20 82/25
84/3 91/22 104/7
differently [1]  18/6
difficult [26]  46/6
47/11 48/17 49/12
50/13 50/16 51/23

52/21 53/09 55/9 55/20
56/16 56/21 59/2 60/8
61/5 69/24 73/12
73/15 74/14 74/24
75/13 76/4 77/4 77/19
94/3
difficulty [1]  61/12
digital [1]  21/25
dire [10]  15/21 15/24
16/13 16/18 16/19
17/3 21/4 21/17 22/13
24/19
direct [1]  6/2
direction [7]  51/10
80/9 80/11 91/18
91/19 102/11 102/12
disagree [1]  78/3
disagreed [1]  114/8
disclosures [2]  20/5
20/6
discovery [2]  13/19
20/5
discuss [6]  4/12
20/16 25/6 78/10
101/25 109/7
discussed [1]  53/25
discussing [1]  8/6
discussion [3]  6/16
11/8 19/15
discussions [1]  12/18
dismissed [3]  34/9
34/10 34/25
dispute [2]  11/7 12/6
disputes [1]  23/15
dissatisfaction [1]
59/16
distinction [2]  42/12
106/5
distributor [1]  57/3
DISTRICT [3]  1/1 1/2
1/3
division [2]  1/2 32/16
Divya [2]  31/13 38/7
document [11]  6/11
7/10 7/24 9/1 9/3 9/17
11/10 14/10 16/4
18/21 112/16
documentary [2]  6/9
13/3
documents [16]  6/15
6/24 7/3 7/9 7/18 7/20
7/21 8/3 8/10 8/12
8/14 8/16 9/6 9/24
10/3 10/24
dollar [2]  15/5 19/13
door [1]  95/23
Doss [1]  30/13
doubt [5]  24/16 35/8
80/19 105/11 106/10
Douglas [1]  3/22
Douglas Lampe [1]
3/22
down [16]  7/5 7/15
12/13 12/15 25/12
26/23 44/21 55/17
85/7 95/2 96/6 99/9
110/14 107/24 110/11
110/13

**Downey [1]**  53/7
downsizing [3]  59/14
59/16 59/21
Downtown [2]  25/15
34/18
DPS6 [1]  29/6
drain [1]  22/10
Draper [1]  30/14
drastic [1]  5/19
drive [5]  66/1 69/24
76/11 77/12 96/11
drive-away [1]  96/11
driven [2]  64/16 67/20
driver [2]  54/13 69/17
drives [1]  69/12
driving [1]  69/11
71/17 74/12 75/4
75/18 87/16 88/1
88/18 88/22 97/1
98/15
drove [3]  63/21 66/11
66/12
drug [1]  38/11
drugs [1]  42/4
due [3]  59/21 72/24
78/20
during [12]  11/4 14/4
22/7 25/1 25/15 26/8
26/9 26/10 26/24
30/10 51/17 59/12
duties [1]  58/3
duty [4]  23/7 26/5
32/24 43/15

**E**

each [4]  16/23 17/11
82/4 114/4
earlier [5]  27/18 44/14
69/9 75/5 75/10
early [1]  94/20
easy [1]  61/7
Econoline [7]  58/5
58/8 58/21 69/4 77/15
92/3 98/8
ed [3]  40/22 53/6
53/10
Ed Butts [1]  53/6
Edge [1]  66/1 66/15
editor [1]  36/20
edits [1]  36/21
effect [3]  72/5 103/9
105/18
efficient [1]  27/16
efficiently [1]  26/20
effort [3]  14/9 14/15
14/17
efforts [1]  15/13 73/11
103/10
eight [8]  8/14 17/6
17/14 17/22 107/11
107/13 107/15 110/7
either [11]  11/10
30/17 36/22 46/7
47/12 50/12 79/2
85/19 104/12 105/4
112/19

**El [1]**  40/22
El Segundo [1]  40/22
elation [1]  25/12
electrical [1]  41/23
elementary [1]  33/14
Eligibility [1]  33/2
embarrass [1]  25/2
embarrassed [4]
102/11 102/17 103/13
103/14
embarrassing [1]
84/16
embarrassment [1]
103/8
emotion [1]  100/25
emphatic [2]  105/7
106/7
emphatically [1]
106/6
employ [1]  86/12
employed [3]  32/11
33/16 39/21
employer [1]  58/3
employment [1]  67/11
end [6]  6/15 8/11 24/3
70/11 106/12 113/25
ended [2]  63/12 71/20
engagement [1]  43/2
engine [6]  8/18 64/3
72/23 74/21 76/18
100/24
engineer [4]  34/2 34/4
36/19 41/24
engines [1]  92/8
enough [1]  44/18
entered [1]  7/22
entertainment [1]
41/25
entire [4]  9/5 9/8
17/13 98/12
entirely [1]  84/9
entitled [3]  90/8 90/11
118/6
equipment [1]  54/17
equipped [2]  29/5
92/7
equity [2]  50/3 50/14
err [1]  114/25
error [1]  95/10
Escape [3]  64/25 65/1
67/20
Escort [2]  65/12 69/4
especially [2]  66/5
79/14
essence [1]  5/14
establishes [1]  15/8
estate [2]  32/7 46/15
estimate [2]  24/3 24/4
even [10]  18/1 40/9
57/20 60/25 78/2 89/4
92/11 96/16 104/11
117/1
evening [1]  10/6
event [4]  24/17 25/5
44/10 115/12
evidence [47]  6/6 6/6
6/9 6/11 6/18 8/25
11/14 13/3 13/24 14/1

**E**

evidence... **[37]** 19/18 19/21 20/7 20/8 20/10 27/22 28/20 35/10 44/25 61/13 72/5 73/9 77/20 77/25 78/6 78/23 79/7 79/8 80/1 80/9 81/2 81/4 81/17 81/20 96/25 97/4 100/8 103/1 104/6 104/11 104/12 104/18 105/8 105/10 105/20 106/8 111/3
evidentiary **[1]** 13/2
ex **[1]** 4/15 5/3
ex parte **[2]** 4/15 5/3
exact **[1]** 62/11
exactly **[3]** 7/24 72/22 76/16
examination **[2]** 104/25 105/22
example **[4]** 9/1 13/20 16/22 19/12
exceed **[1]** 22/22
excellent **[1]** 69/6
except **[1]** 69/5
exchange **[1]** 96/19
exchanging **[1]** 11/19
excuse **[3]** 7/5 21/14 108/10
excused **[3]** 17/2 17/3 112/1
executive **[1]** 42/23
exercise **[4]** 17/1 17/12 18/3 18/8
exercises **[1]** 17/11
exercising **[1]** 16/15
exhibits **[5]** 5/24 8/7 9/12 12/9 26/18
expecting **[1]** 38/12
Expedition **[1]** 65/13
experience **[40]** 22/9 52/17 53/25 54/1 55/20 56/3 59/2 61/3 62/11 63/25 67/24 72/1 72/8 73/13 74/14 74/23 75/12 76/4 77/1 77/3 77/7 84/18 84/21 84/24 85/4 85/5 85/6 89/25 91/15 93/18 94/2 94/14 94/25 97/6 97/7 98/19 98/22 99/22 100/23 104/3
experienced **[7]** 29/25 62/3 74/3 74/8 77/16 88/12 99/2
experiences **[21]** 10/2 30/17 52/15 53/20 54/25 62/24 64/17 65/3 65/15 65/17 66/3 66/19 67/10 68/3 68/23 77/19 82/25 83/12 83/21 89/23 89/25
experiencing **[1]** 87/16
expert **[1]** 88/3
expertise **[1]** 46/14

**F**

explain **[1]** 44/25
explained **[1]** 114/12
explicitly **[1]** 19/17
exploitation **[1]** 5/16
explored **[1]** 13/25
Explorer **[5]** 56/10 56/12 64/24 64/24 64/25
exposure **[1]** 57/15
express **[2]** 23/3 111/10
extended **[1]** 13/8
extends **[1]** 14/19
extensive **[2]** 57/14 60/3
extent **[1]** 13/8
exterior **[1]** 72/23
Exxon **[1]** 51/2

**F**

F-150 **[1]** 65/25
F1 **[1]** 66/14
facilities **[2]** 29/11 29/21
facility **[1]** 58/13
fact **[17]** 9/1 14/9 14/14 14/16 14/24 15/2 15/5 15/7 15/8 15/14 18/25 26/24 28/22 55/7 58/22 65/2 90/3
facts **[4]** 27/22 81/13 91/21 97/5
fail **[1]** 54/11
failed **[1]** 29/13
fair **[35]** 25/3 25/10 46/7 47/5 47/11 48/17 49/13 50/17 51/24 54/2 55/9 55/20 56/17 57/17 73/16 73/17 74/14 76/5 78/8 78/13 79/4 81/11 82/12 83/7 83/10 89/24 90/4 97/8 102/4 102/17 102/25 105/12 105/15 106/9 106/16
fairly **[1]** 85/5
fairness **[1]** 13/13
faith **[4]** 15/13 19/7 19/9 30/2
fallout **[1]** 79/18
familiar **[1]** 47/7
family **[11]** 25/18 45/7 47/20 48/2 50/21 57/1 61/16 66/21 68/1 68/12 73/24
fan **[2]** 66/4 84/8
fans **[1]** 82/24
Fantastic **[1]** 89/20
far **[4]** 13/16 68/3 84/3 114/12
fashion **[1]** 78/10
father **[10]** 54/6 54/15 57/2 66/22 66/24 67/7 67/8 67/9 67/9 69/4
father-in-law **[5]** 66/22 66/24 67/8 67/9 67/9

fault **[1]** 74/3
faulty **[1]** 71/15
favor **[6]** 83/10 101/21 102/16 104/4 104/15 104/22
FBI **[4]** 35/24 36/5 47/23 47/24
FCRR **[1]** 1/23
federal **[3]** 1/23 24/2 54/7
feel **[5]** 86/14 90/7 90/9 100/24 101/5
feeling **[6]** 38/21 80/5 81/21 95/3 101/8 104/6
feelings **[4]** 79/11 79/21 80/2 105/15
feels **[4]** 86/11 88/1 89/23 90/4
fees **[1]** 19/12
fell **[1]** 63/25
fellow **[1]** 40/11
felt **[1]** 106/18
Fernando **[1]** 31/24
few **[3]** 22/9 36/8 99/2
fiancé **[1]** 42/24
Fields **[1]** 30/13
Fiesta **[6]** 61/17 62/6 62/9 64/11 70/22 87/8
fifth **[1]** 113/24
fifth line **[1]** 113/24
fight **[1]** 83/10
fights **[1]** 9/9
figure **[5]** 8/7 10/7 11/24 77/7 94/18
figured **[2]** 9/12 114/24
filed **[20]** 4/16 4/17 6/23 7/8 7/10 7/12 7/16 7/17 8/1 8/24 9/19 11/17 28/23 45/5 45/5 75/25 76/2 80/13 90/7 96/20
filing **[2]** 29/20 90/21
film **[1]** 38/4
final **[4]** 7/16 93/3 104/25 105/22
finally **[1]** 111/11
financial **[1]** 100/14
find **[3]** 15/15 71/6 71/18
fine **[7]** 4/2 18/1 18/10 59/25 60/11 68/3 73/20
finished **[1]** 60/14
fire **[1]** 54/19
firm **[5]** 45/14 45/15 46/14 50/7 50/9
firm's **[1]** 45/17
firms **[1]** 50/3
first **[26]** 1/24 15/3 17/7 17/14 17/20 17/21 17/22 24/25 28/4 30/23 36/11 41/4 49/23 66/11 69/13 82/22 84/14 85/15 85/16 88/18 88/22 90/25 95/20 101/25

107/15 107/18
five **[6]** 37/5 37/5 41/18 58/4 59/18 66/8 76/14 114/1
fixed **[4]** 58/13 96/23 99/6 101/6
fixer **[2]** 43/22 43/23
fleet **[1]** 58/4
fleets **[1]** 54/24
Flex **[3]** 67/22 87/23 97/16
Flexes **[1]** 77/11
fly **[1]** 12/16
focus **[31]** 9/13 29/2 29/3 29/7 29/11 29/14 29/17 29/19 29/24 57/21 59/7 59/9 61/17 62/6 62/17 63/2 63/18 64/11 66/16 69/10 70/8 70/22 83/25 86/17 87/8 92/18 92/20 94/24 99/11 99/22 100/6
focused **[2]** 50/10 60/24
fog **[2]** 82/15 82/19
folks **[4]** 26/16 44/15 101/23 111/23
follow **[8]** 35/15 37/16 78/2 80/20 93/14 104/5 105/14 110/12
follow-up **[1]** 105/14
followed **[2]** 15/4 105/3
following **[9]** 21/8 24/18 27/21 30/9 78/18 82/1 101/20 109/11 112/7
forbid **[1]** 115/12
force **[1]** 23/12
FORD **[117]** 1/8 3/5 3/19 3/21 3/22 4/5 4/8 4/17 5/6 5/14 5/18 6/6 6/21 7/4 14/18 19/22 21/11 21/19 28/13 29/2 29/3 29/3 29/4 29/5 29/7 29/10 29/13 29/14 29/17 29/18 29/19 29/21 30/1 51/16 51/20 52/6 52/15 52/17 53/6 53/7 53/11 53/22 54/22 56/6 56/10 56/16 58/5 59/7 59/9 61/17 61/17 62/6 62/6 62/9 62/17 63/2 63/14 63/18 64/16 64/22 65/11 65/12 65/12 65/12 65/13 65/22 66/1 66/4 66/21 66/23 67/11 67/11 67/13 67/20 67/22 68/1 68/1 68/3 68/18 68/20 69/3 69/10 69/13 70/8 70/22 70/22 71/12 77/11 77/15 79/22 82/24 83/2 84/7 84/8

85/3 87/5 90/10 92/7 92/10 99/11 99/22 99/23 100/6 100/17 101/1 101/9 102/10 102/12 103/8 103/9 103/15 104/1 113/22 116/25 117/3
Ford Edge **[1]** 66/1
Ford Escort **[1]** 65/12
Ford Explorer **[1]** 56/10
Ford Fiesta **[4]** 61/17 62/6 62/9 70/22
Ford Flexes **[1]** 77/11
Ford Focus **[19]** 29/2 29/3 29/7 29/14 29/17 59/7 59/9 61/17 62/6 62/17 63/2 63/18 64/11 69/10 70/8 70/22 99/11 99/22 100/6
Ford motor **[1]** 51/16
Ford Motor Company **[12]** 3/21 4/5 4/17 21/19 28/13 29/4 29/5 29/10 29/13 79/22 87/5 104/1
Ford Motor Company's **[1]** 29/18
Ford's **[3]** 6/14 12/19 15/12
Fords **[12]** 51/17 53/21 57/8 57/10 66/10 67/19 67/19 69/15 69/17 85/23 92/7 99/3
foregoing **[1]** 118/4
Forest **[2]** 54/9 54/18
forgive **[2]** 36/10 43/23
forgot **[1]** 69/5
form **[3]** 13/12 28/19 111/10
format **[1]** 118/7
forth **[3]** 16/15 17/11 106/12
fortunate **[1]** 23/18
forward **[1]** 21/4
found **[2]** 37/7 73/2
foundation **[2]** 6/14 13/4
four **[6]** 38/12 52/7 58/4 65/11 99/14 116/9
four-day **[1]** 116/9
four-year-old **[1]** 38/12
fourth **[3]** 64/9 64/18 65/3
FRANCISCO **[2]** 2/18 2/22
FRANK **[4]** 2/16 3/20 28/13 30/7
Frank Kelly **[2]** 3/20 28/13
Frank P **[1]** 30/7
frankly **[3]** 22/15 26/3 103/11

**F**

free [1] 73/3
freeway [1] 96/14
French [1] 24/19
Friday [2] 7/17 24/11
Fridays [1] 23/24
friend [5] 47/18 48/4
50/5 50/7 50/12
friends [2] 45/8 49/21
front [6] 31/22 43/21
69/12 75/21 96/15
96/18
frustrated [1] 99/25
full [3] 51/6 57/12
57/13
full-size [2] 57/12
57/13
fund [1] 37/23
funds [1] 96/10
further [5] 10/14
20/16 81/15 112/4
115/3
furthest [1] 110/12
Fusion [2] 65/1 68/21
Fyie [1] 30/15

**G**

Gabriel [1] 31/24
Galpin [1] 29/3
Galpin Ford [1] 29/3
garbage [3] 71/23
88/17 88/22
Garo [1] 30/13
Garo Atamian [1]
30/13
gas [2] 76/18 94/15
gave [3] 70/15 75/5
76/23
general [8] 3/23 10/3
33/21 76/19 92/15
102/9 102/25 105/15
generally [5] 35/9
100/25 101/2 101/9
114/25
generic [1] 89/10
generous [1] 116/23
gentlemen [8] 21/13
28/8 28/12 31/1 93/11
101/17 110/25 111/6
getting [3] 9/13 71/2
100/2
gift [1] 41/11
Gilhooly [7] 31/11
36/12 36/13 87/18
97/13 108/13 110/3
girlfriend [3] 32/8
32/11 44/10
girls [1] 34/5
give [13] 22/13 24/7
26/6 27/6 28/25 41/11
79/5 82/4 110/21
111/16 112/10 114/20
115/14
given [11] 6/11 21/1
35/5 35/15 37/16 40/9
57/14 59/11 76/11
115/19 117/1
gives [1] 26/25

giving [3] 21/17 71/20
114/12
gmail.com [1] 1/25
GMC [2] 75/18 96/1
GMC Jimmy [1] 75/18
God [3] 31/5 111/4
115/12
goes [6] 15/12 22/14
76/17 78/8 78/13
105/13
golden [1] 110/9
gone [4] 26/3 76/14
86/5 89/25
good [63] 3/7 3/9 3/12
3/13 3/15 3/18 3/20
4/4 4/6 4/7 4/9 6/22
15/12 19/7 19/9 21/12
23/4 23/19 25/19 28/3
28/7 28/12 30/2 32/5
32/6 32/19 32/20
33/18 33/20 34/1
36/13 36/15 37/1
37/21 37/22 38/8 38/9
38/22 38/24 39/4 39/5
40/20 40/21 41/6 41/7
41/14 42/21 42/22
43/5 44/7 55/1 56/16
69/5 82/22 82/25
89/21 93/11 93/12
97/10 99/4 109/19
111/19 114/19
Google [2] 87/6 87/9
Googled [1] 86/24
GORDON [2] 2/21
19/25
Gotcha [1] 80/14
government [3] 23/1
47/20 54/7
grandmother [1]
63/17 64/1 83/22
granted [1] 9/21
Gray [1] 49/21
great [40] 21/22 22/17
32/17 33/7 33/15
33/23 35/18 36/23
37/18 38/5 40/17
42/20 43/9 44/13 46/9
49/15 52/25 54/4 55/6
56/19 57/25 59/22
60/12 61/9 62/4 62/14
64/13 68/7 68/12
68/17 69/1 69/7 70/6
70/16 71/8 71/9 72/15
77/6 79/10 110/19
Great Britain [1]
22/17
Greg [1] 30/13
Greg Overla [1] 30/13
grew [1] 57/1
grind [1] 69/11
ground [1] 60/14
ground-up [1] 60/14
grounds [1] 102/7
group [8] 2/3 2/11
16/17 17/13 24/25
26/4 44/15 44/19
Guerrero [6] 31/9
33/18 49/1 69/2

108/15 110/11
guess [11] 8/5 8/19
13/7 57/15 61/21
68/10 73/1 73/2 73/18
93/3 116/12
guilty [1] 37/7
guy [2] 89/12 89/14
guys [1] 83/11
GYN's [1] 43/19

**H**

Haiti [1] 23/10
Haitian [1] 23/11
half [3] 34/16 35/14
91/5
hallway [1] 27/24
hamstrung [1] 13/18
hand [8] 9/13 22/1
30/20 30/25 48/24
90/9 90/15 110/24
handle [3] 23/24
24/13 69/24
hands [7] 21/22 23/12
30/21 44/20 52/2 53/1
94/12
handy [1] 14/8
happen [4] 26/11 57/8
87/22 114/17
happened [4] 75/17
76/16 96/13 100/16
happens [9] 24/1 41/5
76/10 76/13 76/20
99/5 99/5 115/20
115/21
harbor [1] 72/1
hard [4] 21/2 73/8
94/18 96/10
HARDY [1] 2/16
harken [1] 72/6
Harley [1] 89/11
Harry [1] 30/12
Harry Altalaryan [1]
30/12
having [8] 5/21 6/3
9/9 26/3 54/15 63/13
74/19 100/6
he's [10] 38/19 46/15
49/25 52/22 93/15
104/6 104/22 105/5
106/8 116/10
head [1] 27/4
health [1] 87/1
hear [28] 5/10 5/18
27/22 27/24 28/10
30/10 62/14 72/5 73/9
75/22 77/20 77/25
81/3 84/23 86/22
88/20 90/1 90/19
96/25 97/5 97/9 98/24
105/8 106/7 106/17
111/8 111/17 115/23
heard [16] 4/12 6/21
18/20 18/20 19/6 21/8
21/21 30/3 67/25
70/20 82/1 97/12
98/11 100/6 109/11
112/7
hearing [1] 80/19

hearsay [3] 13/3
14/10 19/3
heartburn [1] 45/3
heat [1] 76/19
heavy [1] 54/17
hedge [1] 37/23
Heights [1] 32/21
held [5] 23/1 78/18
101/20 103/12 118/6
help [7] 23/5 23/20
31/4 36/11 52/12 57/2
111/4
helped [1] 57/6
helpful [1] 27/17
helping [1] 51/6
helps [1] 95/21
hence [1] 67/13
herding [1] 49/25
hereby [2] 14/19
118/3
herself [1] 103/11
Hi [2] 37/2 43/11
HIGGINS [6] 2/11 3/10
4/13 12/24 28/7 30/5
high [10] 27/15 33/12
33/13 37/3 39/8 39/14
51/6 51/10 63/22 68/5
higher [1] 114/13
highly [1] 24/16
hill [1] 64/5
HILLS [1] 2/8
himself [1] 10/1
histology [2] 43/11
43/24
historical [1] 22/13
history [2] 22/16
22/17
hit [1] 96/15
hold [4] 50/20 61/10
64/14 108/1
holiday [1] 24/2
Hollywood [1] 36/19
home [5] 32/11 38/2
38/18 41/24 43/17
homeowners [1]
91/10
Honda [3] 72/22 73/14
100/24
honest [5] 4/20 10/11
24/22 25/1 84/13
honestly [1] 113/2
Honey [2] 35/25 36/1
HONORABLE [1] 1/3
honoring [1] 26/14
hope [1] 25/22
hopefully [2] 20/22
20/25
horrible [1] 22/9
horror [1] 52/19
Hospital [1] 43/12
hour [1] 21/1
hours [1] 22/10
house [2] 26/18 45/14
however [1] 28/20
Hugger [1] 60/16
Hugger Orange [1]
60/16
HUGRET [5] 2/21 4/5

7/1 28/15 30/8
huh [2] 44/6 88/14
humble [1] 103/5
hundred [3] 61/22
84/12 102/23
hundreds [1] 99/3
hurt [1] 96/19
husband [15] 32/22
33/1 34/3 37/3 41/9
41/17 49/9 57/6 61/23
62/2 67/14 68/20
69/12 71/6 86/24
husband's [1] 57/16
hypothetical [1] 17/19

**I**

I'd [4] 15/18 20/25
101/25 107/3
identified [1] 8/10
identify [3] 72/3
101/22 101/23
identifying [1] 8/12
idling [1] 74/20
ignorance [1] 43/24
ignore [2] 15/1 26/13
ignored [1] 16/11
II [2] 33/3 60/15
III [2] 2/16 30/7
illustrious [1] 26/4
imagined [1] 22/25
immediate [2] 50/21
73/24
impacts [1] 79/14
impaired [2] 29/9
29/24
impartial [22] 25/3
46/7 47/12 48/17
49/13 50/17 51/24
54/2 55/9 55/21 56/17
57/17 73/16 74/15
78/13 79/4 81/11 83/7
102/18 105/12 105/15
106/9
impartiality [1] 103/2
important [12] 21/17
23/3 23/5 23/18 23/20
24/25 25/19 25/25
26/1 26/21 42/12
112/3
imposition [1] 25/18
in 2017 [1] 14/10
In-house [1] 45/14
included [2] 20/5 20/6
including [3] 8/10
50/22 104/1
inclusive [1] 1/9 1/18
19/14
incorporate [1]
114/14
Independence [1]
22/15
Indiana [1] 48/11
48/12
indicate [4] 12/17
16/14 91/8 102/17
indicated [2] 102/3
103/25
indication [1] 105/23

**I**

Indies [1] 23/10
individual [2] 24/24
86/10
individuals [2] 26/4
46/16
industries [2] 78/22
79/15
industry [2] 41/25
57/15
influence [3] 79/23
100/7 100/20
information [7] 6/2
7/4 39/22 62/23 84/23
96/20 100/17
initial [2] 20/5 90/21
initially [1] 7/14
injured [1] 75/23
injuries [1] 22/18
insights [1] 52/14
inspected [1] 62/1
instance [1] 24/12
instances [1] 97/15
instead [1] 9/13
instruct [2] 35/10
42/17
instructed [3] 35/7
37/13 37/14
instruction [10] 112/4
113/6 113/8 114/2
114/8 114/10 114/14
114/19 114/21 115/1
Instruction 16 [1]
113/6
Instruction Number
16 [1] 113/8
Instruction Number
19 [1] 114/2
Instruction Number 3
[1] 114/8
instructions [17]
35/14 35/15 37/15
37/16 40/8 40/12
40/13 78/1 80/20
108/25 111/3 111/16
112/18 112/22 114/20
115/1 115/14
insurance [3] 76/2
76/14 96/19
intend [8] 8/7 8/12
10/22 11/1 11/3 20/24
116/11 116/25
intends [1] 6/6
interesting [1] 48/13
interior [1] 60/16
Internet [1] 25/13
intimidated [1] 61/14
introduce [8] 6/6 8/7
11/1 11/14 19/4 26/15
28/1 28/1
introduced [6] 6/18
7/6 8/21 11/23 12/1
18/23
investment [3] 68/15
87/5 100/13
involve [2] 58/20 60/9
involved [3] 47/6
72/12 92/12

involves [1] 100/5
involving [1] 70/21
Island [1] 23/10
issue [24] 5/2 7/3 8/4
9/13 10/25 12/18
19/21 25/5 73/11 83/1
85/9 86/22 88/2 88/16
88/23 88/24 89/1
91/11 94/9 94/15 98/1
99/11 112/24 116/10
issues [17] 9/5 13/3
19/16 30/1 61/14 62/3
63/11 65/7 65/18
79/17 85/10 92/4
100/14 112/19 113/1
115/12 116/21
items [1] 23/25
itself [2] 11/10 11/21

**J**

Jacob [1] 30/13
Jacob Doss [1] 30/13
jail [1] 49/3
Jane [1] 31/16
jargon [1] 61/15
Jefferson [1] 22/24
Jennifer [2] 31/14
31/17
Jimmy [2] 75/18 96/1
job [5] 27/21 41/14
51/14 51/15 100/13
join [1] 26/4
jointly [1] 7/17
JR [1] 1/3
judge [7] 1/3 35/6
40/14 41/7 80/21
114/18 114/20
judge's [1] 80/20
judges [2] 18/6 46/1
judicial [2] 12/4 23/10
118/8
JUI [1] 1/23 118/14
118/15
Julie [1] 31/12
jump [4] 59/5 70/17
84/25 94/13
jumping [1] 25/12
juncture [1] 102/15
juries [1] 40/1
juror [28] 25/4 31/21
34/23 35/11 35/13
42/18 45/1 52/23 79/3
83/9 94/3 98/23
100/21 102/5 103/22
105/9 105/23 106/14
108/5 108/15 108/16
108/16 108/17 108/18
108/19 108/19 108/20
108/21
Juror 16 [1] 103/22
Juror Number 1 [2]
31/21 108/15
Juror Number 12 [1]
108/5
Juror Number 2 [1]
108/16
Juror Number 3 [1]
108/16

Juror Number 4 [1]
108/17
Juror Number 5 [1]
108/19
Juror Number 6 [1]
108/19
Juror Number 7 [1]
108/20
Juror Number 8 [1]
108/21
jurors [26] 16/23 17/1
17/2 17/14 20/22 21/9
26/1 26/19 27/21
30/22 31/3 40/11
42/11 82/2 83/7 97/4
102/24 103/4 105/10
107/2 107/11 107/13
108/23 109/5 109/12
110/20
Jury Seat [1] 31/10
Jury Seat Number 10
[1] 31/15
Jury Seat Number 2
[1] 31/9
Jury Seat Number 5
[1] 31/11
Jury Seat Number 9
[1] 31/14
just -- I [1] 85/2
justice [2] 23/16
25/19

**K**

Kara [1] 30/14
Kara Kennedy [1]
30/14
keep [5] 22/10 24/5
71/21 77/24 100/1
keeper [1] 26/17
keeping [1] 63/12
KELLY [11] 2/16 3/20
13/5 13/13 19/6 28/13
30/7 81/15 93/9
101/11 102/21
Kelly's [2] 13/11 20/8
Kennedy [1] 30/14
kept [4] 75/20 93/3
96/16 106/14
Keyes [1] 74/9
Keystone [2] 53/7
53/16
kicking [2] 63/18 64/2
kid [1] 51/10
kidding [4] 42/8 59/20
59/20 111/25
kiddos [1] 41/10
kids [5] 37/24 59/18
66/8 82/19 110/8
KIESEL [16] 2/7
kill [1] 48/21
kind [12] 34/11 34/13
37/10 52/23 54/2
56/17 57/10 77/12
85/2 89/8 93/22
111/14
kinds [1] 54/16
King [1] 22/17
KIRNOS [4] 2/12 3/14

28/6 30/6
knee [1] 115/10
knew [1] 114/23
KNIGHT [1] 2/11
knowing [2] 80/10
81/13
knowledge [1] 61/4
known [4] 21/17
22/12 44/24 86/3
Kuhn [1] 30/15
Kuligowski [11] 31/15
41/1 41/3 41/6 65/20
71/13 84/6 102/4
103/4 103/17 109/16
Kwasniewicz [2]
30/14 116/1

**L**

L.A [3] 49/3 49/9
69/17
L.A. [1] 33/1
L.A. County [1] 33/1
L.L.P [1] 2/16
lack [1] 81/1
ladies [8] 21/12 28/8
28/12 31/1 93/11
101/17 110/25 111/6
Lampe [1] 3/22
language [1] 61/15
large [1] 32/14
last [12] 4/18 6/1 8/11
19/18 23/21 24/8
41/15 44/4 105/25
106/21 108/8 108/12
lastly [3] 78/2 78/4
78/7
late [3] 4/17 20/3
56/14
later [1] 96/23
law [24] 2/3 2/3 2/7
2/7 2/11 2/11 2/12
2/12 2/16 2/17 2/21
22/21 29/15 46/15
49/12 66/22 66/24
67/8 67/9 67/9 71/21
74/1 78/2 86/13
laws [1] 86/14
lawsuit [1] 29/20
75/25 93/17 94/7
lawyer [4] 19/25 47/19
48/4 49/21
lawyers [6] 26/11
30/18 46/2 47/2 48/21
111/17
lay [1] 6/14
leading [4] 63/7
105/17 106/3 106/4
lean [2] 80/8 104/18
leaning [6] 80/18
81/17 102/11 102/12
102/16 102/22 103/8
104/4 104/4 104/9
104/15 104/22 104/22
105/18 105/20 105/23
leanings [2] 80/17
84/11
leans [1] 103/14
learning [1] 77/7

lease [1] 71/20
leased [5] 61/17 65/21
71/12 71/15 71/23
least [2] 44/4 115/20
leather [1] 60/16
lectern [1] 112/24
led [1] 94/15
left [4] 16/23 26/22
42/5 106/18
legal [1] 45/8
legitimate [1] 103/16
lemon [2] 71/21 74/1
length [1] 59/11
let [30] 10/5 11/13
25/6 53/19 56/4 57/20
70/25 78/10 82/17
82/23 83/1 83/19
84/17 85/2 85/7 85/17
85/17 85/18 86/7
86/16 86/20 87/11
87/25 88/11 89/22
90/6 101/18 108/6
109/7 113/5
letter [26] 6/10 10/21
11/21 12/7 13/12
13/15 13/22 14/4
14/12 14/18 15/4 15/7
15/10 15/14 15/16
15/18 18/15 18/16
18/24 18/25 19/19
70/8 71/3 112/11
112/11 112/14
Leuchtenburg [19]
31/12 37/19 37/20
37/21 49/17 49/18
49/19 50/25 55/16
68/9 70/2 70/18 70/23
72/20 85/18 87/2
100/11 108/17 110/15
liability [1] 90/10
liable [2] 28/23 45/6
life [8] 9/18 25/18
25/25 32/9 46/25
65/22 67/5 104/3
light [2] 55/25 104/8
like [57] 5/9 14/23
15/18 20/25 21/25
23/4 23/6 23/20 23/20
25/20 32/3 49/13
50/17 51/24 52/10
52/12 52/20 55/9
55/21 56/22 57/18
59/3 59/10 60/8 60/24
61/5 67/21 67/22
68/14 69/18 69/24
72/4 72/5 72/9 73/16
73/19 74/15 74/24
75/13 75/17 75/18
76/5 77/5 77/8 77/20
80/21 84/15 89/11
93/19 101/5 101/25
105/5 106/23 107/2
107/4 107/20 108/9
likelihood [1] 27/15
likely [1] 21/1
limine [4] 6/5 12/17
13/1 112/13
limited [1] 50/23

**L**

**Lincoln [1]** 32/21
**Lincoln Heights [1]** 32/21
**line [3]** 55/17 113/8 113/24
**lines [1]** 48/22
**list [5]** 5/25 6/14 7/14 7/16 7/17 7/22 8/11 8/15 9/18 9/22 9/25 20/4 104/11
**listen [7]** 35/15 37/15 40/12 42/16 79/7 97/4 103/1
**listening [2]** 61/12 97/8
**lists [1]** 30/9
**liter [1]** 8/17
**literal [1]** 24/20
**literally [3]** 23/12 24/19 76/16
**litigation [1]** 45/19
**little [10]** 39/13 48/15 54/12 83/2 83/13 84/16 85/8 93/12 95/20 95/21
**live [15]** 32/7 32/20 33/20 34/1 36/18 37/2 37/22 38/9 40/21 41/8 41/16 42/22 43/5 43/12 44/8
**lives [1]** 99/14
**LLP [3]** 2/7 2/11 2/21
**locally [1]** 79/15
**long [15]** 23/11 24/8 34/15 37/8 39/6 53/12 53/17 67/3 79/22 80/6 81/4 81/7 91/6 104/2 116/1
**Long Beach [1]** 39/6
**long-standing [1]** 116/1
**longer [2]** 7/14 93/13
**Longoria [1]** 30/12
**look [9]** 10/24 18/17 20/11 20/13 25/17 60/18 79/23 112/17 114/19
**looked [1]** 112/12
**looking [2]** 83/7 112/11
**Looks [1]** 93/19
**Lorelyn [1]** 31/14
**LOS [11]** 1/17 1/24 2/4 2/13 3/1 32/21 32/23 34/3 34/18 43/12 48/10
**Los Angeles [4]** 32/21 34/18 43/12 48/10
**Los Angeles County [1]** 32/23
**losing [1]** 88/1
**loss [3]** 74/4 87/16 97/1
**lost [3]** 87/12 96/15 98/8
**lot [7]** 47/20 51/5 79/17 86/12 89/10

**lots [2]** 66/10 66/10
**LTD [1]** 66/13
**luck [2]** 38/24 109/19
**lunch [5]** 108/24 109/8 110/22 111/19 117/6

---

**M**

**ma'am [1]** 37/1
**Madam [1]** 26/17
**Madam Clerk [1]** 26/17
**made [9]** 6/7 10/5 10/20 15/3 16/2 16/11 19/7 19/25 20/4
**mail [2]** 70/8 70/14
**mainly [2]** 61/1 76/14
**maintain [1]** 58/16
**maintenance [1]** 52/13 55/15 58/6 58/15 58/17 60/3 60/4 61/23 88/23 88/25 99/4
**maintenanced [1]** 71/5
**make [42]** 22/3 22/6 25/10 27/6 27/14 27/16 31/2 40/15 44/17 46/6 47/11 48/17 49/12 49/17 50/13 50/16 51/23 52/22 54/1 55/8 55/20 56/16 56/21 59/2 60/7 61/4 72/1 72/6 74/14 74/24 75/13 76/4 77/4 77/19 79/25 80/2 88/20 94/3 99/21 101/21 104/24 117/2
**making [3]** 13/23 13/23 102/18
**Malaugh [1]** 70/1
**malpractice [1]** 45/23
**man [2]** 22/25 67/13
**manager [2]** 38/10 38/19
**managing [3]** 46/14 49/20 49/25
**manufactured [1]** 29/3
**manufacturer [4]** 50/23 72/2 94/8 100/25
**manufacturers [1]** 101/9
**manufacturing [1]** 38/11
**many [6]** 5/24 16/21 21/24 22/18 59/17 76/20
**March [1]** 29/2
**Maria [1]** 31/9
**MARK [8]** 1/5 3/4 21/10 21/19 28/4 29/1 30/11 30/13
**Mark Fields [1]** 30/13
**Mark Pedante [3]** 21/19 28/4 30/11

**Mark Pedante's [1]** 29/1
**marked [1]** 20/9
**marketing [5]** 35/24 36/3 36/4 41/17 42/23
**marks [1]** 26/18
**Marlborough [13]** 31/16 41/13 45/8 46/10 56/25 59/6 61/19 66/8 70/25 86/17 108/4 108/5 109/22
**married [13]** 32/21 34/3 36/20 37/23 38/12 39/7 40/22 41/9 41/17 43/7 43/13 43/16 57/6
**Maslar [11]** 31/14 40/18 47/15 47/16 47/17 63/16 64/15 64/17 83/17 108/19 110/13
**match [1]** 29/12
**matched [1]** 84/24
**math [1]** 108/15
**matter [9]** 13/18 14/12 18/24 19/20 24/8 97/7 111/11 111/14 118/6
**matters [11]** 4/11 5/25 13/16 19/4 23/5 23/12 23/15 23/20 26/1 72/14 109/7
**Matthew [1]** 30/15
**Matthew Fyie [1]** 30/15
**Maverick [1]** 66/12
**maybe [13]** 35/4 40/15 56/14 57/12 67/4 89/9 94/15 97/3 102/23 107/5 113/21 116/10 116/25
**McNeeley [1]** 30/12
**mean [13]** 5/2 14/19 14/23 24/21 46/23 51/10 63/21 64/2 68/4 94/18 99/2 105/4 105/6
**meaning [1]** 58/11
**means [1]** 24/19
**meant [1]** 18/8
**mechanic [10]** 50/24 54/6 55/8 57/7 58/15 58/19 58/23 66/25 67/3 67/5
**mechanical [1]** 61/13
**mechanics [1]** 57/2
**media [3]** 70/20 92/15 113/11
**medical [2]** 45/23 116/2
**meet [5]** 8/9 10/6 24/7 81/8 106/9
**meets [1]** 81/7
**MEI [3]** 1/23 118/14 118/15
**Melaugh [12]** 31/8 32/2 32/3 32/5 60/13 61/11 76/8 90/14

**93/20 94/13 107/21 109/18
**Melaugh's [1]** 93/15
**members [4]** 24/22 50/21 61/16 73/24
**memory [1]** 104/8
**men [1]** 49/3
**mental [2]** 27/14 44/17
**mention [3]** 20/8 54/11 66/21
**mentioned [9]** 22/12 27/18 28/18 44/14 51/9 84/6 87/10 87/23 94/14
**mere [1]** 28/22
**merits [1]** 5/18
**messed [1]** 106/24
**met [3]** 9/11 26/17 104/12
**MetLife [1]** 113/22
**mic [2]** 85/25 100/11
**Micale [1]** 30/11
**microphone [12]** 32/18 39/3 44/20 45/10 50/20 64/15 70/25 74/6 88/19 90/18 93/20 95/23
**middle [2]** 23/13 37/3
**might [12]** 27/13 44/17 44/18 57/5 61/14 77/20 80/18 81/18 84/10 94/3 100/7 100/20
**mike [2]** 61/11 99/9
**mileage [1]** 68/5
**miles [1]** 61/23 67/21 67/23 98/21
**military [1]** 54/15
**mind [17]** 32/10 32/25 33/11 35/21 36/16 50/20 57/9 64/15 64/21 65/23 77/24 81/18 81/21 104/19 105/11 106/10 106/19
**mindful [1]** 27/5
**mine [1]** 113/23
**minor [1]** 113/1
**minute [5]** 92/1 105/4 107/7 107/8 110/18
**minutes [5]** 16/18 20/21 82/4 107/5 107/7
**mirror [1]** 63/25
**misconduct [1]** 50/10
**misheard [1]** 39/25
**Miss [58]** 16/9 16/9 32/18 33/18 33/25 36/24 37/12 38/6 39/2 40/18 41/2 41/3 41/6 41/13 43/4 45/10 45/11 46/10 47/15 49/1 53/2 56/8 56/20 56/25 59/6 61/19 62/7 62/22 63/16 64/15 65/20 66/8 68/19 69/2 69/8 70/25 71/13 74/17 75/16 84/6

**87/12 87/17 95/23 97/11 103/4 103/17 108/4 108/5 108/10 108/11 108/15 108/16 108/17 108/20 108/20 109/16 109/20 110/1
**Miss Aleman [8]** 32/18 69/8 75/16 87/12 87/17 95/23 97/11 109/20
**Miss Barboza [2]** 39/2 53/2
**Miss Guerrero [4]** 33/18 49/1 69/2 108/15
**Miss Kuligowski [8]** 41/3 41/6 65/20 71/13 84/6 103/4 103/17 109/16
**Miss Marlborough [9]** 41/13 46/10 56/25 59/6 61/19 66/8 70/25 108/4 108/5
**Miss Maslar [4]** 40/18 47/15 63/16 64/15
**Miss Morgan [5]** 45/10 45/11 62/7 62/22 108/20
**Miss Ormsbee [3]** 36/24 68/19 108/16
**Miss Scruggs [4]** 43/4 56/8 56/20 74/17
**Miss Shah [2]** 38/6 108/17
**Miss Skruggs [1]** 108/20
**Miss Taft [2]** 16/9 16/9
**Miss Yuan [5]** 33/25 37/12 108/10 108/11 110/1
**missed [2]** 68/18 113/3
**missing [1]** 14/12
**misspoke [1]** 35/4
**mitigate [1]** 79/14
**mixed [1]** 91/11
**mixed-use [1]** 91/11
**mode [1]** 22/5
**model [3]** 76/22 76/24 92/12
**modern [1]** 60/25
**modifications [1]** 60/4
**mom [2]** 41/24 62/9
**moment [4]** 14/2 20/11 21/14 27/8
**moments [1]** 82/15
**Monday [3]** 24/1 24/1 24/18
**Monica [1]** 37/23
**monitor [1]** 26/25
**Montebello [1]** 33/21
**MONTGOMERY [1]** 2/18
**monthly [1]** 76/10
**months [1]** 36/8
**moot [1]** 8/4
**more [19]** 9/8 9/9

**M**

more... **[17]** 25/16
45/21 50/3 54/17
54/20 57/11 57/16
60/25 63/20 73/18
78/5 80/8 80/12 88/23
101/11 102/23 117/1
**Morgan [7]** 31/17
42/21 45/10 45/11
62/7 62/22 108/20
**morning [44]** 3/7 3/9
3/12 3/13 3/15 3/18
3/20 4/4 4/6 4/7 4/9
6/22 12/22 21/12 28/3
28/7 28/12 32/5 32/6
32/19 32/20 33/19
33/20 34/1 36/13
36/15 37/1 37/21
37/22 38/8 38/9 39/4
39/5 40/20 40/21 41/6
41/7 42/21 42/22 43/5
44/7 82/22 93/11
93/12
**most [4]** 26/21 55/3
83/2 94/20
**mostly [1]** 49/22
52/13
**motion [6]** 6/23 6/24
7/19 8/1 11/18 13/1
**motions [4]** 6/5 9/20
9/21 112/13
**motor [21]** 1/8 3/5
3/21 3/22 4/5 4/17
21/11 21/19 28/13
29/4 29/5 29/10 29/13
29/18 51/16 73/10
73/15 73/25 79/22
87/5 104/1
**motorcycle [3]** 60/5
60/7 89/5
**move [2]** 21/3 47/15
**moving [3]** 24/5 75/20
96/16
**Mr. Altman [11]** 79/3
82/6 82/21 90/14 93/8
102/1 103/19 104/8
105/1 105/25 106/13
**Mr. Altman's [1]**
104/10
**Mr. C [6]** 59/24 59/24
67/17 77/10 89/4 99/9
**Mr. Chang [8]** 16/8
87/18 97/13 108/13
110/3 112/23 112/25
115/7
**Mr. Cooper [9]** 43/10
54/5 55/17 56/5 56/9
74/5 85/9 88/13
108/21
**Mr. Hugret [1]** 7/1
**Mr. Kelly [7]** 13/5
13/13 19/6 81/15 93/9
101/11 102/21
**Mr. Kelly's [2]** 13/11
20/8
**Mr. Kwasniewicz [1]**
116/1
**Mr. Leuchtenburg [12]**
37/19 50/25 55/16

68/9 70/18 70/23
72/20 85/18 87/2
100/11 108/17 110/15
**Mr. Malaugh [1]** 70/1
**Mr. Melaugh [8]** 32/2
60/13 61/11 76/8
93/20 94/13 107/21
109/18
**Mr. Melaugh's [1]**
93/15
**Mr. Pedante [4]** 3/8
3/11 86/9 89/25
**Mr. Pedante's [4]** 10/1
14/5 29/24 90/8
**Mr. Schlenger [3]**
44/5 103/23 110/5
**Mrowka [1]** 13/21
**Mrs [2]** 53/3 53/4
**Mrs. [9]** 58/1 63/1
65/10 75/3 83/4 85/22
86/17 92/3 109/24
**Mrs. Barboza [8]** 58/1
63/1 65/10 75/3 83/4
85/22 92/3 109/24
**Mrs. Marlborough [1]**
86/17
**Ms. Aleman [2]** 62/16
107/23
**Ms. Barboza [2]** 99/10
108/7
**Ms. Guerrero [1]**
110/11
**Ms. Kuligowski [1]**
102/4
**Ms. Marlborough [2]**
45/8 109/22
**Ms. Maslar [4]** 64/17
83/17 108/19 110/13
**Ms. Morgan [1]** 42/21
**Ms. Mrowka [1]** 13/21
**Ms. Shah [2]** 108/17
110/14
**much [17]** 5/21 6/1
12/11 12/12 14/3
54/24 55/8 57/21
76/19 77/2 79/1 90/25
91/13 91/24 94/17
95/11 109/25
**muffler [1]** 96/22
**multiple [4]** 25/21
67/20 71/18 101/22
**murder [1]** 37/11
**must [2]** 44/24 45/2
**Mustang [4]** 65/13
66/11 68/11 69/13
**myself [2]** 20/18
30/17

**N**

**name [9]** 21/18 21/20
28/7 36/10 41/5 41/15
49/17 52/3 109/14
**names [5]** 16/5 16/8
27/8 30/3 109/14
**Nassihi [1]** 30/7
**national [1]** 5/17
**nature [8]** 45/16 46/2
46/11 46/22 48/6

48/11 49/24 78/20
**navigation [2]** 94/23
94/24
**Nazarus [1]** 93/19
**necessarily [2]** 25/2
103/14
**necessitate [1]** 19/15
**need [12]** 5/18 10/12
20/16 21/3 31/23
41/20 60/21 63/19
68/5 94/23 111/24
114/1
**needed [1]** 18/11
**needs [1]** 58/6
**negative [10]** 64/17
65/15 66/2 66/19
67/10 67/24 68/22
78/21 79/18 83/21
**network [3]** 36/19
36/20 67/18
**never [23]** 13/7 13/8
13/18 20/3 20/4 20/5
20/5 20/9 20/10 32/8
32/24 34/22 40/23
41/10 42/25 43/8
43/14 43/15 62/3
64/10 68/2 69/22
96/21
**nevertheless [1]**
60/10
**new [3]** 60/25 64/24
64/24
**newer [4]** 76/22 76/23
77/2 94/21
**news [1]** 113/11
**next [15]** 17/8 23/22
24/1 24/3 28/5 95/17
95/23 97/20 98/11
107/22 107/25 108/6
110/14 116/3 116/11
**night [5]** 4/18 6/1 9/14
23/14 60/18
**Ninth [4]** 106/24
114/18 114/20 115/1
**Ninth Circuit [3]**
106/24 114/18 115/1
**Nissan [7]** 71/15
71/17 72/6 72/10
72/11 84/18 85/4
**nodding [1]** 27/4
**None [1]** 80/24
**nonhearsay [5]** 15/10
15/11 18/21 20/12
112/14
**nonobjectively [1]**
80/1
**nonprofit [1]** 39/7
**nonsense [1]** 10/11
**nonverbal [1]** 27/3
**normal [1]** 76/10
**note [3]** 22/23 27/14
44/17
**nothing [3]** 51/20
93/25 103/13
**notice [1]** 12/5 12/21
61/24 86/21 86/23
**noticed [1]** 71/7
**notices [1]** 71/21

**notion [1]** 106/18
**Nova [4]** 60/15 60/15
95/19 95/19
**NOVEMBER [3]** 1/15
3/1 118/10
**number [45]** 7/18 7/20
8/16 9/24 10/23 14/8
29/12 29/22 31/9 31/9
31/10 31/11 31/11
31/12 31/13 31/13
31/14 31/15 31/16
31/16 31/17 31/18
31/18 31/19 31/21
44/15 102/5 107/21
108/5 108/10 108/15
108/16 108/16 108/17
108/19 108/19 108/20
108/21 109/14 113/2
113/7 113/8 114/2
114/2 114/8
**Number 1 [2]** 31/9
107/21
**Number 16 [2]** 113/2
113/7
**Number 19 [1]** 114/2
**Number 3 [1]** 31/10
**Number 4 [1]** 108/10

**O**

**o'clock [2]** 111/8
111/15
**oath [1]** 26/19
**OB [1]** 43/19
**OB/GYN's [1]** 43/19
**objection [2]** 18/12
18/14
**objections [1]** 112/19
**objective [3]** 104/11
105/8 106/16
**objectively [1]** 78/24
**obligation [2]** 23/6
23/7
**observation [1]** 93/15
**obvious [1]** 8/5
**obviously [10]** 23/17
58/21 60/8 66/20
72/11 73/7 86/9 89/24
91/16 114/13
**occasions [1]** 25/21
**occupation [2]** 39/23
41/20
**occupations [1]** 39/9
**occur [2]** 96/9 99/12
**occurred [2]** 77/14
96/4
**occurrence [1]** 98/13
**October [9]** 7/13
10/20 11/9 12/7 12/21
13/21 14/15 15/2
112/11
**October 2017 [1]** 15/2
**October 6th, 2017 [1]**
112/11
**off [12]** 22/5 31/20
38/22 63/25 72/24
75/19 75/20 80/4
81/17 96/14 96/14
97/9

**off-ramp [2]** 96/14
96/14
**offer [16]** 10/20 11/8
11/10 11/12 11/20
11/21 12/21 13/23
13/24 14/25 15/3
18/22 19/7 19/9 19/14
20/1
**offered [8]** 14/9 14/10
14/11 14/14 14/21
14/24 15/12 18/23
**offering [2]** 19/7
116/24
**offers [1]** 6/7
**office [6]** 3/23 32/15
43/19 43/21 43/22
47/1
**OFFICIAL [1]** 1/23
**often [1]** 41/5
**oh [4]** 18/8 66/16 70/3
82/10
**oil [8]** 51/6 51/9 51/20
55/18 55/24 56/5
56/11 69/5
**old [15]** 38/12 43/13
43/13 48/20 57/12
63/17 63/18 64/25
83/23 88/17 88/21
94/19 94/24 95/1
108/1
**old-style [1]** 57/12
**older [6]** 35/23 54/12
76/24 95/11
**oldest [1]** 32/23
**Once [2]** 7/16 17/5
24/9
**one [68]** 2/18 14/23
15/5 16/22 19/13
21/14 25/16 28/23
33/8 33/13 35/24
38/13 40/1 40/2 41/25
46/10 47/5 47/7 49/21
52/5 55/14 58/24 64/9
64/19 65/1 65/12
65/12 66/14 66/16
68/10 68/13 68/24
72/7 75/4 75/9 76/4
76/16 77/1 77/15
79/20 80/5 80/9 81/17
83/1 85/18 90/9 91/18
92/1 93/3 96/19 98/13
100/20 101/11 102/2
102/3 102/11 102/22
103/4 104/10 105/23
105/25 107/7 107/8
108/1 113/18 114/4
115/25 117/1
**one-time [1]** 98/13
**ones [2]** 44/1 76/24
**online [1]** 86/22
**only [15]** 14/16 14/24
16/22 19/21 22/25
35/15 59/20 64/8
76/24 96/24 102/2
103/4 114/4 116/10
116/17
**oOo [1]** 117/7
**open [5]** 21/8 77/24

**O**

**open... [3]** 82/1 109/11 112/7
**opening [10]** 6/17 10/22 11/1 11/4 111/16 111/17 112/17 113/7 114/8 115/14
**operating [1]** 55/4
**opinion [2]** 103/5 111/10
**opponent [1]** 13/7
**opponent's [1]** 12/1
**opportunities [1]** 29/13
**opportunity [5]** 5/22 6/8 13/20 25/22 51/17
**opposed [1]** 97/6
**opposition [1]** 4/17
**optimistic [1]** 24/6
**oral [1]** 19/22
**orally [1]** 10/21
**Orange [1]** 60/16
**order [3]** 6/25 7/22 112/16
**ordered [1]** 26/7
**orders [4]** 6/4 10/2 27/19 27/21
**Oregon [2]** 99/14 99/18
**organ [1]** 69/11
**organization [2]** 38/11 99/3
**original [3]** 27/12 64/23 90/23
**Ormsbee [4]** 31/12 36/24 68/19 108/16
**oscillation [1]** 95/2
**otherwise [2]** 22/5 24/2
**Ours [2]** 113/19 113/20
**out [29]** 5/13 5/24 8/7 9/12 10/7 11/24 20/19 22/10 27/8 27/24 29/1 52/10 52/12 73/2 75/6 76/17 77/7 80/7 82/16 94/18 97/23 97/24 97/25 98/11 102/10 105/23 114/20 116/7 116/23
**outboard [3]** 72/23 73/14 100/24
**outset [2]** 104/22 104/23
**outside [7]** 27/19 27/24 32/11 38/1 38/17 43/17 112/7
**over [20]** 8/11 9/14 16/19 23/9 32/18 39/3 44/21 46/22 54/8 54/18 58/19 67/21 67/23 71/23 92/15 92/15 98/21 101/8 101/8 116/9
**overheating [1]** 94/15
**Overla [1]** 30/13
**oversaw [2]** 58/5 58/10

**overseeing [1]** 58/3
**own [10]** 10/1 10/2 10/2 22/8 23/12 50/9 57/21 59/6 59/11 99/3
**owned [19]** 59/6 61/16 62/5 62/9 62/17 63/2 64/8 64/10 64/16 64/18 64/22 65/11 65/13 65/21 68/2 69/3 69/4 71/12 94/21
**owner [3]** 44/9 73/2 91/11
**ownership [1]** 72/7
**owns [2]** 67/19 68/20

**P**

**P. [1]** 30/8
**pack [1]** 74/21
**page [1]** 118/7
**Pages [1]** 1/18
**paint [2]** 60/16 72/24
**Palos [1]** 34/2
**Palos Verdes [1]** 34/2
**panel [3]** 82/24 102/9 108/24
**paper [1]** 9/14
**paperwork [1]** 5/23
**paragraph [2]** 114/4
**paralegal [1]** 45/12
**Paramount [3]** 39/8 39/16 39/17
**pared [1]** 7/15
**parents [1]** 23/9
**PARK [2]** 2/13 43/6
**parsing [1]** 14/24
**part [4]** 11/17 58/2 71/2 100/13
**parte [2]** 4/15 5/3
**participant [1]** 112/2
**particular [3]** 87/7 92/11 92/12
**particularly [8]** 10/10 16/8 65/14 66/2 66/18 67/6 68/22 106/14
**parties [12]** 4/11 7/18 9/3 9/11 16/16 24/5 26/7 26/11 27/18 44/23 47/5 114/8
**parties' [1]** 113/3
**partner [3]** 46/14 49/20 49/25
**parts [3]** 53/6 89/7 89/11
**party [4]** 12/1 13/7 13/10 45/2
**party's [1]** 12/4
**party-opponent [1]** 13/7
**party-opponent's [1]** 12/1
**Pascarella [1]** 30/15
**Paso [1]** 41/16
**pass [12]** 17/9 17/10 17/20 17/21 18/2 18/7 18/9 32/18 86/13 95/22 99/9 100/11
**passenger [1]** 58/5
**passes [2]** 17/23 18/2

**past [5]** 24/10 26/12 46/3 60/2 73/3
**patent [1]** 5/16
**Paterson [2]** 28/14
**pathologist [1]** 44/2
**patience [1]** 93/12
**Patrick [1]** 30/12
**Patrick McNeeley [1]** 30/12
**Patterson [1]** 3/24
**pause [2]** 18/18 107/9
**pay [1]** 27/13
**paying [1]** 22/3
**payments [1]** 29/16
**PEDANTE [10]** 1/5 3/5 3/8 3/11 21/11 21/19 28/4 30/11 86/9 89/25
**Pedante's [5]** 10/1 14/5 29/1 29/24 90/8
**penalties [1]** 29/17
**Pendleton [1]** 54/8
**people [7]** 23/4 23/20 25/20 43/25 55/4 67/25 86/12
**percent [2]** 84/13 102/23
**peremptories [11]** 16/23 16/24 17/6 17/7 17/12 17/12 17/13 18/2 18/3 107/4 107/15
**peremptory [12]** 16/13 16/15 17/1 17/20 17/21 18/9 107/18 107/22 107/25 108/6 108/8 108/12
**perfect [3]** 69/10 105/9 117/4
**performance [1]** 91/13
**perhaps [4]** 25/15 26/21 89/2 114/15
**period [4]** 11/18 51/18 63/4 73/3
**permission [1]** 3/25
**person [5]** 26/21 68/1 80/12 84/7 97/8
**personal [1]** 21/24 54/20 104/3
**personal-type [1]** 54/20
**personally [3]** 55/14 68/2 71/12
**perspective [1]** 22/14
**pharmacist [1]** 41/8
**phasing [1]** 82/16
**phones [1]** 12/1
**pick [4]** 17/14 17/22 21/18 107/15
**picked [4]** 20/25 26/2 27/12 35/12
**Pinto [1]** 66/11
**place [1]** 22/5
**placed [1]** 20/8
**places [2]** 25/14 26/18
**plaintiff [15]** 2/2 4/14 17/7 17/8 17/8 18/19 29/1 29/6 29/10

**past [6]** 24/10 26/12 29/16 29/19 90/17 90/20 91/16 93/15 93/16 102/1 104/16 104/23 107/19 107/25 108/8 115/3 115/16
**plaintiff's [5]** 9/18 17/20 18/13 91/16 116/20
**plaintiffs [6]** 8/3 8/18 17/18 28/1 104/4 114/3
**plaintiffs' [1]** 7/21
**planning [1]** 116/2
**plastic [1]** 72/25
**pleadings [1]** 9/15
**please [24]** 3/6 3/19 21/25 27/13 27/13 28/10 30/10 30/22 30/24 31/7 31/8 36/17 39/3 65/24 78/10 78/17 93/21 99/10 100/11 101/19 110/23 111/10 111/22 112/6
**plenty [1]** 60/4
**plug [1]** 51/6
**pluralized [1]** 114/3
**point [6]** 4/25 5/24 9/18 17/5 18/20 30/22 66/12 73/18 78/22 83/11 101/14 106/17 114/21 115/2 115/24 116/22
**pointing [1]** 81/5
**police [1]** 23/12
**policy [1]** 47/6
**portion [1]** 6/14
**posed [1]** 102/9
**position [2]** 102/20 103/12
**positions [1]** 42/24
**positive [12]** 64/17 65/3 65/14 65/16 66/2 66/18 66/20 67/10 67/24 68/22 83/12 83/20
**possible [2]** 15/18 27/17
**post [3]** 12/19 50/5 60/15
**post-conviction [1]** 50/5
**post-demand [1]** 12/19
**potential [2]** 30/9 30/19
**potentially [1]** 8/5
**POWELL [4]** 2/12 3/16 28/6 30/6
**power [8]** 52/6 52/15 74/4 87/12 87/16 88/1 96/16 97/1
**PowerPoint [1]** 16/1
**PowerShift [1]** 29/6
**practice [7]** 45/17 46/12 46/22 47/3 48/7 48/13 49/24
**practicing [1]** 46/18
**precisely [1]** 6/5

**prefer [1]** 112/21
**pregnancy [3]** 38/25 82/14 82/15
**pregnant [1]** 108/18
**preliminary [2]** 109/7 112/10
**preparation [1]** 13/19
**preponderance [2]** 35/9 44/25
**prepping [1]** 52/11
**presence [4]** 21/8 82/1 109/11 112/8
**present [3]** 3/8 22/17 30/4
**presented [3]** 30/1 77/25 78/6
**preserve [1]** 8/1
**preserved [1]** 22/23
**President [1]** 22/24
**President Jefferson [1]** 22/24
**press [2]** 86/22 87/6
**presume [1]** 28/22
**pretty [8]** 22/9 54/24 76/9 76/19 90/25 94/17 95/11 96/10
**previous [4]** 58/3 68/13 70/7 77/13
**primarily [1]** 46/15
**principles [1]** 23/1
**prior [5]** 32/8 36/21 39/10 51/12 62/20
**private [2]** 50/3 50/14
**probably [13]** 21/1 25/13 39/10 42/3 52/7 54/23 57/20 75/17 89/1 99/13 103/4 114/19 116/8
**Probe [2]** 69/4 69/5
**problem [14]** 59/13 71/11 74/22 94/18 96/21 96/22 96/24 97/19 98/5 98/18 99/4 106/21 115/19 115/24
**problems [8]** 62/19 63/7 64/2 64/3 69/22 72/3 72/19 77/8
**procedure [2]** 16/14 16/16 18/12
**proceed [3]** 16/24 82/6 82/21
**proceeding [1]** 9/20
**proceedings [9]** 1/14 5/6 5/15 18/18 26/24 78/18 101/20 107/9 118/6
**process [10]** 16/12 20/23 21/17 22/7 25/15 26/3 26/7 26/11 27/16 112/3
**product [1]** 38/19
**production [1]** 38/4
**prohibit [1]** 10/19
**project [1]** 38/10
**promise [1]** 24/4
**proof [11]** 11/10 35/7 35/9 35/10 37/13 42/15 42/17 80/21

## P

proof... [3] 106/19 114/9 114/12
proper [1] 8/18
properly [1] 29/14
proposing [1] 18/4
proprietary [2] 7/9 8/2
prosecution [1] 50/10
prospective [4] 21/9 82/2 102/5 109/12
Prospective Juror Number [1] 102/5
protect [1] 8/2
protective [2] 6/25 7/22
prove [5] 15/7 15/12 44/24 45/2 104/24
proved [1] 19/8
provide [1] 80/22
provided [3] 29/22 32/8 112/18
provisions [1] 6/12
pry [2] 25/2 25/9
prying [1] 33/12
public [3] 5/25 9/2 79/16
pull [1] 113/5
purchase [3] 29/2 85/3 85/3
purchased [2] 93/4 100/3
purchasing [1] 63/12
purported [1] 19/13
purpose [2] 19/3 112/15
pursuant [1] 118/3
push [1] 21/2
pushed [2] 73/8 79/15
putting [1] 16/8

## Q

qualifications [1] 31/3
quarter [6] 109/2 109/3 109/6 112/9 115/11 117/5
question [20] 8/6 15/21 15/24 17/15 17/17 21/23 25/5 30/5 80/15 82/12 84/9 97/3 101/12 101/16 102/8 104/10
questioning [1] 102/14
questions [20] 24/24 24/25 25/1 27/3 27/6 27/14 31/2 31/21 36/17 44/15 44/18 44/19 53/20 63/20 78/5 79/3 82/5 86/17 102/25 105/18
quite [6] 22/15 23/11 26/2 41/4 57/6 103/10
quote [1] 48/20

## R

raise [8] 10/15 21/25 30/20 30/24 44/20
raised [2] 90/9 90/15
ramp [2] 96/14 96/14
range [1] 92/20
rangers [1] 65/12
rather [2] 19/24 55/5
reach [3] 35/2 35/3 42/3
reached [3] 34/8 35/1 42/5
read [7] 4/19 28/24 68/15 70/20 70/23 109/13 109/14
ready [5] 71/5 108/25 115/15 115/18 115/18
real [3] 27/1 32/7 46/15
real estate [2] 32/7 46/15
really [18] 5/18 7/24 18/8 24/21 50/14 51/20 52/19 60/17 74/7 81/10 83/21 91/12 91/20 92/19 94/19 99/1 101/2 113/17
rearview [1] 63/24
reason [4] 24/10 24/15 35/5 114/17
reasonable [3] 29/12 29/22 35/8
reasons [3] 22/2 76/13 76/20
rebuild [1] 95/12
rebuilding [1] 95/21
rebuilds [1] 60/24
rebuilt [1] 95/17
recall [9] 61/24 63/8 68/15 70/8 70/21 73/2 86/20 86/21 92/16
recalled [1] 70/5
recalls [1] 100/17
receipt [1] 11/19
receive [1] 113/25
received [4] 8/13 35/14 70/8 113/25
receiving [1] 71/21
recent [1] 94/20
recently [2] 90/17 90/20
reception [1] 22/8
recess [3] 20/20 21/5 21/6 21/7 117/6
reconfigure [1] 110/10
record [7] 6/1 9/2 10/6 11/8 11/17 12/5 27/5
recruiter [1] 42/23
redacted [2] 18/24 19/11
Redondo [1] 42/23
Redondo Beach [1] 42/23
REES [1] 2/21
Reese [1] 19/25
refer [2] 10/25 67/25
reference [5] 10/20 10/22 11/4 11/11
referenced [2] 59/11 75/10
referred [1] 112/12
referring [1] 10/24
refurbished [1] 57/7
refusal [1] 29/18
regarded [1] 23/11
regardless [4] 80/17 80/18 105/14 106/8
registered [1] 73/1
regularly [1] 56/11
regulations [1] 118/8
rehabilitate [2] 103/10 103/11
rehabilitated [2] 102/13 102/24
reject [1] 20/2
rejection [3] 11/9 11/12 11/20
relate [1] 99/23
related [3] 8/16 10/1 88/25
relates [3] 13/9 13/14 18/20 31/22 61/13 103/17 112/15
relationship [8] 30/17 47/10 49/11 50/12 50/15 52/22 58/22 73/18
relay [1] 63/6 64/1
relevant [1] 12/18
relief [1] 50/5
remain [1] 8/17
remainder [1] 23/25
remaining [2] 9/22 110/7
remand [1] 11/18
remedy [1] 5/19
remember [12] 15/16 34/7 34/10 34/18 40/9 51/17 65/8 69/23 82/19 98/1 105/2 112/18
remind [3] 22/3 44/16 107/14
reminder [1] 23/18
removal [1] 79/16
remove [2] 8/19 103/18
removed [2] 8/14 44/1
render [2] 78/5 111/2
repair [17] 10/2 29/11 29/11 29/21 29/22 50/24 51/2 51/2 52/6 55/15 58/6 58/13 60/3 74/20 97/18 98/11 98/17
repaired [4] 97/24 97/25 98/2 98/4
repairs [5] 52/12 58/11 68/6 75/10 77/14
repeated [2] 22/17
repeatedly [1] 111/9
repetitively [1] 106/7
replace [3] 29/14 29/19 85/20
replaced [15] 58/8 58/24 63/3 63/8 63/9 63/11 74/10 74/21 77/17 85/10 85/11 85/24 86/4 93/2 98/12
replacement [2] 67/21 67/23
replacements [1] 86/18
reported [2] 75/5 118/5
reporter [5] 1/23 26/22 44/21 88/20 90/19
REPORTER'S [1] 1/14
reports [2] 58/17 68/16
represent [1] 28/13
represented [1] 46/16
repurchase [1] 29/18
repurchased [1] 73/25
request [4] 8/24 9/4 10/19 114/21
require [1] 104/24
required [1] 29/14
research [7] 68/16 87/3 87/5 87/10 100/12 100/13 111/13
reseat [1] 17/2
resentment [1] 72/1
residence [1] 31/23
residential [2] 54/19 54/20
residents [1] 91/12
resolve [7] 14/9 14/15 14/17 15/4 15/13 19/8 73/11
respect [3] 20/8 76/21 100/12
respectfully [2] 22/4 114/21
respecting [1] 26/14
response [7] 8/14 9/10 44/20 70/4 80/25 102/18 105/9
responses [2] 27/15 104/10
responsibility [2] 91/9 91/13
rest [1] 23/8
rested [1] 115/22
restitution [1] 29/16
restoration [1] 60/15
restricting [1] 6/16
restroom [1] 21/3
result [2] 9/2 76/1
resulted [1] 75/9
resume [2] 24/18
resuming [1] 109/1
retailer [1] 32/14
retired [2] 34/4 54/9
return [12] 5/21 52/11 109/15 109/16 109/18 109/20 109/22 110/1 110/3 110/5 111/24 112/3
revelation [1] 18/8
review [3] 4/21 5/22 6/9
reviewed [1] 7/16
reviewing [3] 6/4 16/12 19/10
rewind [1] 11/13
rid [1] 93/5
right [157]
rise [2] 21/6 111/21
road [1] 107/24
Robert [2] 30/15 30/15
Robert Kuhn [1] 30/15
Robert Pascarella [1] 30/15
Robles [1] 41/16
ROGER [4] 2/12 3/14 28/6 30/6
Roger Kirnos [3] 3/14 28/6 30/6
roll [1] 101/8
room [13] 1/24 24/12 109/15 109/17 109/19 109/21 109/23 109/25 110/2 110/4 110/6 112/2 112/4
roommate [3] 70/7 70/10 70/11
Ropes [1] 49/21
row [3] 17/23 27/9 27/10
rude [2] 26/13 27/20
rule [5] 6/11 6/12 13/22 73/19 104/12
Rule 30 [1] 13/22
Rule 68 [2] 6/11 6/12
rules [2] 26/6 26/14 42/16
ruling [3] 12/17 13/1 13/2
rulings [2] 9/23 19/11
running [3] 65/23 71/16 84/19
runs [2] 26/20 68/12
RUSSELL [5] 2/11 3/10 4/13 28/7 30/5

## S

S1000RR [1] 89/18
Safe [1] 109/23
safety [6] 29/9 30/1 88/2 88/16 88/24 89/1
sake [1] 114/13
sale [3] 59/14 59/15 59/21
sales [3] 41/17 53/6 53/10
SAMANTHA [4] 2/17 4/8 28/15 30/7
Samantha Burnett [3] 4/8 28/15 30/7
same [9] 7/13 36/20 40/10 42/10 48/1 53/19 55/24 59/10 80/7
SAN [4] 2/18 2/22 31/24 31/24

**S**

San Fernando [1] 31/24
San Gabriel [1] 31/24
Santa [3] 37/23 41/8 41/16
Santa Barbara [1] 41/16
Santa Monica [1] 37/23
satisfy [1] 18/24
save [1] 17/10
saying [11] 11/14 11/25 13/5 14/17 14/24 15/9 15/10 19/24 81/16 97/6 106/15
scheduling [3] 115/23 116/17 116/21
Schlenger [6] 31/19 44/5 70/3 78/15 103/23 110/5
school [11] 33/10 33/12 33/14 33/14 37/3 37/3 39/8 39/14 51/6 51/10 63/22
science [1] 37/4
scientist [2] 44/9 104/3
screen [3] 22/16 31/22 94/23
scribbling [1] 16/5
Scruggs [6] 31/17 43/4 55/23 56/8 56/20 74/17
seal [5] 6/23 6/24 9/4 9/7 9/20
sealing [1] 5/2
seat [19] 27/9 31/8 31/8 31/9 31/10 31/11 31/11 31/12 31/13 31/13 31/14 31/17 31/16 31/16 31/17 31/18 31/18 31/19 110/12
seat 1 [1] 27/9
Seat Number [1] 31/18
Seat Number 11 [1] 31/16
Seat Number 12 [1] 31/16
Seat Number 13 [1] 31/17
Seat Number 14 [1] 31/18
Seat Number 16 [1] 31/19
Seat Number 4 [1] 31/11
Seat Number 6 [1] 31/12
Seat Number 7 [1] 31/13
Seat Number 8 [1] 31/13
seated [4] 26/21 31/7 111/22 112/6

seats [2] 17/2 110/10
second [8] 11/13 26/21 69/14 70/5 95/20 108/1 113/3 114/4
secret [2] 8/2 47/23
secrets [1] 5/12
Section [1] 118/3
security [1] 5/17
see [23] 8/24 15/18 21/22 22/16 23/22 24/21 25/14 26/11 26/16 27/24 28/15 30/21 59/13 62/2 75/16 79/17 80/1 95/21 95/25 100/8 111/19 112/23 117/4
seeing [2] 43/7 80/9
seeking [2] 5/6 19/3
seeks [1] 29/16
seem [2] 81/10 105/7
seemed [2] 68/14 92/22
seems [2] 5/7 72/3
seen [3] 13/7 13/8 13/9
Segundo [1] 40/22
selected [5] 35/11 37/15 42/17 45/1 100/21
selection [4] 3/25 20/23 26/9 26/10
self [1] 83/2
self-assessment [1] 83/2
sell [2] 32/7 71/5
semiprivate [3] 25/6 25/8 78/10
senior [1] 33/13
sensation [1] 74/4
sense [4] 24/7 40/15 80/3 88/15
sent [3] 8/9 11/22 12/7
sentence [2] 19/18 113/4
sentiment [1] 106/8
separate [1] 15/14
separates [1] 23/7
series [1] 31/21
serious [3] 29/7 41/12 41/12
serve [6] 23/5 23/20 25/20 26/1 31/3 34/5
served [17] 25/20 26/5 32/24 33/22 35/6 37/24 38/15 39/25 40/2 40/23 41/10 42/2 42/25 43/8 43/15 44/12 54/15
service [9] 32/8 34/5 36/21 39/10 44/12 47/23 51/7 54/9 54/18
serviced [1] 65/6
session [1] 25/6
set [4] 10/11 35/13 37/15 91/6
setting [1] 93/17

settle [1] 71/20
settlement [9] 6/7 10/20 11/20 11/21 12/18 12/21 18/22 90/22 91/1
seven [4] 37/9 85/20 85/24 86/5
Seventh [1] 22/20
Seventh Amendment [1] 22/20
several [2] 67/19 93/2
severe [1] 77/16
sexual [2] 34/14 93/24
shade [1] 57/2
shade-tree [1] 57/2
Shah [6] 31/13 38/6 38/7 108/17 108/17 110/14
Shakespeare [1] 48/20
shaking [1] 98/10
shakings [1] 27/4
shall [2] 22/22 22/23
share [4] 27/2 52/14 54/25 67/10
shared [6] 45/25 46/21 47/10 48/12 55/7 100/1
sharing [4] 47/2 57/9 64/21 106/15
shed [1] 104/8
sheriff [2] 49/9 49/9
shook [2] 2/16 75/19
shop [6] 50/24 51/3 52/6 74/21 85/19 97/19
short [1] 17/1
shot [1] 79/5
show [4] 11/3 16/3 18/15 19/7
showed [1] 51/11
shown [1] 19/1
shows [1] 36/21
shudder [1] 98/25
shuddering [4] 74/3 74/19 77/21 94/16
shut [1] 7/5
shutdown [2] 96/2 96/7
shuttle [2] 69/16 69/23
shuttles [1] 69/17
side [24] 16/19 17/11 18/2 18/13 25/7 28/23 45/5 46/7 47/2 47/12 48/1 72/7 81/7 82/4 84/18 84/25 91/16 91/17 104/12 105/4 106/9 112/20 116/20 117/3
sidebar [6] 17/4 17/7 78/16 78/18 101/18 101/20
sides [17] 10/15 46/17 78/9 78/14 79/5 80/5 81/6 81/11 82/12 82/17 83/7 90/5 105/12 105/16 106/1

settle [1] 71/20
106/4 106/16
signed [1] 13/21
significant [4] 7/20 9/24 71/1 72/18
significantly [1] 7/14
Simi [1] 43/13
Simi Valley [1] 43/13
simply [8] 5/24 20/7 26/12 26/13 27/20 45/4 59/15 103/6
since [4] 68/12 74/22 92/11 94/21
single [4] 26/23 32/7 33/21 44/10
sir [13] 32/5 36/14 37/17 37/21 52/3 56/7 56/23 59/23 63/5 74/25 78/19 80/14 99/8
sister [6] 49/2 49/11 53/5 53/9 54/1 66/12
sit [14] 3/25 56/21 59/3 59/10 60/8 61/5 73/12 74/24 75/13 77/4 77/19 101/14 110/14 114/18
sites [1] 25/14
sitting [3] 28/5 98/23 100/20
situation [8] 58/18 72/4 74/2 85/1 90/3 92/15 92/17 96/1
six [2] 37/9 38/12
size [2] 57/12 57/13
skip [3] 85/7 86/8 87/11
skipped [4] 42/5 42/7 68/14 70/18
skips [1] 95/20
Skruggs [1] 108/20
slide [1] 110/11
slides [1] 44/2
slightly [1] 104/7
small [1] 44/9
smart [1] 112/23
smartphones [1] 21/24
solely [1] 78/6
solemnly [2] 31/1 111/1
solved [2] 98/18 98/20
somebody [1] 12/10
somehow [1] 106/18
someone [3] 69/24 104/21 117/1
someone's [1] 51/8 51/9
something [16] 14/13 18/4 23/7 40/14 53/14 61/22 70/23 71/3 78/9 89/24 97/22 97/23 98/8 99/1 104/24 115/20
sometimes [4] 52/11 95/5 95/6 99/5
somewhat [1] 103/7
son [5] 38/12 45/9 63/2 63/6 100/6

son's [3] 92/14 92/17 99/11
soon [3] 38/13 44/18
Sorqan [1] 31/11 36/12
sorry [20] 36/4 37/5 41/3 49/16 53/8 62/14 64/25 68/17 70/3 73/6 75/22 78/4 80/18 82/8 82/10 85/3 88/21 93/19 108/1 115/7
sort [9] 7/23 15/1 24/8 26/6 73/19 79/15 79/20 106/13 114/11
sought [1] 73/25
sounded [1] 14/23
sounds [2] 5/9 60/23
sources [1] 115/2
South [1] 31/24
South Bay [1] 31/24
speak [4] 24/20 24/22 26/8 27/19 86/1 101/24
speaking [1] 114/25
special [1] 40/22
specific [4] 31/23 51/20 55/1 91/13
specifically [11] 9/25 45/24 50/3 53/21 57/16 58/23 67/11 76/21 87/9 102/9 105/7
specifics [1] 52/20
speed [1] 95/16
SPENCER [4] 2/21 4/5 28/15 30/8
Spencer Hugret [2] 4/5 28/15
Spencer P. Hugret [1] 30/8
spent [1] 55/8
spilled [1] 24/15
sport [2] 89/14 89/16
sport-bike [1] 89/14
spouse [3] 38/1 38/17 43/17
stacked [1] 115/22
Stadium [1] 113/22
staff [1] 30/18
stall [2] 88/13 88/23
stalled [2] 77/12 98/9
stalling [4] 88/12 88/15 97/16 97/16
stand [3] 30/24 68/1 110/23
standard [2] 76/9 114/13
standing [1] 116/1
start [4] 4/10 10/12 22/23 31/20 32/1 45/9 80/4 80/7 81/17 83/2 83/5 83/6 83/13 83/14 102/1 102/10 107/4
started [8] 36/8 46/13 50/9 52/10 74/19 88/18 88/22 89/8
starting [2] 27/9 105/23

**S**

state [8]  3/6 5/12 39/10 42/3 69/17 82/15 92/24 102/6
stated [2]  19/5 19/20
statement [2]  10/22 28/24
statements [3]  15/14 111/17 115/15
states [6]  1/1 6/10 19/17 22/21 118/4 118/8
station [1]  26/20
stay [1]  41/24
stay-at-home [1] 41/24
stenographically [1] 118/5
step [1]  20/19
STEPHANIE [4]  2/7 3/17 28/6 30/6
Stephanie Taft [3] 3/17 28/6 30/6
stepson [1]  54/11
Steve [2]  3/24 28/14
Steve Patterson [1] 3/24
stop [3]  10/5 24/17 71/16
stopped [2]  84/19 89/8
stories [8]  46/1 46/21 46/24 47/1 47/4 48/13 48/16 52/19
story [1]  99/25
street [4]  1/24 2/22 23/16 23/16
stretch [1]  116/15
strict [1]  27/19
strike [4]  17/9 17/11 107/14 107/20
strong [1]  81/10
strongly [1]  81/5
struck [1]  104/9
student [1]  96/9
students [1]  43/14
study [1]  79/13
stuff [4]  51/5 55/25 56/1 61/7
stuttering [2]  77/16 98/9
style [1]  57/12
subject [12]  6/12 6/24 7/19 7/22 8/18 9/4 9/22 9/23 11/6 11/6 63/8 111/14
submitted [1]  111/11
substantially [2]  29/8 29/24
substantive [1]  8/13
successful [1]  95/5
such [6]  5/18 6/18 13/22 16/25 20/3 31/2
sudden [1]  91/9
suffered [1]  16/9
suffice [1]  31/25
suggest [1]  114/15
suggested [2]  15/25

114/10
SUITE [4]  2/4 2/13 2/18 2/22
suits [1]  22/21
summary [1]  28/25
summons [1]  25/12
supervisor [1]  43/12
supplemental [1]  20/6
support [4]  7/8 9/19 9/23 36/7
supporting [2]  6/2 7/8
supposed [1]  14/25
sure [25]  4/15 4/24 5/12 5/21 9/10 13/13 15/17 17/18 22/3 22/6 25/10 27/6 47/19 49/17 64/23 71/14 88/20 92/19 101/21 102/2 102/8 102/23 106/1 107/20 117/2
suspect [4]  25/11 35/6 37/12 104/8
swear [5]  30/23 31/1 108/24 110/21 111/1
swears [1]  26/19
sworn [1]  110/19
system [6]  23/4 23/10 23/19 25/19 26/1 84/3

**T**

table [1]  4/1
TAFT [6]  2/7 3/17 16/9 16/9 28/6 30/6
Tahoe [1]  74/8
take [14]  5/21 12/4 13/21 14/2 18/17 20/11 20/20 21/2 21/5 26/10 27/3 33/15 44/21 88/8
taken [7]  19/21 20/10 21/7 26/24 58/18 97/18 117/6
takes [1]  112/21
taking [2]  23/23 100/1
talk [7]  47/5 47/8 49/23 98/24 106/22 111/12 111/13
talked [5]  46/3 55/16 78/8 78/12 110/8
talking [7]  5/3 5/12 9/12 12/20 61/6 84/1 87/7
talks [1]  64/5
task [1]  26/23
taught [1]  51/13
teacher [4]  37/4 39/8 39/15 40/22
team [2]  28/5 101/23
technical [2]  61/13 61/15
technician [2]  36/7 43/6
technology [1]  94/22
telling [1]  102/15
Tempo [1]  69/4
ten [4]  16/18 20/21 52/5 82/4
tend [2]  22/10 78/21

terms [6] 8/10 13/2 19/10 19/17 116/23
Terrible [1]  84/21
testimony [3]  19/22 20/10 111/18
text [1]  19/19
thank [85]  4/3 4/22 5/20 6/19 6/20 10/13 10/18 14/3 18/10 20/15 21/16 28/9 28/11 28/16 28/17 31/7 32/17 33/23 36/9 36/23 38/5 38/15 39/1 40/17 40/25 41/15 42/20 43/1 43/3 43/9 44/3 44/13 47/14 52/1 52/25 54/4 54/14 55/12 57/25 59/22 60/12 62/4 63/14 65/19 66/6 67/15 68/7 68/17 68/18 69/7 69/25 70/2 70/18 72/15 72/17 73/22 75/1 75/15 80/14 81/24 82/18 84/14 93/7 93/8 93/10 93/12 94/6 95/22 97/10 99/8 100/10 101/17 107/17 108/10 108/23 109/10 109/16 109/25 110/2 110/4 110/6 110/19 112/2 112/4 117/5
thankful [1]  25/21
that's -- I [1]  101/6
them [29]  4/19 4/20 4/21 8/3 8/9 8/19 17/10 22/5 22/5 30/4 41/21 41/22 44/1 58/9 58/13 60/10 65/6 66/15 67/20 67/25 73/8 79/24 101/3 101/4 108/24 110/8 113/5 115/18 115/22
themselves [2]  28/1 55/5
theory [2]  13/14 24/21
There's [2]  11/16 76/20
thereafter [1]  30/5
therein [1]  19/5 111/2
thing [7]  14/23 42/10 63/18 71/16 73/19 76/10 79/20
things [8]  14/24 25/25 51/12 52/12 68/10 86/7 90/13 92/2
think [67]  13/11 13/25 15/17 16/10 16/18 17/5 17/16 20/12 20/12 22/24 23/18 24/8 26/2 27/13 40/13 45/4 45/10 48/19 52/24 57/17 57/19 57/23 58/23 60/11 64/5 66/16 66/17 67/4 71/22 71/24 73/11 73/15 73/17 74/5 77/6 77/22 78/23 80/5

83/18 83/22 85/2 85/5 87/2 87/22 88/7 89/18 90/9 94/3 94/5 100/7 100/20 101/2 101/10 102/4 102/22 103/4 103/7 103/10 103/12 103/16 105/14 106/17 112/14 115/17 116/3 116/4 116/6
third [2]  24/16 113/8
thoroughly [1]  4/21
though [8]  14/1 18/1 48/4 57/20 62/15 77/7 89/4 96/16
thought [7]  8/6 39/24 66/21 94/9 103/9 104/9 106/12
thousand [1]  61/22
three [10]  16/23 17/12 18/2 32/22 37/4 52/7 65/22 66/14 82/19 95/16
three-speed [1]  95/16
throughout [3]  8/11 92/20 26/16
throw [1]  71/22
Thursday [4]  23/23 24/10 24/18 116/8
ticket [1]  110/9
till [3]  12/6 20/24 117/5
tire [1]  55/25
tires [2]  51/6 51/21
tissue [1]  43/25
tissues [1]  44/1
title [3]  46/16 47/6 118/4
today [6]  3/25 4/10 23/23 28/14 41/12 115/20
today's [1]  115/20
told [7]  37/12 40/14 50/16 51/11 52/22 97/9 99/24
tomorrow [1]  115/21
too [6]  12/10 12/12 59/17 60/22 69/10 82/19
took [4]  23/12 61/23 74/20 86/25
top [1]  27/9
Torrance [3]  34/20 34/21 38/10
toss [1]  95/7
total [1]  69/10
totaled [3]  62/13 62/18 62/20
totality [1]  106/25
Totally [1]  91/22
touching [1]  31/3
tow [1]  54/12
tow truck [1]  54/12
toward [1]  100/25
towards [6]  72/1 80/12 103/8 103/15 113/24 114/25
TOWER [1]  2/18
town [2]  42/5 42/8

track [2]  95/2 96/6
trade [1]  8/2
train [1]  26/20
training [3]  45/8 51/12 53/21
transactional [1] 46/15
transcript [4]  1/14 26/25 118/5 118/7
transcripts [1]  5/3
transferred [2]  54/8 54/18
transmission [41] 29/6 29/8 30/1 56/1 56/2 58/8 58/23 60/21 62/1 62/3 63/3 63/7 64/3 65/7 65/17 65/19 67/21 67/23 69/6 70/23 71/4 75/5 75/7 75/10 76/18 77/13 77/17 84/3 85/20 85/23 86/18 93/2 94/15 95/13 95/13 95/16 98/8 98/12 98/18 98/25 99/22
transmissions [3] 53/22 61/6 86/4
transportation [1] 79/16
travels [1]  109/23
tree [1]  57/2
trial [41]  1/18 3/5 4/10 5/6 5/11 5/13 7/1 8/13 9/2 9/5 9/8 9/15 10/11 11/1 11/10 11/24 22/19 22/22 22/24 23/21 24/2 24/18 26/9 26/12 26/16 27/23 30/11 31/4 59/12 72/5 73/12 81/3 88/9 91/2 91/4 91/6 93/23 95/9
trials [1]  23/24
tried [1]  6/2
truck [1]  54/12
trucks [4]  54/19 55/15 65/25 66/5
true [4]  31/2 77/9 111/2 118/4
truly [1]  111/1
truth [8]  14/11 14/22 18/23 19/4 19/20 24/20 24/22 81/5
try [11]  6/6 10/7 21/1 25/3 52/3 85/16 95/1 101/21 107/2 111/1 116/15
trying [5]  11/24 14/22 18/5 25/9 95/12
TUESDAY [7]  1/15 3/1 23/23 116/3 116/6 116/8
turn [3]  22/5 25/8 44/1
turned [2]  75/19 75/20
TV [3]  36/19 36/21 67/18
Twenty [1]  40/3
twice [3]  58/9 58/24

**T**

**twice...** [1] 77/12
**two** [22] 17/23 19/16 22/3 33/8 34/4 35/19 37/5 39/8 39/25 51/1 53/7 58/7 58/9 58/25 59/1 65/12 65/25 66/14 68/10 69/11 107/5 107/7
**type** [5] 45/13 50/2 54/20 69/18 72/24
**types** [2] 55/1 64/22
**typically** [1] 23/23
**typographical** [1] 113/2
**typos** [1] 113/3

**U**

**Uh** [2] 44/6 88/14
**Uh-huh** [2] 44/6 88/14
**ultimate** [1] 106/13
**unable** [1] 29/11
**unbiased** [2] 25/3 25/10
**uncle** [4] 49/20 49/24 50/12 50/13
**under** [11] 13/22 26/19 27/19 37/4 37/5 51/8 51/9 73/25 74/10 97/1 97/22
**understand** [10] 4/11 7/2 14/22 25/17 25/24 40/16 44/23 45/1 61/8 116/16
**understands** [1] 13/17
**understood** [2] 9/16 19/10
**undivided** [1] 22/6
**unemployed** [2] 33/5 33/9
**unenviable** [1] 26/23
**unequivocal** [1] 103/7
**unfortunate** [1] 77/3
**unfortunately** [2] 60/23 62/12
**unhappy** [1] 70/9 92/21 92/22
**UNITED** [3] 1/1 118/4 118/8
**unknown** [1] 39/9
**unless** [3] 18/7 61/19 104/5
**unlikely** [1] 24/17
**unnecessarily** [1] 116/15
**unnecessary** [1] 9/9
**unpack** [1] 39/14
**unrelated** [3] 8/16 8/17 66/22
**unsure** [1] 84/9
**until** [5] 6/17 17/11 23/21 77/25 111/11
**unusual** [2] 74/3 74/19
**up** [39] 5/21 7/13 7/25 8/20 12/6 12/22 15/4 17/10 19/25 25/12

27/16 44/18 48/25 52/2 53/1 57/1 59/14 59/15 59/21 60/14 63/7 63/12 64/4 70/11 71/20 76/12 76/23 80/2 86/1 93/14 96/10 103/24 105/3 105/14 106/24 110/13 112/23 113/5 115/13
**upon** [2] 31/3 31/4
**upset** [4] 73/7 101/3 101/4 114/17
**upstairs** [1] 20/14
**us** [10] 22/18 23/7 27/17 41/11 57/9 69/12 71/2 79/11 99/23 102/15
**use** [8] 8/3 8/12 29/9 29/24 61/14 67/19 91/11 114/15
**used** [9] 7/25 10/3 13/7 14/4 19/18 54/12 56/11 72/25 88/22
**usurpations** [1] 22/18
**utilized** [1] 20/7

**V**

**Valley** [3] 31/24 31/24 43/13
**value** [2] 22/21 29/9 98/14
**van** [3] 67/20 69/5 98/14
**vans** [10] 58/4 58/4 58/5 58/8 58/21 69/19 75/4 77/15 92/3 92/4
**various** [1] 81/7
**vehicle** [17] 8/17 10/1 29/5 29/9 29/23 29/25 51/16 54/24 64/16 73/25 87/13 88/13 95/18 97/16 97/16 97/18 98/11
**vehicles** [24] 52/17 54/20 54/22 55/5 55/5 56/6 58/7 58/16 58/18 58/25 59/1 64/9 64/22 65/12 65/17 65/22 66/5 68/4 68/4 68/5 72/19 73/10 95/11 99/2
**Venice** [1] 32/7
**Verdes** [1] 34/2
**verdict** [11] 34/7 35/1 35/2 35/3 39/11 40/6 42/4 42/6 78/5 90/9 111/2
**version** [2] 18/24 113/15
**versus** [4] 3/5 14/18 21/11 21/19
**veterinary** [1] 43/6
**via** [2] 13/12 28/19
**vibration** [7] 74/4 74/20 75/20 94/16 95/2 96/2 98/25
**view** [2] 23/6 78/23
**viewing** [1] 61/13

vintage [2] 59/10 60/25 61/1 61/4 77/2 88/6
**Violent** [1] 98/10
**visit** [1] 25/14
**vitally** [1] 25/19
**voiced** [1] 102/4
**voir** [10] 15/21 15/24 16/13 16/18 16/19 17/3 21/4 21/17 22/13 24/19
**voir dire** [10] 15/21 15/24 16/13 16/18 16/19 17/3 21/4 21/17 22/13 24/19
**Volkswagen** [2] 88/18 88/22

**W**

**wait** [4] 85/25 105/3 106/7 110/18
**waiting** [3] 10/10 20/13 20/18
**walk** [4] 25/7 26/12 64/22 76/15
**walked** [1] 72/4
**wanted** [11] 24/7 30/4 68/14 69/9 80/1 81/13 82/11 82/17 114/7 114/15 116/14
**wants** [1] 18/19
**war** [3] 45/25 46/21 46/23
**warn** [1] 115/21
**warning** [1] 115/20
**warranty** [13] 10/2 29/4 29/8 29/12 29/23 71/11 72/19 73/10 74/10 97/23 97/23 97/24 97/25
**wash** [1] 101/8
**waste** [1] 10/9
**wasting** [1] 9/8
**Wednesday** [2] 23/22 24/3
**week** [6] 8/11 24/16 95/17 116/2 116/3 116/11
**weekend** [3] 8/12 9/14 116/9
**weeks** [1] 110/8
**weird** [1] 77/13
**welcome** [6] 21/13 21/15 33/24 44/13 97/12 101/15
**went** [4] 6/1 24/15 25/13 100/3
**WEST** [4] 1/24 23/10 32/15 36/19
**West Coast** [1] 32/15
**West Hollywood** [1] 36/19
**West Indies** [1] 23/10
**WESTERN** [1] 1/2
**whisk** [1] 23/13
**Whittier** [1] 31/23
**why** [14] 5/18 14/2 30/21 32/1 35/5 36/11

45/9 52/3 55/17 61/10 64/14 74/5 76/13 91/8
**wife** [4] 36/20 39/8 39/14 65/13
**wife's** [2] 68/12 74/8
**Wilhemina** [1] 31/17
**willful** [1] 29/18
**willfulness** [1] 112/15
**willing** [3] 23/5 25/20 73/3
**WILSHIRE** [2] 1/8
**win** [2] 90/10 90/11
**winners** [1] 110/9
**wish** [7] 6/3 10/15 25/6 61/20 78/10 79/2 112/24
**wishes** [3] 4/12 6/21 112/20
**without** [2] 19/10 80/18
**witness** [8] 6/13 6/14 20/3 20/4 106/14 116/10 116/17 116/25
**witnesses** [7] 19/22 26/19 30/10 30/19 115/15 115/18 116/21
**wonder** [1] 93/16
**wonderful** [1] 25/13
**Wondering** [1] 51/16
**word** [3] 24/19 26/23 105/25
**words** [4] 24/21 81/6 83/6 103/9
**work** [38] 25/18 34/2 37/22 37/23 38/1 38/10 38/17 41/16 43/17 45/13 45/14 46/1 48/14 50/2 50/7 51/17 51/23 55/15 56/15 56/20 57/14 57/17 57/21 60/3 60/6 61/6 67/18 73/20 77/12 78/21 85/13 89/11 96/17 96/17 98/11 99/3 116/24 117/2
**worked** [15] 50/22 51/1 52/6 52/7 53/5 53/16 54/7 54/16 54/21 54/23 55/1 66/23 85/15 85/19 85/23
**worker** [2] 33/3 41/24
**Worker II** [1] 33/3
**working** [11] 32/23 34/5 35/19 35/24 49/22 50/3 52/18 57/16 67/11 95/1 100/3
**works** [10] 32/14 32/22 35/23 36/5 41/9 41/17 41/25 43/18 45/15 47/20
**world** [1] 23/8
**Worries** [1] 64/4
**writer** [2] 33/6 33/7
**written** [2] 29/4 29/12
**wrong** [6] 13/9 62/2

71/3 71/6 71/19 114/18
**wrongful** [1] 49/22

**X**

**Xiaozhen** [1] 31/10

**Y**

**year** [12] 34/16 35/14 38/12 43/13 43/13 56/12 57/22 63/17 75/18 91/5 92/18 92/20
**years** [26] 16/10 32/21 37/9 38/12 39/11 40/3 40/9 42/3 42/11 46/22 51/1 52/6 52/7 53/7 53/14 53/18 54/7 54/9 63/24 67/5 74/19 84/1 87/7 87/10 92/12 99/14
**yesterday** [2] 4/16 113/22
**young** [2] 82/19 110/7
**younger** [1] 35/24
**Your Honor** [46] 3/8 4/7 4/13 5/5 6/22 7/7 8/20 9/16 10/16 12/4 12/8 12/12 14/4 14/20 15/11 15/19 16/12 18/10 20/17 28/11 53/3 53/15 53/23 54/3 55/3 55/11 55/22 58/2 75/11 75/14 80/15 82/7 82/9 91/24 93/14 94/12 101/14 103/22 106/1 107/20 108/2 108/9 114/7 115/8 115/24 116/19
**Yuan** [6] 31/10 33/25 37/12 108/10 108/11 110/1

**Z**

**Zach** [1] 28/6
**Zach Powell** [1] 28/6
**ZACHARY** [3] 2/12 3/16 30/6
**Zachary Powell** [2] 3/16 30/6