1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3     HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5   MARK PEDANTE,                    )
                                     )
6                  PLAINTIFF,        )
                                     )
7            vs.                     ) No. CV 17-6656-AB
                                     )
8   FORD MOTOR COMPANY, A            )
    DELAWARE CORPORATION, AND DOES   )
9   1 THROUGH 10, INCLUSIVE,         )
                                     )
10                 DEFENDANTS.       )
    _____ )
11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            THURSDAY, NOVEMBER 14, 2019

16                  8:54 A.M.

17            LOS ANGELES, CALIFORNIA

18   Day 6 of Jury Trial, Pages 1267 through 1379, inclusive

19

20

21

22   _____

23          **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
            FEDERAL OFFICIAL COURT REPORTER
24          350 WEST FIRST STREET, ROOM 4311
            LOS ANGELES, CALIFORNIA 90012
25              cmjui.csr@gmail.com

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFF:

 3          THE ALTMAN LAW GROUP
            BY:  BRYAN C. ALTMAN, ATTORNEY AT LAW
 4          10250 CONSTELLATION BOULEVARD, SUITE 2500
            LOS ANGELES, CALIFORNIA 90067
 5          310-277-8481

 6              AND

 7          KIESEL LAW LLP
            BY:  STEPHANIE M. TAFT, ATTORNEY AT LAW
 8          8648 WILSHIRE BOULEVARD
            BEVERLY HILLS, CALIFORNIA 90211
 9          310-854-4444

10              AND

11          KNIGHT LAW GROUP LLP
            BY:  RUSSELL HIGGINS, ATTORNEY AT LAW
12          AND ROGER KIRNOS, ATTORNEY AT LAW
            AND ZACHARY POWELL, ATTORNEY AT LAW
13          1801 CENTURY PARK EAST, SUITE 2500
            LOS ANGELES, CALIFORNIA 90067
14          310-552-2250

15    FOR THE DEFENDANT:

16          SHOOK, HARDY & BACON L.L.P.
            BY:  FRANK P. KELLY III, ATTORNEY AT LAW
17          AND ANDREW L. CHANG, ATTORNEY AT LAW
            AND SAMANTHA K. BURNETT, ATTORNEY AT LAW
18          ONE MONTGOMERY TOWER, SUITE 2700
            SAN FRANCISCO, CALIFORNIA 94104
19          415-544-1900

20              AND

21          GORDON & REES LLP
            BY:  SPENCER P. HUGRET, ATTORNEY AT LAW
22          275 BATTERY STREET, SUITE 2000
            SAN FRANCISCO, CALIFORNIA 94111
23          415-986-5900

24

25
```

```
 1                         I N D E X

 2                      NOVEMBER 14, 2019

 3
     DEFENDANT'S
 4   WITNESSES                                    PAGE

 5   CHRISTOPHER KWASNIEWICZ (RESUMED)
         CROSS-EXAMINATION BY MR. ALTMAN (RESUMED)  1282
 6       REDIRECT EXAMINATION BY MR. KELLY           1327
         RECROSS-EXAMINATION BY MR. ALTMAN           1335
 7
     PLAINTIFF'S
 8   WITNESSES                                    PAGE

 9   ANTHONY MICALE (IN REBUTTAL)
10       DIRECT EXAMINATION BY MR. ALTMAN           1341
         CROSS-EXAMINATION BY MR. KELLY             1342
11       REDIRECT EXAMINATION BY MR. ALTMAN         1343

12

13                        EXHIBITS

14   TRIAL
     EXHIBITS                   MARKED  ADMITTED  NOT ADMIT
15
     190                                1291
16
     193                                1295
17

18

19

20

21

22

23

24

25
```

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          LOS ANGELES, CALIFORNIA; THURSDAY, NOVEMBER 14, 2019

 2                           8:54 A.M.

 3                              - -

 4          (The following was heard in open court outside the

 5           presence of the jury:)

 6               THE CLERK:  Calling civil case 17-6656, Mark

 7     Pedante versus Ford Motor Company, et al., jury trial,

 8     Day 6.

 9               Counsel, please state your appearances.

10               MR. ALTMAN:  Yes, good morning. Bryan Altman with

11     my colleagues, Your Honor, on behalf of Mr. Pedante.

12               THE COURT:  Good morning.

13               MR. CHANG:  Andrew Chang for defendant Ford,

14     Your Honor.

15               THE COURT:  Good morning.

16               MR. CHANG:  Good morning.

17               THE COURT:  All right.  What are the issues you

18     wish to raise this morning?

19               MR. CHANG:  Your Honor, this follows up from our

20     discussion yesterday about the admitted facts to be read to

21     the jury.

22               THE COURT:  All right.

23               MR. CHANG:  I would direct Your Honor, if

24     possible, to Docket Number 627, the joint final pretrial

25     conference order the Court entered November 5th.
```

```
 1              THE COURT:  Hold on one second.

 2              MR. CHANG:  Of course.

 3              Your Honor, I do have a copy, to make things

 4    easier.

 5              THE COURT:  If you do, that would be great.  I'm

 6    just having trouble logging on here.

 7              MR. CHANG:  And I turned it over to the page 5,

 8    Your Honor, the admitted facts, which I believe basically

 9    state something to the effect of these facts are admitted

10    and need not be proven; and it's a list of facts the parties

11    jointly submitted on November 1st.

12              THE COURT:  Okay.

13              MR. CHANG:  These are -- Items 7 through 9 on that

14    list are the issues in dispute, the fact issues in dispute.

15    Plaintiffs -- the dispute that we had been having was the

16    form in which these would be presented to the jury.

17              Last night plaintiffs requested that the Facts 7

18    through 9 be modified to state on November 1st, Ford

19    admitted X.

20              THE COURT:  Admit -- what's the X?

21              MR. CHANG:  Admitted each of the facts 7 through

22    9.

23              THE COURT:  As opposed to just saying "Ford

24    admits"?

25              MR. CHANG:  Exactly, Your Honor.  These are the
```

1    facts in the form that they were presented to the Court by

2    the parties.  The Court has entered the order stating that

3    they are admitted and requiring no further proof.

4    Modifications at this time we think are inappropriate.

5              There are, of course, other facts that we would

6    want to include for other facts as well for purposes of

7    argument, but we think for purposes of just getting these

8    facts in front of the jury that are admitted, they should be

9    read the way that they are stated in that order.

10             THE COURT:  All right.

11             Mr. Higgins.

12             MR. HIGGINS:  Thank you, Your Honor.  As phrased,

13   I think the Court, after seeing the presentation of evidence

14   and the issues here, it is an argumentative statement of the

15   admitted fact.  Ford admits that --

16             THE COURT:  What's argumentive?  Ford admits

17   that --

18             MR. HIGGINS:  By the date that they prefer to have

19   the date exist in October 2017, that the vehicle had been

20   presented with a reasonable number of opportunities and so

21   forth.

22             THE COURT:  Okay.

23             MR. HIGGINS:  Ford's preference so far has been to

24   simply have that read to the jury as a fact.  We think that,

25   in order to show a complete truthful and accurate picture of

1    the admission, that it should stay on November 1st, Ford

2    admitted that by October 17 and so on.

3             THE COURT:  And I'm sorry.  Tell me what's the

4    significance from the plaintiff's side?  Are you going to be

5    giving up state secrets by telling me this?

6             MR. HIGGINS:  No, there's no state secret.  The

7    significance from the plaintiff's side is that this date

8    is -- goes to the heart of the case.

9             THE COURT:  What date?  The November --

10            MR. HIGGINS:  October 2017, that Ford is

11   presenting a defense that as though it had admitted and

12   taken responsibility as far back as October 2017, which we

13   believe is highly argumentative, doesn't reflect the

14   truthful state of the facts.

15            THE COURT:  I'm sorry, but correct me if I am

16   wrong.  These facts, weren't they submitted by both sides?

17            MR. HIGGINS:  They were submitted in the final

18   pretrial conference order.  We don't dispute that it says

19   what it says.

20            THE COURT:  Right.  But when they were submitted,

21   I mean, you guys traded these documents back and forth.  You

22   didn't object to these at the time, did you?

23            MR. HIGGINS:  We objected at a meet and confer,

24   but I don't believe that we have any ability to control for

25   the purposes of the final pretrial conference order what

1    Ford chooses to admit.

2              THE COURT:  Wait, I'm sorry.  Maybe I -- you both

3    submitted this document as a joint proposed final pretrial

4    conference order.  In it, it says these are admitted facts.

5              It didn't say these are admitted facts that Ford

6    says and we disagree.  Correct?  I mean, I'm not trying to

7    play games.  I'm just trying to understand.  If in fact,

8    when this was submitted, was it submitted with the

9    understanding you had met and conferred and said, "Okay,

10   this is what we submit.  We agree these are the admitted

11   facts, we agree that these are stipulated facts"?

12             MR. HIGGINS:  We did not agree that these -- that

13   the facts as phrased in the final pretrial conference order

14   would be read to the jury unchanged.

15             We understood that as to bound the issues for

16   trial and to bound the presentation of certain arguments and

17   issues, but we didn't expect that this would be a -- read

18   out -- the final pretrial conference order into the

19   evidence.

20             THE COURT:  Okay.  Again, I just want to make sure

21   I understand.  You both believe -- or I guess your position

22   is the admitted facts and the stipulated facts, you did not

23   anticipate or agree that these -- didn't think that these

24   with possibly be read to the jury.

25             MR. HIGGINS:  As phrased, no.

```
 1                THE COURT:  Okay.
 2                MR. CHANG:  That --
 3                MR. HIGGINS:  And we made it clear to them.
 4                MR. CHANG:  That is not my understanding,
 5     Your Honor.
 6                THE COURT:  I mean, I have to tell you.  Look.
 7     I'm relatively new, and I guess there's a first time for
 8     everything, but I've never had a situation where in the
 9     final pretrial conference order it says, "These are the
10     admitted facts."
11                I think anyone reading this would assume the
12     parties agree that these facts are accurate and -- I mean,
13     and usually they -- I mean, I can't think -- I'm trying to
14     think if there's been ever a case where these facts were not
15     read to the jury.
16                And just walk me through again.  I'm just trying
17     to make sure I understand this.  Your objection to
18     specifically -- it's 7, 8, and 9.  Everything else you're
19     fine with?
20                MR. HIGGINS:  Yes.
21                THE COURT:  And so your objection -- what would
22     you want 7 to read, for example?
23                MR. HIGGINS:  To reflect the truthful state of the
24     facts, on November 1st, 2019, Ford admitted that, by
25     October 2017, the -- Mr. Pedante's vehicle had a --
```

```
 1          THE COURT:  And tell me why couldn't Mr. Altman
 2   just argue that?  I don't --
 3          MR. HIGGINS:  Well, it isn't -- it's been
 4   certainly discussed in trial but --
 5          THE COURT:  There's a lot of things that have been
 6   discussed.
 7          MR. HIGGINS:  Right.  So --
 8          THE COURT:  Mr. Altman's going to talk about a lot
 9   of things, I'm sure.  I'm not sure why this is so --
10          MR. KIRNOS:  We have been meeting and conferring
11   continuously with Mr. Chang over -- since the weekend
12   concerning the format in which the stipulated facts will be
13   read to the jury and had brought this up to him repeatedly.
14          MR. CHANG:  Your Honor, the only discussions that
15   we have had are -- we wanted these facts to be read in the
16   stipulated facts jury instruction.  Plaintiffs objected and
17   said they did not want that to be included in the stipulated
18   facts.  We said we believe they are already in stipulated
19   because they are in the admitted facts section.
20          And then we said we would bring up with the Court
21   how we could bring them up -- have them be presented to the
22   jury otherwise.  They did not present alternative language
23   until last night they wanted to be included.
24          THE COURT:  Yeah, I have to tell you, I mean, it
25   seems to me this is what you all agreed to.  I'm inclined to
```

```
 1    read it as is.

 2              Mr. Altman's going to do what he's going to do.   I

 3    mean, he's going to say this happened in November.   I guess

 4    I'm not seeing the significance of the dispute.   So I'm

 5    inclined to read them as signed and agreed to by the

 6    parties.

 7              So what else do we need to discuss this morning?

 8              MR. CHANG:  Your Honor, there is one additional

 9    fact that we added based on the stipulation of damages.   So

10    we presented -- we prepared a statement by the Court that

11    the only difference that plaintiffs had as to which was that

12    additional clause.   We can provide that to the Court if

13    that's how the Court would like to read the --

14              THE COURT:  Yeah.   I mean, if you have a document

15    that I could take a look at, that would be great.

16              MR. HIGGINS:  Thank you.

17              THE COURT:  And so you would propose that these

18    nine items be included in the jury instruction regarding

19    either stipulated facts or admitted facts.

20              MR. CHANG:  Or just read to the jury, Your Honor.

21    That was the discussion we had yesterday.   This -- we're

22    fine with this statement just simply being read as follows:

23    The following facts were admitted and require no proof, just

24    following the language of the admitted facts section of

25    the --
```

```
 1              THE COURT:  And what preference, if any, does

 2   plaintiff have with respect to the timing of reading these

 3   admitted facts?  I could do it at the conclusion of the

 4   parties' case or in an instruction or what's the -- do the

 5   plaintiffs have a preference?

 6              MR. HIGGINS:  In an instruction, Your Honor.

 7              THE COURT:  Okay.  So you rather them be put in

 8   the instruction under the stipulated facts.

 9              MR. HIGGINS:  Yes, Your Honor.  And with respect

10   to this, I would simply note that on the document that I've

11   just been handed, there isn't a -- "Ford admits that" should

12   precede the recitation on Number 7.

13              MR. CHANG:  Your Honor, and we can -- is this

14   going to be read in the jury instructions, Your Honor?  We

15   can --

16              THE COURT:  I'm sorry.

17              MR. CHANG:  Apologize, Your Honor.  The specific

18   language we can address in the charge conference, Your

19   Honor, if we want to get the jury in here.  I mean --

20              THE COURT:  I mean, why not just take what's in

21   Document 627?

22              MR. CHANG:  That is what is in the language,

23   Your Honor.

24              THE COURT:  It's not --

25              MR. CHANG:  The language is taken directly --
```

```
 1    Number 7 is Number, I believe, 8 in the charge conference --
 2            THE COURT:  Oh, there are 11?  Where are the
 3    remaining two --
 4            MR. CHANG:  The two facts don't -- the other
 5    facts, they don't need to be read.  They had to do with the
 6    stipulation as to the use deduction and --
 7            THE COURT:  All right.  So the verbiage is
 8    directly taken from the -- the verbiage is directly taken
 9    from Document 627.
10            MR. CHANG:  Yes, Your Honor, except for Number 9,
11    which was the stipulated facts.  Plaintiffs ask that the
12    words "compensatory and restitutionary damages" be read, and
13    that's fine with me, Your Honor.
14            THE COURT:  I'm sorry.  Say that one last part
15    again.
16            MR. CHANG:  On Number 9, they wanted to say
17    plaintiff's compensatory --
18            MR. HIGGINS:  Or restitutionary.
19            MR. CHANG:  One or the other.
20            THE COURT:  So can you submit the document with
21    that and then I will read it.
22            MR. CHANG:  I will, Your Honor.  Thank you.
23            THE COURT:  Is there anything else we need to
24    discuss?
25            MR. ALTMAN:  No, Your Honor.
```

| | |
|---|---|
| 1 | THE COURT:  From the plaintiff? |
| 2 | MR. HIGGINS:  I don't think so, Your Honor. |
| 3 | THE COURT:  All right.  So you have one hour left. |
| 4 | We're getting this trial done by noon.  I'm going to give |
| 5 | you all a copy of the instructions.  I asked you last night |
| 6 | to really look at -- I'm really concerned with a lot of |
| 7 | these CACI instructions.  I don't see how they apply.  I |
| 8 | just don't. |
| 9 | And so I want someone to be able to discuss with |
| 10 | me why they should.  The proposal I have takes them all |
| 11 | out -- or not all of them but a lot of them out. |
| 12 | MR. ALTMAN:  Your Honor, so if I could just |
| 13 | understand the logistics.  We will finish Mr. Kwasniewicz. |
| 14 | We would like to be heard as to these instructions so that |
| 15 | we can respond to the Court. |
| 16 | And then, Your Honor, if we could just have a |
| 17 | brief amount of time so that we can restructure whatever |
| 18 | closing arguments we have to comply with the Court's final |
| 19 | decision on these. |
| 20 | THE COURT:  Okay.  You can have a brief amount of |
| 21 | time, but we are moving today.  Okay. |
| 22 | MR. ALTMAN:  But -- |
| 23 | THE COURT:  No, I just want to be clear.  You say |
| 24 | okay, but not on your time.  This will be on the Court's |
| 25 | time.  We are moving forward.  I'm giving you the |

1   instructions.

2          Someone else on the team can review the

3   instructions.  When the case is done, I'll give you an

4   opportunity to be heard as it relates to the instructions, I

5   will make copies of the instructions, you'll get prepared

6   for your closing, and then we will proceed.  I'll instruct,

7   then close, and then the jury will have it.

8          So I'm going to push you all.  When I come out,

9   we're going to be ready to go.  Okay?  I just want to make

10  sure there's no misunderstanding.

11         I get it.  You guys need to -- you want to

12  prepare, but we need to get this to the jury because I'm

13  concerned that we're going to start losing jurors if we

14  start going into tomorrow and next week.

15         So all right.  If there's nothing further, let's

16  take a brief recess while we get the jurors here, and we'll

17  resume our testimony.  Thank you.

18         THE CLERK:  All rise.  This Court is in recess.

19      (Recess taken 9:09 to 9:42 p.m.)

20      (The following was heard in open court in the presence

21       of the jury:)

22         THE COURT:  All right.  Good morning, ladies and

23  gentlemen.  We're going to resume our cross-examination.

24         Mr. Altman, you may proceed.

25         MR. ALTMAN:  Yes, thank you.

```
 1                    CHRISTOPHER KWASNIEWICZ,

 2                having been previously duly sworn,

 3                     testified as follows:

 4                 CROSS-EXAMINATION (RESUMED)

 5   BY MR. ALTMAN:

 6   Q    Good morning, Mr. Kwasniewicz.

 7   A    Good morning.

 8   Q    Mr. Kwasniewicz, when you took the stand yesterday on

 9   of behalf Ford, did I get this right that this is the first

10   time you're testifying for Ford?

11   A    In front of a jury, yes.

12   Q    Oh.  But you've testified many times, however, on

13   behalf of your employer; is that correct?

14   A    Yeah, doing depositions for the DPS6 only.

15   Q    Right.  But I mean the idea of testifying, being sworn,

16   under oath, responding to questions of counsel, you've done

17   that for at least going back, I know, till through -- for a

18   DPS6 matter since 2016 in Vargas; is that correct?

19   A    I think I have done it eight times now.  I've testified

20   eight times.

21   Q    You've been flying out to California repeatedly for

22   depositions in DPS6 matters?

23   A    Yes, about eight times.

24   Q    Other consumers other than Mr. Pedante?

25   A    Yeah.  The Vargas -- I think I did a couple depositions
```

```
 1    for Vargas, and then for Pedante.  So yeah, about eight
 2    total, eight depositions total on DPS6.
 3    Q    And you've been meeting with various attorneys for
 4    Ford -- I think you mentioned several from other parts of
 5    the country in regards to --
 6              MR. KELLY:  Objection, Your Honor.  Relevance.
 7              THE COURT:  Sustained.
 8              MR. ALTMAN:  Okay.
 9    Q    And one of the things you responded to yesterday is you
10    said that you're not getting a bonus for being here.  Do you
11    remember that?
12    A    Yeah.
13    Q    You're actually -- I mean, you're a salaried employee.
14    Do I have that right?
15    A    I am a salaried employee, yes.
16    Q    You're not getting docked for being here.  You're on
17    company time; is that correct?
18    A    Yes.  I'm on company time, yeah.
19    Q    Got it.  Okay.
20    A    Away from my family, yeah.
21    Q    Sure.  We all are, sir.
22    A    Yeah.
23    Q    Yeah.  Okay.  So let me ask you something.  You talked
24    to us about MAM issues when it goes into the various failure
25    modes.  But if I understand this correctly, you performed
```

1    testing of a Ford Focus vehicle in July of this year; is

2    that right?

3    A     Yes.  Yep.

4    Q     And that was a test that you were conducting.  You

5    didn't have any plaintiff's experts invited to that; is that

6    correct?

7    A     No, sir.

8    Q     Is that correct that there were no plaintiff's experts

9    there?

10   A     That is correct.

11   Q     And none were invited; is that correct?

12   A     Yes.

13   Q     Okay.

14   A     Correct.

15   Q     And the only testing that you did on a -- with respect

16   to MAM issues is on a single Ford vehicle, the single Focus;

17   is that correct?

18   A     Yeah.  We did one Focus, yes.

19   Q     Right.  And when I asked you in your deposition in this

20   case last month on October 16th, you had indicated that that

21   was some kind of a test vehicle, you weren't sure if it was

22   ever used or owned by a consumer.  Do you remember that?

23   A     That was correct, yes.

24   Q     And you couldn't tell me the mileage on the vehicle; is

25   that correct?

```
 1    A     Yeah.  I don't know what the mileage was.  It was just

 2    a Focus.  We wanted to grab a Focus, and we had one

 3    in the --

 4    Q     I just need -- is that correct that you didn't know the

 5    mileage?

 6    A     Yes, sir.

 7    Q     And in addition, you couldn't tell what the repair

 8    history, if any, was on this Focus that you decided to do

 9    testing for the MAM on a single car; is that correct?

10    A     Yeah, that's correct.  I --

11    Q     Okay.

12    A     It was, yeah.

13    Q     And I think in -- and in terms of the issues for the

14    MAM where you claim that this doesn't pose an unreasonable

15    risk of safety to any consumers, your testing consisted of

16    this one vehicle; is that correct?

17    A     I'm sorry.  I'm little confused.  Can you restate it,

18    please.  Sorry.

19    Q     You've testified that the -- when a MAM fails, there's

20    no issue of safety, and your testing -- your testimony is

21    based on your testing of this one vehicle; is that correct?

22    A     Oh.  No, sir.

23          MR. ALTMAN:  Your Honor, if I could turn the

24    Court's attention to his testimony in Pedante, this case,

25    from October 16th at page 56, lines 6, through 57, line 3.
```

```
 1                THE COURT:  I'm not sure if I have that depo.  You

 2    said -- what was the date again?

 3                MR. ALTMAN:  October 16th, Your Honor, for

 4    Pedante.  There's actually a collection of cases that his

 5    testimony was for.  Hightower, Quintero, Pedante.

 6                THE COURT:  All right.  I have October 24th.  I

 7    have a Volume 2.  I don't know unless in this mass of

 8    documents -- I don't see a Volume 1, which is what I assume

 9    you're referring to.

10                MR. ALTMAN:  Your Honor, apparently my colleagues

11    also have a copy of the deposition.

12                THE COURT:  All right.

13                MR. KELLY:  Your Honor, could we have page and

14    line again, please.

15                MR. ALTMAN:  Sure.  Your Honor, it's page 56,

16    line 6, through page 57, line 3.

17                MR. KELLY:  Thank you.

18                THE COURT:  Can I have counsel approach, please.

19          (The following proceedings were held at sidebar.)

20                THE COURT:  If my memory serves me correctly, your

21    question was with respect to whether or not the issue with

22    the MAM was testing with respect to one vehicle; correct?

23                MR. ALTMAN:  Right.  So I had asked him is --

24                THE COURT:  On page 56.

25                MR. ALTMAN:  Right.  I asked how many DPS6 -- I
```

```
 1    had asked him -- I started by asking him how many DPS6
 2    vehicles, Ford and Focus, were manufactured.  He said over
 3    3 million.
 4            And I said, "And you're testing for this MAM
 5    failure, this is in this one vehicle; is that right?"  And
 6    that's when he said, "Yes, it was," and he went into some
 7    details about the test.
 8            THE COURT:  So that's line 19?
 9            MR. ALTMAN:  Well, actually, to set it up,
10    Your Honor --
11            THE COURT:  Well, wait.  Then you set it up with a
12    question.
13            MR. ALTMAN:  I did.
14            THE COURT:  You didn't set it up with him.
15            MR. ALTMAN:  Well, I can do that if I ask him --
16            THE COURT:  Okay.
17            MR. ALTMAN:  And it goes from 6 then, if I set
18    that up, to page -- to line 3 of the next page.
19            THE COURT:  Okay.  And just, in the interest of
20    time, let's just get this over with.  Thank you.
21            MR. ALTMAN:  Right.  Thank you.
22        (The following was heard in open court in the presence
23         of the jury:)
24    BY MR. ALTMAN:
25    Q    Mr. Kwasniewicz, when I asked you how many
```

```
 1   DPS6-equipped vehicles Ford manufactured, I think you gave

 2   me an estimate of over 3 million; is that correct?

 3   A     Yes.

 4             MR. ALTMAN:  Your Honor, with that, now can I read

 5   these questions?

 6             THE COURT:  All right.  Just hold on.  Just let

 7   him read the question.

 8             THE WITNESS:  Yes, sir.

 9             MR. ALTMAN:  Your Honor, I'll start at line 6 and

10   go to line 3.

11                  QUESTION:  Can you give me a sense

12             of how many DPS6-equipped Focuses and Fiestas

13             Ford manufactured and produced?

14                  ANSWER:  I don't know that.  That's

15             a great -- that's a great question.

16                  QUESTION:  I asked you that in

17             April.

18                  ANSWER:  Yeah.

19                  QUESTION:  And you said you would

20             let me know.

21                  ANSWER:  Yeah.  I am going to give

22             you an est- -- well, I don't want to give you

23             an estimate but over 3 million.

24                  QUESTION:  Okay.

25                  ANSWER:  How does that sound?
```

```
 1                    QUESTION:  And I have this right,
 2           that the testing that you did for the failure,
 3           the failure mode of the MAM took place in this
 4           one vehicle, this test vehicle?
 5                    ANSWER:  Yeah.  It was just a -- it
 6           was just a-- the vehicle was already -- or the
 7           software has already been validated when it
 8           was signed off initially before it went into
 9           production.  This is just going back and --
10           and, you know, it's just basically spot
11           checking this, yeah.
12   Q    Sir, you also did some testing of Mr. Pedante's
13   vehicle; is that correct?
14   A    Yeah.
15   Q    You did a vehicle inspection?
16   A    Yeah, we did a vehicle inspection, yes.
17   Q    And that vehicle inspection was in March -- there was
18   one in March of this year; right?
19   A    Correct.
20   Q    2019?
21   A    Correct.
22   Q    When I asked you in your deposition, I asked you what
23   was -- the testing consisted of, and you indicated there was
24   a test drive of about ten miles.  Do you remember that?
25   A    Yes, sir.
```

```
 1   Q    Okay.  Is that still accurate, sir?

 2   A    Yeah.  About a ten-mile run, yeah.

 3   Q    And one of the things I asked you about, whether you

 4   were trying to recreate real world conditions, I said did

 5   you go up any steep grades.  Do you remember me asking you

 6   that?

 7   A    Yeah.  I think I answered yes to that.

 8   Q    Yes.  And when I asked you what was the steep grades

 9   that you went up, like -- in fact, I even asked did you go

10   up the Grapevine or something, I think you said the length

11   of the steep grade you went on for your real world testing

12   was 200 feet.  Do you remember that?

13   A    Yes.  We -- yes.  Yep.

14   Q    And I think when you did the second vehicle inspection

15   later this year -- I think it was in October; is that

16   correct?

17   A    That's correct.

18   Q    Last month?

19   A    Yep.

20   Q    You had done the same testing and you did a test right

21   at about ten miles again.  Remember?

22   A    Yeah.  And I'm -- I was with Micale.  I think it was

23   around ten miles.  I'm not familiar with the area, but I

24   would say ten miles.

25   Q    Okay.  And I asked you again did you try that time to
```

```
 1   simulate real world conditions going up any steep grades,
 2   and you said, "Yeah, we did and then that was also about
 3   200 feet."  Is that accurate?
 4   A    I would say about 200 feet.  It was a pretty steep
 5   grade, yeah.
 6   Q    Okay.  So the length of the steep grade was 200 feet
 7   that you went up?
 8   A    Yeah, I would say about 200 feet, yeah.
 9   Q    Okay.  Sir, one of the things you've also talked about
10   is you've said that there was a technical service bulletin
11   that came out, I think it was -- if we could turn to
12   Exhibit 190.
13            Your Honor, apparently there's no --
14            MR. KELLY:  No objection.
15            THE COURT:  190 will be admitted.  You may
16   publish.
17            MR. ALTMAN:  Right.
18        (Trial Exhibit 190 was admitted into evidence.)
19   BY MR. ALTMAN:
20   Q    And, sir, this is a technical service bulletin that was
21   issued in March -- on March 24th of 2011.  Do you remember
22   that?  Or --
23   A    I remember it, but it's way before my time, and it
24   looks like it's for a Fiesta, yeah.
25   Q    Right.  And I think you've told us in your deposition
```

```
1   that the issues -- that the Fiesta and the Focus are
2   basically the identical car -- identical transmission with
3   some slight changes in the size of the -- there's some size
4   changes; is that correct?
5   A    They're similar transmissions, different gear ratios
6   inside, and it's a different clutch, uses a different clutch
7   material, an RCF material versus a -- the 8080 material,
8   which is for the heavier car like a Focus versus a Fiesta.
9   Q    The input that shaft, that was an issue that presented
10  both in the Focus and the Fiesta; is that correct?  The
11  seals that you were -- that you've discussed yesterday that
12  needed to be replaced?
13  A    Yeah, we found that the machining -- I told you about
14  the lead of the shaft.  It's the same shaft and we found the
15  machining lead.  So that went into -- that machine that
16  created that lead was used on both the Focus and Fiesta.
17  Q    Right.  And you may recall that there were multiple
18  presentations where Mr. Pedante brought his vehicle into a
19  Ford dealership and one of the things that were done is
20  seals were continually being replaced is that correct?
21  A    Yeah.  If you read the TSB, and the TSB will indicate
22  that --
23  Q    Sir, I just need to know is that your understanding
24  from the multiple presentations where the seals and the
25  input shaft seals, were they continually being replaced?
```

```
 1   A     I don't think continually being replaced, no.  I would
 2   say I think they were changed out twice, three times, I
 3   think.  I'd have to go back and look at all the repair
 4   orders, but they weren't -- every time the vehicle came in
 5   for a clutch, the seals were not replaced every time.
 6   Q     Right, not every time particularly.
 7   A     No.  It's up to the technician -- it's up for the
 8   technician to make the rule.
 9   Q     And so, when Mr. Pedante's having these replaced
10   several times, according to you but the jury has the repair
11   history --
12   A     Uh-huh.
13   Q     -- can you tell me, when he was presenting his car for
14   a buyback, can you tell me how many Ford vehicles -- how
15   many Focuses were affected with this input shaft seal issue?
16   A     I can't tell you because not all of them had -- not all
17   of them had the same issue; right?  There was -- I can't
18   give you the answer to that.
19         Like I said, the machine that makes that shaft,
20   there's eight different machines.  Only one of them was
21   programmed wrong.  So -- and then, you know, there were
22   multiple issues the team was solving.  We had a lead on the
23   shaft.  We had that mold following of a seal.  We had other
24   issues that were going on.  So not every vehicle saw the
25   same issue.
```

```
 1   Q    Right.  But when I asked you if you could tell me --
 2   during your earlier depositions this year whether you could
 3   tell me how many cars -- how many Focuses were affected, you
 4   said yeah, you could, you could do a keyword search to pull
 5   the information from Ford's AWS, all warranty system; is
 6   that correct?
 7   A    That's correct.  That would give you a -- it would give
 8   you some type of indication based on, you know, how many
 9   units we built, and you would say, if we had this many
10   warranty claims, you'd kind of -- you'd be able to kind of
11   piece it together and, you know, come up with a number
12   saying okay --
13   Q    And, sir, when you're being asked about how many were
14   affected, so we -- Ford -- it's in Ford's warranty system --
15   A    Uh-huh.
16   Q    -- did you pull that information at any time?
17   A    I didn't.  I didn't pull it.
18   Q    Did you ask anyone to pull it so we could show them?
19   A    I didn't.  I didn't know that --
20   Q    Okay.
21   A    Yeah, I didn't pull it.
22   Q    Let me go to another technical service bulletin.  This
23   is also dealing with now oil leaking out of these input
24   shaft seals, if I could turn your attention to Exhibit 193.
25             MR. KELLY:  No objection.
```

```
 1              THE COURT:  193 will be admitted.
 2         (Trial Exhibit 193 was admitted into evidence.).
 3    BY MR. ALTMAN:
 4    Q    And again, this is dealing with DPS6; is that correct?
 5    I mean, it says fluid leak from clutch housing; is that
 6    correct?
 7    A    Yeah, this is the Fiesta.
 8    Q    Okay.  But, again, another DPS6-equipped vehicle; is
 9    that correct?
10    A    Yes.
11    Q    Okay.
12    A    One of the options.
13    Q    And again, during your April deposition, I asked you if
14    you could tell me how many Focuses were affected with the
15    issue of the oil leaking out of the input shaft seal area.
16    Do you remember that generally?
17    A    Yeah.  Yep.
18    Q    And do you have that information now, sir?
19    A    I don't.
20    Q    Did you ask anyone to get that information?
21    A    I didn't.  I didn't, and I'm --
22    Q    Okay.
23    A    I didn't know that it was -- I didn't know that I had
24    to provide it after the deposition.
25    Q    And, sir, you've also made the claim that the loss of
```

1   motive power, among other things, shuddering, the

2   hesitation, stalling -- none of that presents a safety issue

3   for a DPS6-equipped vehicle; is that correct?

4   A    All the testing that we performed, yeah, it doesn't --

5   does not present itself as a safety issue.

6   Q    Well, in fact, sir, Ford has reported multiple

7   accidents and injuries --

8            MR. KELLY:  Objection, Your Honor.  May we

9   approach.

10            THE COURT:  Sustained.  Sidebar.

11       (The following proceedings were held at sidebar.)

12            THE COURT:  Mr. Kelly.

13            MR. KELLY:  Yes, Your Honor.  This is a motion in

14   limine that we've had an order on for quite some time.

15   There's no foundation to ask this witness about reports that

16   Ford makes to the government that's been excluded

17   continuously throughout the case pursuant to your order.

18            The framing of the question to this witness in

19   that form suggests to the jury that there are accidents

20   concerning shudder or loss of motive power with the DPS6

21   that were reported to the government for which there's no

22   evidence that would allow that to be admitted in front of

23   the jury.  That's a blatant, obvious failure to comply with

24   your order, Your Honor.

25            THE COURT:  All right.

```
 1              Mr. Altman.
 2              MR. ALTMAN:  Yeah, couple things, Your Honor.  It
 3   has not been excluded.  Second of all, Your Honor, this man
 4   has made the claim that there have been -- there's no safety
 5   issues presented at his deposition.  They know this.
 6              He was asked about accidents and injuries and
 7   death, and he testified at length about this.  They made a
 8   firm stance, Your Honor, where there's no safety issues.  So
 9   to not allow impeachment of that -- I'm not going to get
10   into reports.  I'm not going to get --
11              THE COURT:  Well, but wait a minute, Mr. Altman.
12   We talked about this.  We went through the whole -- the
13   exhibits in particular, and it listed all the accidents,
14   et cetera.  I said that was not going to come in.  So what
15   are you going to ask him about?
16              MR. ALTMAN:  Well, I'm going to ask has ever been
17   a part of anything where there's been accidents and injuries
18   that have been reported to Ford.
19              THE COURT:  Right.  All right.  The objection's
20   sustained.
21         (The following was heard in open court in the presence
22          of the jury:)
23   BY MR. ALTMAN:
24   Q    Sir, one of the things that you get at Ford is, you get
25   customer complaints about performance of their vehicles; is
```

```
 1   that correct?
 2   A    I'm not -- I don't following you.  We have warranty
 3   claims that come in.
 4   Q    You also have 14D reports where you get complaints from
 5   customers; is that correct?
 6   A    No.
 7   Q    What is the 14 reports that you've talked about?
 8   A    14D?
 9   Q    Yes.
10   A    A 14D is what we call 14 Discipline.  It's an
11   engineering tool.  There's a 5D, an 8D, and then obviously a
12   14D.
13        And basically, they're just -- it states what the
14   root cause is and then what the fix is, and then they're
15   the -- we call it the 14 Disciplines.  And then you kind of
16   go through a methodic -- it's a methodic tool to ensure that
17   you're preventing it from happening in the future.
18   Q    Sure.  Let me ask you something.
19        You also get customer complaints -- is that
20   correct? -- where they talk about their issues with their
21   DPS6?  Or Ford doesn't -- Ford doesn't have an intake for
22   that?
23   A    Oh no, we have an intake for it.
24   Q    Right.
25   A    I'm just trying to figure out what -- it's not a
```

```
 1    warranty.  That would probably be more like in our TGWs.

 2  Q    Right, the things gone wrong?

 3  A    Things gone wrong, yeah.

 4  Q    Right.  And in fact, Ford has received hundreds of

 5    thousands of complaints from DPS6 customers; is that

 6    correct?

 7  A    I'm not sure hundreds and thousands, no.  We -- we

 8    audit our customers.  We have a -- we use a system where we

 9    actually go out and we query our customers after you

10    purchase the vehicle.

11          We want to get their feedback to make it better.

12    So upon purchasing a vehicle, at the 90-day point of owning

13    the vehicle, because a customer now becomes familiar with

14    the vehicle, we send them a survey.  It's either done over

15    the phone, or it's done through a mail-in, and now

16    everything's going to computer.

17          But we get their feedback in, we do the cut --

18    things gone wrong and things gone right.  We kind of

19    particularly care about the things gone wrong because we

20    want to make it better for the customer.

21  Q    Right, of course.

22          So when you get these customer complaints, when

23    they're reporting things that are going wrong to Ford and

24    the issues that they've had, you yourself have had no role

25    in investigating accidents; is that correct?
```

```
 1              MR. KELLY:  Objection, Your Honor.  Relevance,
 2  Your Honor.
 3              THE COURT:  I'll allow it.
 4              THE WITNESS:  Yeah, I am not an accident
 5  investigator.
 6  BY MR. ALTMAN:
 7  Q    Right.  So when you tell --
 8  A    I do not work --
 9  Q    -- the jury there's no safety issues, you don't have
10  any role in investigating accidents, do you?
11  A    No, I'm not a safety -- no.
12  Q    Got it.
13  A    Nope.
14  Q    Also, sir, let me ask you something.  One of the claims
15  that you've made in your testimony is that the warranty
16  claims were better, that things got better.  And I want to
17  ask you about that.
18              Can you explain to the jury what this term "R per
19  thousand" means?
20  A    Sure.  Repairs per thousand.  Ford builds a lot of
21  vehicles, and so a way of kind of breaking it down, you
22  know, so you can get it to where it's a manageable amount,
23  we take the -- it's kind of a deep, lengthy equation they
24  use.  But you're looking over basically every thousand
25  vehicles built, how many repairs were done.
```

```
 1              So you could have 3Rs per thousand.  So basically,
 2      for every thousand vehicles built, there were three repairs.
 3              And we just break it down so it's manageable to
 4      look at because if not, you'd be looking over a million
 5      vehicles.  You know, Ford builds a lot of vehicles.  Ford --
 6      we, you know, build a million F-150s in over a year, so we
 7      break it down by model year --
 8      Q    Thank you.
 9      A    -- just something you can actually look at, look it
10      over a little better, break it down further.
11      Q    Mr. Kwasniewicz, thank you for that.
12              And Ford, in tracking R per thousand, it tracks R
13      per thousand, repairs per thousand, 60 days from the built
14      and sold date; is that correct?
15      A    Yeah, absolutely.  I think I mentioned before that my
16      engineers are always looking over the warranty --
17      Q    Sir, I just need an answer to the question.
18      A    Oh.  Yes.
19      Q    So the tracking that Ford does for this R per thousand
20      is 60 days from the built and sold date.  But if a car
21      wasn't sold after four months of its build date, that would
22      never fall within Ford's R per thousand tracking; is that
23      correct?
24      A    No.  Incorrect.
25      Q    Okay.
```

```
 1   A    Any repair that --

 2             MR. ALTMAN:  Your Honor, I'm sorry if I could turn

 3   the Court's attention to his deposition testimony in another

 4   DPS6 case, Cazares, from June of last year.  And if I could

 5   turn your attention to page 86, lines 11 through 16,

 6   Your Honor.

 7             THE COURT:  All right.  You may proceed.

 8             MR. ALTMAN:  Thank you.

 9                  QUESTION:  So if I'm understanding

10                  right, if a vehicle was built but it wasn't

11                  sold for whatever reason until four months

12                  later, that vehicle would just never fall

13                  within an RF per thousand calculation.

14                      ANSWER:  That's correct, sir.

15   Q    Sir, in addition, the R per thousand calculation

16   doesn't embrace all of the actual cars with problems, just

17   the ones that Ford decides to track; is that correct?

18   A    No, sir.

19             MR. ALTMAN:  One moment.

20             Your Honor, if I could turn the Court's attention

21   to his deposition testimony in the same case, Cazares, on

22   the same page, line -- page 86, lines 5 through 10.

23             THE COURT:  All right.  You may proceed.

24             MR. ALTMAN:  (Reading:)

25                  QUESTION:  So the RF per thousand
```

```
 1              only applies to that window, 60 days after

 2              production?

 3                   ANSWER:  Correct.  It has to be

 4              built and sold within 60 days.  And once it's

 5              built and sold within 60 days, then we track

 6              the vehicle for three months after that.

 7   Q   Sir, you actually previously conceded that the R per

 8   thousand, the repairs per thousand for the DPS6 was among

 9   the highest of any Ford vehicle; is that correct?

10   A    I'd have to go back and there and check that data.

11   Q    Sir, would you -- would concede that it was very high?

12   A    I'd have to go back and check the data.  At three

13   months in service, we have our objective measure, but we

14   still continue looking at all warranty claims throughout the

15   warranty period, and that's what we do.

16          But you have to have a metric to set yourself

17   against.  So that's what I meant when I answered the

18   question.

19   Q    Would you concede it was high, sir?

20   A    I mean --

21   Q    That's fine.

22          Your Honor --

23   A    I'm not --

24          MR. ALTMAN:  May we go to his testimony again.

25          THE COURT:  What page?
```

```
1            MR. ALTMAN:  Page 86, line 21, through 87, line 7.

2            THE COURT:  All right.  You may proceed.

3            MR. ALTMAN:  (Reading:)

4                      QUESTION:  And out of the ones that

5            are being tracked, what is the RFs per

6            thousand on DPS6 transmission problems as of

7            the time you had the position?

8                      ANSWER:  I don't know.  Don't have

9            that in front of me.

10                      QUESTION:  It was fairly high?

11                      QUESTION:  Comparatively to other?

12                      ANSWER:  Comparatively to other

13            transmissions in the Ford -- in our Ford

14            system, it was high.

15   Q    Sir, your testimony about warranty claims get -- got

16   better and better, one of the things that Mr. Pedante had to

17   have done is he had to have new seals put in in the summer

18   of 2013; is that correct?

19   A    Summer of 2013?

20   Q    I'm sorry.  Summer of 2014.  Thank you.

21   A    Yes, sir.

22   Q    Okay.  And the Focuses, I think you told us, were

23   starting to be sold in 2011; is that correct?

24   A    Calendar year 2011 for a '12 model year, yes, sir.

25   Q    Then you indicated that there were changes in the
```

1    materials for the -- there were changes in material, the

2    8080 changes in chips, changes in calibration; is that

3    correct?

4    A    Amongst, yes, seals and some other things as well.

5    Q    And then at some point in time, your claim is that the

6    warranty claims got better, they were reduced; is that

7    correct?

8    A    That is correct.

9    Q    Okay.  Can you tell us when the warranty claims were

10   reduced for the various issues of the DPS6 in the Focus?

11   A    I don't have the -- it's very tough.  I see a lot of

12   data; right?  There's a lot of data floating around.

13        I just recall seeing histogram -- histogram is

14   probably the wrong word, but from '14 -- you know, '13, '14,

15   '15, '16, '17, and I have seen the data that steps down --

16   they continue to step down -- and it got to a level where

17   are it's running about where our automatic --

18   hydraulic-based automatic transmissions are, which some of

19   those are best in class.  So we consider that to be a good

20   warranty number.

21   Q    You mean -- well, you also acknowledge that the

22   DPS6-equipped Focuses were worst in class at one point.  Do

23   you remember that?  They had the highest repair rates.

24   A    No.  I don't -- I'd have to go back and look at all the

25   data.  But, you know, we try to -- you know, best in class

```
 1   is what we all try to strive for.  If we don't, then believe
 2   me, you're left behind.
 3   Q    Your claims -- you're here in a case involving a 2013
 4   DPS6 Focus.  Your claims that the warranty rates got better,
 5   do you have that data, sir, to corroborate what you're
 6   telling them?
 7   A    I'm sure we can get it.  I have seen the data, yes.
 8   Can't recall what the data -- in front of me what the
 9   numbers look like, but I have seen the numbers.
10   Q    So this case has been pending for two years, sir.
11        Do you think you can get the data so maybe we can
12   call the jury back in a couple months?
13        MR. KELLY:  Your Honor, I would object to that on
14   a number of grounds.
15        THE COURT:  Why don't you state the grounds so --
16        MR. KELLY:  Argumentative, Your Honor.
17        THE COURT:  Sustained.
18        MR. ALTMAN:  Fine.
19   Q    Sir, let me ask you something.
20        At one point in time, Ford extended the warranty
21   on DPS6-equipped vehicles; is that correct?
22   A    Yes.  For our customer satisfaction, correct.
23   Q    But it didn't extend the warranty on the earlier model
24   vehicles; is that correct?
25   A    That's incorrect, sir.
```

```
 1   Q    Well, sir, do you have anything to show that the

 2   warranty was extended on the earlier model vehicles?

 3   A    Yes.  We have -- we did an FSA14M01 where we extended

 4   the warranty from vehicles -- actually, Mr. Pedante's

 5   vehicle, we extended it from a five-year/60,000 miles to a

 6   seven-year/hundred thousand miles.  And then on the MAM,

 7   because that's an emissions compliant component, it went

 8   from eight years/80,000 miles to ten years/150,000 miles.

 9            And we did that so the customer didn't -- was

10   protected and they didn't have to pay any out-of-pocket

11   expenses.

12   Q    Right.  Well, when you say they didn't have to pay, you

13   mean beyond what they paid when they bought the warranty

14   with the car in the first place?

15   A    Yeah, that's the way it's implied.

16   Q    Well, let me ask you something.  That was for 2013 on.

17   These cars were sold from 2011, Focuses; is that correct?

18            MR. KELLY:  Objection, Your Honor.  Argumentative

19   in form.  Assumes facts not in evidence.

20            THE COURT:  Sustained.

21   BY MR. ALTMAN:

22   Q    Well, you just told us the Focus was sold starting in

23   2011; is that correct?

24   A    The 2012 Focus built in 2011, yes.  We're covered --

25   we're extended warranty --
```

```
 1    Q    Sir, can you --

 2    A    -- from '11, '12s, '13s, '14s; '15s.  Yeah.  Yeah.

 3    Q    I don't know what that was the answer to, but let me

 4    ask you this.

 5    A    Well --

 6    Q    Were you selling these Focuses starting in 2011?

 7    A    Yes, as a 2012 model year.

 8    Q    Right.  But calendar year 2011?

 9    A    Correct.

10    Q    So when someone would buy with it a five-year warranty

11    in 2011 or a 60,000-mile warranty, we would start from the

12    date that they bought the car; right?

13    A    Yes.

14    Q    Okay.  And you talked about a 14M01 that would extend

15    warranties for someone in, for example, Mr. Pedante's car;

16    correct?

17    A    That is correct.  We extended the warranty.

18    Q    Sure.  But for the cars before that, they're aging out

19    of warranty.  So when you claim the warranty rates got

20    better, your AWS system only picks up warranty repairs;

21    correct?

22              MR. KELLY:  Objection, Your Honor.  Relevance to

23    those other vehicles.

24              THE COURT:  Sustained.

25
```

```
 1   BY MR. ALTMAN:
 2   Q    Well, sir, let me ask you -- your AWS system, according
 3   at least to Mr. Doss, that only picks up warranty repairs;
 4   right?  It's called the all warranty system; right?
 5   A    It picks up all warranty -- anything that's under
 6   warranty on the vehicle --
 7   Q    Right.
 8   A    -- and for powertrain, it was a 5/60,
 9   five-year/60,000 --
10   Q    Sir, the question --
11   A    -- is all covered.
12   Q    The question is does all warranty system picks up
13   warranty repairs -- right? -- anything under warranty?
14   A    Anything under warranty, extended warranty, yes.
15   Q    Sure.  So If you're not covered by a warranty and you
16   still have to get your Ford repaired, it won't be contained
17   within the all warranty system --
18            MR. KELLY:  Objection --
19   BY MR. ALTMAN:
20   Q    -- correct?
21            MR. KELLY:  Sorry.
22            Objection, Your Honor.  Irrelevance.  403.
23            THE COURT:  Overruled.
24   BY MR. ALTMAN:
25   Q    If you have a repair, sir, that is outside --
```

```
1              THE COURT:  Counsel, let him answer the question.
2              THE WITNESS:  Yeah.  Any -- if it's covered under
3   warranty, whether it's the base warranty or the extended
4   warranty, it's going to show up in the AWS system.
5              If a customer -- if it's outside of warranty and
6   the customer pays out of pocket, we don't track it.  It's
7   not in the AWS system.
8   BY MR. ALTMAN:
9   Q    Right.  So you don't track repairs related to DPS6
10  issues if they're not -- if they're outside of warranty; is
11  that correct?
12  A    Yeah.  I mean -- yeah, it's -- we can look at the
13  ROs --
14  Q    You have answered the question.
15  A    -- you can see the dealership but yeah.
16  Q    Okay.  Now, sir, one of the things that you were aware
17  of when you took over after the design and development of
18  the DPS6 was done, you're aware that DPS6-equipped vehicles
19  got worse over time; isn't that correct, sir?
20  A    I don't think they got worse over time, no.  We were
21  finding issues with parts, and we were fixing them, and the
22  warranty was getting better --
23  Q    Sir, let me ask --
24  A    -- throughout the years.
25  Q    Let me ask you to turn for a moment to Exhibit 339.
```

```
 1                 And Mr. Kwasniewicz, let me ask you, at the 70,000
 2      average mile mark for your DPS6-equipped vehicles that Ford
 3      sold in China, a hundred percent of them failed --
 4                 MR. KELLY:  Objection, Your Honor.  Relevance.
 5                 THE COURT:  Sustained.
 6      BY MR. ALTMAN:
 7      Q    Well, sir, Ford was selling DPS6-equipped vehicles
 8      where at a 70,000-mile mark, a hundred percent of them
 9      failed; is that correct, sir?
10      A    No, sir.
11      Q    Have you confronted the people that wrote the e-mail at
12      your company about this?
13                 MR. KELLY:  Objection, Your Honor.  Hearsay.
14                 THE COURT:  Sustained.
15      BY MR. ALTMAN:
16      Q    Sir, you also made -- one of the claims you made is
17      that the changes in the materials also fixed things and
18      improved the warranty rates.  Do you remember that?
19      A    That is correct.
20      Q    And you remember I asked you for data that could
21      corroborate that when I deposed you in April in Michigan.
22      Do you remember that?
23      A    I don't recall, but yeah.
24      Q    Then I asked you again in October of this year if you
25      had that information.  You didn't have it then either.
```

1   Remember?

2   A     Correct.

3   Q     And you don't have it with you today; right?

4   A     I don't -- I don't have -- yeah.  We'd have to -- I

5   mean, I'm sure it's available.  We'd have to get it for you.

6   Q     Sure.  And, sir, actually, you were asked about that

7   nearly three years ago to the date today in Vargas.  You

8   were asked for this information corroborating your claim

9   that the material changes fix things.  Do you remember that?

10  A     Yes.  And like I said, I've seen the data.  I don't

11  have the data in front of me.  I can't tell you exactly -- I

12  mean, I look at a lot of numbers, a lot of data.  I can't

13  tell was those numbers are, but I have seen data that show

14  that it is improved.

15  Q     Sure.  So, sir, when you were asked three years ago on

16  November 21st, you didn't produce it then, you didn't

17  produce it in April of this year, and you didn't produce it

18  in October of this year; is that correct?

19  A     That is correct.  I guess I didn't know that I -- to

20  follow up.  I'm new to the deposition circuit here.  So I

21  didn't know that I was supposed to follow up after.  So

22  sorry.

23  Q     Got it.

24        So attorneys were asking you questions about

25  information, and you didn't provide it.

```
 1              MR. KELLY:  Objection, Your Honor.  Argumentive.
 2              THE COURT:  Sustained.
 3    BY MR. ALTMAN:
 4    Q    So you talked about a change in the warning system, for
 5    example, with the -- if there was a loss of communication
 6    with the MAM.  There was an overt detection warning change
 7    that made -- that took place; is that correct?
 8    A    That's correct.  When we have an internal failure in
 9    their MAM, we developed a patch level on top of -- for a new
10    system that would overlay on top of the system that was
11    already in place.
12    Q    And I think you talked about there was this 15B22 field
13    service action; is that right?  That was that overt
14    detection action?
15    A    That is correct.  That went out as a customer
16    satisfaction.
17    Q    And you indicated that, if that went on, there was some
18    period of time before the vehicle failed or, I guess, went
19    into that was call what you called open clutch but loss of
20    motive power fail-safe mode?
21    A    Yeah.  Yeah.
22    Q    Okay.  Sir, do you have anything that can corroborate
23    that there's a delay between when this overt action light
24    comes on and when it goes into this fail-safe mode where
25    they lose motive power?
```

```
 1    A    Yes, I can.

 2    Q    Do you have that with you, sir?

 3    A    I do not have it with me.  But under my tenure as a

 4    DPS6, we did a lot of testing on it.  And to be

 5    conservative, it's roughly about 4,000 miles of -- from when

 6    you initially have the flag set to when it actually does --

 7    goes into loss of motive of power.

 8    Q    You have a --

 9    A    Comes out to be about three months -- with

10    conservatively three months of driving.

11    Q    You have that information we can show the jury?

12    A    I do not have it in front of me.  I just -- I was

13    pretty intimate during the design of that.

14    Q    Right.  And you were aware that Mr. Pedante would

15    present his vehicle where he wouldn't get any indication.

16    You're aware of that from his deposition testimony?

17    A    I don't recall that in his -- he thought he said he had

18    an engine light, if I am not mistaken.

19    Q    One time.

20    A    I'm just -- I'm trying to recall --

21    Q    Sure.

22    A    -- what's going on, but I think there was an indication

23    that there was an engine light that came on.

24    Q    So Mr. Pedante took his vehicle in on March 1st, 2016,

25    to have this warning system placed on his vehicle; is that
```

```
 1   correct?
 2   A    Yes.  He received a letter in the mail and the vehicle
 3   came in, and they reflashed it for free with the latest
 4   calibration.
 5   Q    Right.  And that was Exhibit 13.  That's that repair
 6   order where he comes in in August of 2016.  You're aware of
 7   that.
 8   A    I'm sorry.  I thought you were talking about the
 9   March 13th --
10   Q    I'm sorry, March.  Yeah.  I'm sorry, March 1st.
11   A    Yeah.
12   Q    Got it.
13            And so this field service action was done as some
14   kind of a safety measure; right?
15   A    It wasn't a safety measure.  It was a customer
16   satisfaction effort.
17   Q    Okay.  And so we have the new overt warning system
18   in -- and then on August 3rd, later in the year, he lost all
19   motive power with no warning light.
20   A    Once again, there was an engine light that occurred,
21   but it was not due to the MAM failing.
22            If I do recall -- we talked about yesterday -- I
23   kind of pieced it all together that he had a battery that
24   was damaged as well as a ground cable that was corroded.
25   Q    Sir, let me ask you about that.
```

```
 1            So one of the things as you're aware of from his

 2   testimony that he -- in his deposition, he testified he lost

 3   motive power trying to get on the freeway.  Do you remember

 4   that?

 5   A    Yeah.

 6   Q    Okay.  And then you indicated it was a battery issue.

 7   Do you remember that?

 8   A    Well, what I indicated was that it was a ground issue

 9   and, basically, if -- it's a high current draw system, and

10   when we lost ground, the system -- it goes into fail-safe

11   mode where if it doesn't know what gear it's in, it opens

12   the clutches because we do not want to have the vehicle stay

13   in gear.  As you come down to speed, it will stall the

14   engine.

15   Q    Sir, let me ask --

16   A    We did not want to stall the engine.

17   Q    Let me ask you something.  I think you indicated that

18   he went in, it was the sign of a failing battery, among

19   other things.  Do you remember that?

20   A    That's what the dealership wrote down.

21   Q    Right.

22   A    When the vehicle came in, they noted it on the repair

23   order.

24   Q    And then that same battery lasted for about eight

25   months longer before he had to have his TCM replaced.  Do
```

```
 1  you recall that?
 2  A    Actually, he brought it in eight months later for -- to
 3  have the battery replaced and the negative ground cable.
 4  Q    Right.  So the battery --
 5  A    Bearing that --
 6  Q    -- went about eight more months, and then he brought it
 7  in.  And I think you indicated the battery was the issue.
 8  A    I did not say the battery was the issue, sir.
 9  Q    Oh, so the battery's not the cause anymore.
10  A    No, I never said that.  I said that the corroded
11  battery terminal on the cable that came in, which I said the
12  grounding of that cable is very important and -- because
13  it's a high current draw system.
14            And what they did in that August repair is they
15  cleaned the battery cable and reinstalled it, and he went on
16  his way.  They did replace the MAM, which I believe was the
17  right thing to do because that's what the TSB said to do.
18            He did come back.  Mr. Pedante came back, all good
19  intentions, in March of 2017, and he had the cable replaced
20  as well as the battery replaced.
21  Q    Right.  And then, when he came in in March of 2017
22  where he had the cable replaced, he's got a new TCM.  And
23  then again his TCM failed after that; is that correct?
24  A    It -- from my records, the TCM did not fail in the
25  August of 2018 when they replaced -- are you talking about
```

```
 1    when they replaced the MAM again?

 2    Q    Yes.  They just replaced the MAM for no -- just for the

 3    hell of it; right?

 4    A    I'm not --

 5              MR. KELLY:  Your Honor, I'm sorry.  Argumentative.

 6              THE COURT:  Sustained.

 7    BY MR. ALTMAN:

 8    Q    Well, sir, the technicians who were there -- you didn't

 9    talk to any of the technicians that actually did the repair

10    work, did you?

11    A    When he brought it in in 2018?

12    Q    He brought it in in 2018, '17, '16, '15, '14.

13    A    No, sir, I did not talk --

14    Q    Okay.  And so they replaced it even after a new battery

15    cable, even after a new battery, even after this overt

16    warning protection thing, he also then has a TCM replaced in

17    2018; is that correct?

18    A    Yes, but --

19    Q    Thank you.

20              Sir, you also talked about -- you said it was the

21    battery cable.  So that would be some -- that would create

22    some loss in communication?

23    A    Yeah, absolutely.  The --

24    Q    If I could have you turn to Exhibit 17 for a moment.

25              THE COURT:  17 has been previously admitted.
```

```
 1   BY MR. ALTMAN:

 2   Q    Sir, the codes that are listed there are U01001 and

 3   U1013; is that correct?

 4   A    Hold on a second, sir.  I'm not there yet.  Sorry.

 5   Q    That's fine.  We have it on --

 6   A     Wait.

 7   Q    We have it on the display so we can actually get

 8   through the time we have a limited amount.

 9   A    I'm sorry.  It's not in this book, then.

10   Q    That's fine.  If you could just look on the screen,

11   sir.

12   A    All right.  Hold on one second.

13   Q    Right in front of you.

14           Do you see that -- where it says U0101?

15   A    Yes.

16   Q    U01.

17   A    In pink there?

18   Q    Right.  Those are communications codes, loss of

19   communication codes; is that correct?

20   A    Yes, the U -- yeah.

21   Q    And if there's an issue with the battery of any kind,

22   that would be a B1318 code; is that correct?

23   A    I'm not sure what the code would be for a loss of

24   battery.  I thought it was a U3003, was a battery voltage

25   issue.
```

```
1    Q    And the date of this -- well, you don't see 3003 as a

2    code that was discovered here; is that correct?

3    A    No, but it did pop a U --

4    Q    Sir, is that correct?  Do you see a U3003 code here?

5    A    I do see one up in the yellow right there, U3003.

6    Q    That's the title, sir.  You don't see it as a code that

7    the technicians found; is that correct?

8    A    I do not, no.

9    Q    Okay.  The date of this was August of 2016.  Do you see

10   that, sir?

11   A    That is correct, sir.

12   Q    I think one of the things you testified about is that

13   the -- there are session data that's uploaded to Ford,

14   additional information that goes to Ford; is that correct?

15   A    There is.  When the IDS is plugged in, it's

16   automatically downloaded.

17   Q    Can we go to Exhibit 314, sir?  That is the session

18   data from your report for this August 2016 presentation.

19   A    Which one was that again?  3- what?

20   Q    314.

21         Do you have the session data for that -- that you

22   were looking at, that you looked at in your report as well,

23   the session data that was uploaded to Ford from this

24   August 2016 presentation?  If you know -- if you have it.

25   A    Yeah.  Yeah, I think we do have it.
```

```
 1              Frank, I -- didn't we have it yesterday, Frank?  I
 2   thought so.
 3              It was a session data that was done on August 16
 4   that it showed like a U101.
 5              MR. KELLY:  It's Exhibit, Your Honor, 719.
 6              THE COURT:  719, I believe, has been admitted
 7   already.
 8              MR. KELLY:  Portions have, Your Honor.
 9              THE COURT:  I show page 10.
10              MR. ALTMAN:  Your Honor, I would move for the
11   introduction of 719-18 through -23.
12              THE COURT:  Actually, the whole document's already
13   been admitted.  It was admitted on November the 12th.  So
14   you may publish.
15              MR. KELLY:  May I consult with counsel for just a
16   second?
17              THE COURT:  Yes.
18   BY MR. ALTMAN:
19   Q    Sir, one of the things that you took, the session data
20   also includes the vehicle power; right?  It's the power
21   within the vehicle system; is that correct?
22   A    I don't follow you.  I'm not --
23   Q    What does VPWR refer to, V-P-W-R?
24   A    That's battery power.
25   Q    Right.  And that's in the system of the -- that's part
```

```
 1    of the session data; is that correct?

 2    A    I don't think that is part of the session data.

 3    Q    Well, if I can turn to you 719, page 20.

 4             THE WITNESS:  Hey, Frank, mine aren't numbered

 5    like that.

 6             THE COURT:  It's already been admitted.  Do you

 7    want to publish it?

 8             MR. ALTMAN:  Yeah, let's publish it.

 9             THE WITNESS:  Yeah, if you could throw it up on

10    the screen.

11    BY MR. ALTMAN:

12    Q    Sir, VPWR refers to power?

13    A    Yeah.  It's -- yeah, battery power.

14    Q    And so, if there was some issue with the battery, you

15    would suspect that the power in the vehicle would be

16    reduced, would you not?

17    A    Yeah.  And it was indicated by Mr. Pedante -- he said

18    that the vehicle was a long, slow crank when he went to

19    start it after he shut it off.

20    Q    Well, he couldn't start it.  And then, according to the

21    session data, sir, for August of 2016, the same repair that

22    you are referring to, the VPWR is at 14.3 volts.

23             Does that indicate that there's an issue with the

24    battery?

25    A    Well, yeah.  You got to understand, if you have a
```

```
1    grounding issue, that grounding terminal which they
2    indicated, the vehicle's not going to start.
3            You could have a 14-volt battery, but if the
4    grounding isn't there, it's not going to make connection,
5    and the starter won't crank over.  So that's -- I mean, I'm
6    just reading what was in there.  It was a long, slow crank,
7    and the dealer commented that the ground cable in the
8    battery --
9    Q    Sir, I have to move on.  I'm sorry.  We just --
10   A    Okay.
11   Q    So Let's go to Exhibit 99?
12   A    Exhibit 99.
13   Q    Page 3 -- actually, page 5.  This is from "Things Gone
14   Wrong."  It's one of the reports that you referred to; is
15   that correct, sir?
16   A    That I -- that I what, sir.
17   Q    You talked about TGW, Things Gone Wrong --
18   A    Yes.
19   Q    -- is that correct?
20   A    Yup.
21   Q    And I think one of the things you indicated is that --
22   well --
23           Your Honor, apparently, this is based on your
24   order, and if there's no objection, I'd like to --
25           THE COURT:  Well, it'll be admitted over defense
```

```
 1    objection.
 2              MR. ALTMAN:   Sure.
 3    Q    Sir, let me refer you to the black box at the bottom of
 4    this page.   It says "Top systemic issues by region 2012
 5    model year."
 6              V48 refers to automatic transmissions; is that
 7    correct?
 8    A    That is correct, all transmissions.
 9    Q    The DPS6 accounts for over half of the North American
10    automatic transmission things gone wrong, even though it
11    accounts for less than 25 percent of the FNA volume.   And
12    FNA is Ford North America; is that correct?
13    A    That is correct.
14    Q    So the DPS6 accounted for over half of the problems
15    that were wrong with automatic transmissions, even though
16    they accounted -- half of the things gone wrong, even though
17    it accounted for only 25 percent of the transmissions for
18    all Ford vehicles; is that correct, sir?
19    A    Can you say that again?   I'm sorry.
20    Q    Sure.
21              The DPS6 was a quarter of the automatic
22    transmissions that Ford was putting out; is that correct?
23    A    At the time, I'm not sure.   But this is -- yeah.
24    Q    And the DPS6 accounted for over half of the problems of
25    Ford's automatic transmissions; is that correct?
```

```
 1    A     Okay.

 2    Q     That's fine.

 3          Let's also go to Exhibit 316, page 7.  When you

 4    said that some of these vehicles -- when I asked you how

 5    many vehicles had transmission problems, you said there were

 6    some vehicles.

 7    A     Yeah.

 8    Q     Actually, for model year 2013, there were over 600,000

 9    DPS6 equipped vehicles that had one or more transmission

10    repairs, as of 2013; is that correct?

11    A     I'm not sure.  I'd have to look at the data.  Do you

12    have it?

13    Q     Well, let me ask you.  How many Focuses were produced

14    by Ford in -- for model year 2013?

15    A     It's -- once again, that's a great question.  I don't

16    know.  I mean --

17    Q     About 600,000?

18    A     I don't know.  I really don't know how many units we

19    built.  I mean, it's -- it started in 2012, went all the way

20    to, 2000 and, what, '19?

21    Q     Sir, can you show us anything that shows that there's a

22    single 2013 Focus with a DPS6 that hasn't had a transmission

23    repair?

24    A     I'm sure there's -- yeah.  I don't have it in front of

25    me, but not every vehicle had an issue with a --
```

1  particularly with DPS6.  It's --

2  Q    Sir, in 2013, you also projected that Ford would

3  have -- for model -- the next model year, there was going to

4  be need to be -- 90 percent of the DPS6s were going to have

5  their clutches replaced; is that correct.

6  A    You'd have to show me this data.

7  Q    Sure.  Well, let me go to your testimony in Vargas.

8         You had testified that there was somewhere between

9  50 and 90 percent of a clutch replacement rate for -- that

10 was predicted in 2013 for model year 2014; is that correct?

11 A    Yes.  I think what you're referring to is a hazard

12 analysis, and that's a prediction tool based on very limited

13 data and that --

14 Q    Right.  Well, the hazard --

15 A    So that never happened.

16 Q    The hazard -- well, what was the replacement rate, sir?

17 A    I don't know what the replacement rate was, but if it

18 was that high --

19 Q    Well, when --

20 A    It wasn't.

21 Q    Sir, when Shawn McClain came up with 90 percent

22 predicted rate of replacement -- Shawn McClain is someone

23 that works with you?

24 A    Shawn McClain worked for me.  He was our warranty

25 analyst at the time.

```
1    Q     Right.

2    A     And like I say, we're always looking at warranty on a

3    daily basis and we try to come up with tool sets to make

4    this a little more conservative so we're not shorting

5    ourselves.

6    Q     Finally, sir, you talked about the -- your theory that

7    there's the oil on the clutch that led to these clutch

8    replacements.  Sir, was there any observation in any --

9    by -- in any of the repair presentations that there was an

10   oil leak at any time in any of the repair presentations?

11   A     In Micale's vehicle?  I'm sorry, in Micale's vehicle.

12   Pedante's vehicle?  I can't remember.

13   Q     Right.  Well, at your deposition, you testified there

14   was no observation of any oil leak by any of the technicians

15   at any presentation.  Do you remember that?

16   A     I don't recall, but I don't -- I remember looking at

17   the repair orders.  I don't recall them saying it was any

18   oil leaks.

19          MR. ALTMAN:  That's fine.  Thank you, sir.  I have

20   nothing further.

21          THE COURT:  Mr. Kelly.

22          MR. KELLY:  Very briefly, Your Honor.

23                    REDIRECT EXAMINATION

24   BY MR. KELLY:

25   Q     Mr. Kwasniewicz, did you ask your staff to pull
```

```
 1   together data of the average number of repairs over time for
 2   the DPS6 from the 2012 model year through the 2017 model
 3   year?
 4   A    I think I did, but it was a long time ago.  I don't
 5   know the number.  But I do recall -- I do recall seeing a
 6   document that showed that the warranty was improving year
 7   over year.  I can't tell you the number.  I just -- I can't
 8   tell you what the numbers were.
 9   Q    Take a look at Exhibit 841 in the white binders to your
10   right.
11   A    841?
12   Q    Your other right.
13   A    Nope.  Must be my left.
14              MR. ALTMAN:  May we approach?
15              THE COURT:  All right.
16              MR. KELLY:  I'm sorry.  My fault.  863.
17              MR. ALTMAN:  I take that back, Your Honor.
18              MR. KELLY:  863.
19              THE COURT:  Hold on.
20              MR. ALTMAN:  Your Honor, may we approach?
21              THE COURT:  All right.
22       (The following proceedings were held at sidebar.)
23              THE COURT:  What's the issue?
24              MR. ALTMAN:  Your Honor, by the same token, the
25   Court has not allowed us to go into any of this information.
```

```
 1            THE COURT:  Wait a minute.  Wait, Mr. Altman.  You
 2   just went into a litany of questions about improving, not
 3   improving, and you're saying he's not allowed to ask
 4   questions about that?
 5            MR. ALTMAN:  Can we go into other documents now
 6   where it shows that it wasn't?
 7            THE COURT:  But you asked the question and now --
 8   and he's not allowed to rehabilitate the witness at all?  Is
 9   that what you're saying?
10            MR. ALTMAN:  He's using a document that you did
11   not preapprove.  This is not --
12            THE COURT:  Wait a minute.  I'm sorry, Mr. Altman.
13   You can't -- well --
14            MR. ALTMAN:  Let me ask --
15            THE COURT:  Make your objection.  Go ahead.
16            MR. ALTMAN:  Well, Your Honor, you have not gone
17   through this document.  This is --
18            THE COURT:  You're right.  I have not gone through
19   the document.  He's showing me the document now.  I think
20   I'm allowed to make a ruling based on that.  I don't know
21   how that's any different than virtually every exhibit we've
22   gone through during the course of this trial.
23            MR. ALTMAN:  Your Honor, this is a demonstrative
24   that they created.
25            THE COURT:  Okay.  And are you saying --
```

```
 1              MR. KELLY:  It's based on the data as Mr. --

 2              MR. ALTMAN:  No, but the data --

 3              MR. KELLY:  I'm sorry.  Based on the data from

 4  Mr. Kwasniewicz's office and his staff pulled to put into

 5  this graph.

 6              MR. ALTMAN:  Your Honor, this is the data.  It's

 7  pulling from hearsay.  We've got Sanchez issues.  We've got

 8  classic Sanchez issues, Your Honor.  They're going to claim

 9  that this is based on some data?

10              MR. KELLY:  It's just asking him about --

11              MR. ALTMAN:  No, no.

12              THE COURT:  Hold on.  One at a time, please.

13              MR. ALTMAN:  I'm asking based on his testimony.

14  That's what I've used.  I've asked based -- we've

15  constrained it with what the judge -- with what you have

16  allowed in terms of page 5.  This -- he's -- counsel just

17  represented it's based on data that his office pulled.  So

18  it's complete hearsay, complete hearsay.

19              THE COURT:  Mr. Kelly.

20              MR. KELLY:  Yes.

21              THE COURT:  Let me see the document, please.

22              MR. KELLY:  Oh, sure, Your Honor.  There you go.

23              THE COURT:  All right.  Go ahead.

24              MR. KELLY:  Sure.

25              Hearsay's he's been -- being examined about so
```

1    far.  But he was challenged.  You say that the warranty went

2    down.  Do you have the data?

3              Well, I have seen the data.

4              Okay, here's the data.  This data -- he will

5    testify this data was pulled by his office at his request to

6    track over time the warranty rates by a measure, average

7    number of repairs per customer, based upon the warranty

8    data.

9              MR. ALTMAN:  Your Honor, it's still --

10             THE COURT:  But wait, Mr. Altman.  I'm sorry.  I

11   can't take any more of this.  You are using it as a sword

12   and a shield when you deem fit.

13             You asked him repeatedly, do you have the data?  I

14   know where you're going, Mr. Altman, so that you can then

15   argue later why you think you should get these CACI

16   instructions.

17             And you're now saying you can ask those questions,

18   leave it out there for him to say, I have it, but I don't

19   know where it is, and not allow Ford to -- and say, is there

20   any information to show in the document?  I don't think this

21   document is admissible, but he can review it and then say

22   based on that, that's his information.

23             MR. ALTMAN:  I guess that's fine.

24        (The following was heard in open court in the presence

25         of the jury:)

```
 1                THE COURT:  Mr. Kelly, you may continue.

 2                MR. KELLY:  Thank you, Your Honor.

 3     Q    Mr. Kwasniewicz, do you have Exhibit 863 in front of

 4     you?

 5     A    Yes, sir, I do.

 6     Q    And does it appear to be a chart?

 7     A    It is a chart.

 8     Q    And what is it a chart of?

 9     A    It is a chart of 2012 model year, '13 --

10                MR. ALTMAN:  Your Honor, I am going to object that

11     if he's reciting it, he's --

12                THE COURT:  The objection is noted but overruled.

13                Continue.

14                THE WITNESS:  Well, the chart is a 2012, '13, '14,

15     '15, '16 model year -- it's the progression of the warranty

16     over the years at one year in service, two years in service

17     and three years in service.

18                MR. KELLY:  May I display 863, Your Honor, for

19     purposes of demonstrative?

20                THE COURT:  Yes, over plaintiff's objection, you

21     may.

22     BY MR. KELLY:

23     Q    Up on your screen, Mr. Kwasniewicz?

24     A    It is, sir.

25     Q    Would you explain to the jury first where this data
```

```
 1    came from?

 2    A     Okay.  This data came from AWS.  These are warranty

 3    claims that came in, which just stands for, you know, our

 4    analytical warranty system.

 5          And this data was taken a while ago.  I had my

 6    team do it a while ago because I do recall seeing the data.

 7    And basically what it's looking at is for a customer that

 8    owned the vehicle over one year, customer owned the vehicle

 9    over two years and at three years, and it just says the

10    average number of repairs per customer.

11          So the goal was, when I came in in '13, obviously,

12    my objective was to get the warranty down.  So by the time

13    we hit -- you know, as you can see from '13 model year, for

14    one year, it's -- for one year, you had -- let's just --

15    let's just say you had -- I don't know what -- this is

16    probably -- say .5.

17          The next model year it was down to .3.  And then

18    obviously, '15 model year, and then down '16 model year and

19    '17 model year.

20          So an average customer would -- an average

21    customer may have a .1 issue with their DPS6 transmission.

22    So not every customer had an issue.  And this is our

23    warranty system which we pay the -- you know, we pay the

24    dealership for the repair.

25    Q    When you indicated that, in your experience in this
```

```
 1   job, by 2016 the warranty repairs were tracking down, is it
 2   based on data like this?
 3   A     Absolutely.  That's what I said.  By the time I left
 4   the -- 2016, we were building at or better than our
 5   hydraulic-based automatic transmission, which in some case,
 6   some of them are -- some of those transmissions would
 7   deem -- be deemed what we call best in class.  So in that
 8   class of vehicles versus our competitor, we -- our
 9   transmission would be a little better.
10   Q     One other area, Mr. Kwasniewicz.  On cross-examination
11   you were asked about the testing that was done on the MAM in
12   July of 2019.  You recall that?
13   A     Yes.
14   Q     That was on one vehicle; correct?
15   A     That was -- correct.
16   Q     The MAM recalibration reset and the TCM replacements,
17   that you talked about yesterday were all done back
18   in 2014, 2015; correct?
19   A     That is correct.  We did a -- once we came up with the
20   new chip set that we talked about yesterday, the ATIC 91 and
21   ATIC 106, we just didn't test it on one vehicle and put it
22   out.
23         There was a lot of vehicles, a lot of mileage, a
24   lot of component testing, a lot of bench testing, a lot of
25   testing is going to be put into that, not just done on one
```

```
 1   vehicle.  That's not -- no auto company just does a test on
 2   one vehicle.  We do it on a lot of vehicles.
 3           And all we did back in 2019 is, just for our own
 4   self, we got a vehicle, and we went and injected signals,
 5   and we were just recording data to -- so we could develop a
 6   report.  In case a question ever came up, we could say
 7   here's what -- here's what would pop up on the screen.
 8   That's all we did on one vehicle.  But all that testing --
 9   all the testing was done in droves and it's archived in a
10   DVP and everything.
11   Q    All done before you make the change?
12   A    Well before we made the change.  It wouldn't have gone
13   in -- it wouldn't have been signed off on just one vehicle.
14   It was a lot of -- lot of testing.
15           MR. KELLY:  Thank you, sir.  Thank you,
16   Your Honor.
17           THE COURT:  Mr. Altman.
18                    RECROSS-EXAMINATION
19   BY MR. ALTMAN:
20   Q    So Mr. Kwasniewicz, I've been asking you for this data,
21   and you've been asked for this data since 2016, and someone
22   in your office came up with a chart that -- purportedly
23   summarizing this data that we've been asking for; is that
24   correct?
25   A    I did.
```

```
 1   Q    And when was --
 2   A    I don't know if Shawn McClain put this together, but we
 3   stumbled across the data.  I've seen this data before and I
 4   just -- you know.
 5   Q    But -- well, who put this chart together?  Who actually
 6   created this chart?
 7   A    I do not know.
 8   Q    And when was it created, sir?
 9   A    I do not know.
10   Q    It was created for trial purposes; correct?
11   A    I do not know.
12   Q    And the data that you have that you claim that this
13   summarizes, where's that data, sir?
14   A    That's going to be in our AWS system.
15   Q    And if I have this correct, sir, nearly all of these
16   consumers that bought a 2012, '13, '14, or '15 DPS6-equipped
17   vehicle had at least two repairs to their transmissions?
18   A    This would be an average customer -- let's just
19   choose 2014.  Over a three-year period they could have -- on
20   an average customer, would have a little over two repairs on
21   their transmission.
22   Q    Sure.  So by the time Mr. Pedante came to Ford rather
23   than Ford coming to him his model year had ten different
24   changes in the input shaft seals -- is that correct? --
25   where there were ten different process changes?
```

```
 1   A     Yeah, there was ten different -- you know, there was
 2   ten different process improvements.  We did the input seal
 3   shaft protector.  There was six product changes.  I mean, we
 4   weren't sitting around.  We were --
 5   Q     And there were also --
 6   A     They were getting these corrected.  I mean, obviously,
 7   our -- quality is number one for us to get our customer
 8   right.  So --
 9   Q     Of course, sir.
10               And there were two -- at least two technical
11   service bulletins.  There were actually at least two special
12   service messages; is that correct?
13   A     That is correct.
14   Q     And so all things took place, and it looks like
15   the 2013, if you look at the first bar, had the highest rate
16   of repairs?
17   A     Yes, yep.
18   Q     So clearly this information was known to Ford in 2016;
19   right?
20   A     Well, yeah.  I mean --
21               MR. ALTMAN:  Okay.  I have nothing further.
22               THE WITNESS:  And we were --
23               MR. ALTMAN:  I have nothing further.
24               THE WITNESS:  We were solving problems.  That's
25   what we do.
```

```
 1              THE COURT:  Mr. Kelly.

 2              MR. KELLY:  No questions, Your Honor.

 3              THE COURT:  All right.  May this the witness be

 4   excused?

 5              MR. ALTMAN:  Yes.

 6              MR. KELLY:  Yes, Your Honor.

 7              THE COURT:  Thank you, sir.  You may step down.

 8   You are excused.

 9              THE WITNESS:  Okay.

10              MR. KELLY:  May we approach, Your Honor.

11              THE COURT:  Yes.

12         (The following proceedings were held at sidebar.)

13              THE COURT:  Yes, Mr. Kelly.

14              MR. KELLY:  That's our last witness.  We're going

15   to close the evidence with the exception of requests for you

16   to take judicial notice.  That was part of the jury

17   instruction pack.  I don't know if you want to -- and our

18   approach was just to have you instruct on that if you agree

19   to take judicial notice.

20              THE COURT:  Judicial notice of what?  I'm sorry,

21   I'm not --

22              MR. KELLY:  That's right.  Two things.  One -- one

23   was the date on which the motion to remand opposition was

24   filed, which is the date on which the offer expired --

25              THE COURT:  I'm going to interrupt you just in the
```

```
 1   interest of time.
 2           MR. KELLY:  Yeah.
 3           THE COURT:  I think I know which two you're
 4   talking about.  I gave you all what I propose as the jury
 5   instructions.  I don't think it includes that.  So --
 6           MR. KELLY:  Okay.
 7           THE COURT:  -- we're going to -- I'll ask whether
 8   both sides rest subject to the introduction of exhibits.
 9   Assuming the answer is yes, then I'm going to excuse the
10   jurors and probably ask them to come back at 12:30 and so we
11   can get through all this other stuff, have the instructions
12   ready.  I will instruct, you'll close, and then they will
13   deliberate.
14           MR. ALTMAN:  Okay.  Can I just talk to my
15   colleagues for two minutes to see if we want Mr. Micale to
16   do anything in rebuttal?  I don't think we do, but can I
17   just have two minutes?
18           THE COURT:  You have literally two minutes.
19           MR. ALTMAN:  Okay.
20           THE COURT:  Just go ahead.
21           MR. HUGRET:  Thank you, Your Honor.
22           MR. ALTMAN:  May we approach one more time?
23           THE COURT:  Yes.
24           MR. ALTMAN:  We want to call Mr. Micale for very
25   brief.
```

```
 1              THE COURT:  You have five minutes.

 2              MR. ALTMAN:  Thank you.

 3              THE COURT:  You have five minutes on the clock.

 4   And then when that ends, Mr. Altman, just so we're clear, I

 5   will tell you cease your examination.

 6              MR. KELLY:  We would have a Daubert motion on

 7   anything he offers an opinion on because I can't imagine,

 8   based on what we know now, that any opinion would be based

 9   on an adequate scientific methodology and helpful to the

10   jury in any respect.

11              THE COURT:  All right.  The objection's noted but

12   overruled.

13          (The following was heard in open court in the presence

14           of the jury:)

15              MR. ALTMAN:  Your Honor, we will call --

16              THE COURT:  Hold on.  Hold on.

17              Defense, do you rest your case?

18              MR. KELLY:  Yes, Your Honor, subject to the

19   pending motion.

20              THE COURT:  All right.  Do you wish to call any

21   witnesses in rebuttal, Mr. Altman?

22              MR. ALTMAN:  Anthony Micale, very briefly, Your

23   Honor.

24              THE COURT:  All right.

25              Mr. Micale, please step forward.  I'll remind you
```

```
 1    you are still under oath, sir.
 2              THE WITNESS:  Yes, sir.
 3                       ANTHONY MICALE,
 4             having been previously duly sworn,
 5                   testified as follows:
 6              MR. ALTMAN:  May I proceed, Your Honor?
 7              THE COURT:  Yes.
 8                     DIRECT EXAMINATION
 9    BY MR. ALTMAN:
10    Q    Mr. Micale, you've been sitting through the testimony
11    of Mr. Kwasniewicz the entire time; is that correct?
12    A    I have.
13    Q    Okay.  His idea that it's about a battery or a battery
14    cable, is there any validity to that?
15              MR. KELLY:  Objection, Your Honor.  No foundation.
16    Daubert.
17              THE COURT:  Sustained.
18    BY MR. ALTMAN:
19    Q    Sir, you've looked at the session data that
20    Mr. Kwasniewicz apparently looked at; is that correct?
21    A    That is correct.
22    Q    What was the VPWR ratings or, generally, what were the
23    VPWR ratings and what does that mean?
24    A    VPWR is the vehicle power.  It's the power that's
25    powering the vehicle coming off the alternator.  It is at
```

```
 1   above 14 volts, which is well above battery voltage.
 2   Q    Is there -- if there is a cable issue, would that
 3   affect the system going to the MAM?
 4              MR. KELLY:  Objection, Your Honor.  No foundation.
 5   Daubert.
 6              THE COURT:  Overruled.
 7              THE WITNESS:  There's nothing that would go to the
 8   MAM.  There's is no power issue at all.
 9   BY MR. ALTMAN:
10   Q    Okay.  That's completely wrong, what he came up with?
11              MR. KELLY:  Objection, Your Honor.  Argumentative.
12   No foundation.
13              THE COURT:  Sustained.
14              MR. ALTMAN:  That's fine, Your Honor.  I'm done.
15              THE COURT:  Any cross-examination.
16              MR. KELLY:  Briefly, Your Honor.
17                        CROSS-EXAMINATION
18   BY MR. KELLY:
19   Q    Good morning, Mr. Micale.
20   A    Good morning.
21   Q    You've been here every day since you left the stand.
22   A    I believe so, yes.
23   Q    What are you charging these folks --
24              MR. ALTMAN:  Your Honor --
25
```

```
 1   BY MR. KELLY:

 2   Q    -- every day for being here?

 3             MR. ALTMAN:  Your Honor, this is outside the

 4   scope.

 5             THE COURT:  Overruled.

 6             THE WITNESS:  I don't have the amount of hours I

 7   worked in the day.  So I don't know per day.

 8   BY MR. KELLY:

 9   Q    What's your hourly rate again?

10   A    My hourly rate is $350 an hour.

11   Q    And you're charging them that hourly rate for sitting

12   here in court.

13   A    That is correct, sir.

14   Q    How about -- where are you staying every night here?

15   A    Whatever hotel I can get a room into, however --

16   Q    What are you charging for that?

17   A    I don't know the bills.

18             MR. KELLY:  That's all I have, Your Honor.

19             MR. ALTMAN:  Just one more.  One moment, Your

20   Honor.

21             THE COURT:  All right.

22                        REDIRECT EXAMINATION

23   BY MR. ALTMAN:

24   Q    Mr. Micale, does the fact that you're getting paid for

25   your work, does that change the physics of the electrical
```

```
 1   current system?
 2   A     Absolutely not.
 3             MR. ALTMAN:  Thank you.
 4             THE COURT:  Mr. Kelly.
 5             MR. KELLY:  No, Your Honor.
 6             THE COURT:  All right.  Thank you, sir.  You may
 7   step down.
 8             All right.  Any further witnesses?
 9             MR. ALTMAN:  No, Your Honor.
10             THE COURT:  All right.  Any -- well, both sides
11   have rested.  At this time, subject to the motions that
12   we'll deal with at a different time --
13             Is there something you wanted to say, Mr. Altman?
14             MR. ALTMAN:  Just that we also have a motion, Your
15   Honor, but that's fine.
16             THE COURT:  All right.  So ladies and gentlemen,
17   what we're going to do -- something a little different.
18   We're going to take a break at this time.  I'm going to ask
19   that you come back at 12:30.  Okay?  The reason being is
20   that I want to deal with a whole host of issues, let you eat
21   lunch, and then with an eye towards us getting our ducks in
22   order so that, when you come back after lunch at 12:30, I
23   will give you closing jury instructions, you'll hear the
24   arguments of the lawyers, and then you will begin your
25   deliberations.  So I hope you can understand why I'm trying
```

1    to do this.  There's been delays, and I'm trying to minimize

2    your time.

3           So take this hour and a half, rest, relax,

4    stretch, do what you need to do, other than do not talk

5    about the case.  Don't allow anyone to talk to you about the

6    case.  Do not conduct any research of any kind on any

7    subject matter connected to the case.

8           We'll see you back at 12:30, and I'm going to do

9    everything in my power to make sure that, when you come

10   back, I will give you the instructions, the parties will

11   argue, and then you will begin your deliberations.

12          All right.  We'll see you back at 12:30.  Thank

13   you.

14          THE CLERK:  All rise for the jury.

15      (The following was heard in open court outside the

16       presence of the jury:)

17          THE COURT:  We're going to take ten minutes so you

18   guys can get your stuff together with respect to the

19   instructions.  We'll argue about the instructions.  I think

20   the parties have agreed about the special verdict form.  If

21   I'm incorrect, you'll let me know.  Then I'll get the

22   instructions printed, and then we'll hopefully be -- we'll

23   we won't hopefully.  We will be ready by the time the jurors

24   get back.

25          All right.  So we'll take ten minutes.  We'll see

```
 1    you at ten after 11:00, please.
 2              THE CLERK:  All rise.  This Court is in recess.
 3         (Recess taken 11:00 to 11:20 A.M.)
 4              THE COURT:  All right.  So I've given you all a
 5    copy of the proposed jury instructions.  And my clerk is
 6    going to give you an additional instruction with respect to
 7    the stipulations of fact that you can review as well.
 8              All right.  Who wishes to be heard first with
 9    respect to the instructions?  I guess we'll start with the
10    plaintiff.
11              MR. HIGGINS:  Thank you, Your Honor.
12              THE COURT:  All right.
13              MR. HIGGINS:  Russell Higgins for Mr. Pedante,
14    Your Honor.
15              With respect to the instructions, setting aside
16    for a moment the new -- the just recently received
17    stipulations of fact, first, with respect to instructions
18    concerning expert witness testimony, the parties had
19    stipulated to and submitted proposals to follow CACIs 219,
20    220, and 221.
21              We do note that there is an A1 instruction which
22    is instruction, I believe, Number 15, which is in the set
23    the Court issued concerning expert witness testimony.
24              Plaintiff would simply submit that we're more
25    comfortable with the level of detail in the instructions
```

```
 1   that are set forth in the CACIs.  They're correct and

 2   nonargumentative statements of the law, and we'd ask that

 3   the Court reconsider issuance of these three CACIs in place

 4   of the Court's instruction Number 15.

 5            THE COURT:  What is your -- well, look,

 6   number one, I think my court order's pretty clear.

 7   Ninth Circuit is the preference.  There's a Ninth Circuit

 8   instruction on this point.  What's your heartburn about the

 9   verbiage of the Ninth Circuit instruction?

10            MR. HIGGINS:  I don't have any heartburn about the

11   verbiage that's in the Ninth Circuit instruction.  We just

12   think that it's not sufficiently detailed.  For example,

13   CACI instructions -- I'm sorry, 221 set forth criteria that

14   the jury may consider with respect to evaluating the weight

15   of an expert's opinion.

16            And Section -- I'm sorry, proposed CACI 220

17   discusses the further guidance with respect to evaluation of

18   hypothetical questions and answers thereto, which are not in

19   the -- which are not in Court's Number 15.  Having said

20   that --

21            THE COURT:  Go ahead.  I'm sorry.

22            MR. HIGGINS:  Very simply that I realize, of

23   course, that this is well within the Court's discretion, and

24   I know that the Court has a preference.  We simply want to

25   make that last pitch for the additional guidance provided by
```

```
 1    the CACI instructions.

 2              THE COURT:  And what is Ford's position, if any,

 3    with respect to this?

 4              MR. CHANG:  Your Honor, Ford is perfectly fine

 5    with the Ninth Circuit instruction.  We don't think it's

 6    necessary, but at the same time, we don't necessarily

 7    object.

 8              THE COURT:  All right.  Thank you.

 9              All right.  What's the next objection or issue?

10              MR. HIGGINS:  We'd like to discuss proposed

11    CACI 203.  The Court brought this up at sidebar yesterday.

12              THE COURT:  Right.

13              MR. HIGGINS:  CACI 203 -- and just to make it

14    absolutely clear, there was a proposed CACI 204 that dealt

15    with willful spoliation of evidence.  That's really not the

16    ambit of 203, which deals with the parties having the power

17    to produce stronger or weaker evidence and inferences that

18    the jury could draw from the production of weak evidence by

19    a party that is in position to produce strong evidence.

20              So I understand that -- and recall from the

21    discussion at sidebar that the Court indicated it had never

22    given such an instruction in a federal court.

23              We simply want to point out a couple of things.

24    First, that this is a statement of an ancient principle by

25    today's standards.  It has been endorsed in California
```

```
 1    Courts dating back to -- at least as far as back an 1899
 2    case in the California Supreme Court, which is -- sorry, I
 3    have to go back and forth with the glasses on and glasses
 4    off.
 5              THE COURT:  By any chance -- I mean, that's nice
 6    it's 1899.  Do you have anything from 1999, 2009, 2019?
 7              MR. HIGGINS:  I do not have -- I haven't given --
 8    I have not got complete citations to everything, but it has
 9    been endorsed in federal courts as well, in the
10    Ninth Circuit opinion -- well, in a 1927 decision of the
11    United States Supreme Court, Mammoth Oil Company versus
12    United States, 275 U.S. 13.
13              It has been cited in the Ninth Circuit citing
14    Mammoth Oil in the case of Hann, H-a-n-n, versus Venetian
15    Blind Corporation 111 F.2d 455 at 459 and other district
16    court opinions citing as well to Mammoth Oil and relying on
17    the principle that, when a party that is in the position to
18    produce strong evidence instead chooses to only produce weak
19    evidence, that the jury may distrust the weaker evidence.
20              We believe that that is a situation that is
21    applicable to this case.  Ford Motor Company has raised
22    defenses based on, for example --
23              THE COURT:  What defenses has Ford raised that
24    they have to prove in this case?
25              MR. HIGGINS:  Well, the only defense they've
```

1   raised that they have to prove in this case that's

2   applicable to the Song-Beverly Act cause of action is their

3   defense of good faith.

4              Directly to that, Mr. Doss has testified for --

5              THE COURT:  Okay.  What are the elements of good

6   faith?

7              MR. ALTMAN:  I don't believe that there are any

8   particular elements.  It's a --

9              THE COURT:  I think that's the point I'm trying to

10  make.  Do they have any burden as it relates to the good

11  faith defense that we're talking about?

12             MR. HIGGINS:  One of the particular elements of --

13  that goes to good faith is -- and -- is that the

14  manufacturer would need to demonstrate that it had relied on

15  all reasonably available information that is germane to the

16  decision whether or not to buy back the vehicle.

17             THE COURT:  All right.  Please continue.

18             MR. HIGGINS:  In order to do so, we've had

19  Mr. Doss, for example, testify concerning the reviews that

20  were conducted by people that were not him, that -- those

21  witnesses were never produced to describe exactly the amount

22  of information that they relied upon.

23             We expect that Ford, very likely in an hour or so

24  in their closing argument, will make the argument that they

25  chose to admit that the vehicle qualified by October 2017

1    because that's when they made their offer, and they'll

2    contend that this further evidence of additional repair

3    presentations was considered, but they haven't produced a

4    shred of evidence from Mr. Doss or anyone else that

5    anyone --

6              THE COURT:  I'm sorry to interrupt.  When Ford

7    made its offer in 2017, what was the offer?  Tell me --

8              MR. HIGGINS:  That's the letter that we discussed

9    at sidebar from Ms. Molly Mrowka to our offers.  That was

10   the $75,000 and one dollar offer.

11             But there has not been any evidence produced by

12   Ford concerning the basis, the reasons for making that

13   offer, the reasons -- the information that was considered in

14   doing so.

15             We've also got a very high likelihood, based on

16   the arguments that we've heard so far, that Ford will make

17   the contention that it had every reason to believe that by

18   October of 2017 when they denied Mr. Pedante's request to

19   repurchase the vehicle, that there had been sufficient

20   improvements to the seals and so forth in the transmission,

21   but they believed that it had been permanently fixed by that

22   point.

23             However, Mr. Doss also testified that it is not

24   the policy of the California lemon law team to consult with

25   the engineers concerning what is the level of technology

1    that's going into these cars.

2         And so overall, Ford, we believe, has had -- has

3    had the power, having access to all of the witnesses and all

4    the documents and everything in their entire company, to

5    produce evidence to substantiate those defenses but have

6    chosen not to.

7         We submit that proposed CACI 203 will be relevant

8    and applicable and necessary because of those reasons.

9         THE COURT:  All right.  Anything further -- well

10   let's hear from Ford on the 203.

11        MR. CHANG:  Your Honor, we agree that 203 is

12   inappropriate to bring.  It's based on a California

13   Evidence Code Section 412, which provides, if weaker and

14   less satisfactory evidence is offered when it was within the

15   power of the party to produce stronger and more satisfactory

16   evidence, the evidence offered should be viewed with

17   distrust.

18        There's no applicable correlating Federal Rule of

19   Evidence on which to base in this trial such an instruction.

20        In fact, all of the instructions relating to the

21   better evidence rule are included in the federal rules and

22   don't have any similar presumption here.

23        We would also disagree that plaintiff had

24   established that there is stronger evidence that was

25   available and not available to plaintiffs that -- to prove

1    an issue in dispute.

2            So just on the foundational bases that are

3    identified in the directions for use in CACI for 203, we

4    don't believe that it is an appropriate instruction to

5    offer.

6            THE COURT:  All right.  Thank you.

7            Mr. Higgins, one question I -- one question that

8    jumps to mind is that, given that the jurors are going --

9    jurors will get two questions, the first being did

10   Ford Motor Company willfully fail to repurchase or replace

11   Mr. Pedante's Ford Focus, and then the next question about

12   damages, how does this instruction fit into that at all?

13           MR. HIGGINS:  Willfulness is the crux of the case

14   that's been presented to this entire trial so far.  Whether

15   Ford acted willfully and failed to rely on and review the

16   reasonably information -- reasonably available information

17   concerning the ongoing problems with these vehicles that

18   suggested that the vehicle was not susceptible to repair in

19   2016, whether they adequately considered information

20   suggesting that these are safety problems that they can't

21   ignore.

22           So it all -- the entire case goes to willfulness.

23   We believe all of the evidence that has been submitted by

24   both sides ultimately goes to willfulness.

25           Ford must demonstrate that it reasonably and in

```
 1   good faith actually believed that the facts imposing the
 2   obligation to repurchase the vehicle weren't present.  So
 3   subject to that --
 4            THE COURT:  Tell me where -- I don't recall an
 5   instruction that touches upon what you just articulated, but
 6   like I said, I've been -- I'm trying to read through all of
 7   this and I may have missed it.
 8            MR. HIGGINS:  It should be in CACI 3244, which --
 9   I'm sorry Your Honor.  Let me look at the Court's
10   instructions.
11            Your Instruction Number 20 sets forth these issues
12   in the third paragraph.
13            THE COURT:  Meaning the definition of willful?  Is
14   that -- am I looking at the wrong --
15            MR. HIGGINS:  Yes.  And then it says, "However, a
16   violation is not willful if you find that Ford reasonably
17   and in good faith believed that the facts," et cetera.
18            THE COURT:  But they don't have a burden to prove
19   that; right?
20            MR. HIGGINS:  Of course they do.  We believe that
21   it is an affirmative defense.  They pled it as their
22   18th affirmative defense in the answer to the original
23   Complaint, which is at Docket 1-8.
24            THE COURT:  Okay.
25            Mr. Yang -- Mr. Chang.  I'm sorry.
```

```
 1              MR. CHANG:  Yes.  Thank you, Your Honor.

 2              Focusing on the burden of proof question, we did

 3    propose -- because this was an issue that plaintiff stated

 4    in openings that Ford had the burden, we propose

 5    Instruction Number 8, a Ford special instruction that Ford

 6    does not have the burden of proof on this issue.

 7              The issue of willfulness is an element of

 8    plaintiff to show the state of mind of the defendant.  It is

 9    defined in a certain way, and in order to prove that, they

10    have the burden.  We do not have the burden.  Presumption --

11    the good faith is presumed under the law first.

12              But also in analogous cases where -- where the

13    good faith of the party is an element of the state of mind

14    that must be proven by the other party, it is the burden of

15    that other party, not the party, to disprove good faith.

16              THE COURT:  What's your response to Mr. Higgins's

17    point that you pled good faith as an affirmative defense?

18              MR. CHANG:  Your Honor, things are pled as

19    affirmative defenses.  That doesn't make it an affirmative

20    defense under the law.  The burdens of proof and the

21    presumptions are set forth under the law.  You can't just

22    manufacture something that -- manufacture something and

23    impose upon yourself a burden.

24              I believe in fact the answer specifically said we

25    are not doing so.  Sometimes you assert things when there
```

```
 1    might be a questionable claim whether there is.  Here I
 2    don't believe there is.
 3              THE COURT:  All right.
 4              All right, Mr. Higgins, anything you with to
 5    say -- anything further you wish to state?
 6              MR. HIGGINS:  Concerning the burden of good faith,
 7    Your Honor, under applicable Ninth Circuit precedent -- or
 8    I'm sorry.  Within the Ninth Circuit, we've cited to the
 9    Court in our arguments concerning the proposed good faith
10    instruction that Ford submitted citations to authority,
11    including Ambrose versus Coffey -- I don't want to recite
12    them at length, but multiple citations to cases illustrating
13    that a party asserting good faith as a defense is -- has the
14    burden of proof to establish that good faith.
15              And it is also notably within Song-Beverly Act
16    cases, specifically under Kwan versus Mercedes Benz, a case
17    that's been cited many times to the Court.
18              The -- whether the manufacturer reasonably
19    believed the product conformed to warranty or that their
20    failure to replace a refund was the result of a good faith
21    and reasonable belief, those would be matters for the
22    defense to prove.
23              Submitted.
24              THE COURT:  All right.  Mr. Chang.
25              MR. CHANG:  A few points, Your Honor.
```

```
 1              First on the issue of the good faith affirmative
 2    defense, in the final pretrial conference order, which
 3    expressly takes the place of all pleadings, we withdrew all
 4    affirmative defenses in this case so that we have not taken
 5    on the burden of proving any affirmative defenses.
 6              Secondly, as to all of the cases cited, they're
 7    all Section 1983 cases in which the elements of the claim
 8    have nothing to do with the state of mind required, and they
 9    specifically identify that good faith is an affirmative
10    defense.
11              THE COURT:  All right.  Thank you.
12              Mr. Higgins, any other -- any other argument you
13    wish to raise with respect to any other instructions?
14              MR. HIGGINS:  With respect to instructions,
15    Your Honor, no.
16              THE COURT:  All right.  So just 203?
17              MR. HIGGINS:  Yes, Your Honor.
18              THE COURT:  All right.  Okay.  So I'm not going to
19    read 203.  I said it earlier.  It's not a Ninth Circuit
20    instruction -- that's the Court's preference.  I have
21    genuine questions whether it even applies, given the facts
22    of this case.
23              Defense has indicated that they have not -- they
24    are not asserting any affirmative defenses.  I think that --
25    and I think given the charge in this case, I also think that
```

```
 1   these instruction for 203 specifically is not applicable.
 2   So I will not read that instruction.
 3           Anything further, Mr. Higgins, with respect to the
 4   instruction?
 5           MR. HIGGINS:  With respect to the instructions,
 6   Your Honor, no.
 7           THE COURT:  All right.
 8           Mr. Chang, anything further with respect to the
 9   instructions?
10           MR. CHANG:  Yes, Your Honor.
11           Your Honor, maybe a couple of just minor -- well,
12   one minor issue first.  We did notice that in
13   Instruction Number 16, there was a typographical error.
14   It's minor but --
15           THE COURT:  This is with respect to failure to
16   promptly repurchase?
17           MR. CHANG:  Yes, Your Honor.  In the third line to
18   establish this claim, it's just that there's a double H for
19   "he."  Line 8, Your Honor, I apologize.
20           THE COURT:  Line 8.  All right.  Thank you.
21           MR. CHANG:  Then, Your Honor, if we could go to
22   Number 17.
23           THE COURT:  Repair opportunities?
24           MR. KELLY:  Correct, Your Honor.  There was a
25   proposed edition that I assume the Court saw and rejected by
```

1    Defendant Ford, beginning -- the paragraph beginning

2    "opportunities" as plural.

3           Plaintiff has argued throughout this trial that

4    repairs unrelated to the transmission count towards a

5    reasonable number of opportunities.  And I can cite some

6    record citations if the Court would like to see them or if

7    there's any dispute about that.

8           They've also incorrectly argued that many

9    Song-Beverly liability somehow arises immediately, a vehicle

10   qualifies as a lemon and subject to repurchase upon either

11   two or three repair attempts.  That's not a correct

12   statement of the law.

13          "Opportunities" as plural paragraph that we

14   proposed, which was a modification to this exact CACI

15   instruction that was made by Judge Kronstadt of the

16   Central District of California and approved by the Ninth

17   Circuit -- yes, in an unpublished decision, but it was -- it

18   is in fact citeable -- specifically recognized that that was

19   an appropriate statement of the law, it correctly stated the

20   law, was not misleading, and the purpose that

21   Judge Kronstadt gave for that modification was because of

22   a -- I believe it was something to the effect of a modest

23   chance of confusion.

24          THE COURT:  But do we think there's a modest

25   chance of confusion in this case?

1           MR. CHANG:  I think there may be a strong chance

2      of confusion, given the substantial argument that's been

3      made that two repair presentations by itself qualifies as a

4      lemon and Ford is required to repurchase based solely on two

5      repair presentations, even if they're unrelated to the

6      transmission affected --

7           THE COURT:  What are the two repair -- what are

8      the two repair qualifications in this case?  What are -- I

9      mean --

10          MR. CHANG:  I can give the Court an example of how

11     plaintiffs have set forth in the opening statement, I

12     believe -- yes -- where they said they anticipate that Doss

13     will testify that a vehicle qualifies for replacement -- in

14     other words, it's a lemon -- on the third repair attempt.

15     And by that math, Ford should have replaced or bought back

16     Mr. Pedante's car in November of 2015 because that was the

17     third repair on the vehicle.

18          But the November 2015 repair had nothing to do

19     with the transmission.  It had to do with the smell coming

20     from the air conditioning vent that was repaired by

21     replacing, I believe, a heater core.

22          THE COURT:  Okay.

23          MR. CHANG:  So by trying to combine unrelated

24     repairs to the defect that's at issue in this litigation and

25     using that, along with other repairs that are related to the

1    transmission and stating there is some sort of per se rule

2    that that means it's automatically qualified as a lemon, we

3    think that "opportunities" as plural, that specifically

4    tells the jury to focus on the particular problem is

5    appropriate.

6            THE COURT:  Right.  So tell me, how does this

7    interplay with a couple things?  One, the clutch got

8    replaced eight times.  I mean, so why are we worried about

9    three -- I mean, it's not like we're talking about three

10   versus four.  We're talking about eight times this clutch

11   got repaired.  And I thought Ford had basically admitted at

12   the beginning of the trial, "We should have repurchased this

13   car."

14           MR. CHANG:  Your Honor, that's correct.  My

15   understanding of plaintiff's theory of willfulness is

16   that -- that Ford -- sorry.  Plaintiff's theory of

17   willfulness by Ford is that Ford was willful because it

18   didn't repurchase by, apparently, the date that they

19   requested in August 2016 and based on the arguments that

20   they've made in front of the jury.

21           Now they're saying we were wrongful and willful

22   earlier on, and they're using this improper repair

23   calculation to support that.

24           THE COURT:  All right.  Okay.  I think I under --

25   I understand your argument.  It just seems to me that, if

```
 1    you are focusing on that, you're climbing uphill.  I mean,
 2    you got -- the guy's got eight clutch repairs.  I mean,
 3    but -- all right.  I understand your argument.
 4              What's the plaintiff's response, if any?
 5              MR. HIGGINS:  Your Honor, we set forth our
 6    response in the briefing concerning Ford's proposed special
 7    instruction, but it's a very simple argument.
 8              The fact that they -- that Mr. Pedante had three
 9    clutch replacements before he called Ford and requested a
10    buyback of his vehicle and a TCM replacement, it does render
11    this somewhat moot.
12              But it is true that the language of the statute is
13    very, very clear -- nonconformity and vehicle do not mean
14    the same thing.  The statute --
15              THE COURT:  So you are going to argue that --
16    you're going to really place a lot of weight on this foul
17    smell as part of the issues in the car?
18              MR. HIGGINS:  Evidence of willfulness in this case
19    is not only that they ignored the three clutch replacements
20    and the TCM replacement in 2016, but they also ignored all
21    the other problems.
22              And the CACIs and the case law are very, very
23    clear every opportunity to repair the vehicle counts to
24    conform the vehicle to its warranty, not to conform a -- not
25    to repair a particular component or to repair a particular
```

1    symptom or to repair a particular nonconformity to its

2    warranty.

3           THE COURT:  So what's your response to Mr. Chang's

4    argument that, look.  Judge Kronstadt thought there might be

5    some confusion on this issue and wanted to just -- and this

6    sort of -- this would avoid any confusion, I guess?

7           MR. HIGGINS:  We don't think that it causes any

8    particular confusion.  It's the state of the law in

9    California.  And as the Court has pointed out, even if we

10   were to focus on particular nonconformities, it would meet.

11   This is really not a necessary adjustment to the Court's --

12          THE COURT:  But I guess I'll push back on you for

13   a moment.  I mean, given the evidence that's been presented

14   in the case, you've got more than enough opportunities for

15   Ford to fix this thing --

16          MR. HIGGINS:  Sure.

17          THE COURT:  -- and they didn't.  So what

18   difference does it make if I give this instruction?  I mean,

19   what's the prejudice to the plaintiff?  I mean, the guy's --

20   I mean, eight times.  I mean, I don't know how else -- I'll

21   just keep saying it.  Eight times.  What more do you need?

22          MR. HIGGINS:  Eight times definitely demonstrates

23   that they never did conform it to the warranty, but three

24   clutch replacements and one TCM replacement and the other

25   problems that Ford -- that Mr. Pedante had to present for

```
 1    repair on separate occasions all by September 2016 is the --
 2    is one of the major factors of our argument.
 3              THE COURT:  All right.
 4              Mr. Chang, anything further on this point?
 5              MR. CHANG:  Not on this point, Your Honor.
 6              THE COURT:  All right.  I'm not -- I mean, I
 7    understand your position, Ford.  I think -- I just don't
 8    think it's necessary.  I don't think there's going to be
 9    this level of confusion that you have expressed.  So I'm not
10    inclined to make that change, Mr. Chang.
11              MR. CHANG:  Thank you, Your Honor.
12              THE COURT:  What else, sir?
13              MR. CHANG:  If you give me one second just to
14    confirm, I believe there is just one other -- there was --
15    where did that go?  Oh, yes, Your Honor.  The judicial
16    notice request that we had made --
17              THE COURT:  Which one -- I just --
18              MR. CHANG:  That had been a part of our
19    judicial -- our Disputed Instruction Number 1.
20              THE COURT:  Right.  All right.
21              MR. CHANG:  There -- we had proposed two,
22    plaintiffs proposed two.  We'd both objected to each other.
23    Your Honor, I would just simply focus -- the Court did not
24    include it, but we would move and request judicial notice of
25    the date of the opposition to the motion to remand that was
```

1   filed by Ford.

2          THE COURT:  What's the significance of that?

3          MR. CHANG:  Your Honor, it's relevant to the

4   admitted Exhibit 711, which is the October 6th, 2017

5   settlement offer.

6          THE COURT:  Okay.  Why is it relevant?

7          MR. CHANG:  It specifically states, Your Honor,

8   this offer shall be deemed rejected if it is not accepted

9   before Ford files an opposition to your planned motion to

10  remand, and it cannot be given in evidence upon trial.

11         But it's the first clause that's relevant too

12  because of the expiration date.  There was substantial

13  evidence and argument presented through Mr. Pedante and at

14  sidebar that there was just -- it was Thursday that they

15  made the offer, and then it was Monday when the offer was

16  expired.  That's simply not true.  The request for judicial

17  notice will show that the -- the date was, I believe,

18  October 27th, Your Honor.  Let me check that.

19         Yes, Your Honor October 27th.  So the offer was

20  made on the 6th.  The offer expired by its terms on

21  October 27th when Ford filed its motion to remand.  The

22  Court specifically, at sidebar when discussing the

23  admissibility of this exhibit, told plaintiff's counsel,

24  "You've left the jury with the impression that somehow this

25  offer was" -- and Mr. Pedante is following along -- of just

1  that somehow there was an offer made and that by the time he

2  got there Ford said, "You know what?  We don't want to do

3  this anymore," and that's not what this letter says.

4          THE COURT:  All right.

5          Mr. Higgins, you wish to respond?

6          MR. HIGGINS:  Of course.  First, we don't believe

7  that the state of the evidence is as Mr. Chang characterizes

8  it.  Mr. Pedante testified, among other things, that, by the

9  time they had a chance to talk about it, it seemed like it

10  was more or less withdrawn or expired either simultaneously

11  or within a short time before or after.  I don't recall that

12  there was a Friday-Monday testimony.  Mr. Chang maybe can

13  show it to me.

14          THE COURT:  No, but the testimony was clearly

15  given to give the impression that literally Mr. Pedante had

16  no time to figure -- no fault to Mr. Pedante, but the way it

17  what presented was as if literally, if you don't act now,

18  it's gone.

19          MR. HIGGINS:  Indeed it had --

20          THE COURT:  That's not accurate.

21          MR. HIGGINS:  Well, it certainly is a matter for

22  argument.  It's a --

23          THE COURT:  Right, but that's --

24          MR. HIGGINS:  -- short period of time.

25          THE COURT:  That's the point.  And to put further

1    context to the argument, shouldn't the jurors know what the

2    dates were in relation to that exhibit?

3            MR. HIGGINS:  If the -- the major concern, of

4    course, is that this -- to talk about confusing the issues

5    and inviting speculation by the jury, the filing of the

6    opposition for the motion to remand is in and of itself a

7    can of worms that the jury couldn't possibly understand --

8            THE COURT:  All right.  Go ahead.

9            MR. HIGGINS:  -- unless -- I didn't recall any

10   attorneys being on the panel as accepted, but --

11           THE COURT:  No, but -- and the reason why I

12   giggled is just that -- I mean, the letter says it will

13   expire upon a motion for remand, and all that, I guess, the

14   defense is asking is they should know that the offer for

15   remand came -- or the remand motion came on this date.

16           I don't think that invites any sort of confusion

17   as to what a motion for remand is.  It's just here's a

18   timeline.  And I'm sorry.  I was trying to find Exhibit 711.

19   For some reason --

20           MR. HIGGINS:  While we are we're on the subject of

21   711, Your Honor, I've got a concern about the exhibit

22   itself, and it may not -- I think it's the concern that I

23   raised with Ford's counsel earlier today, which is that 711,

24   as we're discussing it, is the -- and as we discussed it at

25   sidebar and as it was published to the jury was this

```
 1    October 2017 letter.

 2              In some of the Dropboxes that we've gotten from

 3    the defense, it looks like the Rule 68 offer was listed as

 4    711.  I want to make sure that the correct instruction is

 5    being --

 6              MR. CHANG:  Yeah, that's been corrected.

 7              MR. HIGGINS:  That's been corrected.  Okay.

 8              MR. CHANG:  Yeah.  And I have a copy if

 9    Your Honor needs --

10              THE COURT:  I just found it.  I'm just looking at

11    it.

12              All right.  I'm sorry, Mr. Higgins.  Anything

13    further?

14              MR. HIGGINS:  Not as to that issue.  Thank you.

15              THE COURT:  All right.  I'm inclined to add that

16    additional data point to the jurors, just simply that their

17    opposition was filed on this date -- on the date of

18    October 27th --

19              MR. CHANG:  Thank you, Your Honor.

20              THE COURT:  -- 2017.

21              MR. KELLY:  Thank you, Your Honor.

22              MR. CHANG:  Thank you, Your Honor.

23              THE COURT:  Go ahead.

24              MR. HIGGINS:  Your Honor, I'm sorry.  Finally --

25    nothing further as to the offer letter.
```

1          We had requested judicial notice of the filing of

2     the defendant's Answers.

3          THE COURT:  What's the relevance of that?

4          MR. HIGGINS:  The continuing denials of liability

5     that are set forth in -- and actually, we didn't seek

6     to -- and I wanted to make this absolutely plain.  We don't

7     seek to have the entire Answers be admitted into evidence.

8     We don't think that that will be profitable for anybody.

9     But only that the Court take judicial notice of the fact

10    that Ford denied liability for the express warranty

11    violation in its original Answer and in -- as recently in

12    its Answer filed in response to the First Amended Complaint.

13         THE COURT:  I'm I still -- I mean, I think

14    Mr. Altman has probably a lot to argue in this case about

15    Ford's denials, and I'm not sure how that is a -- such a

16    significant point that merits the filing -- a judicial

17    notice -- I mean, Ford's denied it.  That's why we're in

18    trial.

19         MR. HIGGINS:  Sure.

20         THE COURT:  I mean, Mr. Pedante said -- again, I

21    keep going back -- eight times.  I mean, I think it's a

22    relatively -- a simple issue for the jury to take in.

23         MR. HIGGINS:  We understand, Your Honor.  We

24    simply submit that it's an equally simple matter for the

25    Court to instruct the jury very, very plainly that in

```
 1    answering the original Complaint in 2017 and in answering

 2    again in 2019, the dates, therefore, are stated in our brief

 3    that Ford explicitly denied liability for these counts.

 4    Submitted on that.

 5           THE COURT:  All right.  Thank you.

 6           Anything further, Mr. Chang, about the

 7    instructions?

 8           MR. CHANG:  Your Honor, I guess just briefly, we

 9    did discuss the Proposed Instruction Number 8 to clarify the

10    issue who has the burden of proof.

11           It's unclear to me if the Court now may be

12    considering it or not.  I don't have anything more to add.

13    I just wanted to get clarification on that.

14           THE COURT:  Well, perhaps against my better

15    judgment, I'm just going to ask Mr. Altman directly.

16           Are you going to argue that Ford has the burden of

17    proving good faith in this case?

18           MR. ALTMAN:  Well, I'm going to argue that they

19    haven't -- I'm sorry.  I'm going to argue that they haven't

20    shown good faith in this case, that the evidence doesn't

21    support a finding of good faith.

22           THE COURT:  Okay.  So that's interesting.  We're

23    being wordsmiths here.  Arguably, the second phrasing, the

24    evidence doesn't support a finding of good faith, I don't

25    think that's objectionable.  Query whether they haven't
```

```
1   shown good faith.

2           I think that, I think, crosses -- gets closer to

3   the line because I don't -- I mean, with all due respect to

4   Mr. Higgins -- and he's done a great job in this case -- I

5   don't think, given the fact that Ford has said, "We're not

6   presenting an affirmative defense," they don't have to prove

7   anything.

8           I mean, even when you look at the instruction, it

9   defines what willful is.  It tells what the jury -- gives

10  the jury guidance as how to determine what willful is.

11          But I don't think there's an instruction that says

12  you as a jury must find and Ford must prove that they acted

13  in good faith.  I -- go ahead.

14          MR. ALTMAN:  I can abbreviate this.  My argument

15  is not Ford must prove, but I will argue certainly the

16  instruction that the evidence -- everything that Ford's put

17  on and everything we've put on, none of that sustains that.

18          THE COURT:  None of that sustains a good faith on

19  behalf of Ford.

20          MR. ALTMAN:  Right.

21          THE COURT:  I think if you phrase it that way,

22  it's arguably less objectionable.

23          I mean, Mr. Chang, if you think otherwise, speak

24  now or forever hold your peace.

25          MR. CHANG:  Your Honor, the only thing I would
```

1    point out is that there was statement already made, I

2    believe, twice in this case by plaintiff's counsel that we

3    have the burden.

4              And I know that the jury is instructed that

5    opening statements aren't evidence, the Court will instruct

6    on the law, and I accept that we expect the jury to do that,

7    but I do think given that, we would request that, obviously,

8    to the extent plaintiffs limit the prejudice by not arguing

9    again that Ford has the good faith, that's something,

10   Your Honor.

11             THE COURT:  All right.  Well, I'm sure you -- you

12   can -- you've made your objection now.  You can make it

13   during closing argument, if you deem it appropriate.

14             Mr. Altman, as an officer of the Court, has

15   indicated what he intends to argue.  Based on what he said,

16   I don't think it crosses the line.  We'll see if when the

17   juices get flowing whether he forgets about that or not.

18             MR. CHANG:  Thank you, Your Honor.

19             THE COURT:  Anything further that we need to

20   discuss this afternoon or, I guess soon to be this

21   afternoon?

22             Mr. Higgins.

23             MR. HIGGINS:  Thank you, Your Honor.  Plaintiff

24   moves for a directed verdict on Ford's liability for, not

25   the amount of, but liability for imposition of a civil

1   penalty --

2          THE COURT:  All right.

3          MR. HIGGINS:  -- on the grounds that under

4   Civil Code Section 1794, Subdivision E, Ford has failed to

5   demonstrate that it maintains a qualified third-party

6   dispute resolution process, and, as a result, there is no

7   burden even to prove willfulness because the -- it is a

8   burden of Ford Motor Company to demonstrate that it has and

9   maintains such a process and without such a process in place

10  and evidence of such a process in place a civil penalty may

11  be imposed by a jury without even a finding of willfulness.

12         THE COURT:  All right.  Thank you.

13         Mr. Hugret, you seemed ready to tackle this issue.

14         MR. HUGRET:  Thank you, Your Honor, yes.

15         Interesting motion, clever argument, minor

16  problem.  Recall plaintiffs objected to any questioning or

17  evidence by Ford Motor Company of a third-party dispute

18  resolution program through the Better Business Bureau.

19         In fact, I was not allowed to ask our witnesses

20  about whether Mr. Pedante could have done X, Y, or Z.

21         And Mr. Doss, in confirming to the jury that he

22  was -- that there are written policies and procedures in

23  place, was directed to a plaintiff's exhibit which is in

24  fact their policies and procedures for the third-party

25  dispute resolution program housed by their Better Business

1    Bureau.

2         The fact that plaintiffs seek to preclude us from

3    asking any questions or eliciting any evidence about the

4    existence of a third-party dispute resolution program and

5    then turn around and use that as the bases for a directed

6    verdict after the close of evidence is, in my opinion,

7    disingenuous at best.

8         THE COURT:  All right.

9         Mr. Higgins, what's your response, if any?

10        MR. HIGGINS:  Two brief responses.

11        First, we believe that that mischaracterizes the

12   testimony at trial.  Mr. -- the questions that were being

13   objected to were on the basis that it suggested that

14   Mr. Pedante had any additional burden in order for Ford to

15   have an obligation to repurchase the vehicle, any suggestion

16   that Mr. Pedante had any additional burden to go through

17   additional administrative steps to reach that point.

18        Second, notably, when Mr. Doss was presented for

19   his deposition, he was --

20        THE COURT:  His deposition or trial?

21        MR. HIGGINS:  His deposition.  He was not allowed

22   to answer any questions concerning any of Ford's affirmative

23   defenses and at no time -- and this is extremely

24   important -- at no time during the course of discovery in

25   this case or any of the other IDP cases, frankly, at no time

```
 1    during the course of discovery has Ford produced any

 2    evidence that it actually maintains a qualifying third-party

 3    dispute resolution program.  So let me talk about what that

 4    is.

 5            Under Civil Code Section 1793.22, there are nine

 6    criteria that a qualifying program must meet.  There -- it

 7    must be certified, for example, by the Department of

 8    Consumer Affairs.

 9            There are all different kinds of requirements that

10    it must meet.  Not a shred of evidence about the quality or

11    protocols of the BBB program has ever been produced in

12    discovery.  They should not be allowed at this point further

13    to try -- to the extent that Mr. Doss would have been

14    questioned about this issue, they should not have been

15    allowed to question him about matters that weren't produced

16    in discovery.

17            Having said that, I'll submit.

18            THE COURT:  All right.  Mr. Hugret.

19            MR. HUGRET:  Yes, Your Honor.  Thank you.

20            Again, interesting points.  First -- second

21    problem they have is, 1794(e) is never alleged in the

22    Complaint nor is it cited anywhere in the allegations

23    Mr. Pedante filed in this case.  It's not an issue for this

24    Court to decide.  It's not an issue for this jury to decide.

25            Second of all, plaintiff's sole allegation in this
```

```
 1    case has been Ford's willful failure to repurchase or

 2    replace the Focus when an obligation essentially existed to

 3    under the state's lemon law, or the Song-Beverly Act.

 4             I would submit to Your Honor that, given that it's

 5    not alleged in the Complaint nor an issue that should be --

 6    that was presented in this trial, it's not a proper grounds

 7    for a directed verdict.

 8             THE COURT:  All right.  Thank you.  I'll take

 9    the -- that issue under submission.

10             Does Ford have any similar motions to raise at

11    this time?

12             MR. CHANG:  Not from defendant, Your Honor.

13             THE COURT:  All right.  So I'm going to make --

14    we're going to make copies.  I'd ask you to come back in ten

15    minutes so I can give you have the copies, take one final

16    look.  We'll make one final -- we'll make copies after that.

17    I will -- what I'll do is I'll give you the copies.  Unless

18    there's an objection that hasn't been raised previously,

19    you'll just let my courtroom deputy know, and then we'll

20    make copies, and then we'll have them ready for the jurors

21    so that I can instruct, and then you can close.

22             Reluctantly, I'll ask, even though I have notes

23    about this somewhere, how much time did I give you all for

24    closing?

25             MR. ALTMAN:  Your Honor, I wrote down that you had
```

1  given us 40 minutes, and I don't -- and I don't know if --

2  it seemed like you had given both sides 40 minutes,

3  notwithstanding that we have the burden.  I've never seen

4  that before but --

5       THE COURT:  Right.  And I never do that.  I always

6  give each side whatever time, and I always give the

7  plaintiff and extra ten minutes for rebuttal.  I just can't

8  remember if it was 40 -- I was hoping it was going to be 15,

9  but that's probably not the case.

10      MR. CHANG:  No, it was 40, Your Honor, with ten

11 minutes for rebuttal.

12      THE COURT:  Okay.  So 40 minutes.  Just so the

13 parties understand, when we start getting down to the

14 one-minute mark, I'll say "Counsel, please wrap it up," and

15 at the 40 minutes, if you're not done, I'll say "Thank you,

16 Counsel," just so -- I'll do it to both sides.

17      All right.  So let's have you come back in ten

18 minutes so you can look one last time at the instructions.

19      Anything further before we take this ten-minute

20 recess from the plaintiff?

21      MR. ALTMAN:  No, Your Honor.

22      THE COURT:  Defense?

23      MR. CHANG:  The only question is do you want us to

24 submit another jury -- judicial notice instruction?

25      THE COURT:  No.  We'll work on that right now.

```
1              MR. CHANG:  Thank you.

2              THE CLERK:  All rise.  This Court is in recess.

3        (Recess taken 12:02 P.M.)

4                         --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9

10   Date:  November 14, 2019.

11

12

13

14                    __/S/ CHIA MEI JUI _____

15                    Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25
```

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**MR. ALTMAN: [74]**
1270/9 1279/24
1280/11 1280/21
1281/24 1283/7
1285/22 1286/2
1286/9 1286/14
1286/22 1286/24
1287/8 1287/12
1287/14 1287/16
1287/20 1288/3
1288/8 1291/16
1297/1 1297/15
1302/1 1302/7
1302/18 1302/23
1303/23 1303/25
1304/2 1306/17
1321/9 1322/7 1324/1
1327/18 1328/13
1328/16 1328/19
1328/23 1329/4
1329/9 1329/13
1329/15 1329/22
1330/1 1330/5
1330/10 1330/12
1331/8 1331/22
1332/9 1337/20
1337/22 1338/4
1339/13 1339/18
1339/21 1339/23
1340/1 1340/14
1340/21 1341/5
1342/13 1342/23
1343/2 1343/18
1344/2 1344/8
1344/13 1350/6
1370/17 1371/13
1371/19 1376/24
1377/20
**MR. CHANG: [53]**
1270/12 1270/15
1270/18 1270/22
1271/1 1271/6
1271/12 1271/20
1271/24 1275/1
1275/3 1276/13
1277/7 1277/19
1278/12 1278/16
1278/21 1278/24
1279/3 1279/9
1279/15 1279/18
1279/21 1348/3
1352/10 1354/25
1355/17 1356/24
1358/9 1358/16
1358/20 1359/25
1360/9 1360/22
1361/13 1364/4
1364/10 1364/12
1364/17 1364/20
1365/2 1365/6 1368/5
1368/7 1368/18
1368/21 1370/7
1371/24 1372/17
1376/11 1377/9
1377/22 1377/25
**MR. HIGGINS: [60]**
1272/11 1272/17

1272/22 1273/5
1273/9 1273/16
1273/22 1274/11
1274/24 1275/2
1275/19 1275/22
1276/2 1276/6
1277/15 1278/5
1278/8 1279/17
1280/1 1346/10
1346/12 1347/9
1347/21 1348/9
1348/12 1349/6
1349/24 1350/11
1350/17 1351/7
1353/12 1354/7
1354/14 1354/19
1356/5 1357/13
1357/16 1358/4
1362/4 1362/17
1363/6 1363/15
1363/21 1366/5
1366/18 1366/20
1366/23 1367/2
1367/8 1367/19
1368/6 1368/13
1368/23 1369/3
1369/18 1369/22
1372/22 1373/2
1374/9 1374/20
**MR. HUGRET: [3]**
1339/20 1373/13
1375/18
**MR. KELLY: [50]**
1283/5 1286/12
1286/16 1291/13
1294/24 1296/7
1296/12 1299/25
1306/12 1306/15
1307/17 1308/21
1309/17 1309/20
1311/3 1311/12
1312/25 1318/4
1321/4 1321/7
1321/14 1327/21
1328/15 1328/17
1329/25 1330/2
1330/9 1330/19
1330/21 1330/23
1332/1 1332/17
1335/14 1338/1
1338/5 1338/9
1338/13 1338/21
1339/1 1339/5 1340/5
1340/17 1341/14
1342/3 1342/10
1342/15 1343/17
1344/4 1358/23
1368/20
**MR. KIRNOS: [1]**
1276/9
**THE CLERK: [5]**
1270/5 1281/17
1345/13 1346/1
1378/1
**THE COURT: [211]**
**THE WITNESS: [12]**
1288/7 1300/3 1310/1
1322/3 1322/8

1337/21
1337/23 1338/8
1341/1 1342/6 1343/5

**$**
**$350 [1]** 1343/10
**$75,000 [1]** 1351/10

**'**
**'11 [1]** 1308/2
**'12 [1]** 1304/24
**'12s [1]** 1308/2
**'13 [6]** 1305/14 1332/9
1332/14 1333/11
1333/13 1336/16
**'13s [1]** 1308/2
**'14 [5]** 1305/14
1305/14 1318/12
1332/14 1336/16
**'14s [1]** 1308/2
**'15 [5]** 1305/15
1318/12 1332/15
1333/18 1336/16
**'15s [1]** 1308/2
**'16 [4]** 1305/15
1318/12 1332/15
1333/18
**'17 [3]** 1305/15
1318/12 1333/19
**'19 [1]** 1325/20

**-**
**-- I [1]** 1275/13
**-- or [1]** 1274/21
**--oOo [1]** 1378/4
**-23 [1]** 1321/11

**.**
**.1 [1]** 1333/21
**.3 [1]** 1333/17
**.5 [1]** 1333/16

**1**
**10 [3]** 1267/9 1302/22
1321/9
**10250 [1]** 1268/4
**106 [1]** 1334/21
**11 [2]** 1279/2 1302/5
**111 [1]** 1349/15
**11:00 [2]** 1346/1
1346/3
**11:20 [1]** 1346/3
**1267 [1]** 1267/18
**12:02 [1]** 1378/3
**12:30 [5]** 1339/10
1344/19 1344/22
1345/8 1345/12
**12th [1]** 1321/13
**13 [2]** 1315/5 1349/12
**1379 [1]** 1267/18
**13th [1]** 1315/9
**14 [5]** 1267/15 1269/2
1270/1 1298/7
1379/10
**14 Discipline [1]**
1298/10
**14 Disciplines [1]**
1298/15
**14 volts [1]** 1342/1

**14-volt [1]** 1323/3
**14.3 volts [1]** 1322/22
**14D [4]** 1298/4 1298/8
1298/10 1298/12
**14M01 [1]** 1308/14
**15 [4]** 1346/22 1347/4
1347/19 1377/8
**150s [1]** 1301/6
**15B22 [1]** 1313/12
**16 [3]** 1302/5 1321/3
1358/13
**16th [2]** 1284/20
1286/3
**17 [4]** 1273/2 1318/24
1318/25 1358/22
**17-6656 [1]** 1270/6
**17-6656-AB [1]**
1267/7
**1793.22 [1]** 1375/5
**1794 [2]** 1373/4
1375/21
**18 [1]** 1321/11
**1801 [1]** 1268/3
**1899 [2]** 1349/1
1349/6
**18th affirmative [1]**
1354/22
**19 [1]** 1287/8
**190 [3]** 1291/12
1291/15 1291/18
**1900 [1]** 1268/19
**1927 [1]** 1349/6
**193 [3]** 1294/24
1295/1 1295/2
**1983 [1]** 1357/7
**1999 [1]** 1349/6
**1st [5]** 1271/11
1271/18 1273/1
1314/24 1315/10

**2**
**20 [2]** 1322/3 1354/11
**200 feet [5]** 1290/12
1291/3 1291/4 1291/6
1291/8
**2000 [2]** 1268/22
1325/20
**2009, 2019 [1]** 1349/6
**2011 [9]** 1291/21
1304/23 1304/24
1307/17 1307/23
1307/24 1308/6
1308/8 1308/11
**2012 [8]** 1307/24
1308/7 1324/4
1325/19 1328/2
1332/9 1332/14
1336/16
**2013 [11]** 1304/18
1304/19 1306/3
1307/16 1325/8
1325/10 1325/14
1325/22 1326/2
1326/10 1337/15
**2014 [3]** 1304/20
1326/10 1336/19
**2015 [3]** 1334/18
1360/16 1360/18

**2016 [15]** 1282/18
1314/24 1315/6
1320/9 1320/18
1320/24 1322/21
1334/1 1334/4
1335/21 1337/18
1353/19 1361/19
1362/20 1364/1
**2017 [14]** 1272/19
1273/10 1273/12
1275/25 1317/19
1317/21 1328/2
1350/25 1351/7
1351/18 1365/4
1368/1 1368/20
1370/1
**2018 [4]** 1317/25
1318/11 1318/12
1318/17
**2019 [10]** 1267/15
1269/2 1270/1
1275/24 1289/20
1334/12 1335/3
1349/6 1370/2
1379/10
**203 [10]** 1348/11
1348/13 1348/16
1352/7 1352/10
1352/11 1353/3
1357/16 1357/19
1358/1
**204 [1]** 1348/14
**21 [1]** 1304/1
**219 [1]** 1346/19
**21st [1]** 1312/16
**220 [2]** 1346/20
1347/16
**221 [2]** 1346/20
1347/13
**2250 [1]** 1268/14
**23 [1]** 1321/11
**24th [1]** 1286/6
**25 percent [2]**
1324/11 1324/17
**2500 [2]** 1268/4
1268/13
**2700 [1]** 1268/18
**275 [2]** 1268/22
1349/12
**27th [4]** 1365/18
1365/19 1365/21
1368/18
**28 [1]** 1379/4

**3**
**3 million [3]** 1287/3
1288/2 1288/23
**3003 [1]** 1320/1
**310-277-8481 [1]**
1268/5
**310-552-2250 [1]**
1268/14
**310-854-4444 [1]**
1268/9
**314 [2]** 1320/17
1320/20
**316 [1]** 1325/3
**3244 [1]** 1354/8

**3**

**3287 [2]** 1267/23
1379/15
**339 [1]** 1310/25
**350 [1]** 1267/24
**3rd [1]** 1315/18
**3Rs [1]** 1301/1

**4**

**4,000 miles [1]** 1314/5
**40 [6]** 1377/1 1377/2
1377/8 1377/10
1377/12 1377/15
**403 [1]** 1309/22
**412 [1]** 1352/13
**415-544-1900 [1]**
1268/19
**415-986-5900 [1]**
1268/23
**4311 [1]** 1267/24
**4444 [1]** 1268/9
**455 [1]** 1349/15
**459 [1]** 1349/15

**5**

**5/60 [1]** 1309/8
**50 [1]** 1326/9
**56 [3]** 1285/25
1286/15 1286/24
**57 [2]** 1285/25
1286/16
**5900 [1]** 1268/23
**5D [1]** 1298/11
**5th [1]** 1270/25

**6**

**60 [6]** 1301/13
1301/20 1303/1
1303/4 1303/5 1309/8
**60,000 [1]** 1309/9
**60,000-mile [1]**
1308/11
**600,000 [2]** 1325/8
1325/17
**627 [3]** 1270/24
1278/21 1279/9
**6656 [1]** 1270/6
**68 [1]** 1368/3
**6th [1]** 1365/20

**7**

**70,000 [1]** 1311/1
**70,000-mile [1]**
1311/8
**711 [5]** 1365/4
1367/18 1367/21
1367/23 1368/4
**719 [3]** 1321/5 1321/6
1322/3
**719-18 [1]** 1321/11
**753 [1]** 1379/3

**8**

**8080 [2]** 1292/7
1305/2
**841 [2]** 1328/9
1328/11
**8481 [1]** 1268/5

**86 [3]** 1302/5 1302/22
1304/1
**863 [4]** 1328/16
1328/18 1332/3
1332/18
**8648 [1]** 1268/8
**87 [1]** 1304/1
**8:54 [2]** 1267/16
1270/2
**8D [1]** 1298/11

**9**

**90 percent [3]** 1326/4
1326/9 1326/21
**90-day [1]** 1299/12
**90012 [1]** 1267/24
**90067 [2]** 1268/4
1268/13
**90211 [1]** 1268/8
**91 [1]** 1334/20
**94104 [1]** 1268/18
**94111 [1]** 1268/22
**99 [2]** 1323/11
1323/12
**9:09 [1]** 1281/19
**9:42 [1]** 1281/19

**A**

**a -- I [1]** 1359/22
**a 2013 [1]** 1306/3
**A1 [1]** 1346/21
**AB [1]** 1267/7
**abbreviate [1]**
1371/14
**ability [1]** 1273/24
**able [2]** 1280/9
1294/10
**absolutely [6]**
1301/15 1318/23
1334/3 1344/2
1348/14 1369/6
**accept [1]** 1372/6
**accepted [2]** 1365/8
1367/10
**access [1]** 1352/3
**accident [1]** 1300/4
**accidents [7]** 1296/7
1296/19 1297/6
1297/13 1297/17
1299/25 1300/10
**according [3]** 1293/10
1309/2 1322/20
**accounted [4]**
1324/14 1324/16
1324/17 1324/24
**accounts [2]** 1324/9
1324/11
**accurate [5]** 1272/25
1275/12 1290/1
1291/3 1366/20
**acknowledge [1]**
1305/21
**across [1]** 1336/3
**act [4]** 1350/2 1356/15
1366/17 1376/3
**acted [2]** 1353/15
1371/12
**action [5]** 1313/13

**131/469** 1313/23
1315/13 1350/2
**actual [1]** 1302/16
**actually -- I [1]**
1283/13
**add [2]** 1368/15
1370/12
**added [1]** 1277/9
**addition [2]** 1285/7
1302/15
**additional [10]** 1277/8
1277/12 1320/14
1346/6 1347/25
1351/2 1368/16
1374/14 1374/16
1374/17
**address [1]** 1278/18
**adequate [1]** 1340/9
**adequately [1]**
1353/19
**adjustment [1]**
1363/11
**administrative [1]**
1374/17
**admissibility [1]**
1365/23
**admissible [1]**
1331/21
**admission [1]** 1273/1
**admit [4]** 1269/14
1271/20 1274/1
1350/25
**admits [4]** 1271/24
1272/15 1272/16
1278/11
**admitted [36]** 1269/14
1270/20 1271/8
1271/9 1271/19
1271/21 1272/3
1272/8 1272/15
1273/2 1273/11
1274/4 1274/5
1274/10 1274/22
1275/10 1275/24
1276/19 1277/19
1277/23 1277/24
1278/3 1291/15
1291/18 1295/1
1295/2 1296/22
1318/25 1321/6
1321/13 1321/13
1322/6 1323/25
1361/11 1365/4
1369/7
**Affairs [1]** 1375/8
**affect [1]** 1342/3
**affected [5]** 1293/15
1294/3 1294/14
1295/14 1360/6
**affirmative [12]**
1354/21 1354/22
1355/17 1355/19
1355/19 1357/1
1357/4 1357/5 1357/9
1357/24 1371/6
1374/22
**after [18]** 1272/13
1295/24 1299/9

**1301/21 1303/1**
1303/6 1310/17
1312/21 1317/23
1318/14 1318/15
1318/15 1322/19
1344/22 1346/1
1366/11 1374/6
1376/16
**afternoon [2]** 1372/20
1372/21
**again [23]** 1274/20
1275/16 1279/15
1286/2 1286/14
1290/21 1290/25
1295/4 1295/8
1295/13 1303/24
1311/24 1315/20
1317/23 1318/1
1320/19 1324/19
1325/15 1343/9
1369/20 1370/2
1372/9 1375/20
**against [1]** 1303/17
1370/14
**aging [1]** 1308/18
**ago [5]** 1312/7
1312/15 1328/4
1333/5 1333/6
**agree [7]** 1274/10
1274/11 1274/12
1274/23 1275/12
1338/18 1352/11
**agreed [3]** 1276/25
1277/5 1345/20
**ahead [7]** 1329/15
1330/23 1339/20
1347/21 1367/8
1368/23 1371/13
**air [1]** 1360/20
**al [1]** 1270/7
**all that [1]** 1367/13
**allegation [1]** 1375/25
**allegations [1]**
1375/22
**alleged [2]** 1375/21
1376/5
**allow [5]** 1296/22
1297/9 1300/3
1331/19 1345/5
**allowed [9]** 1328/25
1329/3 1329/8
1329/20 1330/16
1373/19 1374/21
1375/12 1375/15
**along [2]** 1360/25
1365/25
**already [5]** 1276/18
1289/6 1289/7
1313/11 1321/7
1321/12 1322/6
1372/1
**alternative [1]**
1276/22
**alternator [1]** 1341/25
**ALTMAN [22]** 1268/3
1268/3 1269/5 1269/6
1269/10 1269/11
1270/10 1276/1

**1281/24 1297/1**
1297/11 1329/1
1329/12 1331/10
1331/14 1335/17
1340/4 1340/21
1344/13 1369/14
1370/15 1372/14
**Altman's [1]** 1276/8
1277/2
**always [4]** 1301/16
1327/2 1377/5 1377/6
**ambit [1]** 1348/16
**Ambrose [1]** 1356/11
**Amended [1]** 1369/12
**America [1]** 1324/12
**American [1]** 1324/9
**among [4]** 1296/1
1303/8 1316/18
1366/8
**Amongst [1]** 1305/4
**amount [7]** 1280/17
1280/20 1300/22
1319/8 1343/6
1350/21 1372/25
**analogous [1]**
1355/12
**analysis [1]** 1326/12
**analyst [1]** 1326/25
**analytical [1]** 1333/4
**ancient [1]** 1348/24
**and that [1]** 1326/13
**ANDREW [2]** 1268/17
1270/13
**Andrew Chang [1]**
1270/13
**ANDRÉ [1]** 1267/3
**ANGELES [5]**
1267/17 1267/24
1268/4 1268/13
1270/1
**another [4]** 1294/22
1295/8 1302/3
1377/24
**answer [19]** 1288/14
1288/18 1288/21
1288/25 1289/5
1293/18 1301/17
1302/14 1303/3
1304/8 1304/12
1308/3 1310/1 1339/9
1354/22 1355/24
1369/11 1369/12
1374/22
**answered [3]** 1290/7
1303/17 1310/14
**answering [2]** 1370/1
1370/1
**answers [3]** 1347/18
1369/2 1369/7
**Anthony [2]** 1340/22
1341/3
**Anthony Micale [1]**
1340/22
**anticipate [2]** 1274/23
1360/12
**anymore [2]** 1317/9
1366/3
**apologize [2]** 1278/17

**A**

apologize... [1]
1358/19
apparently [5]
1286/10 1291/13
1323/23 1341/20
1361/18
apparently there's [1]
1291/13
appear [1] 1332/6
appearances [2]
1268/1 1270/9
applicable [6]
1349/21 1350/2
1352/8 1352/18
1356/7 1358/11
applies [2] 1303/1
1357/21
apply [1] 1280/7
approach [7] 1286/18
1296/9 1328/14
1328/20 1338/10
1338/18 1339/22
appropriate [4]
1353/4 1359/19
1361/5 1372/13
approved [1] 1359/16
April [4] 1288/17
1295/13 1311/21
1312/17
archived [1] 1335/9
area [3] 1290/23
1295/15 1334/10
aren't [2] 1322/4
1372/5
arguably [2] 1370/23
1371/22
argue [11] 1276/2
1331/15 1345/11
1345/19 1362/15
1369/14 1370/16
1370/18 1370/19
1371/15 1372/15
argued [2] 1359/3
1359/8
arguing [1] 1372/8
argument [16] 1272/7
1350/24 1350/24
1357/12 1360/2
1361/25 1362/3
1362/7 1363/4 1364/2
1365/13 1366/22
1367/1 1371/14
1372/13 1373/15
argumentative [6]
1272/14 1273/13
1306/16 1307/18
1318/5 1342/11
argumentive [2]
1272/16 1313/1
arguments [6]
1274/16 1280/18
1344/24 1351/16
1356/9 1361/19
arises [1] 1359/9
around [4] 1290/23
1305/12 1337/4
1374/5

articulated [1] 1354/5
aside [1] 1346/15
asked [28] 1280/5
1284/19 1286/23
1286/25 1287/1
1287/25 1288/16
1289/22 1289/22
1290/3 1290/8 1290/9
1290/25 1294/1
1294/13 1295/13
1297/6 1311/20
1311/24 1312/6
1312/8 1312/15
1325/4 1329/7
1330/14 1331/13
1334/11 1335/21
asking [9] 1287/1
1290/5 1312/24
1330/10 1330/13
1335/20 1335/23
1367/14 1374/3
assert [1] 1355/25
asserting [2] 1356/13
1357/24
assume [3] 1275/11
1286/8 1358/25
Assumes [1] 1307/19
Assuming [1] 1339/9
ATIC [2] 1334/20
1334/21
attempt [1] 1360/14
attempts [1] 1359/11
attention [5] 1285/24
1294/24 1302/3
1302/5 1302/20
audit [1] 1299/8
August [10] 1315/6
1315/18 1317/14
1317/25 1320/9
1320/18 1320/24
1321/3 1322/21
1361/19
August 16 [1] 1321/3
August 2016 [2]
1320/18 1320/24
August 3rd [1]
1315/18
authority [1] 1356/10
auto [1] 1335/1
automatic [8] 1305/17
1305/18 1324/6
1324/10 1324/16
1324/21 1324/25
1334/5
automatically [2]
1320/16 1361/2
available [5] 1312/5
1350/15 1352/25
1352/25 1353/16
average [8] 1311/2
1328/1 1331/6
1333/10 1333/20
1333/20 1336/18
1336/20
avoid [1] 1363/6
aware [6] 1310/16
1310/18 1314/14
1314/16 1315/6

1316/770
Away [1] 1283/20
AWS [7] 1294/5
1308/20 1309/2
1310/4 1310/7 1333/2
1336/14

**B**

B1318 [1] 1319/22
back [30] 1273/12
1273/21 1282/17
1289/9 1293/3
1303/10 1303/12
1305/24 1306/12
1317/18 1317/18
1328/17 1334/17
1335/3 1339/10
1344/19 1344/22
1345/8 1345/10
1345/12 1345/24
1349/1 1349/1 1349/3
1350/16 1360/15
1363/12 1369/21
1376/14 1377/17
BACON [1] 1268/16
bar [1] 1337/15
base [2] 1310/3
1352/19
based [25] 1277/9
1285/21 1294/8
1305/18 1323/23
1326/12 1329/20
1330/1 1330/3 1330/9
1330/13 1330/14
1330/17 1331/7
1331/22 1334/2
1334/5 1340/8 1340/8
1349/22 1351/15
1352/12 1360/4
1361/19 1372/15
bases [2] 1353/2
1353/2
basically [9] 1271/8
1289/10 1292/2
1298/13 1300/24
1301/1 1316/9 1333/7
1361/11
basis [3] 1327/3
1351/12 1374/13
battery [27] 1268/22
1315/23 1316/6
1316/18 1316/24
1317/3 1317/4 1317/7
1317/8 1317/11
1317/15 1317/20
1318/14 1318/15
1318/21 1319/21
1319/24 1319/24
1321/24 1322/13
1322/14 1322/24
1323/3 1323/8
1341/13 1341/13
1342/1
battery's [1] 1317/9
BBB [1] 1375/11
Bearing [1] 1317/5
becomes [1] 1299/13
before [14] 1289/8

1291/23 1301/15
1308/18 1313/18
1316/25 1335/11
1335/12 1336/3
1362/9 1365/9
1366/11 1377/4
1377/19
begin [2] 1344/24
1345/11
beginning [3] 1359/1
1359/1 1361/12
behalf [4] 1270/11
1282/9 1282/13
1371/19
behind [1] 1306/2
belief [1] 1356/21
believe [28] 1271/8
1273/13 1273/24
1274/21 1276/18
1279/1 1306/1
1317/16 1321/6
1342/22 1346/22
1349/20 1350/7
1351/17 1352/2
1353/4 1353/23
1354/20 1355/24
1356/2 1359/22
1360/12 1360/21
1364/14 1365/17
1366/6 1372/2
1374/11
believed [4] 1351/21
1354/1 1354/17
1356/19
bench [1] 1334/24
Benz [1] 1356/16
best [4] 1305/19
1305/25 1334/7
1374/7
better [17] 1299/11
1299/20 1300/16
1300/16 1301/10
1304/16 1304/16
1305/6 1306/4
1308/20 1310/22
1334/4 1334/9
1352/21 1370/14
1373/18 1373/25
between [2] 1313/23
1326/8
BEVERLY [5] 1268/8
1350/2 1356/15
1359/9 1376/3
beyond [1] 1307/13
bills [1] 1343/17
binders [1] 1328/9
BIROTTE [1] 1267/3
black [1] 1324/3
blatant [1] 1296/23
Blind [1] 1349/15
bonus [1] 1283/10
book [1] 1319/9
both [11] 1273/16
1274/2 1274/21
1292/10 1292/16
1339/8 1344/10
1353/24 1364/22
1377/2 1377/16

both believe [1]
1274/21
bottom [1] 1324/3
bought [4] 1307/13
1308/12 1336/16
1360/15
BOULEVARD [2]
1268/4 1268/8
bound [2] 1274/15
1274/16
box [1] 1324/3
break [4] 1301/3
1301/7 1301/10
1344/18
breaking [1] 1300/21
brief [6] 1280/17
1280/20 1281/16
1339/25 1370/2
1374/10
briefing [1] 1362/6
briefly [4] 1327/22
1340/22 1342/16
1370/8
bring [3] 1276/20
1276/21 1352/12
brought [7] 1276/13
1292/18 1317/2
1317/6 1318/11
1318/12 1348/11
BRYAN [1] 1268/3
1270/10
Bryan Altman [1]
1270/10
build [2] 1301/6
1301/21
building [1] 1334/4
builds [2] 1300/20
1301/5
built [10] 1294/9
1300/25 1301/2
1301/13 1301/20
1302/10 1303/4
1303/5 1307/24
1325/19
bulletin [3] 1291/10
1291/20 1294/22
bulletins [1] 1337/11
burden [20] 1350/10
1354/18 1355/2
1355/4 1355/6
1355/10 1355/10
1355/14 1355/23
1356/6 1356/14
1357/5 1370/10
1370/16 1372/3
1373/7 1373/8
1374/14 1374/16
1377/3
burdens [1] 1355/20
Bureau [2] 1373/18
1374/1
BURNETT [1] 1268/17
Business [2] 1373/18
1373/25
buy [2] 1308/10
1350/16
buyback [2] 1293/14
1362/10

**C**

**cable [12]** 1315/24 1317/3 1317/11 1317/12 1317/15 1317/19 1317/22 1318/15 1318/21 1323/7 1341/14 1342/2
**CACI [12]** 1280/7 1331/15 1347/13 1347/16 1348/1 1348/11 1348/13 1348/14 1352/7 1353/3 1354/8 1359/14
**CACI 203 [3]** 1348/11 1348/13 1352/7
**CACI 220 [1]** 1347/16
**CACI 3244 [1]** 1354/8
**CACIs [4]** 1346/19 1347/1 1347/3 1362/22
**calculation [3]** 1302/13 1302/15 1361/23
**calendar [2]** 1304/24 1308/8
**calibration [2]** 1305/2 1315/4
**CALIFORNIA [16]** 1267/2 1267/17 1267/24 1268/4 1268/8 1268/13 1268/18 1268/22 1270/1 1282/21 1348/25 1349/2 1351/24 1352/12 1359/16 1363/9
**California Supreme [1]** 1349/2
**call [8]** 1298/10 1298/15 1306/12 1313/19 1334/7 1339/24 1340/15 1340/20
**called [3]** 1309/4 1313/19 1362/9
**Calling [1]** 1270/6
**came [20]** 1291/11 1293/4 1314/23 1315/3 1316/22 1317/11 1317/18 1317/21 1326/21 1333/1 1333/2 1333/3 1333/11 1334/19 1335/6 1335/22 1336/22 1342/10 1367/15 1367/15
**car [11]** 1285/9 1292/2 1292/8 1293/13 1301/20 1307/14 1308/12 1308/15 1360/16 1361/13 1362/17
**care [1]** 1299/19
**cars [5]** 1294/3 1302/16 1307/17 1308/18 1352/1

**cases [7]** 1286/4 1355/12 1356/12 1356/16 1357/6 1357/7 1374/25
**cause [3]** 1298/14 1317/9 1350/2
**causes [1]** 1363/7
**Cazares [2]** 1302/4 1302/21
**CCRR [1]** 1267/23
**cease [1]** 1340/5
**CENTRAL [2]** 1267/2 1359/16
**Central District [1]** 1359/16
**CENTURY [1]** 1268/13
**certain [2]** 1274/16 1355/9
**certainly [3]** 1276/4 1366/21 1371/15
**CERTIFICATE [1]** 1379/1
**certified [1]** 1375/7
**certify [1]** 1379/3
**cetera [2]** 1297/14 1354/17
**challenged [1]** 1331/1
**chance [5]** 1349/5 1359/23 1359/25 1360/1 1366/9
**CHANG [12]** 1268/17 1270/13 1276/11 1354/25 1356/24 1358/8 1364/4 1364/10 1366/7 1366/12 1370/6 1371/23
**Chang's [1]** 1363/3
**change [6]** 1313/4 1313/6 1335/11 1335/12 1343/25 1364/10
**changed [1]** 1293/2
**changes [11]** 1292/3 1292/4 1304/25 1305/1 1305/2 1305/2 1311/17 1312/9 1336/24 1336/25 1337/3
**characterizes [1]** 1366/7
**charge [3]** 1278/18 1279/1 1357/25
**charging [3]** 1342/23 1343/11 1343/6
**chart [8]** 1332/6 1332/7 1332/8 1332/9 1332/14 1335/22 1336/5 1336/6
**check [3]** 1303/10 1303/12 1365/18
**checking [1]** 1289/11
**CHIA [3]** 1267/23 1379/14 1379/15
**China [1]** 1311/3
**chip [1]** 1334/20
**chips [1]** 1305/2

**choose [1]** 1336/19
**choose 2014 [1]** 1336/19
**chooses [2]** 1274/1 1349/18
**chose [1]** 1350/25
**chosen [1]** 1352/6
**CHRISTOPHER [1]** 1282/1
**circuit [12]** 1312/20 1347/7 1347/7 1347/9 1347/11 1348/5 1349/10 1349/13 1356/7 1356/8 1357/19 1359/17
**citations [4]** 1349/8 1356/10 1356/12 1359/6
**cite [1]** 1359/5
**citeable [1]** 1359/18
**cited [5]** 1349/13 1356/8 1356/17 1357/6 1375/22
**citing [2]** 1349/13 1349/16
**civil [5]** 1270/6 1372/25 1373/4 1373/10 1375/5
**Civil Code [2]** 1373/4 1375/5
**claim [11]** 1285/14 1295/25 1297/4 1305/5 1308/19 1312/8 1330/8 1336/12 1356/1 1357/7 1358/18
**claims [12]** 1294/10 1298/3 1300/14 1300/16 1303/14 1304/15 1305/6 1305/9 1306/3 1306/4 1311/16 1333/3
**clarification [1]** 1370/13
**clarify [1]** 1370/9
**class [5]** 1305/19 1305/22 1305/25 1334/7 1334/8
**classic [1]** 1330/8
**clause [1]** 1277/12 1365/11
**cleaned [1]** 1317/15
**clear [7]** 1275/3 1280/23 1340/4 1347/6 1348/14 1362/13 1362/23
**clearly [2]** 1337/18 1366/14
**clerk [1]** 1346/5
**clever [1]** 1373/15
**climbing [1]** 1362/1
**clock [1]** 1340/3
**close [5]** 1281/7 1338/15 1339/12 1374/6 1376/21
**closer [1]** 1371/2
**closing [6]** 1280/18 1281/6 1344/23

**1350/24 1372/13 1376/24
**clutch [14]** 1292/6 1292/6 1293/5 1295/5 1313/19 1326/9 1327/7 1327/7 1361/7 1361/10 1362/2 1362/9 1362/19 1363/24
**clutches [2]** 1316/12 1326/5
**cmjui.csr [1]** 1267/25
**code [9]** 1319/22 1319/23 1320/2 1320/4 1320/6 1352/13 1373/4 1375/5 1379/4
**codes [3]** 1319/2 1319/18 1319/19
**Coffey [1]** 1356/11
**colleagues [2]** 1270/11 1286/10 1339/15
**collection [1]** 1286/4
**combine [1]** 1360/23
**comes [3]** 1313/24 1314/9 1315/6
**comfortable [1]** 1346/25
**coming [3]** 1336/23 1341/25 1360/19
**commented [1]** 1323/7
**communication [3]** 1313/5 1318/22 1319/19
**communications [1]** 1319/18
**company [12]** 1267/8 1270/7 1283/17 1283/18 1311/12 1335/1 1349/11 1349/21 1352/4 1353/10 1373/8 1373/17
**Comparatively [2]** 1304/11 1304/12
**compensatory [2]** 1279/12 1279/17
**competitor [1]** 1334/8
**Complaint [5]** 1354/23 1369/12 1370/1 1375/22 1376/5
**complaints [5]** 1297/25 1298/4 1298/19 1299/5 1299/22
**complete [4]** 1272/25 1330/18 1330/18 1349/8
**completely [1]** 1342/10
**compliant [1]** 1307/7
**comply [2]** 1280/18 1296/23
**component [3]** 1307/7 1334/24 1362/25

**computer [1]** 1299/24
**concede [2]** 1303/11 1303/19
**conceded [1]** 1303/7
**concern [3]** 1367/3 1367/21 1367/22
**concerned [2]** 1280/6 1281/13
**concerning [12]** 1276/12 1296/20 1346/18 1346/23 1350/19 1351/12 1351/25 1353/17 1356/6 1356/9 1362/6 1374/22
**conclusion [1]** 1278/3
**conditioning [1]** 1360/20
**conditions [2]** 1290/4 1291/1
**conduct [1]** 1345/6
**conducted [1]** 1350/20
**conducting [1]** 1284/4
**confer [1]** 1273/23
**conference [11]** 1270/25 1273/18 1273/25 1274/4 1274/13 1274/18 1275/9 1278/18 1279/1 1357/2 1379/8
**conferred [1]** 1274/9
**conferring [1]** 1276/10
**confirm [1]** 1364/14
**confirming [1]** 1373/21
**conform [3]** 1362/24 1362/24 1363/23
**conform a [1]** 1362/24
**conformance [1]** 1379/7
**conformed [1]** 1356/19
**confronted [1]** 1311/11
**confused [1]** 1285/17
**confusing [1]** 1367/4
**confusion [8]** 1359/23 1359/25 1360/2 1363/5 1363/6 1363/8 1364/9 1367/16
**connected [1]** 1345/7
**connection [1]** 1323/4
**conservative [2]** 1314/5 1327/4
**conservatively [1]** 1314/10
**consider [2]** 1305/19 1347/14
**considered [3]** 1351/3 1351/13 1353/19
**considering [1]** 1370/12
**consisted [2]** 1285/15 1289/23
**CONSTELLATION [1]**

# C

**CONSTELLATION...**
**[1]** 1268/4
**constrained [1]**
1330/15
**consult [2]** 1321/15
1351/24
**consumer [2]** 1284/22
1375/8
**consumers [3]**
1282/24 1285/15
1336/16
**contained [1]** 1309/16
**contend [1]** 1351/2
**contention [1]**
1351/17
**context [1]** 1367/1
**continually [3]**
1292/20 1292/25
1293/1
**continue [5]** 1303/14
1305/16 1332/1
1332/13 1350/17
**continuing [1]** 1369/4
**continuously [2]**
1276/11 1296/17
**control [1]** 1273/24
**copies [6]** 1281/5
1376/14 1376/15
1376/16 1376/17
1376/20
**copy [5]** 1271/3
1280/5 1286/11
1346/5 1368/8
**core [1]** 1360/21
**CORPORATION [2]**
1267/8 1349/15
**corrected [3]** 1337/6
1368/6 1368/7
**correctly [3]** 1283/25
1286/20 1359/19
**correlating [1]**
1352/18
**corroborate [3]**
1306/5 1311/21
1313/22
**corroborating [1]**
1312/8
**corroded [2]** 1315/24
1317/10
**counsel [12]** 1268/1
1270/9 1282/16
1286/18 1310/1
1321/15 1330/16
1365/23 1367/23
1372/2 1377/14
1377/16
**count [1]** 1359/4
**country [1]** 1283/5
**counts [2]** 1362/23
1370/3
**couple [6]** 1282/25
1297/2 1306/12
1348/23 1358/11
1361/7
**course [11]** 1271/2
1272/5 1299/21
1329/22 1337/9

1347/23 1354/20
1366/6 1367/4
1374/24 1375/1
**Court's [11]** 1280/18
1280/24 1285/24
1302/3 1302/20
1347/4 1347/19
1347/23 1354/9
1357/20 1363/11
**Court's instruction [1]**
1347/4
**courts [2]** 1349/1
1349/9
**covered [4]** 1307/24
1309/11 1309/15
1310/2
**crank [3]** 1322/18
1323/5 1323/6
**create [1]** 1318/21
**created [5]** 1292/16
1329/24 1336/6
1336/8 1336/10
**criteria [2]** 1347/13
1375/6
**cross [7]** 1269/5
1269/10 1281/23
1282/4 1334/10
1342/15 1342/17
**cross-examination [7]**
1269/5 1269/10
1281/23 1282/4
1334/10 1342/15
1342/17
**crosses [2]** 1371/2
1372/16
**crux [1]** 1353/13
**CSR [2]** 1267/23
1379/15
**current [3]** 1316/9
1317/13 1344/1
**customer [21]**
1297/25 1298/19
1299/13 1299/20
1299/22 1306/22
1307/9 1310/5 1310/6
1313/15 1315/15
1331/7 1333/7 1333/8
1333/10 1333/20
1333/21 1333/22
1336/18 1336/20
1337/7
**customers [4]** 1298/5
1299/5 1299/8 1299/9
**cut [1]** 1299/17
**CV [1]** 1267/7

# D

**daily [1]** 1327/3
**damaged [1]** 1315/24
**damages [3]** 1277/9
1279/12 1353/12
**data [56]** 1303/10
1303/12 1305/12
1305/12 1305/15
1305/25 1306/5
1306/7 1306/8
1306/11 1311/20
1312/10 1312/11

1347/12 1312/13
1320/13 1320/18
1320/21 1320/23
1321/3 1321/19
1322/1 1322/2
1322/21 1325/11
1326/6 1326/13
1328/1 1330/1 1330/2
1330/3 1330/6 1330/9
1330/17 1331/2
1331/3 1331/4 1331/4
1331/5 1331/8
1331/13 1332/25
1333/2 1333/5 1333/6
1334/2 1335/5
1335/20 1335/21
1335/23 1336/3
1336/3 1336/12
1336/13 1341/19
1368/16
**date [22]** 1272/18
1272/19 1273/7
1273/9 1286/2
1301/14 1301/20
1301/21 1308/12
1312/7 1320/1 1320/9
1338/23 1338/24
1361/18 1364/25
1365/12 1365/17
1367/15 1368/17
1368/17 1379/10
**dates [2]** 1367/2
1370/2
**dating [1]** 1349/1
**Daubert [3]** 1340/6
1341/16 1342/5
**day [7]** 1267/18
1270/8 1299/12
1342/21 1343/2
1343/7 1343/7
**Day 6 [1]** 1270/8
**days [5]** 1301/13
1301/20 1303/1
1303/4 1303/5
**deal [2]** 1344/12
1344/20
**dealer [1]** 1323/7
**dealership [4]**
1292/19 1310/15
1316/20 1333/24
**dealing [2]** 1294/23
1295/4
**deals [1]** 1348/16
**dealt [1]** 1348/14
**death [1]** 1297/7
**decide [2]** 1375/24
1375/24
**decided [1]** 1285/8
**decides [1]** 1302/17
**decision [4]** 1280/19
1349/10 1350/16
1359/17
**deduction [1]** 1279/6
**deem [3]** 1331/12
1334/7 1372/13
**deemed [2]** 1334/7
1365/8
**deep [1]** 1300/23

**defect [1]** 1360/24
**defendant [5]** 1268/15
1270/13 1355/8
1359/1 1376/12
**defendant's [2]**
1269/3 1369/2
**DEFENDANTS [1]**
1267/10
**defense [19]** 1273/11
1323/25 1340/17
1349/25 1350/3
1350/11 1354/21
1354/22 1355/17
1355/20 1356/13
1356/22 1357/2
1357/10 1357/23
1367/14 1368/3
1371/6 1377/22
**defenses [8]** 1349/22
1349/23 1352/5
1355/19 1357/4
1357/5 1357/24
1374/23
**defined [1]** 1355/9
**defines [1]** 1371/9
**definitely [1]** 1363/22
**definition [1]** 1354/13
**DELAWARE [1]**
1267/8
**delay [1]** 1313/23
**delays [1]** 1345/1
**deliberate [1]** 1339/13
**deliberations [2]**
1344/25 1345/11
**demonstrate [4]**
1350/14 1353/25
1373/5 1373/8
**demonstrates [1]**
1363/22
**demonstrative [2]**
1329/23 1332/19
**denials [2]** 1369/4
1369/15
**denied [4]** 1351/18
1369/10 1369/17
1370/3
**Department [1]**
1375/7
**depo [1]** 1286/1
**deposed [1]** 1311/21
**deposition [16]**
1284/19 1286/11
1289/22 1291/25
1295/13 1295/24
1297/5 1302/3
1302/21 1312/20
1314/16 1316/2
1327/13 1374/19
1374/20 1374/21
**depositions [5]**
1282/14 1282/22
1282/25 1283/2
1294/2
**deputy [1]** 1376/19
**describe [1]** 1350/21
**design [2]** 1310/17
1314/13
**detail [1]** 1346/25

**detailed [1]** 1347/12
**details [1]** 1287/7
**detection [2]** 1313/6
1313/14
**determine [1]** 1371/10
**develop [1]** 1335/5
**developed [1]** 1313/9
**development [1]**
1310/17
**difference [1]** 1277/11
1363/18
**different [12]** 1292/5
1292/6 1292/6
1293/20 1329/21
1336/23 1336/25
1337/1 1337/2
1344/12 1344/17
1375/9
**direct [3]** 1269/10
1270/23 1341/8
**directed [1]** 1372/24
1373/23 1374/5
1376/7
**directions [1]** 1353/3
**directly [5]** 1278/25
1279/8 1279/8 1350/4
1370/15
**disagree [2]** 1274/6
1352/23
**Discipline [1]** 1298/10
**Disciplines [1]**
1298/15
**discovered [1]** 1320/2
**discovery [2]** 1374/24
1375/1 1375/12
1375/16
**discretion [1]** 1347/23
**discuss [6]** 1277/7
1279/24 1280/9
1348/10 1370/9
1372/20
**discussed [5]** 1276/4
1276/6 1292/11
1351/8 1367/24
**discusses [1]**
1347/17
**discussing [2]**
1365/22 1367/24
**discussion [3]**
1270/20 1277/21
1348/21
**discussions [1]**
1276/14
**disingenuous [1]**
1374/7
**display [2]** 1319/7
1332/18
**disprove [1]** 1355/15
**dispute [12]** 1271/14
1271/14 1271/15
1273/18 1277/4
1353/1 1359/7 1373/6
1373/17 1373/25
1374/4 1375/5
**Disputed [1]** 1364/19
**Disputed Instruction**
**Number [1]** 1364/19
**district [5]** 1267/1

**D**

**district...** [4] 1267/2
1267/3 1349/15
1359/16
**distrust** [2] 1349/19
1352/17
**DIVISION** [1] 1267/2
**docked** [1] 1283/16
**Docket** [2] 1270/24
1354/23
**Docket 1-8** [1]
1354/23
**document** [14] 1274/3
1277/14 1278/10
1278/21 1279/9
1279/20 1328/6
1329/10 1329/17
1329/19 1329/19
1330/21 1331/20
1331/21
**Document 627** [2]
1278/21 1279/9
**document's** [1]
1321/12
**documents** [4]
1273/21 1286/8
1329/5 1352/4
**dollar** [1] 1351/10
**don't -- I** [1] 1312/4
**Doss** [9] 1309/3
1350/4 1350/19
1351/4 1351/23
1360/12 1373/21
1374/18 1375/13
**double** [1] 1358/18
**down** [17] 1300/21
1301/3 1301/7
1301/10 1305/15
1305/16 1316/13
1316/20 1331/2
1333/12 1333/17
1333/18 1334/1
1338/7 1344/7
1376/25 1377/13
**downloaded** [1]
1320/16
**DPS6** [37] 1282/14
1282/18 1282/22
1283/2 1286/25
1287/1 1288/1
1288/12 1295/4
1295/8 1296/3
1296/20 1298/21
1299/5 1302/4 1303/8
1304/6 1305/10
1305/22 1306/4
1306/21 1310/9
1310/18 1310/18
1311/2 1311/7 1314/4
1324/9 1324/14
1324/21 1324/24
1325/9 1325/22
1326/1 1328/2
1333/21 1336/16
**DPS6-equipped** [10]
1288/1 1288/12
1295/8 1296/3
1305/22 1306/21

1310/18 1311/2
1311/7 1336/16
**DPS6s** [1] 1326/4
**draw** [3] 1316/9
1317/13 1348/18
**drive** [1] 1289/24
**driving** [1] 1314/10
**Dropboxes** [1] 1368/2
**droves** [1] 1335/9
**ducks** [1] 1344/21
**due** [2] 1315/21
1371/3
**duly** [2] 1282/2 1341/4
**during** [7] 1294/2
1295/13 1314/13
1329/22 1372/13
1374/24 1375/1
**DVP** [1] 1335/10

**E**

**e-mail** [1] 1311/11
**each** [3] 1271/21
1364/22 1377/6
**earlier** [6] 1294/2
1306/23 1307/2
1357/19 1361/22
1367/23
**easier** [1] 1271/4
**EAST** [1] 1268/13
**eat** [1] 1344/20
**edition** [1] 1358/25
**effect** [2] 1271/9
1359/22
**effort** [1] 1315/16
**eight** [17] 1282/19
1282/20 1282/23
1283/1 1283/2
1293/20 1307/8
1316/24 1317/2
1317/6 1361/8
1361/10 1362/2
1363/20 1363/21
1363/22 1369/21
**either** [5] 1277/19
1299/14 1311/25
1359/10 1366/10
**electrical** [1] 1343/25
**element** [2] 1355/7
1355/13
**elements** [4] 1350/5
1350/8 1350/12
1357/7
**eliciting** [1] 1374/3
**embrace** [1] 1302/16
**emissions** [1] 1307/7
**employee** [2] 1283/13
1283/15
**employer** [1] 1282/13
**endorsed** [2] 1348/25
1349/9
**ends** [1] 1340/4
**engine** [5] 1314/18
1314/23 1315/20
1316/14 1316/16
**engineering** [1]
1298/11
**engineers** [2] 1301/16
1351/25

**enough** [1] 1363/14
**ensure** [1] 1298/16
**entered** [2] 1270/25
1272/2
**entire** [1] 1341/11
1352/4 1353/14
1353/22 1369/7
**entitled** [1] 1379/6
**equally** [1] 1369/24
**equation** [1] 1300/23
**equipped** [11] 1288/1
1288/12 1295/8
1296/3 1305/22
1306/21 1310/18
1311/2 1311/7 1325/9
1336/16
**error** [1] 1358/13
**essentially** [1] 1376/2
**est** [1] 1288/22
**establish** [2] 1356/14
1358/18
**established** [1]
1352/24
**estimate** [2] 1288/2
1288/23
**evaluating** [1]
1347/14
**evaluation** [1]
1347/17
**even** [14] 1290/9
1318/14 1318/15
1318/15 1324/10
1324/15 1324/16
1357/21 1360/5
1363/9 1371/8 1373/7
1373/11 1376/22
**everything's** [1]
1299/16
**evidence** [42] 1272/13
1274/19 1291/18
1295/2 1296/22
1307/19 1338/15
1348/15 1348/17
1348/18 1348/19
1349/18 1349/19
1349/19 1351/2
1351/4 1351/11
1352/5 1352/13
1352/14 1352/16
1352/16 1352/19
1352/21 1352/24
1353/23 1362/18
1363/13 1365/10
1365/13 1366/7
1369/7 1370/20
1370/24 1371/16
1372/5 1373/10
1373/17 1374/3
1374/6 1375/2
1375/10
**Evidence Code
Section 412** [1]
1352/13
**exact** [1] 1359/14
**exactly** [3] 1271/25
1312/11 1350/21
**exactly -- I** [1]
1312/11

**examination** [16]
1269/5 1269/6 1269/6
1269/10 1269/10
1269/11 1281/23
1282/4 1327/23
1334/10 1335/18
1340/5 1341/8
1342/15 1342/17
1343/22
**examined** [1] 1330/25
**example** [8] 1275/22
1308/15 1313/5
1347/12 1349/22
1350/19 1360/10
1375/7
**except** [1] 1279/10
**exception** [2] 1338/15
1297/3
**excluded** [2] 1296/16
1297/3
**excuse** [1] 1339/9
**excused** [2] 1338/4
1338/8
**Exhibit 17** [1] 1318/24
**Exhibit 190** [1]
1291/12
**Exhibit 193** [1]
1294/24
**Exhibit 316** [1] 1325/3
**Exhibit 339** [1]
1310/25
**Exhibit 841** [1] 1328/9
**Exhibit 863** [1] 1332/3
**Exhibit 99** [2] 1323/11
1323/12
**exhibits** [4] 1269/13
1269/14 1297/13
1339/8
**exist** [1] 1272/19
**existed** [1] 1376/2
**existence** [1] 1374/4
**expect** [3] 1274/17
1350/23 1372/6
**expenses** [1] 1307/11
**experience** [1]
1333/25
**expert** [2] 1346/18
1346/23
**expert's** [1] 1347/15
**experts** [2] 1284/5
1284/8
**expiration** [1] 1365/12
**expire** [1] 1367/13
**expired** [4] 1338/24
1365/16 1365/20
1366/10
**explain** [2] 1300/18
1332/25
**explicitly** [1] 1370/3
**express** [1] 1369/10
**expressed** [1] 1364/9
**expressly** [1] 1357/3
**extend** [2] 1306/23
1308/14
**extended** [8] 1306/20
1307/2 1307/3 1307/5
1307/25 1308/17
1309/14 1310/3
**extent** [2] 1372/8

1375/13
**extra** [1] 1377/7
**extremely** [1] 1374/23
**eye** [1] 1344/21

**F**

**F-150s** [1] 1301/6
**F.2d** [1] 1349/15
**fact** [20] 1271/14
1272/15 1272/24
1274/7 1277/9 1290/9
1296/6 1299/4
1343/24 1346/7
1346/17 1352/20
1355/24 1359/18
1362/8 1369/9 1371/5
1373/19 1373/24
1374/2
**factors** [1] 1364/2
**facts** [41] 1270/20
1271/8 1271/9
1271/10 1271/17
1271/21 1272/1
1272/5 1272/6 1272/8
1273/14 1273/16
1274/4 1274/5
1274/11 1274/11
1274/13 1274/22
1274/22 1275/10
1275/12 1275/14
1275/24 1276/12
1276/15 1276/16
1276/18 1276/19
1277/19 1277/19
1277/23 1277/24
1278/3 1278/8 1279/4
1279/5 1279/11
1307/19 1354/1
1354/17 1357/21
**fail** [5] 1313/20
1313/24 1316/10
1317/24 1353/10
**fail-safe** [3] 1313/20
1313/24 1316/10
**failed** [6] 1311/3
1311/9 1313/18
1317/23 1353/15
1373/4
**failing** [2] 1315/21
1316/18
**fails** [1] 1285/19
**failure** [9] 1283/24
1287/5 1289/2 1289/3
1296/23 1313/8
1356/20 1358/15
1376/1
**fairly** [1] 1304/10
**faith** [25] 1350/3
1350/6 1350/11
1350/13 1354/1
1354/17 1355/11
1355/13 1355/15
1355/17 1356/6
1356/9 1356/13
1356/14 1356/20
1357/1 1357/9
1370/17 1370/20
1370/21 1370/24

**F**

**faith... [4]** 1371/1 1371/13 1371/18 1372/9
**fall [2]** 1301/22 1302/12
**familiar [2]** 1290/23 1299/13
**family [1]** 1283/20
**far [6]** 1272/23 1273/12 1331/1 1349/1 1351/16 1353/14
**fault [2]** 1328/16 1366/16
**FCRR [1]** 1267/23
**federal [5]** 1267/23 1348/22 1349/9 1352/18 1352/21
**feedback [2]** 1299/11 1299/17
**feet [5]** 1290/12 1291/3 1291/4 1291/6 1291/8
**few [1]** 1356/25
**field [2]** 1313/12 1315/13
**Fiesta [6]** 1291/24 1292/1 1292/8 1292/10 1292/16 1295/7
**Fiestas [1]** 1288/12
**figure [2]** 1298/25 1366/16
**filed [6]** 1338/24 1365/1 1365/25 1368/17 1369/12 1375/23
**files [1]** 1365/9
**filing [3]** 1367/5 1369/1 1369/16
**final [11]** 1270/24 1273/17 1273/25 1274/3 1274/13 1274/18 1275/9 1280/18 1357/22 1376/15 1376/16
**Finally [2]** 1327/6 1368/24
**find [3]** 1354/16 1367/18 1371/12
**finding [4]** 1310/21 1370/21 1370/24 1373/11
**fine [13]** 1275/19 1277/22 1279/13 1303/21 1306/18 1319/5 1319/10 1325/2 1327/19 1331/23 1342/14 1344/15 1348/4
**finish [1]** 1280/13
**firm [1]** 1297/8
**first [18]** 1267/24 1275/7 1282/9 1307/14 1332/25 1337/15 1346/8 1346/17 1348/24

1353/9 1355/11 1357/1 1358/12 1365/11 1366/6 1369/12 1374/11 1375/20
**fit [2]** 1331/12 1353/12
**five [5]** 1307/5 1308/10 1309/9 1340/1 1340/3
**five-year [1]** 1308/10
**five-year/60,000 [1]** 1309/9
**five-year/60,000 miles [1]** 1307/5
**fix [3]** 1298/14 1312/9 1363/15
**fixed [2]** 1311/17 1351/21
**fixing [1]** 1310/21
**flag [1]** 1314/6
**floating [1]** 1305/12
**flowing [1]** 1372/17
**fluid [1]** 1295/5
**flying [1]** 1282/21
**FNA [2]** 1324/11 1324/12
**focus [21]** 1284/1 1284/16 1284/18 1285/2 1285/2 1285/8 1287/2 1292/1 1292/8 1292/10 1292/16 1305/10 1306/4 1307/22 1307/24 1325/22 1353/11 1361/4 1363/10 1364/23 1376/2
**Focuses [9]** 1288/12 1293/15 1294/3 1295/14 1304/22 1305/22 1307/17 1308/6 1325/13
**focusing [1]** 1355/2 1362/1
**folks [1]** 1342/23
**follow [4]** 1312/20 1312/21 1321/22 1346/19
**following [16]** 1270/4 1277/23 1277/24 1281/20 1286/19 1287/22 1293/23 1296/11 1297/21 1298/2 1328/22 1331/24 1338/12 1340/13 1345/15 1365/25
**follows [4]** 1270/19 1277/22 1282/3 1341/5
**for 2013 [1]** 1307/16
**for no [1]** 1318/2
**FORD [104]** 1267/8 1270/7 1270/13 1271/18 1271/23 1272/15 1272/16 1273/1 1273/10 1274/1 1274/5

1278/11 1282/9 1282/10 1283/4 1284/1 1284/16 1287/2 1288/1 1288/13 1292/19 1293/14 1294/14 1296/6 1296/16 1297/18 1297/24 1298/21 1298/21 1299/4 1299/23 1300/20 1301/5 1301/5 1301/12 1301/19 1302/17 1303/9 1304/13 1304/13 1306/20 1309/16 1311/2 1311/7 1320/13 1320/14 1320/23 1324/12 1324/18 1324/22 1325/14 1326/2 1331/19 1336/22 1336/23 1337/18 1348/4 1349/21 1349/23 1350/23 1351/6 1351/12 1351/16 1352/2 1352/10 1353/10 1353/11 1353/15 1353/25 1354/16 1355/4 1355/5 1355/5 1356/10 1359/1 1360/4 1360/15 1361/11 1361/16 1361/17 1361/17 1362/9 1363/15 1363/25 1364/7 1365/1 1365/9 1365/21 1366/2 1369/10 1370/3 1370/16 1371/5 1371/12 1371/15 1371/19 1372/9 1373/4 1373/8 1373/17 1374/14 1375/1 1376/10
**Ford Focus [1]** 1284/1
**Ford Motor Company [4]** 1349/21 1353/10 1373/8 1373/17
**Ford's [14]** 1272/23 1294/5 1294/14 1301/22 1324/25 1348/2 1362/6 1367/23 1369/15 1369/17 1371/16 1372/24 1374/22 1376/1
**foregoing [1]** 1379/4
**forever [1]** 1371/24
**forgets [1]** 1372/17
**form [5]** 1271/16 1272/1 1296/19 1307/19 1345/20
**format [2]** 1276/12 1379/7
**forth [11]** 1272/21

1273/21 1347/1 1347/13 1349/3 1351/20 1354/11 1355/21 1360/11 1362/5 1369/5
**forward [2]** 1280/25 1340/25
**foul [1]** 1362/16
**found [4]** 1292/13 1292/14 1320/7 1368/10
**foundation [4]** 1296/15 1341/15 1342/4 1342/12
**foundational [1]** 1353/2
**four [3]** 1301/21 1302/11 1361/10
**framing [1]** 1296/18
**FRANCISCO [2]** 1268/18 1268/22
**FRANK [4]** 1268/16 1321/1 1321/1 1322/4
**frankly [1]** 1374/25
**free [1]** 1315/3
**freeway [1]** 1316/3
**Friday [1]** 1366/12
**Friday-Monday [1]** 1366/12
**from 1999 [1]** 1349/6
**front [11]** 1272/8 1282/11 1296/22 1304/9 1306/8 1312/11 1314/12 1319/13 1325/24 1332/3 1361/20
**FSA14M01 [1]** 1307/3
**further [21]** 1272/3 1281/15 1301/10 1327/20 1337/21 1337/23 1344/8 1347/17 1351/2 1352/9 1356/5 1358/3 1358/8 1364/4 1366/25 1368/13 1368/25 1370/6 1372/19 1375/12 1377/19
**future [1]** 1298/17

**G**

**games [1]** 1274/7
**gave [3]** 1288/1 1339/4 1359/21
**gear [3]** 1292/5 1316/11 1316/13
**generally [2]** 1295/16 1341/22
**gentlemen [2]** 1281/23 1344/16
**genuine [1]** 1357/21
**germane [1]** 1350/15
**gets [1]** 1371/2
**getting [9]** 1272/7 1280/4 1283/10 1283/16 1310/22 1337/6 1343/24 1344/21 1377/13

**giggled [1]** 1367/12
**give [20]** 1278/4 1281/3 1288/11 1288/21 1288/22 1293/18 1294/7 1294/7 1344/23 1345/10 1346/6 1360/10 1363/18 1364/13 1366/15 1376/15 1376/17 1376/23 1377/6 1377/6
**given [15]** 1346/4 1348/22 1349/7 1353/8 1357/21 1357/25 1360/2 1363/13 1365/10 1366/15 1371/5 1372/7 1376/4 1377/1 1377/2
**gives [1]** 1371/9
**giving [2]** 1273/5 1280/25
**glasses [2]** 1349/3 1349/3
**gmail.com [1]** 1267/25
**goal [1]** 1333/11
**goes [10]** 1273/8 1283/24 1287/17 1313/24 1314/7 1316/10 1320/14 1350/13 1353/22 1353/24
**gone [14]** 1299/2 1299/3 1299/18 1299/18 1299/19 1323/13 1323/17 1324/10 1324/16 1329/16 1329/18 1329/22 1335/12 1366/18
**good [36]** 1270/10 1270/12 1270/15 1270/16 1281/22 1282/6 1282/7 1305/19 1317/13 1342/19 1342/20 1350/3 1350/5 1350/10 1350/13 1354/1 1354/17 1355/11 1355/13 1355/15 1355/17 1356/6 1356/9 1356/13 1356/14 1356/20 1357/1 1357/9 1370/17 1370/20 1370/24 1371/1 1371/13 1371/18 1371/9
**GORDON [1]** 1268/21
**gotten [1]** 1368/2
**government [2]** 1296/16 1296/21
**grab [1]** 1285/2
**grade [3]** 1290/11 1291/5 1291/6

**G**

**grades [3]** 1290/5
1290/8 1291/1
**Grapevine [1]**
1290/10
**graph [1]** 1330/5
**great [6]** 1271/5
1277/15 1288/15
1288/15 1325/15
1371/4
**ground [5]** 1315/24
1316/8 1316/10
1317/3 1323/7
**grounding [4]**
1317/12 1323/1
1323/1 1323/4
**grounds [4]** 1306/15
1306/15 1373/3
1376/6
**GROUP [2]** 1268/3
1268/11
**guess [12]** 1274/21
1275/7 1277/3
1312/19 1313/18
1331/23 1346/9
1363/6 1363/12
1367/13 1370/8
1372/20
**guidance [3]** 1347/1
1347/25 1371/10
**guy's [2]** 1362/2
1363/19
**guys [3]** 1273/21
1281/11 1345/18

**H**

**H-a-n-n [1]** 1349/14
**had a [1]** 1275/25
**half [5]** 1324/9
1324/14 1324/16
1324/24 1345/3
**handed [1]** 1278/11
**Hann [1]** 1349/14
**happened [2]** 1277/3
1326/15
**happening [1]**
1298/17
**HARDY [1]** 1268/16
**have a [1]** 1299/8
**having [9]** 1271/6
1271/15 1282/2
1293/9 1341/4
1347/19 1348/16
1352/3 1375/17
**hazard [3]** 1326/11
1326/14 1326/16
**he's [12]** 1277/2
1277/3 1317/22
1329/3 1329/8
1329/10 1329/19
1330/10 1330/25
1332/11 1332/11
1371/4
**hear [2]** 1344/23
1352/10
**heard [11]** 1270/4
1280/14 1281/4
1281/20 1287/22

1297/21 1331/24
1340/13 1345/15
1346/8 1351/16
**hearsay [4]** 1311/13
1330/7 1330/18
1330/18
**Hearsay's [1]** 1330/25
**heart [1]** 1273/8
**heartburn [2]** 1347/8
1347/10
**heater [1]** 1360/21
**heavier [1]** 1292/8
**held [5]** 1286/19
1296/11 1328/22
1338/12 1379/6
**hell [1]** 1318/3
**helpful [1]** 1340/9
**here's [4]** 1331/4
1335/7 1335/7
1367/17
**hereby [1]** 1379/3
**hesitation [1]** 1296/2
**Hey [1]** 1322/4
**HIGGINS [12]** 1268/11
1272/11 1346/13
1353/7 1356/4
1357/12 1358/3
1366/5 1368/12
1371/4 1372/22
1374/9
**Higgins's [1]** 1355/16
**high [8]** 1303/11
1303/19 1304/10
1304/14 1316/9
1317/13 1326/18
1351/15
**highest [3]** 1303/9
1305/23 1337/15
**highly [1]** 1273/13
**Hightower [1]** 1286/5
**HILLS [1]** 1268/8
**him is [1]** 1286/23
**histogram [2]**
1305/13 1305/13
**history [2]** 1285/8
1293/11
**hit [1]** 1333/13
**hold [9]** 1271/1
1288/6 1319/4
1319/12 1328/19
1330/12 1340/16
1340/16 1371/24
**HONORABLE [1]**
1267/3
**hope [1]** 1344/25
**hopefully [2]** 1345/22
1345/23
**hoping [1]** 1377/8
**host [1]** 1344/20
**hotel [1]** 1343/15
**hour [4]** 1280/3
1343/10 1345/3
1350/23
**hourly [3]** 1343/9
1343/10 1343/11
**hours [1]** 1343/6
**housed [1]** 1373/25
**housing [1]** 1295/5

**however [4]** 1282/12
1343/15 1351/23
1354/15
**HUGRET [3]** 1268/21
1373/13 1375/18
**huh [2]** 1293/12
1294/15
**hundred [3]** 1307/6
1311/3 1311/8
**hundreds [2]** 1299/4
1299/7
**hydraulic [2]** 1305/18
1334/5
**hydraulic-based [2]**
1305/18 1334/5
**hypothetical [1]**
1347/18

**I**

**I'd [7]** 1293/3 1303/10
1303/12 1305/24
1323/24 1325/11
1376/14
**I'm not [1]** 1297/10
**idea [2]** 1282/15
1341/13
**identical [1]** 1292/2
1292/2
**identified [1]** 1353/3
**identify [1]** 1357/9
**IDP [1]** 1374/25
**IDS [1]** 1320/15
**ignore [1]** 1353/21
**ignored [2]** 1362/19
1362/20
**III [1]** 1268/16
**illustrating [1]**
1356/12
**imagine [1]** 1340/7
**immediately [1]**
1359/9
**impeachment [1]**
1297/9
**implied [1]** 1307/15
**important [2]** 1317/12
1374/24
**impose [1]** 1355/23
**imposed [1]** 1373/11
**imposing [1]** 1354/1
**imposition [1]**
1372/25
**impression [2]**
1365/24 1366/15
**improper [1]** 1361/22
**improved [1]** 1311/18
1312/14
**improvements [2]**
1337/2 1351/20
**improving [1]** 1328/6
1329/2 1329/3
**in 2013 [2]** 1326/2
1326/10
**in 2014, 2015 [1]**
1334/18
**in 2017 [2]** 1351/7
1370/1
**in 2019 [1]** 1335/3
1370/2

**in March [1]** 1289/17
**in the [1]** 1285/3
**inappropriate [2]**
1272/4 1352/12
**inclined [4]** 1276/25
1277/5 1364/10
1368/15
**include [2]** 1272/6
1364/24
**included [4]** 1276/17
1276/23 1277/18
1352/21
**includes [2]** 1321/20
1339/5
**including [1]** 1356/11
**inclusive [2]** 1267/9
1267/18
**incorrect [3]** 1301/24
1306/25 1345/21
**incorrectly [1]** 1359/8
**Indeed [1]** 1366/19
**indicate [2]** 1292/21
1322/23
**indicated [15]**
1284/20 1289/23
1304/25 1313/17
1316/6 1316/8
1316/17 1317/7
1322/17 1323/2
1323/21 1333/25
1348/21 1357/23
1372/15
**indication [3]** 1294/8
1314/15 1314/22
**inferences [1]**
1348/17
**information [19]**
1294/5 1294/16
1295/18 1295/20
1311/25 1312/8
1312/25 1314/11
1320/14 1328/25
1331/20 1331/22
1337/18 1350/15
1350/22 1351/13
1353/16 1353/16
1353/19
**initially [2]** 1289/8
1314/6
**injected [1]** 1335/4
**injuries [3]** 1296/7
1297/6 1297/17
**input [7]** 1292/9
1292/25 1293/15
1294/23 1295/15
1336/24 1337/2
**inside [1]** 1292/6
**inspection [4]**
1289/15 1289/16
1289/17 1290/14
**instead [1]** 1349/18
**instruct [6]** 1281/6
1338/18 1339/12
1369/25 1372/5
1376/21
**instructed [1]** 1372/4
**instruction [38]**
1276/16 1277/18

1278/4 1278/6 1278/8
1338/17 1346/6
1346/21 1346/22
1347/4 1347/8 1347/9
1347/11 1348/5
1348/22 1352/19
1353/4 1353/12
1354/5 1354/11
1355/5 1355/5
1356/10 1357/20
1358/1 1358/2 1358/4
1358/13 1359/15
1362/7 1363/18
1364/19 1368/4
1370/9 1371/8
1371/11 1371/16
1377/24
**Instruction Number
16 [1]** 1358/13
**Instruction Number
20 [1]** 1354/11
**Instruction Number 8
[1]** 1355/5
**instructions [31]**
1278/14 1280/5
1280/7 1280/14
1281/1 1281/3 1281/4
1281/5 1331/16
1339/5 1339/11
1344/23 1345/10
1345/19 1345/19
1345/22 1346/5
1346/9 1346/15
1346/17 1346/25
1347/13 1348/1
1352/20 1354/10
1357/13 1357/14
1358/5 1358/9 1370/7
1377/18
**intake [2]** 1298/21
1298/23
**intends [1]** 1372/15
**intentions [1]** 1317/19
**interest [2]** 1287/19
1339/1
**interesting [3]**
1370/22 1373/15
1375/20
**internal [1]** 1313/8
**interplay [1]** 1361/7
**interrupt [2]** 1338/25
1351/6
**intimate [1]** 1314/13
**introduction [1]**
1321/11 1339/8
**investigating [2]**
1299/25 1300/10
**investigator [1]**
1300/5
**invited [2]** 1284/5
1284/11
**invites [1]** 1367/16
**inviting [1]** 1367/5
**involving [1]** 1306/3
**Irrelevance [1]**
1309/22
**issuance [1]** 1347/3
**issue [42]** 1285/20

**I**

issue... **[41]** 1286/21
1292/9 1293/15
1293/17 1293/25
1295/15 1296/2
1296/5 1296/6 1316/8
1317/7 1317/8
1319/21 1319/25
1322/14 1322/23
1323/1 1325/25
1328/23 1333/21
1333/22 1342/2
1342/8 1348/9 1353/1
1355/3 1355/6 1355/7
1357/1 1358/12
1360/24 1363/5
1368/14 1369/22
1370/10 1373/13
1375/14 1375/23
1375/24 1376/5
1376/9
issued **[2]** 1291/21
1346/23
issues **[27]** 1270/17
1271/14 1271/14
1272/14 1274/15
1274/17 1283/24
1284/16 1285/13
1292/1 1293/22
1293/24 1297/5
1297/8 1298/20
1299/24 1300/9
1305/10 1310/10
1310/21 1324/4
1330/7 1330/8
1344/20 1354/11
1362/17 1367/4
items **[2]** 1271/13
1277/18
Items 7 **[1]** 1271/13
itself **[4]** 1296/5
1360/3 1367/6
1367/22

**J**

job **[2]** 1334/1 1371/4
joint **[2]** 1270/24
1274/3
jointly **[1]** 1271/11
JR **[1]** 1267/3
judge **[5]** 1267/3
1330/15 1359/15
1359/21 1363/4
Judge Kronstadt **[3]**
1359/15 1359/21
1363/4
judgment **[1]** 1370/15
judicial **[12]** 1338/16
1338/19 1338/20
1364/15 1364/19
1364/24 1365/16
1369/1 1369/9
1369/16 1377/24
1379/8
JUI **[3]** 1267/23
1379/14 1379/15
juices **[1]** 1372/17
July **[2]** 1284/1

1334/12
jumps **[1]** 1353/8
June **[1]** 1302/4
jurors **[9]** 1281/13
1281/16 1339/10
1345/23 1353/8
1353/9 1367/1
1368/16 1376/20

**K**

keep **[2]** 1363/21
1369/21
KELLY **[10]** 1268/16
1269/6 1269/10
1296/12 1327/21
1330/19 1332/1
1338/1 1338/13
1344/4
keyword **[1]** 1294/4
KIESEL **[1]** 1268/7
kind **[11]** 1284/21
1294/10 1294/10
1298/15 1299/18
1300/21 1300/23
1315/14 1315/23
1319/21 1345/6
kinds **[1]** 1375/9
KIRNOS **[1]** 1268/12
KNIGHT **[1]** 1285/11
known **[1]** 1337/18
Kronstadt **[3]** 1359/15
1359/21 1363/4
Kwan **[1]** 1356/16
Kwasniewicz **[14]**
1280/13 1282/1
1282/6 1282/8
1287/25 1301/11
1311/1 1327/25
1332/3 1332/23
1334/10 1335/20
1341/11 1341/20
Kwasniewicz's **[1]**
1330/4

**L**

L.L.P **[1]** 1268/16
ladies **[2]** 1281/22
1344/16
language **[6]** 1276/22
1277/24 1278/18
1278/22 1278/25
1362/12
last **[10]** 1271/17
1276/23 1279/14
1280/5 1284/20
1290/18 1302/4
1338/14 1347/25
1377/18
lasted **[1]** 1316/24
later **[5]** 1290/15
1302/12 1315/18
1317/2 1331/15
latest **[1]** 1315/3
law **[24]** 1268/3
1268/3 1268/7 1268/7
1268/11 1268/11
1268/12 1268/12
1268/16 1268/17

1268/17 1268/21
1347/2 1351/24
1355/11 1355/20
1355/21 1359/12
1359/19 1359/20
1362/22 1363/8
1372/6 1376/3
lawyers **[1]** 1344/24
lead **[4]** 1292/14
1292/15 1292/16
1293/22
leak **[3]** 1295/5
1327/10 1327/14
leaking **[2]** 1294/23
1295/15
leaks **[1]** 1327/18
least **[6]** 1282/17
1309/3 1336/17
1337/10 1337/11
1349/1
leave **[1]** 1331/18
led **[1]** 1327/7
left **[6]** 1280/3 1306/2
1328/13 1334/3
1342/21 1365/24
lemon **[6]** 1351/24
1359/10 1360/4
1360/14 1361/2
1376/3
length **[4]** 1290/10
1291/6 1297/7
1356/12
lengthy **[1]** 1300/23
less **[4]** 1324/11
1352/14 1366/10
1371/22
let **[28]** 1283/23
1288/6 1288/20
1294/22 1298/18
1300/14 1306/19
1307/16 1308/3
1309/2 1310/1
1310/23 1310/25
1311/1 1315/25
1316/15 1316/17
1324/3 1325/13
1326/7 1329/14
1330/21 1344/20
1345/21 1354/9
1365/18 1375/3
1376/19
letter **[6]** 1315/2
1351/8 1366/3
1367/12 1368/1
1368/25
level **[5]** 1305/16
1313/9 1346/25
1351/25 1364/9
liability **[6]** 1359/9
1369/4 1369/10
1370/3 1372/24
1372/25
light **[5]** 1313/23
1314/18 1314/23
1315/19 1315/20
like **[22]** 1277/13
1280/14 1290/9
1291/24 1292/8

1293/19 1299/1
1306/9 1312/10
1321/4 1322/5
1323/24 1327/2
1334/2 1337/14
1348/10 1354/6
1359/6 1361/9 1366/9
1368/3 1377/2
likelihood **[1]** 1351/15
likely **[1]** 1350/23
limine **[1]** 1296/14
limit **[1]** 1372/8
limited **[1]** 1319/8
1326/12
line **[16]** 1285/25
1286/14 1286/16
1286/16 1287/8
1287/18 1288/9
1288/10 1302/22
1304/1 1304/1
1358/17 1358/19
1358/20 1371/3
1372/16
line 19 **[1]** 1287/8
line 21 **[1]** 1304/1
line 3 **[4]** 1285/25
1286/16 1287/18
1288/10
line 6 **[2]** 1286/16
1288/9
line 7 **[1]** 1304/1
Line 8 **[1]** 1358/19
lines **[3]** 1285/25
1302/5 1302/22
lines 5 **[1]** 1302/22
lines 6 **[1]** 1285/25
list **[2]** 1271/10
1271/14
listed **[1]** 1297/13
1319/2 1368/3
litany **[1]** 1329/2
literally **[3]** 1339/18
1366/15 1366/17
litigation **[1]** 1360/24
little **[6]** 1285/17
1301/10 1327/4
1334/9 1336/20
1344/17
LLP **[3]** 1268/7
1268/11 1268/21
logging **[1]** 1271/6
logistics **[1]** 1280/13
long **[3]** 1322/18
1323/6 1328/4
longer **[1]** 1316/25
look **[21]** 1275/6
1277/15 1280/6
1293/3 1301/4 1301/9
1301/9 1305/24
1306/9 1310/12
1312/12 1319/10
1325/11 1328/9
1337/15 1347/5
1354/9 1363/4 1371/8
1376/16 1377/18
looked **[3]** 1320/22
1341/19 1341/20
looking **[10]** 1300/24

1301/4 1301/16
1303/14 1320/22
1327/2 1327/16
1333/7 1354/14
1368/10
looks **[3]** 1291/24
1337/14 1368/3
LOS **[5]** 1267/17
1267/24 1268/4
1268/13 1270/1
lose **[1]** 1313/25
losing **[1]** 1281/13
loss **[8]** 1295/25
1296/20 1313/5
1313/19 1314/7
1318/22 1319/18
1319/23
lost **[3]** 1315/18
1316/2 1316/10
lot **[21]** 1276/5 1276/8
1280/6 1280/11
1300/20 1301/5
1305/11 1305/12
1312/12 1312/12
1314/4 1334/23
1334/23 1334/24
1334/24 1334/24
1335/2 1335/14
1335/14 1362/16
1369/14
lunch **[2]** 1344/21
1344/22

**M**

machine **[2]** 1292/15
1293/19
machines **[1]** 1293/20
machining **[2]**
1292/13 1292/15
made **[20]** 1275/3
1295/25 1297/4
1297/7 1300/15
1311/16 1311/16
1313/7 1335/12
1351/1 1351/7
1359/15 1360/3
1361/20 1364/16
1365/15 1365/20
1366/1 1372/1
1372/12
mail **[3]** 1299/15
1311/11 1315/2
mail-in **[1]** 1299/15
maintains **[1]** 1373/5
1373/9 1375/2
major **[2]** 1364/2
1367/3
make **[30]** 1271/3
1274/20 1275/17
1281/5 1281/9 1293/8
1299/11 1299/20
1323/4 1327/3
1329/15 1329/20
1335/11 1345/9
1347/25 1348/13
1350/10 1350/24
1351/16 1355/9
1363/18 1364/10

**M**

**make... [8]** 1368/4
1369/6 1372/12
1376/13 1376/14
1376/16 1376/16
1376/20
**makes [2]** 1293/19
1296/16
**making [1]** 1351/12
**MAM [19]** 1283/24
1284/16 1285/9
1285/14 1285/19
1286/22 1287/4
1289/3 1307/6 1313/6
1313/9 1315/21
1317/16 1318/1
1318/2 1334/11
1334/16 1342/3
1342/8
**Mammoth [3]** 1349/11
1349/14 1349/16
**man [1]** 1297/3
**manageable [2]**
1300/22 1301/3
**manufacture [2]**
1355/22 1355/22
**manufactured [3]**
1287/2 1288/1
1288/13
**manufacturer [2]**
1350/14 1356/18
**many [19]** 1282/12
1286/25 1287/1
1287/25 1288/12
1293/14 1293/15
1294/3 1294/3 1294/8
1294/9 1294/13
1295/14 1300/25
1325/5 1325/13
1325/18 1356/17
1359/8
**March [10]** 1289/17
1289/18 1291/21
1291/21 1314/24
1315/9 1315/10
1315/10 1317/19
1317/21
**March 13th [1]** 1315/9
**March 1st [2]** 1314/24
1315/10
**March 24th of [1]**
1291/21
**mark [5]** 1267/5
1270/6 1311/2 1311/8
1377/14
**MARKED [1]** 1269/14
**mass [1]** 1286/7
**material [5]** 1292/7
1292/7 1292/7 1305/1
1312/9
**materials [2]** 1305/1
1311/17
**math [1]** 1360/15
**matter [5]** 1282/18
1345/7 1366/3
1369/24 1379/6
**matters [3]** 1282/22
1356/21 1375/15

**maybe [4]** 1274/2
1306/11 1358/11
1366/12
**Maybe I [1]** 1274/2
**McClain [4]** 1326/21
1326/22 1326/24
1336/2
**me ask [2]** 1310/23
1329/14
**mean [47]** 1273/21
1274/6 1275/6
1275/12 1275/13
1276/24 1277/3
1277/14 1278/19
1278/20 1282/15
1283/13 1295/5
1303/20 1305/21
1307/13 1310/12
1312/5 1312/12
1323/5 1325/16
1325/19 1337/3
1337/6 1337/20
1341/23 1349/5
1360/9 1361/8 1361/9
1362/1 1362/2
1362/13 1363/13
1363/18 1363/19
1363/20 1363/20
1364/6 1367/12
1369/13 1369/17
1369/20 1369/21
1371/3 1371/8
1371/23
**Meaning [1]** 1354/13
**means [2]** 1300/19
1361/2
**meant [1]** 1303/17
**measure [4]** 1303/13
1315/14 1315/15
1331/6
**meet [4]** 1273/23
1363/10 1375/6
1375/10
**meeting [2]** 1276/10
1283/3
**MEI [3]** 1267/23
1379/14 1379/15
**memory [1]** 1286/20
**mentioned [2]** 1283/4
1301/15
**Mercedes [1]** 1356/16
**merits [1]** 1369/16
**messages [1]**
1337/12
**met [1]** 1274/9
**methodic [2]** 1298/16
1298/16
**methodology [1]**
1340/9
**metric [1]** 1303/16
**Micale [9]** 1290/22
1339/15 1339/24
1340/22 1340/25
1341/3 1341/10
1342/19 1343/24
**Micale's [2]** 1327/11
1327/11
**Michigan [1]** 1311/21

**might [2]** 1356/1
1363/4
**mile [4]** 1290/2
1308/11 1311/2
1311/8
**mileage [4]** 1284/24
1285/1 1285/5
1334/23
**miles [9]** 1289/24
1290/21 1290/23
1290/24 1307/5
1307/6 1307/8 1307/8
1314/5
**million [5]** 1287/3
1288/2 1288/23
1301/4 1301/6
**mind [4]** 1353/8
1355/8 1355/13
1357/8
**mine [1]** 1322/4
**minimize [1]** 1345/1
**minor [4]** 1358/11
1358/12 1358/14
1373/15
**minute [5]** 1297/11
1329/1 1329/12
1377/14 1377/19
**minutes [15]** 1339/15
1339/17 1339/18
1340/1 1340/3
1345/17 1345/25
1376/15 1377/1
1377/2 1377/7
1377/11 1377/12
1377/15 1377/18
**mischaracterizes [1]**
1374/11
**misleading [1]**
1359/20
**missed [1]** 1354/7
**mistaken [1]** 1314/18
**misunderstanding [1]**
1281/10
**mode [4]** 1289/3
1313/20 1313/24
1316/11
**model [21]** 1301/7
1304/24 1306/23
1307/2 1308/7 1324/5
1325/8 1325/14
1326/3 1326/3
1326/10 1328/2
1328/2 1332/9
1332/15 1333/13
1333/17 1333/18
1333/18 1333/19
1336/23
**modes [1]** 1283/25
**modest [2]** 1359/22
1359/24
**modification [2]**
1359/14 1359/21
**Modifications [1]**
1272/4
**modified [1]** 1271/18
**mold [1]** 1293/23
**Molly [1]** 1351/9
**moment [6]** 1302/19

**1310/25 1318/24**
1343/19 1346/16
1363/13
**Monday [2]** 1365/15
1366/12
**MONTGOMERY [1]**
1268/18
**month [2]** 1284/20
1290/18
**months [10]** 1301/21
1302/11 1303/6
1303/13 1306/12
1314/9 1314/10
1316/25 1317/2
1317/6
**moot [1]** 1362/11
**more [13]** 1299/1
1317/6 1325/9 1327/4
1331/11 1339/22
1343/19 1346/24
1352/15 1363/14
1363/21 1366/10
1370/12
**morning [11]** 1270/10
1270/12 1270/15
1270/16 1270/18
1277/7 1281/22
1282/6 1282/7
1342/19 1342/20
**motion [13]** 1296/13
1338/23 1340/6
1340/19 1344/14
1364/25 1365/9
1365/21 1367/6
1367/13 1367/15
1367/17 1373/15
**motions [2]** 1344/11
1376/10
**motive [7]** 1296/1
1296/20 1313/20
1313/25 1314/7
1315/19 1316/3
**MOTOR [6]** 1267/8
1270/7 1349/21
1353/10 1373/8
1373/17
**move [3]** 1321/10
1323/9 1364/24
**moves [1]** 1372/24
**moving [2]** 1280/21
1280/25
**Mr. Altman [15]**
1276/1 1281/24
1297/1 1297/11
1329/1 1329/12
1331/10 1331/14
1335/17 1340/4
1340/21 1344/13
1369/14 1370/15
1372/14
**Mr. Altman's [2]**
1276/8 1277/2
**Mr. Chang [7]**
1276/11 1356/24
1358/8 1364/4
1364/10 1366/7
1370/6
**Mr. Chang's [1]**

**1363/3**
**Mr. Doss [7]** 1309/3
1350/19 1351/4
1351/23 1373/21
1373/18 1375/13
1374/18 1375/13
**Mr. Higgins [9]**
1353/7 1356/4
1357/12 1358/3
1366/5 1368/12
1371/4 1372/22
1374/9
**Mr. Higgins's [1]**
1355/16
**Mr. Hugret [2]**
1373/13 1375/18
**Mr. Kelly [7]** 1296/12
1327/21 1330/19
1332/1 1338/1
1338/13 1344/4
**Mr. Kwasniewicz [13]**
1280/13 1282/6
1282/8 1287/25
1301/11 1311/1
1327/25 1332/3
1332/23 1334/10
1335/20 1341/11
1341/20
**Mr. Kwasniewicz's [1]**
1330/4
**Mr. Micale [5]**
1339/15 1339/24
1340/25 1342/19
1343/24
**Mr. Pedante [22]**
1270/11 1282/24
1292/18 1304/16
1314/14 1314/24
1317/18 1322/17
1336/22 1346/13
1362/8 1363/25
1365/13 1365/25
1366/8 1366/15
1366/16 1369/20
1373/20 1374/14
1374/16 1375/23
**Mr. Pedante's [8]**
1275/25 1289/12
1293/9 1307/4
1308/15 1351/18
1353/11 1360/16
**Mr. Yang [1]** 1354/25
**Mrowka [1]** 1351/9
**Ms. Molly Mrowka [1]**
1351/9
**much [1]** 1376/23
**multiple [5]** 1292/17
1292/24 1293/22
1296/6 1356/12
**must [9]** 1328/13
1353/25 1355/14
1371/12 1371/12
1371/15 1375/16
1375/7 1375/10

**N**

**nearly [2]** 1312/7
1336/15
**necessarily [1]**

**N**

**necessarily... [1]** 1348/6
**necessary [4]** 1348/6 1352/8 1363/11 1364/8
**need [14]** 1271/10 1277/7 1279/5 1279/23 1281/11 1281/12 1285/4 1292/23 1301/17 1326/4 1345/4 1350/14 1363/21 1372/19
**needed [1]** 1292/12
**needs [1]** 1368/9
**negative [1]** 1317/3
**never [11]** 1275/8 1301/22 1302/12 1317/10 1326/15 1348/21 1350/21 1363/23 1375/21 1377/3 1377/5
**new [10]** 1275/7 1304/17 1312/20 1313/9 1315/17 1317/22 1318/14 1318/15 1334/20 1346/16
**next [6]** 1281/14 1287/18 1326/3 1333/17 1348/9 1353/11
**nice [1]** 1349/5
**night [4]** 1271/17 1276/23 1280/5 1343/14
**nine [2]** 1277/18 1375/5
**Ninth [11]** 1347/7 1347/7 1347/9 1347/11 1348/5 1349/11 1349/13 1356/7 1356/8 1357/19 1359/16
**Ninth Circuit [9]** 1347/7 1347/7 1347/9 1348/5 1349/10 1349/13 1356/7 1356/8 1357/19
**nonargumentative [1]** 1347/2
**nonconformities [1]** 1363/10
**nonconformity [2]** 1362/13 1363/1
**none [4]** 1284/11 1296/2 1371/17 1371/18
**noon [1]** 1280/4
**Nope [2]** 1300/13 1328/13
**North [2]** 1324/9 1324/12
**North America [1]** 1324/12
**North American [1]** 1324/9

**not -- I [1]** 1367/22
**notably [2]** 1356/15 1374/18
**note [2]** 1278/10 1346/21
**noted [3]** 1316/22 1332/12 1340/11
**notes [1]** 1376/22
**nothing [8]** 1281/15 1327/20 1337/21 1337/23 1342/7 1357/8 1360/18 1368/25
**notice [11]** 1338/16 1338/19 1338/20 1358/12 1364/16 1364/24 1365/17 1369/1 1369/9 1369/17 1377/24
**notice -- I [1]** 1369/17
**notwithstanding [1]** 1377/3
**NOVEMBER [15]** 1267/15 1269/2 1270/1 1270/25 1271/11 1271/18 1273/1 1273/9 1275/24 1277/3 1312/16 1321/13 1360/16 1360/18 1379/10
**November 1st [2]** 1271/18 1273/1
**November 1st, 2019 [1]** 1275/24
**November 2015 [1]** 1360/18
**November 21st [1]** 1312/16
**number [27]** 1270/24 1272/20 1278/12 1279/1 1279/1 1279/10 1279/16 1294/11 1305/20 1306/14 1328/1 1328/5 1328/7 1331/7 1333/10 1337/7 1346/22 1347/4 1347/6 1347/19 1354/11 1355/5 1358/13 1358/22 1359/5 1364/19 1370/9
**Number 15 [2]** 1346/22 1347/19
**Number 17 [1]** 1358/22
**Number 7 [2]** 1278/12 1279/1
**Number 9 [2]** 1279/10 1279/16
**number one [2]** 1337/7 1347/6
**numbered [1]** 1322/4
**numbers [5]** 1306/9 1306/9 1312/12 1312/13 1328/8

**O** **#:1778**

**oath [2]** 1282/16 1341/1
**object [4]** 1273/22 1306/13 1332/10 1348/7
**objected [5]** 1273/23 1276/16 1364/22 1373/16 1374/13
**objection [25]** 1275/17 1275/21 1283/6 1291/14 1294/25 1296/8 1300/1 1307/18 1308/22 1309/18 1309/22 1311/4 1311/13 1313/1 1323/24 1324/1 1329/15 1332/12 1332/20 1341/15 1342/4 1342/11 1348/9 1372/12 1376/18
**objection's [2]** 1297/19 1340/11
**objectionable [2]** 1370/25 1371/22
**objective [2]** 1303/13 1333/12
**obligation [3]** 1354/2 1374/15 1376/2
**observation [2]** 1327/8 1327/14
**obvious [1]** 1296/23
**obviously [5]** 1298/11 1333/11 1333/18 1337/6 1372/7
**occasions [1]** 1364/1
**occurred [1]** 1315/20
**October [20]** 1272/19 1273/2 1273/10 1273/12 1275/25 1284/20 1285/25 1286/3 1286/6 1290/15 1311/24 1312/18 1350/25 1351/18 1365/4 1365/18 1365/19 1365/21 1368/1 1368/18
**October 16th [2]** 1284/20 1286/3
**October 16th at [1]** 1285/25
**October 17 [1]** 1273/2
**October 2017 [6]** 1272/19 1273/10 1273/12 1275/25 1350/25 1368/1
**October 24th [1]** 1286/6
**October 27th [4]** 1365/18 1365/19 1365/21 1368/18
**October 6th, 2017 [1]** 1365/4
**off [5]** 1289/8 1322/19 1335/13 1341/25

1349/4
**offer [18]** 1338/24 1351/1 1351/7 1351/7 1351/10 1351/13 1353/5 1365/5 1365/8 1365/15 1365/15 1365/19 1365/20 1365/25 1366/1 1367/14 1368/3 1368/25
**offered [2]** 1352/14 1352/16
**offers [2]** 1340/7 1351/9
**office [4]** 1330/4 1330/17 1331/5 1335/22
**officer [1]** 1372/14
**OFFICIAL [1]** 1267/23
**Oh [8]** 1279/2 1282/12 1285/22 1298/23 1301/18 1317/9 1330/22 1364/15
**oil [9]** 1294/23 1295/15 1327/7 1327/10 1327/14 1327/18 1349/11 1349/14 1349/16
**once [4]** 1303/4 1315/20 1325/15 1334/19
**one [72]** 1268/18 1271/1 1277/8 1279/14 1279/19 1280/3 1283/9 1284/18 1285/2 1285/16 1285/21 1286/22 1287/5 1289/4 1289/18 1290/3 1291/9 1292/19 1293/20 1295/12 1297/24 1300/14 1302/19 1304/16 1305/22 1306/20 1310/16 1311/16 1314/19 1316/1 1319/12 1320/5 1320/12 1320/19 1321/19 1323/14 1323/21 1325/9 1330/12 1332/16 1333/8 1333/14 1333/14 1334/10 1334/14 1334/21 1334/25 1335/2 1335/8 1335/13 1337/7 1338/22 1338/22 1339/22 1343/19 1343/19 1347/6 1350/12 1351/10 1353/7 1353/7 1358/12 1361/7 1363/24 1364/2 1364/13 1364/14 1364/17 1376/15 1376/16 1377/14 1377/18

**one-minute [1]** 1377/14
**ones [2]** 1302/17 1304/4
**ongoing [1]** 1353/17
**only [15]** 1276/14 1277/11 1282/14 1284/15 1293/20 1303/1 1308/20 1309/3 1324/17 1349/18 1349/25 1362/19 1369/9 1371/25 1377/23
**oOo [1]** 1378/4
**open [8]** 1270/4 1281/20 1287/22 1297/21 1313/19 1331/24 1340/13 1345/15
**opening [2]** 1360/11 1372/5
**openings [1]** 1355/4
**opens [1]** 1316/11
**opinion [5]** 1340/7 1340/8 1347/15 1349/10 1374/6
**opinions [1]** 1349/16
**opportunities [7]** 1272/20 1358/23 1359/2 1359/5 1359/13 1361/3 1363/14
**opportunity [2]** 1281/4 1362/23
**opposed [1]** 1271/23
**opposition [5]** 1338/23 1364/25 1365/9 1367/6 1368/17
**options [1]** 1295/12
**or what's [1]** 1278/4
**order [21]** 1270/25 1272/2 1272/9 1272/25 1273/19 1273/25 1274/4 1274/13 1274/18 1275/9 1296/14 1296/17 1296/24 1315/6 1316/23 1323/24 1344/22 1350/18 1355/9 1357/2 1374/14
**order's [1]** 1347/6
**orders [2]** 1293/4 1327/17
**original [3]** 1354/22 1369/11 1370/1
**otherwise [2]** 1276/22 1371/23
**ourselves [1]** 1327/5
**out [23]** 1274/18 1280/11 1280/17 1281/8 1282/21 1291/11 1293/2 1294/23 1295/15 1298/25 1299/9 1304/4 1307/10 1308/18 1310/6

**O**

**out... [8]** 1313/15
1314/9 1324/22
1331/18 1334/22
1348/23 1363/9
1372/1
**out-of-pocket [1]**
1307/10
**outside [6]** 1270/4
1309/25 1310/5
1310/10 1343/3
1345/15
**over [30]** 1271/7
1276/11 1287/2
1287/20 1288/2
1288/23 1299/14
1300/24 1301/4
1301/6 1301/10
1301/16 1310/17
1310/19 1310/20
1323/5 1323/25
1324/9 1324/14
1324/24 1325/8
1328/1 1328/7 1331/6
1332/16 1332/20
1333/8 1333/9
1336/19 1336/20
**overall [1]** 1352/2
**overlay [1]** 1313/10
**overruled [5]** 1309/23
1332/12 1340/12
1342/6 1343/5
**overt [5]** 1313/6
1313/13 1313/23
1315/17 1318/15
**own [1]** 1335/3
**owned [3]** 1284/22
1333/8 1333/8
**owning [1]** 1299/12

**P**

**pack [1]** 1338/17
**page [23]** 1269/4
1269/8 1271/7
1285/25 1286/13
1286/15 1286/16
1286/24 1287/18
1287/18 1302/5
1302/22 1302/22
1303/25 1304/1
1321/9 1322/3
1323/13 1323/13
1324/4 1325/3
1330/16 1379/7
**page 10 [1]** 1321/9
**page 20 [1]** 1322/3
**Page 3 [1]** 1323/13
**page 5 [3]** 1271/7
1323/13 1330/16
**page 56 [3]** 1285/25
1286/15 1286/24
**page 57 [1]** 1286/16
**page 7 [1]** 1325/3
**page 86 [3]** 1302/5
1302/22 1304/1
**Pages [1]** 1267/18
**paid [2]** 1307/13
1343/24

**panel [1]** 1367/10
**paragraph [3]**
1354/12 1359/1
1359/13
**PARK [1]** 1268/13
**part [7]** 1279/14
1297/17 1321/25
1322/2 1338/16
1362/17 1364/18
**particular [9]** 1297/13
1350/8 1350/12
1361/4 1362/25
1362/25 1363/1
1363/8 1363/10
**particularly [1]** 1293/6
1299/19 1326/1
**parties [9]** 1271/10
1272/2 1275/12
1277/6 1345/10
1345/20 1346/18
1348/16 1377/13
**parties' [1]** 1278/4
**parts [2]** 1283/4
1310/21
**party [13]** 1348/19
1349/17 1352/15
1355/13 1355/14
1355/15 1355/15
1356/13 1373/5
1373/17 1373/24
1374/4 1375/2
**patch [1]** 1313/9
**pay [4]** 1307/10
1307/12 1333/23
1333/23
**pays [1]** 1310/6
**peace [1]** 1371/24
**PEDANTE [28]** 1267/5
1270/7 1270/11
1282/24 1283/1
1285/24 1286/4
1286/5 1292/18
1304/16 1314/14
1314/24 1317/10
1322/17 1336/22
1346/13 1362/8
1363/25 1365/13
1365/25 1366/8
1366/15 1366/16
1369/20 1373/20
1374/14 1374/16
1375/23
**Pedante's [9]** 1275/25
1289/12 1293/9
1307/4 1308/15
1327/12 1351/18
1353/11 1360/16
**penalty [2]** 1373/1
1373/10
**pending [2]** 1306/10
1340/19
**people [2]** 1311/12
1350/20
**per [18]** 1300/18
1300/20 1301/1
1301/12 1301/13
1301/13 1301/19
1301/22 1302/13

**360 [1] 1579** 1302/25
1303/7 1303/8 1304/5
1331/7 1333/10
1343/7 1361/1
**percent [7]** 1311/3
1311/8 1324/11
1324/17 1326/4
1326/9 1326/21
**percent of [1]** 1311/3
**perfectly [1]** 1348/4
**performance [1]**
1297/25
**performed [2]**
1283/25 1296/4
**perhaps [1]** 1370/14
**period [4]** 1303/15
1313/18 1336/19
1366/24
**permanently [1]**
1351/21
**phone [1]** 1299/15
**phrase [1]** 1371/21
**phrased [3]** 1272/12
1274/13 1274/25
**phrasing [1]** 1370/23
**physics [1]** 1343/25
**picks [4]** 1308/20
1309/3 1309/5
1309/12
**picture [1]** 1272/25
**piece [1]** 1294/11
**pieced [1]** 1315/23
**pink [1]** 1319/17
**pitch [1]** 1347/25
**place [11]** 1289/3
1307/14 1313/7
1313/11 1337/14
1347/3 1357/3
1362/16 1373/9
1373/10 1373/23
**placed [1]** 1314/25
**plain [1]** 1369/6
**plainly [1]** 1369/25
**plaintiff [14]** 1267/6
1268/2 1278/2 1280/1
1346/10 1346/24
1352/23 1355/3
1355/8 1359/3
1363/19 1372/23
1377/7 1377/20
**plaintiff's [14]** 1269/8
1273/4 1273/7
1279/17 1284/5
1284/8 1332/20
1361/15 1361/16
1362/4 1365/23
1372/2 1373/16
1375/25
**plaintiffs [12]** 1271/15
1271/17 1276/16
1277/11 1278/5
1279/11 1352/25
1360/11 1364/22
1372/8 1373/16
1374/2
**planned [1]** 1365/9
**play [1]** 1274/7
**pleadings [1]** 1357/3

**please [10]** 1270/9
1285/18 1286/14
1286/18 1330/12
1330/21 1340/25
1346/1 1350/17
1377/14
**pled [3]** 1354/21
1355/17 1355/18
**plugged [1]** 1320/15
**plural [3]** 1359/2
1359/13 1361/3
**pocket [2]** 1307/10
1310/6
**point [17]** 1299/12
1305/5 1305/22
1306/20 1347/8
1348/23 1350/9
1351/22 1355/17
1364/4 1364/5
1366/25 1368/16
1369/16 1372/1
1374/17 1375/12
**pointed [1]** 1363/9
**points [2]** 1356/25
1375/20
**policies [2]** 1373/22
1373/24
**policy [1]** 1351/24
**pop [2]** 1320/3 1335/7
**Portions [1]** 1321/8
**pose [1]** 1285/14
**position [6]** 1274/21
1304/7 1348/2
1348/19 1349/17
1364/7
**possible [1]** 1270/24
**possibly [2]** 1274/24
1367/7
**POWELL [1]** 1268/12
**power [20]** 1296/1
1296/20 1313/20
1313/25 1314/7
1315/19 1316/3
1321/20 1321/20
1321/24 1322/12
1322/13 1322/15
1341/24 1341/24
1342/8 1345/9
1348/16 1352/3
1352/15
**powering [1]** 1341/25
**powertrain [1]** 1309/8
**preapprove [1]**
1329/11
**precede [1]** 1278/12
**precedent [1]** 1356/7
**preclude [1]** 1374/2
**predicted [2]** 1326/10
1326/22
**prediction [1]** 1326/12
**prefer [1]** 1272/18
**preference [6]**
1272/23 1278/1
1278/5 1347/7
1347/24 1357/20
**prejudice [2]** 1363/19
1372/8
**prepare [1]** 1281/12

**prepared [2]** 1277/10
1281/5
**presence [7]** 1270/5
1281/20 1287/22
1297/21 1331/24
1340/13 1345/16
**present [5]** 1276/22
1296/5 1314/15
1354/2 1363/25
**presentation [5]**
1272/13 1274/16
1320/18 1320/24
1327/15
**presentations [7]**
1292/18 1292/24
1327/9 1327/10
1351/3 1360/3 1360/5
**presented [13]**
1271/16 1272/1
1272/20 1276/21
1277/10 1292/9
1297/5 1353/14
1363/13 1365/13
1366/17 1374/18
1376/6
**presenting [3]**
1273/11 1293/13
1371/6
**presents [1]** 1296/2
**presumed [1]** 1355/11
**presumption [2]**
1352/22 1355/10
**presumptions [1]**
1355/21
**pretrial [8]** 1270/24
1273/18 1273/25
1274/3 1274/13
1274/18 1275/9
1357/2
**pretty [3]** 1291/4
1314/13 1347/6
**preventing [1]**
1298/17
**previously [5]** 1282/2
1303/7 1318/25
1341/4 1376/18
**principle [2]** 1348/24
1349/17
**printed [1]** 1345/22
**probably [6]** 1299/1
1305/14 1333/16
1339/10 1369/14
1377/9
**problem [3]** 1361/4
1373/16 1375/21
**problems [10]**
1302/16 1304/6
1324/14 1324/24
1325/5 1337/24
1353/17 1353/20
1362/21 1363/25
**procedures [2]**
1373/22 1373/24
**proceed [6]** 1281/6
1281/24 1302/7
1302/23 1304/2
1341/6
**proceedings [6]**

**P**

**proceedings... [6]**
1267/14 1286/19
1296/11 1328/22
1338/12 1379/6
**process [6]** 1336/25
1337/2 1373/6 1373/9
1373/9 1373/10
**produce [9]** 1312/16
1312/17 1312/17
1348/17 1348/19
1349/18 1349/18
1352/5 1352/15
**produced [8]** 1288/13
1325/13 1350/21
1351/3 1351/11
1375/1 1375/11
1375/15
**product [2]** 1337/3
1356/19
**production [3]** 1289/9
1303/2 1348/18
**profitable [1]** 1369/8
**program [6]** 1373/18
1373/25 1374/4
1375/3 1375/6
1375/11
**programmed [1]**
1293/21
**progression [1]**
1332/15
**projected [1]** 1326/2
**promptly [1]** 1358/16
**proof [7]** 1272/3
1277/23 1355/2
1355/6 1355/20
1356/14 1370/10
**proper [1]** 1376/6
**proposal [1]** 1280/10
**proposals [1]** 1346/19
**propose [4]** 1277/17
1339/4 1355/3 1355/4
**proposed [13]** 1274/3
1346/5 1347/16
1348/10 1348/14
1352/7 1356/9
1358/25 1359/14
1362/6 1364/21
1364/22 1370/9
**Proposed Instruction
[1]** 1370/9
**protected [1]** 1307/10
**protection [1]**
1318/16
**protector [1]** 1337/3
**protocols [1]** 1375/11
**prove [10]** 1349/24
1350/1 1352/25
1354/18 1355/9
1356/22 1371/6
1371/12 1371/15
1373/7
**proven [2]** 1271/10
1355/14
**provide [3]** 1277/12
1295/24 1312/25
**provided [1]** 1347/25
**provides [1]** 1352/13

**proving [2]** 1357/5
1370/17
**publish [4]** 1291/16
1321/14 1322/7
1322/8
**published [1]** 1367/25
**pull [6]** 1294/4
1294/16 1294/17
1294/18 1294/21
1327/25
**pulled [3]** 1330/4
1330/17 1331/5
**pulling [1]** 1330/7
**purchase [1]** 1299/10
**purchasing [1]**
1299/12
**purportedly [1]**
1335/22
**purpose [1]** 1359/20
**purposes [5]** 1272/6
1272/7 1273/25
1332/19 1336/10
**pursuant [1]** 1296/17
1379/3
**push [2]** 1281/8
1363/12
**putting [1]** 1324/22**

**Q**

**qualifications [1]**
1360/8
**qualified [3]** 1350/25
1361/2 1373/5
**qualifies [3]** 1359/10
1360/3 1360/13
**qualifying [2]** 1375/2
1375/6
**quality [2]** 1337/7
1375/10
**quarter [1]** 1324/21
**query [2]** 1299/9
1370/25
**question [30]** 1286/21
1287/12 1288/7
1288/11 1288/15
1288/16 1288/19
1288/24 1289/1
1296/18 1301/17
1302/9 1302/25
1303/18 1304/4
1304/10 1304/11
1309/10 1309/12
1310/1 1310/14
1325/15 1329/7
1335/6 1353/7 1353/7
1353/11 1355/2
1375/15 1377/23
**questionable [1]**
1356/1
**questioned [1]**
1375/14
**questioning [1]**
1373/16
**questions [13]**
1282/16 1288/5
1312/24 1329/2
1329/4 1331/17
1338/2 1347/18

1353/7 1367/21
1374/3 1374/12
1374/22
**Quintero [1]** 1286/5
**quite [1]** 1296/14

**R**

**raise [3]** 1270/18
1357/13 1376/10
**raised [5]** 1349/21
1349/23 1350/1
1367/23 1376/18
**rate [8]** 1326/9
1326/16 1326/17
1326/22 1337/15
1343/9 1343/10
1343/11
**rates [5]** 1305/23
1306/4 1308/19
1311/18 1331/6
**rather [2]** 1278/7
1322/2
**ratings [2]** 1341/22
1341/23
**ratios [1]** 1292/5
**RCF [1]** 1292/7
**reach [1]** 1374/17
**read [25]** 1270/20
1272/9 1272/24
1274/14 1274/17
1274/24 1275/15
1275/22 1276/13
1276/15 1277/1
1277/5 1277/13
1277/20 1277/22
1278/14 1279/5
1279/12 1279/14
1288/4 1288/7
1292/21 1354/6
1357/19 1358/2
**reading [5]** 1275/11
1278/2 1302/24
1304/3 1323/6
**ready [5]** 1281/9
1339/12 1345/23
1373/13 1376/20
**real [3]** 1290/4
1290/11 1291/1
**realize [1]** 1347/22
**really [6]** 1280/6
1280/6 1325/18
1348/15 1362/16
1363/11
**reason [5]** 1302/11
1344/19 1351/17
1367/11 1367/19
**reasonable [3]**
1272/20 1356/21
1359/5
**reasonably [6]**
1350/15 1353/16
1353/16 1353/25
1354/16 1356/18
**reasons [3]** 1351/12
1351/13 1352/8
**rebuttal [4]** 1339/16
1340/21 1377/7
1377/11

**recalibration [1]**
1334/16
**recall [19]** 1292/17
1305/13 1306/8
1311/23 1314/17
1314/20 1315/22
1317/1 1327/16
1327/17 1328/5
1328/5 1333/6
1334/12 1348/20
1354/4 1366/11
1367/9 1373/16
**recall -- I [1]** 1328/5
**received [3]** 1299/4
1315/2 1346/16
**recently [2]** 1346/16
1369/11
**recess [8]** 1281/16
1281/18 1281/19
1346/2 1346/3
1377/20 1378/2
1378/3
**recitation [1]** 1278/12
**recite [1]** 1356/11
**reciting [1]** 1332/11
**recognized [1]**
1359/18
**reconsider [1]** 1347/3
**record [1]** 1359/6
**recording [1]** 1335/5
**records [1]** 1317/24
**recreate [1]** 1290/4
**RECROSS [2]** 1269/6
1335/18
**RECROSS-EXAMINA
TION [2]** 1269/6
1335/18
**REDIRECT [4]** 1269/6
1269/11 1327/23
1343/22
**reduced [3]** 1305/6
1305/10 1322/16
**REES [1]** 1268/21
**refer [2]** 1321/23
1324/3
**referred [1]** 1323/14
**referring [3]** 1286/9
1322/22 1326/11
**refers [2]** 1322/12
1324/6
**reflashed [1]** 1315/3
**reflect [2]** 1273/13
1275/23
**refund [1]** 1356/20
**regarding [1]** 1277/18
**regards [1]** 1283/5
**region [1]** 1324/4
**regulations [1]** 1379/8
**rehabilitate [1]** 1329/8
**reinstalled [1]**
1317/15
**rejected [2]** 1358/25
1365/8
**related [2]** 1310/9
1360/25
**relates [2]** 1281/4
1350/10
**relating [1]** 1352/20

**relation [1]** 1367/2
**relatively [2]** 1275/7
1369/22
**relax [1]** 1345/3
**relevance [5]** 1283/6
1300/1 1308/22
1311/4 1369/3
**relevant [4]** 1352/7
1365/3 1365/6
1365/11
**relied [2]** 1350/14
1350/22
**Reluctantly [1]**
1376/22
**rely [1]** 1353/15
**relying [1]** 1349/16
**remaining [1]** 1279/3
**remand [9]** 1338/23
1364/25 1365/10
1365/21 1367/6
1367/13 1367/15
1367/15 1367/17
**remember [22]**
1283/11 1284/22
1289/24 1290/5
1290/12 1290/21
1291/21 1291/23
1295/16 1305/23
1311/18 1311/20
1311/22 1312/1
1312/9 1316/3 1316/7
1316/19 1327/16
1327/15 1327/16
1377/8
**remind [1]** 1340/25
**render [1]** 1362/10
**repair [33]** 1285/7
1293/3 1293/10
1302/1 1305/23
1309/25 1315/5
1316/22 1317/14
1318/9 1322/21
1325/23 1327/9
1327/10 1327/17
1333/24 1351/2
1353/18 1358/23
1359/11 1360/3
1360/5 1360/7 1360/8
1360/14 1360/17
1360/18 1361/22
1362/23 1362/25
1362/25 1363/1
1364/1
**repaired [1]** 1309/16
1360/20 1361/11
**repairs [21]** 1300/20
1300/25 1301/2
1301/13 1303/8
1308/20 1309/3
1309/13 1310/9
1325/10 1328/1
1331/7 1333/10
1334/1 1336/17
1336/20 1337/16
1359/4 1360/24
1360/25 1362/2
**repeatedly [3]**
1276/13 1282/21

**R**

**repeatedly... [1]**
1331/13
**replace [4]** 1317/16
1353/10 1356/20
1376/2
**replaced [19]** 1292/12
1292/20 1292/25
1293/1 1293/5 1293/9
1316/25 1317/3
1317/19 1317/20
1317/22 1317/25
1318/1 1318/2
1318/14 1318/16
1326/5 1360/15
1361/8
**replacement [8]**
1326/9 1326/16
1326/17 1326/22
1360/13 1362/10
1362/20 1363/24
**replacements [5]**
1327/8 1334/16
1362/9 1362/19
1363/24
**replacing [1]** 1360/21
**reported [4]** 1296/6
1296/21 1297/18
1379/5
**REPORTER [1]**
1267/23
**REPORTER'S [1]**
1267/14
**reporting [1]** 1299/15
**reports [5]** 1296/15
1297/10 1298/4
1298/7 1323/14
**represented [1]**
1330/17
**repurchase [9]**
1351/19 1353/10
1354/2 1358/16
1359/10 1360/4
1361/18 1374/15
1376/1
**repurchased [1]**
1361/12
**request [6]** 1331/5
1351/18 1364/16
1364/24 1365/16
1372/7
**requested [4]** 1271/17
1361/19 1362/9
1369/1
**requests [1]** 1338/15
**require [1]** 1277/23
**required [2]** 1357/8
1360/4
**requirements [1]**
1375/9
**requiring [1]** 1272/3
**research [1]** 1345/6
**reset [1]** 1334/16
**resolution [5]** 1373/6
1373/18 1373/25
1374/4 1375/3
**respect [21]** 1278/2
1278/9 1284/15

1286/21 1286/22
1340/10 1345/18
1346/6 1346/9
1346/15 1346/17
1347/14 1347/17
1348/3 1357/13
1357/14 1358/3
1358/5 1358/8
1358/15 1371/3
**respond [2]** 1280/15
1366/5
**responded [1]** 1283/9
**responding [1]**
1282/16
**response [6]** 1355/16
1362/4 1362/6 1363/3
1369/12 1374/9
**responses [1]**
1374/10
**responsibility [1]**
1273/12
**rest [3]** 1339/8
1340/17 1345/3
**restate [1]** 1285/17
**rested [1]** 1344/11
**restitutionary [1]**
1279/12 1279/18
**restructure [1]**
1280/17
**result [2]** 1356/20
1373/6
**resume [2]** 1281/17
1281/23
**RESUMED [2]** 1269/5
1282/4
**review [4]** 1281/2
1331/21 1346/7
1353/15
**reviews [1]** 1350/19
**RF [2]** 1302/13
1302/25
**RFs [1]** 1304/5
**right [133]**
**rise [4]** 1281/18
1345/14 1346/2
1378/2
**risk [1]** 1285/15
**ROGER [1]** 1268/12
**role [2]** 1299/24
1300/10
**room [2]** 1267/24
1343/15
**root [1]** 1298/14
**ROs [1]** 1310/13
**roughly [1]** 1314/5
**rule [5]** 1293/8
1352/18 1352/21
1361/1 1368/3
**Rule 68 [1]** 1368/3
**rules [1]** 1352/21
**ruling [1]** 1329/20
**run [1]** 1290/2
**running [1]** 1305/17
**RUSSELL [2]** 1268/11
1346/13

**S**

**safe [3]** 1313/20

13*13/24*1316/10

**safety [11]** 1285/15
1285/20 1296/2
1296/5 1297/4 1297/8
1300/9 1300/11
1315/14 1315/15
1353/20
**salaried [2]** 1283/13
1283/15
**SAMANTHA [1]**
1268/17
**same [11]** 1290/20
1292/14 1293/17
1293/25 1302/21
1302/22 1316/24
1322/21 1328/24
1348/6 1362/14
**SAN [2]** 1268/18
1268/22
**Sanchez [2]** 1330/7
1330/8
**satisfaction [3]**
1306/22 1313/16
1315/16
**satisfactory [2]**
1352/14 1352/15
**saying [9]** 1271/23
1294/12 1327/17
1329/3 1329/9
1329/25 1331/17
1361/21 1363/21
**scientific [1]** 1340/9
**scope [1]** 1343/4
**screen [4]** 1319/10
1322/10 1332/23
1335/7
**seal [4]** 1293/15
1293/23 1295/15
1337/2
**seals [10]** 1292/11
1292/20 1292/24
1292/25 1293/5
1294/24 1304/17
1305/4 1336/24
1351/20
**search [1]** 1294/4
**second [11]** 1271/1
1290/14 1297/3
1319/4 1319/12
1321/16 1364/13
1370/23 1374/18
1375/20 1375/25
**Secondly [1]** 1357/6
**secret [1]** 1273/6
**secrets [1]** 1273/5
**section [8]** 1276/19
1277/24 1347/16
1352/13 1357/7
1373/4 1375/5 1379/3
**Section 1793.22 [1]**
1375/5
**Section 1794 [1]**
1373/4
**Section 1983 [1]**
1357/7
**section of [1]** 1277/24
**see [18]** 1280/7
1286/8 1305/11

1310/15 1319/14
1320/1 1320/4 1320/5
1320/6 1320/9
1330/21 1333/13
1339/15 1345/8
1345/12 1345/25
1359/6 1372/16
**seeing [5]** 1272/13
1277/4 1305/13
1328/5 1333/6
**seek [3]** 1369/5
1369/7 1374/2
**seemed [3]** 1366/9
1373/13 1377/2
**seems [2]** 1276/25
1361/25
**seen [8]** 1305/15
1306/7 1306/9
1312/10 1312/13
1331/3 1336/3 1377/3
**self [1]** 1335/4
**selling [2]** 1308/6
1311/7
**send [1]** 1299/14
**sense [1]** 1288/11
**separate [1]** 1364/1
**September [1]** 1364/1
**September 2016 [1]**
1364/1
**serves [1]** 1286/20
**service [11]** 1291/10
1291/20 1294/22
1303/13 1313/13
1315/13 1332/16
1332/16 1332/17
1337/11 1337/12
**session [10]** 1320/13
1320/17 1320/21
1320/23 1321/3
1321/19 1322/1
1322/2 1322/21
1341/19
**set [14]** 1287/9
1287/11 1287/14
1287/17 1303/16
1314/6 1334/20
1346/22 1347/1
1347/13 1355/21
1360/11 1362/5
1369/5
**sets [2]** 1327/3
1354/11
**setting [1]** 1346/15
**settlement [1]** 1365/5
**seven [1]** 1307/6
**seven-year/hundred
[1]** 1307/6
**several [2]** 1283/4
1293/10
**shaft [11]** 1292/9
1292/14 1292/14
1292/25 1293/15
1293/19 1293/23
1294/24 1295/15
1336/24 1337/3
**shall [1]** 1365/8
**Shawn [4]** 1326/21
1326/22 1326/24

1336/2
**shield [1]** 1331/12
**SHOOK [1]** 1268/16
**short [2]** 1366/11
1366/24
**shorting [1]** 1327/4
**show [13]** 1272/25
1294/18 1307/1
1310/4 1312/13
1314/11 1321/9
1325/21 1326/6
1331/20 1355/8
1365/17 1366/13
**showed [2]** 1321/4
1328/6
**showing [1]** 1329/19
**shown [2]** 1370/20
1371/1
**shows [2]** 1325/21
1329/6
**shred [2]** 1351/4
1375/10
**shudder [1]** 1296/20
**shuddering [1]**
1296/1
**shut [1]** 1322/19
**side [3]** 1273/4 1273/7
1377/6
**sidebar [1]** 1286/19
1296/10 1296/11
1328/22 1338/12
1348/11 1348/21
1351/9 1365/14
1365/22 1367/25
**sides [6]** 1273/16
1339/8 1344/10
1353/24 1377/2
1377/16
**sign [1]** 1316/18
**signals [1]** 1335/4
**signed [3]** 1277/5
1289/8 1335/13
**significance [4]**
1273/4 1273/7 1277/4
1365/2
**significant [1]**
1369/16
**similar [3]** 1292/5
1352/22 1376/10
**simple [3]** 1362/7
1369/22 1369/24
**simply [11]** 1272/24
1277/22 1278/10
1346/24 1347/22
1347/24 1348/23
1364/23 1365/16
1368/16 1369/24
**simulate [1]** 1291/1
**simultaneously [1]**
1366/10
**since [4]** 1276/11
1282/18 1335/21
1342/21
**single [4]** 1284/16
1284/16 1285/9
1325/22
**single 2013 [1]**
1325/22

**S**

**sir [90]** 1283/21
1284/7 1285/6
1285/22 1288/8
1289/12 1289/25
1290/1 1291/9
1291/20 1292/23
1294/13 1295/18
1295/25 1296/6
1297/24 1300/14
1301/17 1302/14
1302/15 1302/18
1303/7 1303/11
1303/19 1304/15
1304/21 1304/24
1306/5 1306/10
1306/19 1306/25
1307/1 1308/1 1309/2
1309/10 1309/25
1310/16 1310/19
1310/23 1311/7
1311/9 1311/10
1311/16 1312/6
1312/15 1313/22
1314/2 1315/25
1316/15 1317/8
1318/8 1318/13
1318/20 1319/2
1319/4 1319/11
1320/4 1320/6
1320/10 1320/11
1320/17 1321/19
1322/12 1322/21
1323/9 1323/15
1323/16 1324/3
1324/18 1325/21
1326/2 1326/16
1326/21 1327/6
1327/8 1327/19
1332/5 1332/24
1335/15 1336/8
1336/13 1336/15
1337/9 1338/7 1341/1
1341/2 1341/19
1343/13 1344/6
1364/12
**sitting [3]** 1337/4
1341/10 1343/11
**situation [2]** 1275/8
1349/20
**six [1]** 1337/3
**size [2]** 1292/3 1292/3
**slight [1]** 1292/3
**slow [2]** 1322/18
1323/6
**smell [2]** 1360/19
1362/17
**software [1]** 1289/7
**sold [10]** 1301/14
1301/20 1301/21
1302/11 1303/4
1303/5 1304/23
1307/17 1307/22
1311/3
**sole [1]** 1375/25
**solely [1]** 1360/4
**solving [2]** 1293/22
1337/24

**somehow [3]** 1359/9
1365/24 1366/1
**someone [6]** 1280/9
1281/2 1308/10
1308/15 1326/22
1335/21
**something [15]**
1271/9 1283/23
1290/10 1298/18
1300/14 1301/9
1306/19 1307/16
1316/17 1344/13
1344/17 1355/22
1355/22 1359/22
1372/9
**Sometimes [1]**
1355/25
**somewhat [1]**
1362/11
**somewhere [2]**
1326/8 1376/23
**Song [4]** 1350/2
1356/15 1359/9
1376/3
**Song-Beverly [4]**
1350/2 1356/15
1359/9 1376/3
**soon [1]** 1372/20
**sorry [38]** 1273/3
1273/15 1274/2
1278/16 1279/14
1285/17 1285/18
1302/2 1304/20
1309/21 1312/22
1315/8 1315/10
1315/10 1318/5
1319/4 1319/9 1323/9
1324/19 1327/11
1328/16 1329/12
1330/3 1331/10
1338/20 1347/13
1347/16 1347/21
1349/2 1351/6 1354/9
1354/25 1356/8
1361/16 1367/18
1368/12 1368/24
1370/19
**sort [3]** 1361/1 1363/6
1367/16
**sound [1]** 1288/25
**speak [1]** 1371/23
**special [4]** 1337/11
1345/20 1355/5
1362/6
**specific [1]** 1278/17
**specifically [9]**
1275/18 1355/24
1356/16 1357/9
1358/1 1359/18
1361/3 1365/7
1365/22
**speculation [1]**
1367/5
**speed [1]** 1316/13
**SPENCER [1]**
1268/21
**spoliation [1]** 1348/15
**spot [1]** 1289/10

**staff [2]** 1327/25
1330/4
**stall [2]** 1316/13
1316/16
**stalling [1]** 1296/2
**stance [1]** 1297/8
**stand [2]** 1282/8
1342/21
**standards [1]** 1348/25
**stands [1]** 1333/3
**start [9]** 1281/13
1281/14 1288/9
1308/11 1322/19
1322/20 1323/2
1346/9 1377/13
**started [2]** 1287/1
1325/19
**starter [1]** 1323/5
**starting [3]** 1304/23
1307/22 1308/6
**state [14]** 1270/9
1271/9 1271/18
1273/5 1273/6
1273/14 1275/23
1306/15 1355/8
1355/13 1356/5
1357/8 1363/8 1366/7
**state's [1]** 1376/3
**stated [4]** 1272/9
1355/3 1359/19
1370/2
**statement [8]** 1272/14
1277/10 1277/22
1348/24 1359/12
1359/19 1360/11
1372/1
**statements [2]** 1347/2
1372/5
**states [7]** 1267/1
1298/13 1349/11
1349/12 1365/7
1379/4 1379/8
**stating [2]** 1272/2
1361/1
**statute [2]** 1362/12
1362/14
**stay [2]** 1273/1
1316/12
**staying [1]** 1343/14
**steep [6]** 1290/5
1290/8 1290/11
1291/1 1291/4 1291/6
**stenographically [1]**
1379/5
**step [4]** 1305/16
1338/7 1340/25
1344/7
**STEPHANIE [1]**
1268/7
**steps [2]** 1305/15
1374/17
**still -- I [1]** 1369/13
**stipulated [10]**
1274/11 1274/22
1276/12 1276/16
1276/17 1276/18
1277/19 1278/8
1279/11 1346/19

**stipulation [2]** 1277/9
1279/6
**stipulations [2]**
1346/7 1346/17
**STREET [2]** 1267/24
1268/22
**stretch [1]** 1345/4
**strive [1]** 1306/1
**strong [3]** 1348/19
1349/18 1360/1
**stronger [2]** 1348/17
1352/15 1352/24
**stuff [2]** 1339/11
1345/18
**stumbled [1]** 1336/3
**Subdivision [1]**
1373/4
**Subdivision E [1]**
1373/4
**subject [7]** 1339/8
1340/18 1344/11
1345/7 1354/3
1359/10 1367/20
**submission [1]**
1376/9
**submit [8]** 1274/10
1279/20 1346/24
1352/7 1369/24
1375/17 1376/4
1377/24
**submitted [12]**
1271/11 1273/16
1273/17 1273/20
1274/3 1274/8 1274/8
1346/19 1353/23
1356/10 1356/23
1370/4
**substantial [2]** 1360/2
1365/12
**substantiate [1]**
1352/5
**such [6]** 1348/22
1352/19 1369/15
1373/9 1373/9
1373/10
**sufficient [1]** 1351/19
**sufficiently [1]**
1347/12
**suggested [2]**
1353/18 1374/13
**suggesting [1]**
1353/20
**suggestion [1]**
1374/15
**suggests [1]** 1296/19
**SUITE [4]** 1268/4
1268/13 1268/18
1268/22
**summarizes [1]**
1336/13
**summarizing [1]**
1335/23
**summer [3]** 1304/17
1304/19 1304/20
**support [3]** 1361/23
1370/21 1370/24
**supposed [1]** 1312/21
**Supreme [2]** 1349/2

1349/11
**Supreme Court [1]**
1349/11
**sure [35]** 1274/20
1275/17 1276/9
1276/9 1281/10
1283/21 1284/21
1286/1 1286/15
1298/18 1299/7
1300/20 1306/7
1308/18 1309/15
1312/5 1312/6
1312/15 1314/21
1319/23 1324/2
1324/20 1324/23
1325/11 1325/24
1326/7 1330/22
1330/24 1336/22
1345/9 1363/16
1368/4 1369/15
1369/19 1372/11
**sure there's [1]**
1325/24
**survey [1]** 1299/14
**susceptible [1]**
1353/18
**suspect [1]** 1322/15
**sustained [12]** 1283/7
1296/10 1297/20
1306/17 1307/20
1308/24 1311/5
1311/14 1313/2
1318/6 1341/17
1342/13
**sustains [2]** 1371/17
1371/18
**sword [1]** 1331/11
**sworn [3]** 1282/2
1282/15 1341/4
**symptom [1]** 1363/1
**system [26]** 1294/5
1294/14 1299/8
1304/14 1308/20
1309/2 1309/4
1309/12 1309/17
1310/4 1310/7 1313/4
1313/10 1313/10
1314/25 1315/17
1316/9 1316/10
1317/13 1321/21
1321/25 1333/4
1333/23 1336/14
1342/3 1344/1
**systemic [1]** 1324/4

**T**

**tackle [1]** 1373/13
**TAFT [1]** 1268/7
**take [18]** 1277/15
1278/20 1281/16
1300/23 1328/9
1328/17 1331/11
1338/16 1338/19
1344/18 1345/3
1345/17 1345/25
1369/9 1369/22
1376/8 1376/15
1377/19

**T**

**taken [9]** 1273/12 1278/25 1279/8 1279/8 1281/19 1333/5 1346/3 1357/4 1378/3
**takes [2]** 1280/10 1357/3
**talk [10]** 1276/8 1298/20 1318/9 1318/13 1339/14 1345/4 1345/5 1366/9 1367/4 1375/3
**talked [13]** 1283/23 1291/9 1297/12 1298/7 1308/14 1313/4 1313/12 1315/22 1318/20 1323/17 1327/6 1334/17 1334/20
**talking [6]** 1315/8 1317/25 1339/4 1350/11 1361/9 1361/10
**TCM [9]** 1316/25 1317/22 1317/23 1317/24 1318/16 1334/16 1362/10 1362/20 1363/24
**team [4]** 1281/2 1293/22 1333/6 1351/24
**technical [4]** 1291/10 1291/20 1294/22 1337/10
**technician [2]** 1293/7 1293/8
**technicians [4]** 1318/8 1318/9 1320/7 1327/14
**technology [1]** 1351/25
**telling [2]** 1273/5 1306/6
**tells [2]** 1361/4 1371/9
**ten [18]** 1289/24 1290/22 1290/21 1290/23 1290/24 1307/8 1336/23 1336/25 1337/1 1337/2 1345/17 1345/25 1346/1 1376/14 1377/7 1377/10 1377/17 1377/19
**ten miles [4]** 1289/24 1290/21 1290/23 1290/24
**ten-mile [1]** 1290/2
**ten-minute [1]** 1377/19
**tenure [1]** 1314/3
**term [1]** 1300/18
**terminal [2]** 1317/11 1323/1
**terms [3]** 1285/13 1330/16 1365/20
**test [8]** 1284/4

1284/21 1287/7 1289/4 1289/24 1290/20 1334/21 1335/1
**testified [13]** 1282/3 1282/12 1282/19 1285/19 1297/7 1316/2 1320/12 1326/8 1327/13 1341/5 1350/4 1351/23 1366/8
**testify [3]** 1331/5 1350/19 1360/13
**testifying [2]** 1282/10 1282/15
**testimony [19]** 1281/17 1285/20 1285/24 1286/5 1300/15 1302/3 1302/21 1303/24 1304/15 1314/16 1316/2 1326/7 1330/13 1341/10 1346/18 1346/23 1366/12 1366/14 1374/12
**testing [22]** 1284/1 1284/15 1285/9 1285/15 1285/20 1285/21 1286/22 1287/4 1289/2 1289/12 1289/23 1290/11 1290/20 1296/4 1314/4 1334/11 1334/24 1334/24 1334/25 1335/8 1335/9 1335/14
**TGW [1]** 1323/17
**TGWs [1]** 1299/1
**thank [43]** 1272/12 1277/16 1279/22 1281/17 1281/25 1286/17 1287/20 1287/21 1301/8 1301/11 1302/8 1304/20 1318/19 1327/19 1332/2 1335/15 1335/15 1338/7 1339/21 1340/2 1344/3 1344/6 1345/12 1346/11 1348/8 1353/6 1355/1 1357/11 1358/20 1364/11 1368/14 1368/19 1368/21 1368/22 1370/5 1372/18 1372/23 1373/12 1373/14 1375/19 1376/8 1377/15 1378/1
**that Ford [1]** 1361/16
**the 2013 [1]** 1337/15
**the 2017 [1]** 1328/2
**them [24]** 1275/3 1276/21 1276/21 1277/5 1278/7 1280/10 1280/11

1280/11 1293/16 1293/17 1293/20 1294/18 1299/14 1306/3 1310/21 1311/3 1311/8 1327/17 1334/6 1339/10 1343/11 1356/12 1359/6 1376/20
**theory [1]** 1327/6 1361/15 1361/16
**there's [37]** 1273/6 1275/7 1275/14 1276/5 1281/10 1281/15 1285/19 1286/4 1291/13 1292/3 1293/20 1296/15 1296/21 1297/4 1297/8 1297/17 1298/11 1300/9 1305/12 1313/23 1319/21 1322/23 1323/24 1325/21 1325/24 1327/7 1342/7 1342/8 1345/1 1347/7 1352/18 1358/18 1359/7 1359/24 1364/8 1371/11 1376/18
**therefore [1]** 1370/2
**thereto [1]** 1347/18
**thing [5]** 1317/17 1318/16 1362/14 1363/15 1371/25
**things [38]** 1271/3 1276/5 1276/9 1283/9 1290/3 1291/9 1292/19 1296/1 1297/2 1297/24 1299/2 1299/3 1299/18 1299/18 1299/19 1299/23 1300/16 1304/16 1305/4 1310/16 1311/17 1312/9 1316/1 1316/19 1320/12 1321/19 1323/13 1323/17 1323/21 1324/10 1324/16 1337/14 1338/22 1348/23 1355/18 1355/25 1361/7 1366/8
**think [74]** 1272/4 1272/7 1272/13 1272/24 1274/23 1275/11 1275/13 1275/14 1280/2 1282/19 1282/25 1283/4 1285/13 1288/1 1290/7 1290/10 1290/14 1290/15 1290/22 1291/11 1291/25 1293/1 1293/2 1293/3 1301/15 1304/22 1306/11 1310/20

1313/12 1314/22 1316/17 1317/7 1320/12 1320/25 1322/2 1323/21 1326/11 1328/4 1329/19 1331/15 1331/20 1339/3 1339/5 1339/16 1345/19 1347/6 1347/12 1348/5 1350/9 1357/24 1357/25 1357/25 1359/24 1360/1 1361/3 1361/24 1363/7 1364/7 1364/8 1364/8 1367/16 1367/22 1369/8 1369/13 1369/21 1370/25 1371/2 1371/2 1371/5 1371/11 1371/21 1371/23 1372/7 1372/16
**think that [1]** 1357/24
**third [9]** 1354/12 1358/17 1360/14 1360/17 1373/5 1373/17 1373/24 1374/4 1375/2
**third-party [5]** 1373/5 1373/17 1373/24 1374/4 1375/2
**though [5]** 1273/11 1324/10 1324/15 1324/16 1376/22
**thought [6]** 1314/17 1315/8 1319/24 1321/2 1361/11 1363/4
**thousand [17]** 1300/19 1300/20 1300/24 1301/1 1301/2 1301/12 1301/13 1301/13 1301/19 1301/22 1302/13 1302/15 1302/25 1303/8 1303/8 1304/6 1307/6
**thousands [2]** 1299/5 1299/7
**three [18]** 1293/2 1301/2 1303/6 1303/12 1312/7 1312/15 1314/9 1314/10 1332/17 1333/9 1336/19 1347/3 1359/11 1361/9 1361/9 1362/8 1362/19 1363/23
**three-year [1]** 1336/19
**throughout [4]** 1296/17 1303/14 1310/24 1359/3
**throw [1]** 1322/9
**THURSDAY [3]** 1267/15 1270/1 1365/14

**till [1]** 1282/17
**timeline [1]** 1367/18
**timing [1]** 1278/2
**title [2]** 1320/6 1379/4
**to -- and [1]** 1369/6
**today [4]** 1280/21 1312/3 1312/7 1367/23
**today's [1]** 1348/25
**together [6]** 1294/11 1315/23 1328/1 1336/2 1336/5 1345/18
**token [1]** 1328/24
**told [5]** 1291/25 1292/13 1304/22 1307/22 1365/23
**tomorrow [1]** 1281/14
**too [1]** 1365/11
**took [7]** 1282/8 1289/3 1310/17 1313/7 1314/24 1321/19 1337/14
**tool [4]** 1298/11 1298/16 1326/12 1327/3
**top [3]** 1313/9 1313/10 1324/4
**total [2]** 1283/2 1283/2
**touches [1]** 1354/5
**tough [1]** 1305/11
**towards [2]** 1344/21 1359/4
**TOWER [1]** 1268/18
**track [5]** 1302/17 1303/5 1310/6 1310/9 1331/6
**tracked [1]** 1304/5
**tracking [4]** 1301/12 1301/19 1301/22 1334/1
**tracks [1]** 1301/12
**traded [1]** 1273/21
**transcript [3]** 1267/14 1379/5 1379/7
**transmission [15]** 1292/2 1304/6 1324/10 1325/5 1325/9 1325/22 1333/21 1334/5 1334/9 1336/21 1351/20 1359/4 1360/6 1360/19 1361/1
**transmissions [11]** 1292/5 1304/13 1305/18 1324/6 1324/8 1324/15 1324/17 1324/22 1324/25 1334/6 1336/17
**trial [19]** 1267/18 1269/14 1270/7 1274/16 1276/4 1280/4 1291/18 1295/2 1329/22 1336/10 1352/19

**T**

**trial... [8]** 1353/14
1359/3 1361/12
1365/10 1369/18
1374/12 1374/20
1376/6
**trouble [1]** 1271/6
**true [3]** 1362/12
1365/16 1379/4
**truthful [3]** 1272/25
1273/14 1275/23
**try [5]** 1290/25
1305/25 1306/1
1327/3 1375/13
**try to [1]** 1305/25
**trying [14]** 1274/6
1274/7 1275/13
1275/16 1290/4
1298/25 1314/20
1316/3 1344/25
1345/1 1350/9 1354/6
1360/23 1367/18
**TSB [3]** 1292/21
1292/21 1317/17
**turn [10]** 1285/23
1291/11 1294/24
1302/2 1302/5
1302/20 1310/25
1318/24 1322/3
1374/5
**turned [1]** 1271/7
**twice [2]** 1293/2
1372/2
**two [24]** 1279/3
1279/4 1306/10
1332/16 1333/9
1336/17 1336/20
1337/10 1337/10
1337/11 1338/22
1339/3 1339/15
1339/17 1339/18
1353/9 1359/11
1360/3 1360/4 1360/7
1360/8 1364/21
1364/22 1374/10
**type [1]** 1294/8
**typographical [1]**
1358/13

**U**

**U01 [1]** 1319/16
**U01001 [1]** 1319/2
**U0101 [1]** 1319/14
**U101 [1]** 1321/4
**U1013 [1]** 1319/3
**U3003 [3]** 1319/24
1320/4 1320/5
**Uh [2]** 1293/12
1294/15
**Uh-huh [2]** 1293/12
1294/15
**ultimately [1]** 1353/24
**unchanged [1]**
1274/14
**unclear [1]** 1370/11
**under [18]** 1278/8
1282/16 1309/5
1309/13 1309/14

1310/2 1314/3 1341/1
1355/11 1355/20
1355/21 1356/7
1356/16 1361/24
1373/3 1375/5 1376/3
1376/9
**understand [14]**
1274/7 1274/21
1275/17 1280/13
1283/25 1322/25
1344/25 1348/20
1361/25 1362/3
1364/7 1367/7
1369/23 1377/13
**understanding [5]**
1274/9 1275/4
1292/23 1302/9
1361/15
**understood [1]**
1274/15
**UNITED [5]** 1267/1
1349/11 1349/12
1379/4 1379/8
**units [2]** 1294/9
1325/18
**unless [3]** 1286/7
1367/9 1376/17
**unpublished [1]**
1359/17
**unreasonable [1]**
1285/14
**unrelated [3]** 1359/4
1360/5 1360/23
**until [2]** 1276/23
1302/11
**up [36]** 1270/19
1273/5 1276/13
1276/20 1276/21
1287/9 1287/11
1287/14 1287/18
1290/5 1290/9
1290/10 1291/1
1291/7 1293/7 1293/7
1294/11 1308/20
1309/3 1309/5
1309/12 1310/4
1312/20 1312/21
1320/5 1322/9
1326/21 1327/3
1332/23 1334/19
1335/6 1335/7
1335/22 1342/10
1348/11 1377/14
**uphill [1]** 1362/1
**uploaded [2]** 1320/13
1320/23
**upon [8]** 1299/12
1331/7 1350/22
1354/5 1355/23
1359/10 1365/10
1367/13
**us [12]** 1283/24
1291/25 1304/22
1305/9 1307/22
1325/21 1328/25
1337/7 1344/21
1374/2 1377/1
1377/23

**use [6]** 1279/6 1299/8
1300/24 1353/3
1374/5
**used [3]** 1284/22
1292/16 1330/14
**uses [1]** 1292/6
**using [4]** 1329/10
1331/11 1360/25
1361/22
**usually [1]** 1275/13
**usually they [1]**
1275/13

**V**

**V-P-W-R [1]** 1321/23
**V48 [1]** 1324/6
**validated [1]** 1289/7
**validity [1]** 1341/14
**Vargas [5]** 1282/18
1282/25 1283/1
1312/7 1326/7
**various [3]** 1283/3
1283/24 1305/10
**vehicle [73]** 1272/19
1275/25 1284/1
1284/16 1284/21
1284/24 1285/16
1285/21 1286/22
1287/5 1289/4 1289/4
1289/6 1289/13
1289/15 1289/16
1289/17 1290/14
1292/18 1293/4
1293/24 1295/8
1296/3 1299/10
1299/12 1299/13
1299/14 1302/10
1302/12 1303/6
1303/9 1307/5 1309/6
1313/18 1314/15
1314/24 1314/25
1315/2 1316/12
1316/22 1321/20
1321/21 1322/15
1322/18 1325/25
1327/11 1327/11
1327/12 1333/8
1333/8 1334/14
1334/21 1335/1
1335/2 1335/4 1335/8
1335/13 1336/17
1341/24 1341/25
1350/16 1350/25
1351/19 1353/18
1354/2 1359/9
1360/13 1360/17
1362/10 1362/13
1362/23 1362/24
1374/15
**vehicle's [1]** 1323/2
**vehicles [26]** 1287/2
1288/1 1293/14
1297/25 1300/21
1300/25 1301/2
1301/5 1301/5
1306/21 1306/24
1307/2 1307/4
1308/23 1310/18

1311/2 1311/7
1324/18 1325/4
1325/5 1325/6 1325/9
1334/8 1334/23
1335/2 1353/17
**Venetian [1]** 1349/14
**vent [1]** 1360/20
**verbiage [4]** 1279/7
1279/8 1347/9
1347/11
**verdict [4]** 1345/20
1372/24 1374/6
1376/7
**versus [9]** 1270/7
1292/7 1292/8 1334/8
1349/11 1349/14
1356/11 1356/16
1361/10
**viewed [1]** 1352/16
**violation [2]** 1354/16
1369/11
**virtually [1]** 1329/21
**volt [1]** 1323/3
**voltage [2]** 1319/24
1342/1
**volts [2]** 1322/22
1342/1
**volume [3]** 1286/7
1286/8 1324/11
**Volume 1 [1]** 1286/8
**Volume 2 [1]** 1286/7
**VPWR [6]** 1321/23
1322/12 1322/22
1341/22 1341/23
1341/24

**W**

**wait [8]** 1274/2
1287/11 1297/11
1319/6 1329/1 1329/1
1329/12 1331/10
**walk [1]** 1275/16
**wanted [8]** 1276/15
1276/23 1279/16
1285/2 1344/13
1363/5 1369/6
1370/13
**warning [6]** 1313/4
1313/6 1314/25
1315/17 1315/19
1318/16
**warranties [1]**
1308/15
**warranty [61]** 1294/5
1294/10 1294/14
1298/2 1299/1
1300/15 1301/16
1303/14 1303/15
1304/15 1305/6
1305/9 1305/20
1306/4 1306/20
1306/23 1307/2
1307/4 1307/13
1307/25 1308/10
1308/11 1308/17
1308/19 1308/19
1308/20 1309/3
1309/4 1309/5 1309/6

1309/12 1309/13
1309/13 1309/14
1309/14 1309/15
1309/17 1310/3
1310/3 1310/4 1310/5
1310/10 1310/22
1311/18 1326/24
1327/2 1328/6 1331/1
1331/6 1331/7
1332/15 1333/2
1333/4 1333/12
1333/23 1334/1
1356/19 1362/24
1363/2 1363/23
1369/10
**was -- I [1]** 1295/23
**weak [2]** 1348/18
1349/18
**weaker [3]** 1348/17
1349/19 1352/13
**week [1]** 1281/14
**weekend [1]** 1276/11
**weight [2]** 1347/14
1362/16
**went [19]** 1287/6
1289/8 1290/9
1290/11 1291/7
1292/15 1297/12
1307/7 1313/15
1313/17 1313/18
1316/18 1317/6
1317/15 1322/18
1325/19 1329/2
1331/1 1335/4
**WEST [1]** 1267/24
**WESTERN [1]** 1267/2
**where's [1]** 1336/13
**white [1]** 1328/9
**whole [3]** 1297/12
1321/12 1344/20
**why [11]** 1276/1
1276/9 1278/20
1280/10 1306/15
1331/15 1344/25
1361/8 1365/6
1367/11 1369/17
**will call [1]** 1340/15
**willful [8]** 1348/15
1354/13 1354/16
1361/17 1361/21
1371/9 1371/10
1376/1
**willfully [2]** 1353/10
1353/15
**willfulness [9]**
1353/13 1353/22
1353/24 1355/7
1361/15 1361/17
1362/18 1373/7
1373/11
**WILSHIRE [1]** 1268/8
**window [1]** 1303/1
**wish [5]** 1270/18
1340/20 1356/5
1357/13 1366/5
**wishes [1]** 1346/8
**withdrawn [1]**
1366/10

**W**

**withdrew [1]** 1357/3
**without [2]** 1373/9
1373/11
**witness [7]** 1296/15
1296/18 1329/8
1338/3 1338/14
1346/18 1346/23
**witnesses [7]** 1269/4
1269/8 1340/21
1344/8 1350/21
1352/3 1373/19
**word [1]** 1305/14
**words [2]** 1279/12
1360/14
**wordsmiths [1]**
1370/23
**work [4]** 1300/8
1318/10 1343/25
1377/25
**worked [2]** 1326/24
1343/7
**works [1]** 1326/23
**world [3]** 1290/4
1290/11 1291/1
**worms [1]** 1367/7
**worried [1]** 1361/8
**worse [2]** 1310/19
1310/20
**worst [1]** 1305/22
**wrap [1]** 1377/14
**written [1]** 1373/22
**wrong [15]** 1273/16
1293/21 1299/2
1299/3 1299/18
1299/19 1299/23
1305/14 1323/14
1323/17 1324/10
1324/15 1324/16
1342/10 1354/14
**wrongful [1]** 1361/21
**wrote [3]** 1311/11
1316/20 1376/25

**Y**

**Yang [1]** 1354/25
**year [41]** 1284/1
1289/18 1290/15
1294/2 1301/6 1301/7
1302/4 1304/24
1304/24 1307/5
1307/6 1308/7 1308/8
1308/10 1309/9
1311/24 1312/17
1312/18 1315/18
1324/5 1325/8
1325/14 1326/3
1326/10 1328/2
1328/3 1328/6 1328/7
1332/9 1332/15
1332/16 1333/8
1333/13 1333/14
1333/14 1333/17
1333/18 1333/18
1333/19 1336/19
1336/23
**years [11]** 1306/10
1307/8 1307/8

1310/24 1312/7
1312/15 1332/16
1332/16 1332/17
1333/9 1333/9
**years/150,000 miles
[1]** 1307/8
**years/80,000 miles [1]**
1307/8
**yellow [1]** 1320/5
**yep [5]** 1284/3
1290/13 1290/19
1295/17 1337/17
**yesterday [10]**
1270/20 1277/21
1282/8 1283/9
1292/11 1315/22
1321/1 1334/17
1334/20 1348/11
**Your Honor [102]**
1270/11 1270/14
1270/19 1270/23
1271/3 1271/25
1275/5 1276/14
1277/8 1277/20
1278/6 1278/14
1278/23 1279/10
1279/13 1279/25
1280/16 1283/6
1285/23 1286/3
1286/10 1286/13
1286/15 1287/10
1288/4 1291/13
1296/8 1296/13
1296/24 1297/2
1297/3 1297/8 1300/1
1300/2 1302/2 1302/6
1302/20 1303/22
1306/13 1306/16
1308/22 1309/22
1311/4 1311/13
1313/1 1318/5 1321/5
1321/8 1321/10
1323/23 1328/17
1328/20 1329/16
1329/23 1330/6
1330/8 1330/22
1331/9 1332/10
1332/18 1335/16
1338/2 1338/6
1338/10 1340/15
1340/18 1341/15
1342/16 1343/3
1343/18 1344/5
1344/9 1348/4
1352/11 1354/9
1355/18 1356/7
1357/15 1357/17
1358/6 1358/10
1358/11 1358/17
1358/19 1358/21
1358/24 1361/14
1362/5 1364/5
1364/15 1365/7
1365/18 1365/19
1369/23 1370/8
1371/25 1372/10
1376/4 1376/12
1376/25 1377/10

**Your Honor needs [1]**
1368/9
**Yup [1]** 1323/20

**Z**

**ZACHARY [1]**
1268/12